**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AMERICAN APPAREL, LLC, *et al.*,[1] | : | Case No. 16-12551 |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

**DECLARATION OF MARK WEINSTEN
IN SUPPORT OF THE MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO (A) OBTAIN POSTPETITION SENIOR
SECURED SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C.
§§ 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e) AND 507 AND (B) UTILIZE
CASH COLLATERAL, (II) GRANTING PRIMING LIENS, PRIORITY LIENS
AND SUPERPRIORITY CLAIMS TO THE DIP SECURED PARTIES, (III) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES,
(IV) SCHEDULING A FINAL HEARING PURSUANT TO RULES 4001(b) AND
(c) OF THE BANKRUPTCY RULES AND (V) GRANTING RELATED RELIEF**

I, Mark Weinsten, declare and state as follows:

1. I am the Chief Restructuring Officer for American Apparel, LLC ("AA") and each of its domestic wholly owned subsidiaries (collectively, the "Debtors") that have filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing these chapter 11 cases (the "Cases"), and a Managing Director of Berkeley Research Group, LLC ("BRG").

2. I make this Declaration in support of the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority*

---

[1] The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): American Apparel, LLC (0601); American Apparel (USA), LLC (8940); American Apparel Retail, Inc. (7829); American Apparel Dyeing & Finishing, Inc. (0324); KCL Knitting, LLC (9518); and Fresh Air Freight, Inc. (3870). The address of each of the Debtors is 747 Warehouse Street, Los Angeles, California 90021.

*Financing Pursuant to 11 U.S.C. §§ 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e) and 507 and (B) Utilize Cash Collateral, (II) Granting Priming Liens, Priority Liens and Superpriority Claims to the DIP Secured Parties; (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing Pursuant to Rules 4001(b) and (c) of the Bankruptcy Rules and (V) Granting Related Relief* (the "<u>Motion</u>").[2]

3.  Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  The Debtors have authorized me to submit this Declaration.

4.  My background and qualifications, as well as a description of my engagement with the Debtors, is set forth in the *Declaration of Mark Weinsten in Support of First Day Pleadings*, filed contemporaneously herewith and incorporated herein by reference.

<b><u>The Immediate Need for Access to the DIP Credit Facility</u></b>

5.  I am familiar with the terms of the DIP Credit Facility, its material terms and the adequate protection proposed to be provided by the Debtors.  Based on my experience in the restructuring industry generally, and with the Debtors since 2011 and, particularly, over the last three months, I believe that interim approval of the DIP Credit Facility in the amount of up to $10 million and approval of the use of cash collateral is critical.  BRG advised and assisted the

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion, Interim Order and the DIP Credit Agreement, as applicable.

Debtors in developing the Budget to establish the amount of interim funding required under the DIP Credit Facility. The requested amount will ensure that the Debtors have the necessary liquidity to continue to operate without material disruption following the Petition Date, including in connection with consummating a sale (a "Sale") of their business or some or all of their assets. In particular, the DIP Credit Facility will be used to fund, among other things, approximately $3 million of payroll obligations coming due next week. Absent the DIP Credit Facility, the Debtors likely will run out of cash in the second week of these Cases and will likely convert these Cases to cases under chapter 7. Thus, it is critical that the Debtors obtain the liquidity only available under the DIP Credit Facility at the onset of these Cases in order to continue operating through the consummation of a Sale.

## Liquidity Analysis

6.      Attached to this Declaration as Exhibit A is a liquidity analysis prepared by BRG (the "Liquidity Analysis"). The Liquidity Analysis demonstrates that the aggregate collateral values and particular collateral types increase in value over the anticipated term of the DIP Credit Facility.

7.      The starting point for analyzing whether the Prepetition Collateral will diminish in value is to compare the value of the Prepetition Collateral as of the Petition Date, without the incurrence of the DIP Credit Facility, to the anticipated net proceeds of such collateral if the Debtors were to incur the DIP Credit Facility and pursue a Sale. In other words, while a DIP Credit Facility-funded sale process will protect the Prepetition Collateral from diminution of value through the term of the DIP Credit Facility, that protection is not available to the Prepetition Collateral absent the DIP Credit Facility. Thus, the beginning value of the Prepetition Collateral absent the prospect of a DIP Credit Facility must take into account (a) the

limited cash resources available to subsequently dispose of the Prepetition Collateral and (b) the limited universe of purchasers willing to purchase such assets in an uncontrolled liquidating setting at going-concern price levels as well as the anticipated proceeds such a liquidating setting is likely to yield.  To account for these factors, for each of the asset types that comprise the Prepetition Collateral, I began with the approximate value of such collateral on the Petition Date and used a net orderly liquidation value ("NOLV") heuristic as a proxy to estimate the net proceeds of such collateral over time.

8. Specifically, with respect to accounts receivable ("A/R"), I began with the net amount of A/R reflected on the Debtors' books and records as of the Petition Date and applied an 85% NOLV, which resulted in a beginning A/R collateral value of approximately $9.180 million.  Keeping NOLV constant through the closing date of a Sale (the "Closing Date"), which is assumed to occur in the ninth week of these Cases, I projected that the net proceeds of A/R would increase to approximately $9.696 million.

9. Next, I performed a similar calculation for the three categories of the Debtors' finished goods.  For each, I began with the Debtors' cost of manufacturing the goods, which is the sum of the cost of the underlying raw materials plus the cost of labor and other production costs.  For the applicable NOLV, I relied upon the most recent inventory appraisal to identify the likely proceeds in a liquidation for each type of finished goods:  90% for finished goods in store, 55% for fashion finished goods at the Debtors' distribution center and 41% for wholesale finished goods at the Debtors' distribution center.  In the aggregate, after applying the appropriate NOLV, the net proceeds of finished goods are projected to increase slightly from a Petition Date estimate of approximately $37.176 million to approximately $37.853 million through the Closing Date.

10. I also performed the same calculation with respect to the Debtors' other assets, which include raw materials, property, plant and equipment ("PPE") and the Debtors' intangible assets, such as their intellectual property. For the raw materials, I applied a 15% NOLV, which is reflective of the fact that the estimated net proceeds of the raw materials in an orderly liquidation are likely to be very low. For PPE, I kept this number constant from the Petition Date through the Closing Date. Finally, I increased the value of the Debtors' intangible assets based on the bids that have been received to date through the Debtors' prepetition marketing process. Altogether, based on reasonable assumptions, I projected that the value of the Debtors' other assets would increase from approximately $36.432 million on the Petition Date to approximately $70.913 million on the Closing Date.

11. In the aggregate across the various collateral types (after accounting for the appropriate NOLV), the net proceeds of the Prepetition Collateral are expected to increase from approximately $82.788 million on the Petition Date to approximately $118.462 million on the Closing Date. After subtracting from this amount the anticipated $16.7 million repayment of the DIP Credit Facility, the net proceeds of the Prepetition Collateral are estimated to be approximately $101.762 million on the Closing Date. This represents an increase in the net proceeds anticipated to be available for the Prepetition Secured Lenders of more than $18.974 million between the Petition Date and the Closing Date as compared to the scenario if the Debtors did not procure the DIP Credit Facility and such property had to be liquidated.

12. Thus, as a result of the Debtors' incurrence of the DIP Credit Facility, none of the Prepetition Secured Parties are likely to experience a diminution in the value of their collateral.

**Adequate Protection Liens**

13. Under the proposed DIP Credit Facility, the Prepetition Secured Lenders also will be receiving additional adequate protection liens on certain of the Debtors' property that will be created by the Debtors after the Petition Date.  Specifically, the Prepetition Secured Lenders will receive Adequate Protection Liens (as defined in the Interim Order) that will include liens on approximately $21.5 million of newly manufactured finished goods, which will be converted from raw materials on hand.  The Debtors' cost of acquiring the raw materials was $6.5 million.  In a liquidation, however, the actual proceeds realized on account of these raw materials likely would be substantially less.

14. Separately, the Debtors will generate accounts receivable (on a postpetition basis) of approximately $14.5 million in wholesale sales and approximately $500,000 in new retail credit card receivables.  Thus, to the extent there is a diminution in the value of the Prepetition Collateral, the Prepetition Secured Lenders will receive Adequate Protection Liens on between $30 million and $36.5 million of newly created assets that they would otherwise not be entitled to receive.

**Conclusion**

15. For all of the foregoing reasons, it is unlikely that approval of the DIP Credit Facility would result in a diminution in value of the Prepetition Collateral.  On the other hand, authorizing the Debtors to incur the DIP Credit Facility to fund the Debtors' operations through the closing of a Sale would greatly increase the likelihood that the Debtors can preserve their businesses and, in turn, achieve a value-maximizing outcome for their assets.  Approval of the DIP Credit Facility is, therefore, essential to enable the Debtors to continue operating as they pursue such an outcome.

16. Based on my knowledge of the Debtors' operations and the strategy being employed in these Cases, the Prepetition Secured Lenders' interests in the Prepetition Collateral are likely to be no worse off in these Cases in which the Debtors can incur the DIP Credit Facility than they would be if the Debtors were compelled to immediately seek relief under chapter 7. Thus, because of the likely increase in the net proceeds projected to be received for the Prepetition Collateral, the Court should approve the DIP Credit Facility on the basis that the Prepetition Collateral will not diminish in value during the term of the DIP Credit Facility and thus does not require the Debtors to offer additional adequate protection.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 14, 2016         /s/ Mark Weinsten
       Los Angeles, California         Mark Weinsten
                                    Chief Restructuring Officer

## Exhibit A

## Liquidity Analysis

# LIQUIDITY ANALYSIS

## American Apparel
*($ in thousands)*

|  | On Petition Date | At Sale Closing |
|---|---|---|
| Prepetition Collateral |  |  |
| Accounts Receivable | $ 9,180 | $ 9,696 |
| Finished Goods | 37,176 | 37,853 |
| Other Assets | 36,432 | 70,913 |
| Total | $ 82,788 | $ 118,462 |
| Less: DIP Financing Draws | - | (16,700) |
| Net Proceeds of Prepetition Collateral | $ 82,788 | $ 101,762 |

"Other Assets" includes raw materials, PP&E, and intangible assets.