## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| AMERICAN APPAREL, LLC, *et al.*,[1] | : | Case No. 16-12551 |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |
|  | : |  |

## DECLARATION OF MARK WEINSTEN
## IN SUPPORT OF FIRST DAY PLEADINGS

I, Mark Weinsten, declare and state as follows:

1.      I am the Chief Restructuring Officer for American Apparel, LLC ("AA") and each of its domestic wholly-owned subsidiaries (collectively, the "Debtors") that have filed voluntary petitions (the "Chapter 11 Petitions") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing these chapter 11 cases (these "Cases").  The Debtors and their foreign affiliates (the "Foreign Affiliates") are referred to herein collectively as "American Apparel" or the "Company."

2.      To minimize the adverse effects of filing the Chapter 11 Petitions while at the same time preserving value for the benefit of stakeholders, the Debtors have filed a number of motions requesting various kinds of "first day" relief (collectively, the "First Day Pleadings").[2] I submit this Declaration in support of the Chapter 11 Petitions and the First Day Pleadings.  The First Day Pleadings are necessary to maximize the value of the Debtors' estates and allow them

---

[1]      The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  American Apparel, LLC (0601); American Apparel (USA), LLC (8940); American Apparel Retail, Inc. (7829); American Apparel Dyeing & Finishing, Inc. (0324); KCL Knitting, LLC (9518); and Fresh Air Freight, Inc. (3870).  The address of each of the Debtors is 747 Warehouse Street, Los Angeles, California 90021.

[2]      Unless otherwise defined herein, capitalized terms in this Declaration shall have the meanings ascribed to them in the relevant First Day Pleading.

to maintain their operations while they conduct an auction to sell substantially all of their businesses and assets.

3.      I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such pleadings) and, to the best of my knowledge, after reasonable inquiry, believe that the relief sought in each First Day Pleading: (a) will enable the Debtors to operate in chapter 11 with minimal disruptions until a sale transaction can be effectuated; (b) is critical to the Debtors' ability to maximize the value of their chapter 11 estates and (c) best serves the interests of the Debtors' estates and creditors.  Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above.

4.      I began serving as Chief Restructuring Officer of the Debtors upon the filing of the Chapter 11 Petitions, and immediately prior to that, served as a financial advisor to the Company beginning in August 2016.  Additionally, I functioned as a chief restructuring officer or similar with respect to certain of the Debtors from April 2011 to April 2012 and immediately prior to and during the course of the Debtors' prior chapter 11 proceedings before this Court (the "Prior Chapter 11 Cases") from October 5, 2015 through February 5, 2016.  In these capacities, I have become familiar with the Debtors' businesses, operations and financial affairs. As part of my duties as Chief Restructuring Officer in these Cases, I will be advising the Debtors on their day-to-day operations, bankruptcy compliance, budgets, cash flows, financial analysis and overall sale efforts.

5.      In addition to being a Chief Restructuring Officer of the Debtors, I am a Managing Director of Berkeley Research Group, LLC ("BRG"), an international financial advisory firm, and my business address is BRG's Boston office located at 75 State Street, Suite

1805, Boston, MA 02109.  Prior to joining BRG earlier this year, I was a senior managing director at FTI Consulting, Inc. ("FTI") for 14 years.  My service to the Company prior to August 2016 was rendered during my tenure at FTI.  Over the past 20 years, I have served as Interim Executive Chairman, CEO, CRO and/or CSO for numerous companies, including Manischewitz, LodgeNet, Inspiration Bio Pharmaceuticals and Andrew Marc.  I have also been involved in many retail bankruptcy cases, including Ultimate Electronics, DB Mart, KB Toys, Tower Records, Filene's Basement, Whitehall Jewelers and Sportsman Warehouse.

6.      Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable; (c) my review of relevant documents or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  The Debtors have authorized me to submit this Declaration.

7.      This Declaration is divided into four parts.  Part I sets forth an executive summary.  Part II provides an overview of the Debtors' businesses, their corporate structure and their prepetition indebtedness.  Part III discusses the Debtors' recent financial performance, emergence from chapter 11 in February of this year, the circumstances surrounding the commencement of these Cases and what the Debtors view as the path forward.  Finally, Part IV discusses the First Day Pleadings.

## I.      EXECUTIVE SUMMARY

8.      American Apparel is one of the largest apparel manufacturers in North America. It has three active manufacturing facilities, one distribution facility and, until recently, approximately 193 retail stores in the United States and 18 other countries worldwide.

9.    American Apparel has struggled in recent years with chronic performance problems.  In December 2014, after the dismissal of its founder and former Chief Executive Officer ("CEO"), the Company's then-board of directors hired Paula Schneider to be its new CEO and tasked her with developing a plan to turn around the Company.  It ultimately became clear, however, in 2015, that the Company—which was carrying nearly $300 million of secured debt on its balance sheet—did not have adequate liquidity to meaningfully implement a turnaround plan.  After considering and pursuing various strategic options, the Company ultimately approached its secured noteholders to explore a possible restructuring of its debt.  After extensive negotiations, the Company and the noteholders were able to negotiate the terms of a pre-arranged chapter 11 plan of reorganization, providing for, among other things, (a) the conversion to equity of over $200 million of the Company's secured debt obligations, (b) a $120 million term loan exit facility (consisting of the converted $90 million Prior DIP Facility (as defined below) and $30 million in new capital), (c) the infusion of $10 million in new capital contributed as equity and (d) a contemplated asset-backed revolving loan facility for up to $40 million (the "Additional New Capital").  On October 5, 2015, the Debtors commenced the Prior Chapter 11 Cases in order to pursue and effectuate that pre-arranged plan.

10.    From the outset, the Debtors' proposed pre-arranged plan of reorganization had the overwhelming support of its secured lenders.  And during the course of the Prior Chapter 11 Cases, the Company worked cooperatively with representatives of its remaining creditor constituencies to garner their support, which ultimately resulted in a plan of reorganization that was supported by all of its key creditor constituencies.  This plan of reorganization (the "Prior Plan") was unanimously approved by all classes of creditors, and was confirmed by the Court on

January 27, 2016.  The Prior Plan was substantially consummated and became effective on
February 5, 2016.

11.      Following emergence, the Company faced unfavorable market conditions that
were more persistent and widespread than the Debtors anticipated when they emerged from the
Prior Chapter 11 Cases.  These market conditions were particularly detrimental to retailers.  In
addition, many of the operational and personnel-related initiatives that the Debtors implemented
as part of the turnaround strategy contemplated under the Prior Plan proved unsuccessful.  In
short, the turnaround strategy contemplated by the Prior Plan failed, and since emergence, the
Company has experienced a 32.7%[3] year-over-year decline in sales and a $40 million decline in
EBITDA versus last year.

12.      Additionally, the Company found itself unable to secure the $40 million
Additional New Capital contemplated by the Prior Plan.  Although the Prior Plan contemplated
that the Additional New Capital would be secured by liens senior to those securing the
Company's exit facility obligations, for several months following their exit from chapter 11, the
Company was unable to find a third party willing to provide this new source of capital, due, in
part, to the resignation of its Chief Financial Officer (the "CFO"), who left the Company while it
was attempting to raise the Additional New Capital.

13.      Recognizing the importance of this funding to the Company's ability to execute its
reorganization strategy, certain of the Company's lenders and shareholders backstopped the
Additional New Capital and stepped in to fund the shortfall.  By mid-August 2016, these lenders
(the "Secured Lenders") had provided the Company with loans equal to the amount of the
Additional New Capital *plus* an additional $17 million—for a total of $57 million in excess of

---

[3]      As of September 30, 2016.

their commitments under the Prepetition Credit Facility (defined below).   As of the filing of

these Cases, the Secured Lenders had funded $82 million in excess of their commitments under

the Prepetition Credit Facility, not including interest and fees, all of which cash has been

consumed.  In total, the Secured Lenders have funded the Debtors with over $122 million and

will likely recover only a fraction of the funds that they have advanced.

14.    Notwithstanding the Secured Lenders' significant financial commitments, by

summer 2016, the turnaround strategy contemplated in the Prior Plan had completely failed and

the Company's liquidity challenges hastened.  It became clear that maintaining the Company's

operations as constituted was no longer realistic.  In July 2016, with dwindling cash resources

and sustained poor sales performance, the Debtors engaged Houlihan Lokey Capital Inc.

("Houlihan") and in August, Houlihan began to solicit bids for the sale of all or a portion of the

Company's business.  Houlihan conducted a robust three-month marketing process, canvassing

the market and contacting 53 potential strategic and financial buyers that Houlihan thought might

be interested in the Company's businesses.  Of those 53 parties, 30 parties signed non-disclosure

agreements and gained access to diligence materials, and seven of those parties submitted

Indications of Interest.  Ultimately, three parties decided to move forward with the sale process

and provided the Debtors with letters of intent.

15.    The Debtors, in their business judgment, selected the bid submitted by Gildan

Activewear SRL ("Gildan") or the ("Stalking Horse") as the stalking horse bid for the sale of

their assets in the Cases.  Gildan has agreed to purchase the Debtors' intellectual property and

certain of their wholesale assets (collectively, the "Purchased Assets").  Importantly, as a key

part of their agreement (the "Stalking Horse APA"), Gildan has negotiated for the opportunity to

maintain all or a portion of the Debtors' Los Angeles manufacturing, distribution and warehouse operations.

16.     The Debtors now file these Cases to complete the open and competitive sale process begun several months ago in order to sell substantially all of their assets and business lines with Gildan acting as the Stalking Horse as to the Purchased Assets.  The Debtors intend to maintain their current operations while this sale process is ongoing with the goal of selling part or all of their businesses as a going concern—thereby necessitating the relief sought in the First Day Pleadings—and thereafter intend to discontinue operations, liquidate any remaining unsold assets and wind up their estates.

## II.     OVERVIEW OF THE DEBTORS' BUSINESSES

17.     American Apparel operates a manufacturing, distribution and retail business focused on branded fashion apparel.  In 2015, the Company generated more than $497 million in net sales.

### A.     The Debtors' Business Operations

18.     American Apparel operates in three symbiotic segments:  manufacturing, retail and wholesale.  Each segment is discussed below.

#### 1.     Business Segments

19.     <u>Manufacturing</u>.  The Debtors operate three manufacturing facilities and one distribution facility.  The Debtors' manufacturing operations supply some of the apparel sold through the Company's retail business and all of the apparel sold through the Company's wholesale business.

20.    Retail.  The Company owns and operates approximately 110 retail and outlet stores in 28 states and the District of Columbia.[4]  In addition, the Company operates an online store, located at www.americanapparel.com, that has historically shipped directly to over 29 countries.  In 2015, the Company's (a) brick and mortar retail business generated net sales totaling approximately $277.70 million, including approximately $152.27 million in net sales generated in the United States, and (b) e-commerce business generated approximately $52.20 million in net sales.

21.    Wholesale.  The Company's wholesale business markets and sells undecorated apparel products to distributors and third party screen printers.  The customer base for the wholesale business has historically been centered in the United States.  In 2015, the Company's wholesale business generated net sales totaling approximately $167.42 million, almost all of which was generated in the United States.

### 2.    Foreign Operations

22.    In fiscal year 2015 (which ended December 31, 2015), 68.57% of the Company's revenue was generated by the Debtors inside the United States, and the remaining 31.43% of revenue was generated largely by Foreign Affiliates abroad.  In the days leading up to the filing of these Cases, Foreign Affiliates in the United Kingdom, Ireland, Germany, Spain, Canada, Japan and Australia commenced proceedings to wind down their operations in their local jurisdictions, and the Debtors expect that the remaining Foreign Affiliates will likewise commence wind down proceedings in the coming weeks.  Any proceedings that have been or will be commenced by the Foreign Affiliates are expected to be self-funded.

---

[4]    As described in paragraph 22 below, the Company is in the process of winding down its operations in foreign jurisdictions where, prior to the commencement of that process, it operated approximately 83 stores across 18 countries.

### 3.    Intellectual Property Portfolio

23.    The Company has invested heavily in developing and maintaining a large

portfolio of trademark registrations domestically and internationally.  Among other things, the

Company owns registrations in the United States and certain foreign countries of the following

trademarks: "American Apparel," "Classic Girl," "Standard American," "Classic Baby" and

"Sustainable Edition."  In total, the Company's trademark portfolio includes more than

120 registrations worldwide.  The Company's intellectual property is one of its most valuable

assets.

### B.    The Debtors' Corporate Organizational Structure

24.    AA, the direct or indirect parent of each of the Debtors and Foreign Affiliates, is a

Delaware limited liability corporation.  Each of the other Debtors is organized under the laws of

California.  The Debtors' foreign operations are owned and operated through the Foreign

Affiliates that are organized under the laws of various foreign countries.  A corporate

organization chart depicting the ownership structure of the Debtors and the Foreign Affiliates is

attached as Exhibit A.

25.    The Debtors' day-to-day operations are operated primarily through five entities.

Debtors American Apparel (USA), LLC, American Apparel Dyeing & Finishing, Inc., Fresh Air

Freight, Inc., and KCL Knitting, LLC, collectively operate the Company's manufacturing and

wholesale businesses.  Additionally, Debtor American Apparel Retail, Inc. operates the

Company's domestic retail business and owns some of the Foreign Affiliates.

### C.    The Debtors' Prepetition Indebtedness

26.    As of the date hereof (the "Petition Date"), the Debtors had outstanding debt in

the aggregate principal amount of approximately $215 million under the Prepetition Credit

Facility.  Additionally, AA has guaranteed one of its United Kingdom subsidiaries' obligations

under a $15 million unsecured note due October 15, 2020.

### 1.    Prepetition Credit Facility

27.    During the Prior Chapter 11 Cases, the Company had access to a $90 million debtor-in-possession credit facility (the "Prior DIP Facility"). Upon the effective date of the Prior Plan, loans outstanding under the Prior DIP Facility were converted (the "Converted Loans") to loans under that certain Credit Agreement dated February 5, 2016, by and among certain of the Debtors as Borrowers, the Secured Lenders and Wilmington Trust, National Association as Administrative Agent (the "Prepetition Credit Facility"). In addition to the Converted Loans, the Prepetition Credit Facility also provided the Company with an additional $30 million in funds upon emergence (such loans, together with the Converted Loans, the "Exit Loans"). Subsequent amendments on April 5, May 11, July 12, August 5, September 6, September 20, September 28 and October 21 of 2016 added an additional principal amount of approximately $82 million in the aggregate to the Prepetition Credit Facility. The Debtors' obligations under the Prepetition Credit Facility (the "Prepetition Obligations") are secured by a first-priority lien over substantially all of the Debtors' assets. As of the Petition Date, approximately $780,000 of accrued cash interest on the foregoing loans remains unpaid and outstanding, and there is an aggregate amount of approximately $1.6 million of accrued interest with respect to such loans, inclusive of the foregoing unpaid portion.

### 2.    Funded Unsecured Guaranty Obligations

28.    On March 25, 2015, one of the Foreign Affiliates, American Apparel (Carnaby) Limited, entered into a credit agreement to borrow $15 million from Standard General L.P. ("Standard General"), with interest accruing at 14% per annum and with AA as guarantor (the "Standard General Credit Facility"). In connection with negotiations surrounding the Prior Chapter 11 Cases, AA agreed to reinstate its guarantee of the Standard General Credit Facility.

Upon the filing of these Cases, the outstanding obligations under the Standard General Credit Facility, which AA guarantees, accelerated and are now due.

### 3.    Equity Interests

29.    The Prior Chapter 11 Cases and Prior Plan were premised on a Restructuring Support Agreement pursuant to which substantially all of the Debtors' former bondholders agreed to convert over $200 million in senior notes into equity interests of AA. Accordingly, the Prior Plan provided for American Apparel Inc. to be converted into AA, a limited liability company privately held by funds associated with Monarch Alternative Capital LP, Coliseum Capital Management, LLC, Goldman Sachs Asset Management, L.P., Pentwater Capital Management LP and Standard General and 20 other holders representing less than 1% of the equity of AA.

30.    Funds associated with these entities (Monarch Alternative Capital LP, Coliseum Capital Management, LLC, Goldman Sachs Asset Management, L.P., Pentwater Capital Management LP and Standard General) are also the Debtors' former lenders under the Prior DIP Facility and are currently lenders under the Prepetition Credit Facility.

### III.    EVENTS LEADING TO THE FILING OF THESE CASES AND THE PATH FORWARD

31.    From its inception in 1998 through 2009, American Apparel opened more than 280 stores in 19 countries, opened five manufacturing facilities in Southern California and increased its net sales revenue to $663 million. The Company financed its growth—and, for that matter, its general operations—largely with a combination of borrowings from related and unrelated parties, bank and other debt, lease financing and proceeds from the exercise of purchase rights and issuance of common stock. As a result, the Company was for years burdened with a high level of indebtedness, forcing the Company to dedicate a substantial

portion of its cash flow to pay interest and principal on its debt. In turn, the Company was plagued with reduced liquidity, increased vulnerability to downturns in the business, industry or the general economy, and limited flexibility in planning for or reacting to changes or disruptions in the business and the retail industry.

32.    By the end of 2015, the Company's nearly $300 million in indebtedness (which came at a cost of nearly $40 million annually) was unsustainable, and it filed the Prior Chapter 11 Cases to consummate a financial restructuring. The Prior Chapter 11 Cases successfully reduced the Company's indebtedness and provided the Company with $40 million of fresh liquidity (as well as the contemplated Additional New Capital), along with the Converted Loans, in order to execute the then-CEO's turnaround plan. The turnaround plan contemplated an overhaul of the Debtors' operational systems and processes to improve quality and reduce losses, while at the same time increasing sales through the design of new and seasonal apparel and developing e-commerce.

33.    Unfortunately, that turnaround plan was not successful and the anticipated stabilization and gains in revenue were not fully realized. In addition to a challenging macroeconomic environment in retail generally, which is evidenced by the sheer number of filings that have occurred in this space since the Debtors' emergence from the Prior Chapter 11 Cases—including Golfsmith International Holdings, Inc., Sports Authority Holdings, Inc., Aéropostale, Inc., Pacific Sunwear of California, Inc. and Nasty Gal Inc.,[5] just to name a few of the more well-known recent cases—certain key elements of the turnaround plan were not implemented. Among other things:

---

[5]    *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (CSS) (Bankr. D. Del. Sept. 14, 2016); *In re Sports Authority Holdings, Inc.*, No. 16-10527 (MFW) (Bankr. D. Del. Mar. 2, 2016), *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 4, 2016); *In re Pacific Sunwear of California, Inc.*, No. 16-10882 (LSS) (Bankr. D. Del. Apr. 7, 2016); *In re Nasty Gal Inc.*, No. 16-24862 (SB) (Bankr. C.D. Cal. Nov. 9, 2016).

a. *The Company was not able to optimize its product acquisition and merchandising process.* Before the Prior Chapter 11 Cases, the Company was unable to effectively track and plan (i) what items to manufacture, (ii) when to manufacture them, (iii) when these items would be available in stores and (iv) which stores to make these items available in. The turnaround plan focused on fixing these planning, allocation and forecasting deficiencies. Unfortunately, the measures devoted to that effort failed or were implemented too late, resulting in continued inefficiencies and decreased sales.

b. *The Company failed to improve e-commerce.* The Company's online marketing and sales have historically underperformed (compared to the online performance of its peers). The turnaround plan provided for the expansion and development of the Company's e-commerce platform. With retail foot traffic declining, internet sales were critical to the Debtors' ability to increase their sales revenue. However, the changes to the e-commerce platform that were implemented pursuant to the turnaround plan did not result in a material improvement in e-commerce performance; in fact, sales online declined at a time when increasing numbers of retail customers are making their purchases online. The Company's e-commerce platform accounts for just over 10% of sales. The industry average is 20%.

c. *The Company experienced delays implementing improvements in quality control.* The Company historically lacked robust quality control measures in its manufacturing operations. As a result, garments were manufactured and placed in the distribution system without inspection and with little attention to detail, resulting in high customer returns and customer dissatisfaction. The turnaround plan contemplated changes to that system, but the Company was slow to implement those changes. Ultimately, when a new head of manufacturing was hired, an audit of the Company's inventory discovered chronic quality problems and defects. These problems have been remedied, but the process of finding and addressing those problems effectively shut-down distribution for a period of time, resulting in delays in deliveries to retail stores and wholesale customers, which contributed to the downward sales trend.

d. *The Company did not have a unified and consistent marketing plan.* Prior to 2014, American Apparel was known for its controversial advertising and marketing campaigns. However, over the last two years, the Company lacked a marketing plan and engaged in ad hoc advertising that lacked focus and did not attract or interest the Company's core customer base.

34.     The failure of these and other aspects of the turnaround plan led to a further

decline in revenue and, in the face of mounting losses, members of the Company's senior

management began to leave, including Hassan Natha, the Company's CFO and (most recently) Ms. Schneider, the CEO.

## A.      The Proposed Sale Process

35.      In the months leading up to the filing of these Cases, the Debtors were borrowing more than $2 million each week just to keep the Company afloat. This was not sustainable. As a result, the Debtors began to explore strategic options, including a sale of some or all of their assets. As discussed, the Debtors hired Houlihan and conducted a lengthy and robust marketing process for the Debtors' assets. Houlihan explored all reasonable alternatives, including selling the Company as a whole and by its individual business lines, as well as combining bids to create strategic partnerships. After a lengthy prepetition process, the Debtors determined that filing for chapter 11 relief in order to conduct an auction for substantially all of their assets with Gildan's bid as the stalking horse bid for the Purchased Assets represents the best way to maximize the value of the Debtors' estates for the benefit of their creditors and stakeholders.

36.      The Stalking Horse APA has been extensively negotiated between the parties at arm's length and in good faith and confers several substantial benefits on the Debtors' estates. The Stalking Horse APA allows the Debtors to continue pursuing a sale of substantially all of their assets while at the same time locking in a purchase price of $66 million for their intellectual property. Perhaps more importantly, however, the Stalking Horse APA includes a commitment from the Stalking Horse to purchase the Debtors' wholesale inventory remaining at the conclusion of the sale process and—critically—provides immediate support for the Debtors' manufacturing operations by committing the Stalking Horse to issue purchase orders throughout the course of the Cases for certain of the Debtors' wholesale goods. This commitment will allow the Debtors to keep their supply chain active and produce sufficient inventory to support a sale to either the Stalking Horse or a third party. In addition to maintaining the supply chain, the

Stalking Horse's bid effectively allows the Debtors to amortize overhead costs incurred maintaining its manufacturing facilities and corporate headquarters, which provides significant value for the exclusive benefit of the estates by preserving the value of assets not subject to the Stalking Horse APA, such as the Debtors' retail inventory and below-market leases, if any, that the Debtors may be able to sell at the auction. Additionally, because the Stalking Horse APA provides the Stalking Horse with the option to acquire certain of the Debtors' manufacturing and distribution facilities, the Stalking Horse bid has the potential to preserve jobs and minimize unsecured claims through the assumption of leases.

37.     Accordingly, in order to minimize administrative expenses in these Cases and maximize creditors' recoveries, shortly after the filing of the Chapter 11 Petitions, the Debtors filed the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into the Stalking Horse Purchase Agreement, (C) Approving Bid Protections, (D) Scheduling an Auction, (E) Approving the Form and Manner of Notice thereof, (F) Approving Assumption and Assignment Procedures; and (G) Scheduling a Sale Hearing and Approving the Form and Manner of Notice thereof; (II)(A) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Sale Motion"). The Sale Motion seeks authority to conduct a postpetition sale and marketing process for substantially all the Debtors' assets, with an auction to be held on or about December 21, 2016 (if necessary) and closing of a sale transaction by the end of the year, all as set forth more fully in the Sale Motion.

38.    As noted, the Debtors are experiencing a severe liquidity crisis. In light of their significant liquidity constraints, they have determined, in their business judgment, that a shorter marketing period—one that will allow the Debtors to devote the funds necessary to maintaining the business as a going concern through the marketing and auction period—offers the estates the best chance of preserving the Debtors' value during the sale process, saving jobs and maximizing returns to creditors. The Debtors do not believe that they will not have the necessary liquidity under the DIP Credit Facility (as defined below) to continue operating as a going concern past the end of the year. Therefore, I believe it is in the best interest of the Debtors' estates for the Debtors to proceed with the Stalking Horse APA on the proposed timeline.

## B.    The DIP Credit Facility

39.    In order to fund their working capital needs and keep their operations running through a sale process, subject to Court approval, the Debtors have secured a $30 million postpetition senior secured superpriority debtor-in-possession credit facility (the "DIP Credit Facility") from Encina Business Credit, LLC, as administrative agent and collateral agent, and the lender or lender parties thereto from time to time (the "DIP Lenders"). The Debtors' obligations under the DIP Credit Facility will be secured by priming liens on the majority of the Debtors' assets. All but one of the Prepetition Secured Lenders has consented to the priming of the Prepetition Agent's liens on the Prepetition Collateral by the DIP Lenders, and the DIP Liens will not prime the Prepetition Liens encumbering that portion of the Prepetition Collateral the proceeds of which are allocable to the loans of the non-consenting Prepetition Secured Lender.

40.    I believe that the DIP Credit Facility represents the best terms for debtor-in-possession financing the Debtors were able to arrange following arm's-length negotiations and a thorough marketing process to third party financiers undertaken by Houlihan. The DIP Credit Facility, coupled with cash flow from operations, will permit the Debtors to fund their businesses

through a controlled and orderly sale process. Without the funding provided by the DIP Credit

Facility, the Debtors will experience an immediate liquidity shortfall and will be unable to

conduct a sale process in a way that preserves value for its creditors. Thus, the DIP Credit

Facility will enhance the Debtors' ability to minimize immediate disruption to their business and

instill confidence among employees and service providers and ensure their continued support

pending a sale of the Debotrs' assets.

41.     The principal terms of the DIP Credit Facility, which are described in more detail

in the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain*

*Postpetition Senior Secured Superpriority Financing Pursuant to 11 U.S.C. §§ 361, 362, 363(c),*

*363(e), 364(c), 364(d)(1), 364(e) and 507 and (B) Utilize Cash Collateral, (II) Granting Priming*

*Liens, Priority Liens and Superpriority Claims to the DIP Lenders, (III) Granting Adequate*

*Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing Pursuant to*

*Bankruptcy Rules 4001(b) and (c) and (V) Granting Related Relief* (the "DIP Motion"), and my

declaration and the declaration of Saul E. Burian in support of the DIP Motion, are as follows:[6]

- American Apparel (USA), LLC, as the Lead Borrower, and the other Borrowers party to the DIP Credit Agreement and listed on Schedule 1.01 thereto, as Borrowers.

- Encina Business Credit, LLC shall serve as administrative agent.

- The DIP Lenders will provide up to $30 million in senior secured postpetition financing. Interest shall accrue at LIBOR plus 5.25 % *per annum*, with a LIBOR floor of 0.25%.

- The Debtors' use of cash collateral and the loan proceeds shall be used for working capital and other general corporate purposes, and to pay administrative costs of these Cases.

---

[6]     The following is only a summary of the relevant terms and the terms of the DIP Credit Facility and any related documents shall definitively govern the relationship between the parties thereto.

- The DIP Lenders will be granted a superpriority administrative expense claim pursuant to section 507(b) and priming liens on the Debtors' assets as described above, subject to the Carve-Out (as defined in the DIP Motion); provided, however, that so long as the Prepetition Obligations representing Exit Loans held by Standard General, L.P. or its affiliates (the "SG Exit Loans") remain outstanding, the DIP Lenders' liens shall not (i) extend to the portion of the Debtors' Intellectual Property and Equipment (each term as defined in the DIP Credit Facility) representing 20% of the value of such property at any given time (the "Excluded Interests") nor (ii) prime the Prepetition Liens on the Excluded Interests (including such Prepetition Liens that secure the SG Exit Loans).

- The parties will make representations and warranties customary for a facility of this type.

- Events of Default under the DIP Credit Facility are standard for a facility of this type and include failure to comply with the milestones set forth below.

- The DIP Credit Facility shall terminate on the earliest of:  (i) May 7, 2017; (ii) the date on which the maturity of the DIP Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated); (iii) the termination of the Commitments in accordance with the provisions of Section 2.06 the DIP Credit Agreement; (iv) the date of substantial consummation of a plan of reorganization; or (v) the date on which (A) an Approved 363 Sale with respect to the assets of, or Equity Interests in, the Loan Parties is consummated, or (B) any other 363 Sale of all or substantially all of the assets of the Loan Parties is consummated.

42.    Pursuant to the terms of the DIP Credit Facility, the Debtors must satisfy the following milestones:

- filing of a sale and bidding procedures motion no later than seven days from the Petition Date;

- entry of an order approving bidding procedures, scheduling an auction and granting certain other related relief by no later than 35 days after the Petition Date;

- holding an auction (if necessary) no later than 65 days after the Petition Date;

- entry of one or more orders approving one or more sale transactions for the Debtors' assets with an aggregate purchase price sufficient to repay the DIP Credit Facility (the "Sale Transaction") by no later than 70 days after the Petition Date; and

- closing of the Sale Transaction no later than 80 days after the Petition Date.

In the event that any of these milestones are not satisfied, there will be a default under the DIP Credit Facility. A default under the DIP Credit Facility would likely result in an immediate cessation of the Debtors' operations and, likely, the conversion of these Cases to liquidation proceedings under chapter 7, the result of which would be dramatically reduced creditor recoveries and the elimination of any going concern value.

## IV.   FIRST DAY MOTIONS

43.   In addition to the DIP Motion, concurrently with the filing of these Cases, the Debtors filed the First Day Pleadings seeking relief related to the administration of these Cases, the Debtors' customers and employees, their operations, and their cash and financing needs. A list of the First Day Pleadings is set forth below.

<u>Administrative and Operational First Day Motions</u>

- *Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases*
- *Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and File a Consolidated Creditor Matrix, (II) Authorizing the Filing of a Consolidated List of Top 30 Unsecured Creditors, (III) Approving the Master Service List and (IV) Approving the Form and Manner of Notice of the Commencement of the Debtors' Chapter 11 Cases*
- *Motion for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Shipping and Related Obligations*
- *Motion for an Order Authorizing the Debtors to Pay Certain Prepetition Taxes*
- *Motion for an Order Authorizing the Debtors to Continue Their Insurance Programs and Pay Related Obligations*
- *Debtors' Motion Pursuant to Section 105 of the Bankruptcy Code for an Order (I) Confirming the Protections of Sections 362, 365 and 525 of the Bankruptcy Code and (II) Granting Related Relief*
- *Motion for Interim and Final Orders Establishing Adequate Assurance Procedures with Respect to Debtors' Utility Providers*

<u>Employee and Customer First Day Motions</u>

- *Motion for an Order Authorizing the Debtors to Pay Prepetition Employee Wages, Benefits, and Related Items*

- *Motion for an Order Authorizing the Debtors to (I) Maintain Certain Customer Programs and (II) Honor or Pay Related Prepetition Obligations to their Customers*

<u>Financing and Cash Management Motions</u>

- *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing Pursuant to 11 U.S.C. §§ 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e) and 507 and (B) Utilize Cash Collateral, (II) Granting Priming Liens, Priority Liens and Superpriority Claims to the DIP Secured Parties, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing Pursuant to Rules 4001(b) and (c) of the Bankruptcy Rules and (V) Granting Related Relief*

- *Motion for Interim and Final Orders (I) Approving the Continued Use of the Debtors' Cash Management System, Bank Accounts and Business Forms, (II) Approving on an Interim Basis, the Debtors' Deposit Guidelines and Extending Time to Comply with Section 345(b) of the Bankruptcy Code, (III) Approving Continuation of Ordinary Course Inter-Debtor Transactions, and (IV) Granting Related Relief*

44.     The Debtors have narrowly tailored the First Day Pleadings to meet their goals of: (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible until such time as the sale process is complete; (b) maintaining the confidence and support of their key customer and employee constituencies during the sale process and subsequent wind down of remaining operations; and (c) establishing procedures for the efficient administration of these Cases.

45.     I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

46.     It is my belief that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Company's efforts to maximize the recovery of its creditors through a sale transaction. It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims or continue selected prepetition programs—those First Day Pleadings seeking relief related to the Debtors' obligations to their employees, customers, shippers, taxing authorities and insurers—the relief requested is essential to the Debtors' continued operation through a sale process and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

47.     The success of these Cases depends upon the Debtors' ability to maintain their operations to the extent necessary to effectuate a sale transaction. The relief requested in the First Day Pleadings is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

48.     Accordingly, I respectfully request that all of the relief requested in the First Day Pleadings, and such other and further relief as may be just and proper, be granted.

## **CONCLUSION**

49.     For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: November 14, 2016
      Los Angeles, California

_____
Mark Weinsten
Chief Restructuring Officer

**EXHIBIT A**

**Organization Chart**

NAI-1502251396v1



# American Apparel
*Corporate Organization Chart*