## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN APPAREL, LLC, *et al.*, | ) Case No. 16-12551 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Re: Docket Nos. 5, 68 |
| | ) |
| | ) Obj. Deadline: 12/5/16, 4:00 p.m. |
| | ) Hearing Date: 12/12/16, 1:00 p.m. |
| | ) |

### OBJECTION OF CERTAIN UTILITY COMPANIES
### TO THE MOTION FOR INTERIM AND FINAL ORDERS ESTABLISHING
### PROCEDURES WITH RESPECT TO DEBTORS' UTILITY PROVIDERS

Commonwealth Edison Company ("ComEd"), Georgia Power Company ("Georgia Power"), NStar Electric & Gas Corporation ("NStar"), Orlando Utilities Commission ("OUC"), Public Service Electric and Gas Company ("PSE&G"), Salt River Project ("SRP") and Southern California Edison Company ("SCE") (collectively, the "Utilities"), by counsel, hereby object to the *Motion For Interim and Final Orders Establishing Adequate Assurance Procedures With Respect To Debtors' Utility Providers* (the "Utility Motion"), and set forth the following:

### Introduction

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested by the

Utilities under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors.  This Court should not permit the Debtors to shift their statutory burden.

The Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account containing $350,000 that supposedly reflects approximately two-weeks of the Debtors' estimated utility expenses, net of any prepetition deposits, letters of credit, surety bonds or other similar forms of adequate assurance already provided to the Debtors' utility providers (the "Bank Account").  Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account.  The Debtors' proposal that the Bank Account would be net of any prepetition security does not make sense because Section 366(c)(4) of the Bankruptcy Code expressly provides that a utility can recoup prepetition deposits against prepetition debt without notice or Court order.  Accordingly as ComEd, Georgia Power, PSE&G, SRP and SCE held prepetition deposits greater than two-weeks of Utility charges, the Debtors are proposing that those Utilities would not receive any adequate assurance of payment.

Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment for the

2

Utilities, the Court should reject it as an insufficient form of adequate assurance of payment for the following reasons:

1. Unlike all of the identified and permissible forms of adequate assurance of payment listed in Section 366(c)(1)(A), the Bank Account is not something held by the Utilities, so the Utilities do not have any control over when the Bank Account will be terminated;

2. All funds contained in the Bank Account may remain subject to prepetition liens in favor of the Debtors' secured lenders (this is in complete contrast to the $2.75 million Carve-Out received by the Debtors' professionals in the Cash Collateral pleadings, which remains in place even if there is an event of default);

3. In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a disbursement request;

4. It is underfunded from the outset because the Utilities issue monthly bills;

5. The Debtors are not required to replenish the Bank Account following pay-outs;

6. The Debtors fail to state whether draws from the Bank Account would be limited to two-week amounts;

3

SL1 1442288v2 018560.00201

7.    The Debtors should not reduce the amount of Bank Account on account of the termination of utility services to a Debtor account until the Debtors confirm that all post-petition charges on a closed account are paid in full; and

8.    The Bank Account would not even contain two-weeks of the Debtors' estimated utility charges since the Debtors propose to subtract the total prepetition security held by their utility providers from the total average of two-weeks of utility charges.

The Utilities are seeking the following two-month cash deposits from the Debtors that they are authorized to obtain pursuant to applicable state law or contracts:  (a) ComEd – $8,360; (b) Georgia Power – $4,460; (c) NStar – $1,500; (d) OUC – $1,460; (e) PSE&G – $1,540; (f) SRP – $2,430; and (g) SCE – $389,987. Based on all the foregoing, this Court should deny the Utility Motion as to the Utilities because the amounts of the Utilities' post-petition deposit requests are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.    On November 14, 2016 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now

4

pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.    The Debtors' chapter 11 bankruptcy cases are being jointly administered.

### The Utility Motion

3.    On the Petition Date, the Debtors filed the Utility Motion.

4.    Proper notice of the Utility Motion was not provided to the Utilities prior to the Court entering the *Interim Order Establishing Adequate Assurance Procedures With Respect To the Debtors' Utility Providers* (the "Interim Utility Order") on November 15, 2016.

5.    Because the Utilities were not properly or timely served with the Utility Motion and the Debtors never attempted to contact the Utilities regarding their adequate assurance requests prior to the filing of the Utility Motion, the Utilities had no opportunity to respond to the Utility Motion or otherwise be heard at the *ex parte* hearing on the Utility Motion that took place on November 15, 2016, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief sought by the Debtors) requires that there be "notice and a hearing" to the Utilities.

5

6.    The Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court approval for their own form of adequate assurance of payment, which is the Bank Account containing $350,000 that supposedly reflects two-weeks of the Debtors' estimated monthly utility charges, less any prepetition security held by the Debtors' utility providers.  Utility Motion at ¶ 9. The Debtors' proposal that the Bank Account would be net of any prepetition security does not make sense because Section 366(c)(4) of the Bankruptcy Code expressly provides that a utility can recoup prepetition deposits against prepetition debt without notice or Court order.  Additionally, since ComEd, Georgia Power, PSE&G, SRP and SCE held prepetition deposits greater than two-weeks of utility charges, the Debtors are proposing that those Utilities will not receive any adequate assurance of payment.

7.    The proposed Bank Account is not acceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

8.    The Utility Motion does not address why the Bank Account would be undercapitalized at less than two-weeks of

6

average utility charges when the Debtors know that regulated utilities, such as the Utilities, are required by applicable state laws, regulations, tariffs or contracts to bill the Debtors monthly. Moreover, the Utilities presume that the Debtors want the Utilities to continue to bill the Debtors monthly in arrears pursuant to their billing cycles established by applicable state law.

9.   Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).  Rather, without providing any specifics, the Utility Motion merely states that the Bank Account "together with the Debtors' ability to pay for future utility services in the ordinary course of business" constitutes adequate assurance of payment to the Debtors' utility providers.  Utility Motion at ¶ 9.

### Facts Regarding the Debtors

10.   The Debtors and their foreign affiliates (the "Foreign Affiliates") (collectively, "American Apparel" or the "Company") operate a manufacturing, distribution and retail business focused on branded fashion apparel. *Declaration of Mark Weinsten In Support of First Day Pleadings* ("First Day Declaration") at ¶ 17.

SL1 1442288v2 018560.00201

11.   On October 5, 2015, the Debtors commenced prior Chapter 11 cases in this Court (the "Prior Chapter 11 Cases"). First Day Declaration at ¶ 9.

12.   The turnaround strategy contemplated by the Plan in the Prior Chapter 11 Cases (the "Prior Plan") failed, and since emergence, the Company has experienced a 32.7% year-over-year decline in sales and a $40 million decline in EBITDA versus last year.  First Day Declaration at ¶ 11.

13.   The Company found itself unable to secure the $40 million Additional New Capital contemplated by the Prior Plan. First Day Declaration at ¶ 12. By summer 2016, the turnaround strategy contemplated in the Prior Plan had completely failed. First Day Declaration at ¶ 14.

14.   The Debtors filed the above-captioned Chapter 11 cases to complete a sale process to sell substantially all of their assets to Gildan Activewear SRL ("Gildan") acting as the stalking hours to purchase the assets.  First Day Declaration at ¶ 16.

### The Debtors' Post-Petition Financing

15.   On the Petition Date, the Debtors filed the *Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Senior Secured Superpriority Financing Pursuant To 11 U.S.C. §§ 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e) and 507 and (B) Utilize Cash*

8

*Collateral, (II) Granting Priming Liens, Priority Liens and*
*Superpriority Claims To the DIP Secured Parties, (III) Granting*
*Adequate Protection To Prepetition Secured Parties, (IV)*
*Scheduling a Final Hearing Pursuant To Rules 4001(b) and (c) of*
*the Bankruptcy Rules and (V) Granting Related Relief* (the
"Financing Motion").

16.    Through the Financing Motion, the Debtors seek access
to the proposed $30 million debtor-in-possession super-priority
financing facility (the "DIP Credit Facility").  Financing
Motion at ¶ 1.

17.    The DIP Credit Agreement provides for the following
milestones:  (a) a motion to approve bidding procedures filed
within seven (7) days after the Petition Date; (b) entry of an
order approving bidding procedures within 35 days of the
Petition Date; (c) an auction conducted within 65 days after
the Petition Date; (d) entry of an order approving the sale
within 70 days of the Petition Date; and (e) closing of the
sale within 80 days of the Petition Date.  Financing Motion at
¶ 45.

18.    The Financing Motion also sought a carve-out for the
professional fees and expenses incurred prior to a Carve-Out
Trigger Date, plus an additional $2.75 million incurred
subsequent to a Carve-Out Trigger Notice (the "Carve-Out").
Financing Motion at page 14.

9

SL1 1442288v2 018560.00201

19.    On November 17, 2016, the Court entered the *Interim Order: (I) Authorizing the Debtors To (A) Obtain Post-Petition Senior Secured Superpriority Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363(e), 364(c), 364(d)(1), 364(e) and 507 and (B) Utilize Cash Collateral, (II) Granting Priming Liens, Priority Liens and Superpriority Claims To the DIP Secured Parties, (III) Granting Adequate Protection To Prepetition Secured Parties, (IV) Scheduling a Final Hearing Pursuant To Bankruptcy Rules 4001(b) and (c) and (V) Granting Related Relief* (the "Interim Financing Order").

20.    The Interim Financing Order authorized the Debtors to borrow $10 million on an interim basis.   Interim Financing Order at page 15.

21.    The Interim Financing Order also approved the Carve-Out.   Interim Financing Order at pages 26-28.

22.    Exhibit "B" to the Interim Financing Order is 13-week DIP budget through February 10, 2017 (the "Budget").   It is unclear from the Budget whether the Debtors have budgeted sufficient sums for the timely payment of their post-petition utility expenses.

## The Sale Motion

23.    On the Petition Date, the Debtors filed the *Motion of the Debtors For Entry of Orders (I)(A) Approving Bidding*

10

*Procedures For the Sale of Substantially All of the Debtors'
Assets, (B) Authorizing the Debtors To Enter Into the Stalking
Horse Purchase Agreement, (C) Approving Bid Protections, (D)
Scheduling An Auction, (E) Approving the Form and Manner of
Notice Thereof, (F) Approving Assumption and Assignment
Procedures; and (G) Scheduling a Sale Hearing and Approving the
Form and Manner of Notice Thereof; (II)(A) Approving the Sale
of Substantially All of the Debtors' Assets Free and Clear of
Liens, Claims, Interests and Encumbrances and (B) Approving the
Assumption and Assignment of Executory Contracts and Unexpired
Leases; and (III) Granting Related Relief* (the "Sale Motion").

24. Through the Sale Motion, the Debtors seek the entry
of one or more orders authorizing the sale of the assets to one
or more successful bidders at the auction free and clear of all
liens, claims, interests and encumbrances.  Sale Motion at page
2.

25. The Debtors also seek approval of the Stalking Horse
APA between the Debtors and Gildan.  Sale Motion at page 2.

26. The Stalking Horse APA may be terminated if the
following milestones have not occurred:  (a) the sale closing
has not occurred by February 15, 2017; (b) if the Bidding
Procedures Order is not entered on or before December 5, 2016;
(c) if the Sale Order is not entered on or before January 15,

11

2017; and (d) in the event that the Auction is necessary and is not held on or before January 5, 2017.  Sale Motion at page 7.

## Facts Concerning the Utilities

27.   Each of the Utilities provided the Debtors with prepetition utility goods and/or services and have continued to provide the Debtors with utility goods and/or services since the Petition Date.

28.   Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges. Once a bill is issued, the Debtors have approximately 20 to 30 days to pay the applicable bill. If the Debtors fail to timely pay the bill, a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account. If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or service will be disconnected. Accordingly, under the Utilities' billing cycles, the Debtors could receive at least two months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

29.   In order to avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated

12

billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.  Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' web site links to the tariffs and/or state laws, regulations and/or ordinances are as follows:

ComEd:
     Tariffs:  https://www.comed.com/customer-service/rates-pricing/rates-information/Pages/current-rates.aspx
     Regulations:  http://www.ilga.gov/commission/jcar/admincode/083/08300280sections.html

Georgia Power: http://www.georgiapower.com/pricing/gpc_rates.asp

NStar:

     Electric - https://www.eversource.com/Content/docs/default-source/rates-tariffs/delivery.pdf?sfvrsn=2
     Gas - https://www.eversource.com/Content/docs/default-source/default-document-library/rules-and-regulations.pdf?sfvrsn=0

PSE&G:
     Electric - http://www.pseg.com/family/pseandg/tariffs/gas/pdf/gas_tariff.pdf
     Gas - http://www.pseg.com/family/pseandg/tariffs/electric/pdf/electric_tariff.pdf

OUC:
     The OUC Electric Service Policies, which sets forth the OUC billing cycle, will be provided upon request.

SRP: Rules and Regulations:
     http://www.srpnet.com/about/rulesregs.aspx
     Price Plans:

https://www.srpnet.com/prices/business/PDFX/April2015RatebookP
UBLISHED.pdf

SCE:   http://www.sce.com/AboutSCE/Regulatory/tariffbooks/rules.htm

30.   Subject to a reservation of the Utilities' right to
supplement their post-petition deposit requests if additional
accounts belonging to the Debtors are subsequently identified, the
Utilities' estimated prepetition debt and post-petition deposit
requests are as follows:

| Utility | No. of Accts | Est. Prepet. Debt | Dep. Request |
| --- | --- | --- | --- |
| ComEd | 4 | $4,033.71 | $8,360 (2-month) |
| Georgia Power | 5 | $2,946.26 | $4,460 (2-month) |
| NStar | 4 | n/a | $1,500 (2-month) |
| OUC | 1 | $665.77 | $1,460 (2-month) |
| PSE&G | 3 | $3,762.06 | $1,540 (2-month) |
| SRP | 1 | $819.60 | $2,430 (2-month) |
| SCE | 23 | $204,695 | $389,987 (2-month) |

31.   ComEd held prepetition deposits totaling $2,666.63 that
it will recoup against prepetition debt pursuant to Section
366(c) of the Bankruptcy Code. None of the prepetition deposits
will remain after recoupment.

32.   Georgia Power held prepetition deposits totaling
$4,897.69 that it recouped against prepetition debt pursuant to
Section 366(c) of the Bankruptcy Code.  Any remaining deposit

SL1 1442288v2 018560.00201

credit after recoupment can be applied to Georgia Power's post-petition deposit request.

33.    PSE&G held prepetition deposits totaling $5,899 that it recouped against prepetition debt pursuant to Section 366(c) of the Bankruptcy Code.  Any remaining deposit credit after recoupment can be applied to PSE&G's post-petition deposit request.

34.    SRP held a prepetition deposit in the amount of $2,200 that it recouped against prepetition debt pursuant to Section 366(c) of the Bankruptcy Code.  Any remaining deposit credit after recoupment can be applied to SRP's post-petition deposit request.

35.    SCE held a prepetition deposit in the amount of $103,495 that it will recoup against prepetition debt pursuant to Section 366(c) of the Bankruptcy Code.  None of the prepetition deposit will remain after recoupment.

## Discussion

**A.    THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

SL1 1442288v2 018560.00201

(3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section

16

366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors.  Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to the Utilities.

17

1.   **The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

1. Unlike the statutory approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

2. In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a Disbursement Request.

3. It is underfunded from the outset because the Utilities issue monthly bills and by the time a default notice is issued the Debtors will have received approximately 60 days of commodity or service.

4. The Debtors are not required to replenish the Bank Account following pay-outs.

18

5. All funds contained in the Bank Account may remain subject to prepetition liens in favor of the Debtors' secured lenders (this is in complete contrast to the $2.75 million Carve-Out received by the Debtors' professionals in the DIP Financing pleadings, which remains in place even if there is an event of default).

6. The Debtors may close the Bank Account before all post-petition utility charges are paid in full.

7. The Debtors fail to state whether draws from the Bank Account would be limited to two-week amounts.

8. The Debtors should not reduce the amount of Bank Account on account of the termination of utility services to a Debtor account until the Debtors confirm that all post-petition charges on a closed account are paid in full.

9. The Debtors propose that nothing would be contained in the Bank Account on behalf of ComEd, Georgia Power, PSE&G, SRP or SCE because they held prepetition deposits greater than two-weeks of utility charges.

Accordingly, the Court should not approve the Bank Account as adequate assurance as to the Utilities because the Bank Account is: (a) not the **form** of adequate assurance requested by the Utilities; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

**2. The Utility Motion Should Be Denied As To the Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why

19

this Court should modify the amounts of the Utilities'
requests for adequate assurance of payment.  Under Section
366(c)(3), the Debtors have the burden of proof as to whether
the amounts of the Utilities' adequate assurance of payment
requests should be modified.  *See In re Stagecoach
Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979)
(holding that the debtor, as the petitioning party at a
Section 366 hearing, bears the burden of proof).  However, the
Debtors do not provide the Court with any evidence or
factually supported documentation to explain why the amounts
of the Utilities' adequate assurance requests should be
modified.  Accordingly, the Court should deny the relief
requested by Debtors in the Utility Motion and require the
Debtors to comply with the requirements of Section 366(c) with
respect to the Utilities.

    **B.**    **THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE
ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE
UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY
CODE.**

Section 366(c) was amended to overturn decisions such as
*Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d
646 (2d Cir. 1997), that held that an administrative expense,
without more, could constitute adequate assurance of payment in
certain cases.  Section 366(c)(1)(A) specifically defines the
forms that assurance of payment may take as follows:

(i) a cash deposit;
(ii) a letter of credit;
(iii) a certificate of deposit;
(iv) a surety bond;
(v) a prepayment of utility consumption; or
(vi) another form of security that is mutually agreed
upon between the utility and the debtor or the
trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990).  The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986).  In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

The Utilities bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month. The Utilities then provide the Debtors with approximately 20 to 30 days to pay a bill before a late fee may be charged, and also provide written notice before utility service can be terminated for non-payment pursuant to applicable state laws,

tariffs, regulations and/or contracts.  Based on the foregoing state-mandated billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months.  Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of approximately 45 to 60 days based on their billing cycles.  Furthermore, the amounts of the Utilities' deposit requests are the amounts that the applicable public service commission, which is a neutral third-party entity, permit the Utilities to request from their customers. The Utilities are not taking the position that the deposits that they are entitled to obtain under applicable state law are binding on this Court, but, instead are introducing those amounts as evidence of amounts that their regulatory entities permit the Utilities to request from their customers.

Moreover, in contrast to the improper treatment proposed for the Debtors' Utilities, the Debtors have made certain that post-petition professionals are favored creditors over the Utilities by ensuring the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition default on the use of DIP Financing, by obtaining a $2.75 million professionals carve-out for the payment of their fees/expenses after a default and a guarantee of payment for

22

fees incurred up to a default.  Therefore, despite the fact that the Utilities continue to provide the Debtors with crucial post-petition utility services on the same generous terms that were provided prepetition, with the possibility of non-payment, the Debtors are seeking to deprive the Utilities of any adequate assurance of payment for which they are entitled to for continuing to provide the Debtors with post-petition utility goods/services.

Furthermore, since ComEd, Georgia Power, PSE&G, SRP and SCE held prepetition deposits greater than two-weeks of utility charges, the Debtors are proposing that those Utilities will not receive any adequate assurance of payment whatsoever because the Bank Account would not contain any monies on behalf of those Utilities.  Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security they have requested herein.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.    Denying the Utility Motion as to the Utilities;

2.    Awarding the Utilities the post-petition adequate assurance of payments pursuant to Section 366 in the amount and form satisfactory to the Utilities, which is the form and amount requested herein; and

23

3.    Providing such other and further relief as the Court

deems just and appropriate.

Dated:  December 2, 2016          STEVENS & LEE, P.C.

/s/ John D. Demmy_____
John D. Demmy (Bar No. 2802)
919 North Market Street, Suite 1300
Wilmington, Delaware 19801
Telephone:  (302) 425-3308
E-mail:   jdd@stevenslee.com

and

Russell R. Johnson III
John M. Craig
Law Firm of Russell R. Johnson III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
E-mail:   russj4478@aol.com

*Counsel for Commonwealth Edison
Company, Georgia Power Company,*
NStar Electric & Gas Corporation,
*Orlando Utilities Commission,
Public Service Electric and Gas
Company, Salt River Project and
Southern California Edison
Company*

24