**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| AMERICAN APPAREL, INC., *et al.*,[1] | : | |
| | : | Case No. 15-12055 (BLS) |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | Re: Docket No.: 368 & 496 |

**SECOND NOTICE OF FILING OF PLAN**
**SUPPLEMENT RELATING TO THE FIRST AMENDED JOINT PLAN**
**OF REORGANIZATION OF THE DEBTORS AND DEBTORS IN POSSESSION**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On November 20, 2015, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Joint Plan of Reorganization of the Debtors and Debtors in Possession* [Docket No. 368], which has been amended and is being filed contemporaneously herewith as the *First Amended Joint Plan of Reorganization of the Debtors and Debtors in Possession* (as amended or modified, the "Plan").[2]

2.      On December 30, 2015, the Debtors filed a *Plan Supplement Relating to the Joint Plan of Reorganization of the Debtors and Debtors in Possession* [Docket No. 496].

3.      In accordance with the Plan and the *Order (I) Approving Disclosure Statement, (II) Approving the Form and Manner of Service of Disclosure Statement Notice, (III) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Reorganization, and (IV) Scheduling Hearing on Confirmation of Plan of Reorganization,*

---

[1]      The Debtors are the following six entities (the last four digits of their respective taxpayer  identification numbers follow in parentheses):  American Apparel, Inc. (0601); American Apparel (USA), LLC (8940); American Apparel Retail, Inc. (7829); American Apparel Dyeing & Finishing, Inc. (0324); KCL Knitting, LLC (9518); and Fresh Air Freight, Inc. (3870).  The address of each of the Debtors is 747 Warehouse Street, Los Angeles, California 90021.

[2]      Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan.

entered on November 20, 2015 [Docket No. 365], the Debtors hereby file certain draft forms, signed copies or summaries of material terms of certain documents relating to the Plan and/or to be executed, delivered, assumed and/or performed in connection with the consummation of the Plan on the Effective Date, which comprise this Plan Supplement.

4.    The applicable Plan Exhibits and other documents, including blacklines where applicable, that have now been appended as exhibits to this Plan Supplement are as follows:

- Exhibit D – Litigation Trust Agreement (revised)
  - Exhibit D-1 – Backline of Litigation Trust Agreement
- Exhibit E – New Exit Financing Agreement (revised)
  - Exhibit E-1 – Blackline of New Exit Financing Agreement

5.    The documents contained in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  However, **these documents have not yet been approved by the Bankruptcy Court**.  If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

6.    The Debtors reserve all rights to amend, modify, or supplement the Plan Supplement, and any of the documents contained therein, in accordance with the terms of the Plan.  To the extent material amendments or modifications are made to any of these documents, the Debtors will file a blackline of such document with the Bankruptcy Court.

7.    The Plan, the Disclosure Statement, the Plan Supplement, as well as further information regarding these chapter 11 cases, are available for inspection on the Bankruptcy Court's website at www.deb.uscourts.gov, or free of charge on the Debtors' restructuring website at http://cases.gcginc.com/aai/.  Copies of all Exhibits may be obtained

from the Notice and Claims Agent by calling (877) 940-7795 (toll-free).  The Debtors reserve the right to modify, amend, supplement, restate or withdraw any of the Exhibits after they are filed and shall promptly make such changes available on the Document Website.

**[Remainder of page intentionally left blank.]**

Wilmington, Delaware
Dated:  January 14, 2016

PACHULSKI STANG ZIEHL & JONES LLP

*/s/  Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
Email:      ljones@pszjlaw.com
             joneill@pszjlaw.com
             jmulvihill@pszjlaw.com

and

JONES DAY
Richard L. Wynne (admitted *pro hac vice*)
Erin N. Brady (admitted *pro hac vice*)
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone:    (213) 489-3939
Facsimile:    (213) 243-2539
Email:        rlwynne@jonesday.com
               enbrady@jonesday.com

and

Scott J. Greenberg (admitted *pro hac vice*)
Michael J. Cohen (admitted *pro hac vice*)
222 East 41st Street
New York, NY 10017
Telephone:    (212) 326-3939
Facsimile:    (212) 755-7306
Email:        sgreenberg@jonesday.com
               mcohen@jonesday.com

*Co-Counsel for the Debtors and Debtors in Possession*

**<u>EXHIBIT D</u>**

**Litigation Trust Agreement**

# LITIGATION TRUST AGREEMENT

**THIS LITIGATION TRUST AGREEMENT** (the "Litigation Trust Agreement"), dated as of January __, 2016, by and among American Apparel, Inc. and its undersigned subsidiaries (collectively, the "Reorganized Debtors") and **[_____]** (the "Litigation Trustee"), is hereby executed in order to establish a litigation trust (the "Litigation Trust") pursuant to the *First Amended Joint Plan of Reorganization of the Debtors and Debtors in Possession* [Docket No. __] (the "Plan"). Unless the context otherwise provides, capitalized terms used in this Litigation Trust Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## RECITALS

WHEREAS, on October 5, 2015, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court");

WHEREAS, on January __, 2016, the Debtors filed the Plan with the Court;

WHEREAS, on _____, 2016, the Court entered the Confirmation Order [Docket No. [__]];

WHEREAS, the Litigation Trust is established pursuant to the Plan, which provides for the appointment of the Litigation Trustee to pursue the Specified Causes of Action and distribute the proceeds from any judgments, settlements, or recoveries therefrom (the "Litigation Trust Proceeds" and, together with the Specified Causes of Action and the Litigation Trust Funds, the "Litigation Trust Assets") to each Holder of an Allowed Class 4 General Unsecured Claim and each of their respective successors, assigns, and heirs (collectively, the "Beneficiaries");

WHEREAS, the Litigation Trustee shall be the exclusive trustee of the assets of the Litigation Trust for purposes of 31 U.S.C. § 3713(b) and Internal Revenue Code section 6012(b)(3);

WHEREAS, the Litigation Trustee has agreed to serve as such upon the terms and subject to the conditions set forth in this Litigation Trust Agreement;

WHEREAS, the Litigation Trustee shall have the exclusive authority to prosecute the Specified Causes of Action, and neither the Debtors nor the Reorganized Debtors shall have any control over the Litigation Trust or the Litigation Trust Assets;

WHEREAS, the Litigation Trust is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) and as a "grantor trust" pursuant to the Internal Revenue Code section 671-677 for United States federal income tax purposes, with the Beneficiaries treated as the grantors and owners of the Litigation Trust Assets; and

NOW, THEREFORE, in accordance with the Plan and in consideration of the promises and mutual covenants and agreements contained herein, the validity and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

- 1 -

# ARTICLE I
## ESTABLISHMENT OF TRUST

Section 1.1    <u>Name of Trust</u>.  The trust created by the Litigation Trust Agreement under Delaware law shall be known as the "AAI Litigation Trust" and shall be referred to herein as the Litigation Trust.  The Litigation Trust shall have a separate existence from all of the Reorganized Debtors.  In no circumstance shall the Litigation Trust or Litigation Trustee be the representative of any Reorganized Debtor, and the Litigation Trustee shall use [its][his][her] best efforts to conspicuously show that the Litigation Trustee represents the Litigation Trust, which should not be confused with the Reorganized Debtors.  The Litigation Trust is the trust created pursuant to Article III.H of the Plan.

Section 1.2    <u>Declaration of Trust</u>.  In consideration of the confirmation and consummation of the Plan under the Bankruptcy Code, the Debtors, the Reorganized Debtors and the Litigation Trustee have executed this Litigation Trust Agreement and, effective on the Effective Date of the Plan, in accordance with Section III.H of the Plan, the Debtors and the Debtors' Estates are hereby deemed to have irrevocably assigned, transferred, conveyed and delivered, to the Litigation Trust (i) all the right, title and interests of the Debtors and the Debtors' Estates in and to the Litigation Trust Assets with no reversionary interest whatsoever therein of the Debtors and the Reorganized Debtors, to have and to hold forever, in trust nevertheless, under and subject to the terms and conditions set forth in this Litigation Trust Agreement and in the Plan for the benefit of the Beneficiaries and their successors and assigns permitted under the Plan and this Litigation Trust Agreement; and (ii) the Litigation Trustee shall be vested with and succeed to all privileges and immunities of the Debtors in and to the Litigation Trust Assets, and the Debtors' evidentiary privileges, including the attorney-client privilege, with respect to the Litigation Trust Assets.  The use and distribution of the Litigation Trust Assets shall be made in accordance with this Litigation Trust Agreement and the Plan.

Section 1.3    <u>Purpose.</u>  The Litigation Trust is established for the purposes of liquidating the Litigation Trust Assets and making distributions (if any) to the Beneficiaries in accordance with Treasury Regulations section 301.7701-4(d) with no objective to continue or engage in the conduct of a trade or business.  In furtherance of such purposes, the Litigation Trustee shall be responsible for pursuing, litigating, settling or abandoning the Specified Causes of Action including, without limitation, any counterclaims and defenses related thereto which are transferred to the Litigation Trust.  In the event of any inconsistency between the recitation of the duties and powers of the Litigation Trustee as set forth in the Litigation Trust Agreement and as set forth in the Plan, the provisions of this Litigation Trust Agreement shall govern.

Section 1.4    <u>Transfer of Litigation Trust Assets.</u>

(a)    In accordance with the provisions of the Plan, on the Effective Date, the Debtors and the Reorganized Debtors hereby irrevocably and absolutely transfer, assign, convey, and deliver and are deemed to have irrevocably and absolutely transferred, assigned, conveyed, and delivered to the Litigation Trust, without recourse, all of their respective rights, title, and interest (whether legal, beneficial, or otherwise) in and to all of the Litigation Trust Assets (including any such assets comprising or subject to the attorney-client privilege with respect to the Litigation Trust Assets), all of which assets are, and are hereby deemed, transferred to the Litigation Trust effective

- 2 -

as of the Effective Date, and in each case all of the foregoing in which case such transferred assets shall automatically vest solely in the Litigation Trust free and clear of all Claims, Liens, encumbrances or Interests, subject only to the Plan. For the avoidance of doubt, the Litigation Trust Assets shall not include the Retained Causes of Action.

(b)    To the extent any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable nonbankruptcy law that is not superseded by Bankruptcy Code section 1123 or any other provision of the Bankruptcy Code, the Litigation Trustee shall specifically identify such Litigation Trust Assets (the "Retained Assets") and deliver in writing to the Reorganized Debtors a list of the Retained Assets.  The applicable Reorganized Debtors shall use commercially reasonable efforts to retain the Retained Assets; provided that the Reorganized Debtors are not required to incur any expenses in connection with its obligation to retain Litigation Trust Assets and shall not be required to take any action in connection with such obligation except at the sole cost and expense of the Litigation Trust.  The Litigation Trustee shall be deemed to have been designated as a representative of the Reorganized Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue the Retained Assets on behalf of the Reorganized Debtors.

Section 1.5    <u>Vesting of Causes of Action</u>.  Subject to the provisions of this Litigation Trust Agreement, on and after the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall have the exclusive right to investigate, prosecute, abandon, settle, or compromise any of the Specified Causes Actions, subject to the provisions of this Litigation Trust Agreement and without further order of the Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

Section 1.6    <u>Acceptance by the Litigation Trustee.</u>  The Litigation Trustee is willing and hereby accepts the appointment to serve as Litigation Trustee pursuant to this Litigation Trust Agreement and the Plan, and agrees to observe and perform all duties and obligations imposed upon the Litigation Trustee by this Litigation Trust Agreement and under the Plan, including, without limitation, to accept, hold, and liquidate the Litigation Trust Assets, make distributions (if any) to the Beneficiaries and to otherwise carry out the purpose of the Litigation Trust in accordance with the terms and subject to the conditions set forth herein and in the Plan.  Under no circumstance shall the Litigation Trustee be authorized or contend [it][he][she] is authorized to incur liability on behalf of the Debtors' Estates or the Reorganized Debtors, and any and all liability incurred by the Litigation Trustee, whether for expenses of prosecution, payment of sanctions, or otherwise, shall be the exclusive liability of the Litigation Trust and not the liability of the Debtors' Estates or the Reorganized Debtors.

Section 1.7    <u>Books and Records</u>.

(a)    The Debtors' and the Creditors' Committee's counsel and financial advisors will provide to the Litigation Trustee documents and other information gathered, and relevant work product developed, during the Chapter 11 Cases in connection with its investigation of the Specified Causes of Action.

(b)    The Reorganized Debtors shall preserve and maintain their books and records related to the Specified Causes of Action ("Specified Books and Records") until six years from the

- 3 -

date of this Litigation Trust Agreement. The Reorganized Debtors will, on the reasonable request of the Litigation Trustee, deliver copies of Specified Books and Records that are responsive to such reasonable requests, subject to appropriate confidentiality and privilege arrangements and restrictions.

(c)     The Debtors, the Reorganized Debtors and the Litigation Trustee agree that they all share a common interest with regard to information related to Litigation Trust Assets (which shall include the Specified Books and Records) (the "Common Interest Information"), and they desire, intend and mutually agree that the exchange of Common Interest Information is not intended to, and shall not, waive any evidentiary privileges, protections or immunities, including without limitation the attorney-client privilege, work-product privilege or other privilege or immunity attaching to any such documents or information (whether written or oral).

(d)     The Litigation Trustee agrees to keep confidential all Common Interest Information and shall not disclose Common Interest Information to any third party without the prior written consent of the Reorganized Debtors, which consent shall not be unreasonably withheld.

(e)     Notwithstanding anything to the contrary herein: (i) the Litigation Trustee does not have possession, custody or control over any of the books and records of the Reorganized Debtors within the meaning of the Federal Rules of Civil Procedure and shall have no power over the books and records of the Debtors or Reorganized Debtors beyond the rights granted herein; (ii) the Reorganized Debtors will not be required to incur any expenses and shall be entitled to reimbursement from the Litigation Trust for the reasonable and documented expenses (including legal fees) incurred in discharging their commitments or satisfying any requests of the Litigation Trustee hereunder; and (iii) the Litigation Trust or Litigation Trustee shall not solicit or approach any employee of the Debtors or Reorganized Debtors absent prior written consent of the Reorganized Debtors.

## ARTICLE II
## FUNDING OF THE LITIGATION TRUST

Section 2.1     Litigation Trust Funding. All Litigation Trust Expenses, including all fees and expenses of the Litigation Trustee and the Professionals (as defined in Section 4.4 herein), shall be funded solely from the Litigation Trust Assets. The Debtors and the Reorganized Debtors shall not have any liability or obligation whatsoever with respect to the funding or payment of any Litigation Trust Expenses.

Section 2.2     Litigation Trust Expenses. The Litigation Trustee and all Professionals shall have no personal liability in the event there are insufficient funds to pay the Litigation Trust Expenses.

## ARTICLE III
## LITIGATION TRUST ASSETS

Section 3.1     Liquidation of Litigation Trust Assets. The Litigation Trustee shall take such steps as the Litigation Trustee deems necessary to investigate, pursue, litigate, settle, compromise, transfer, sell, dispose of and/or abandon all or any of the Specified Causes of Action, to reduce the

- 4 -

Specified Causes of Action to cash proceeds and to make distributions of the cash proceeds to the Beneficiaries as required under the Plan and this Litigation Trust Agreement.  The Litigation Trustee's actions with respect to disposition of the Litigation Trust Assets shall in all events be taken in a manner so as reasonably to maximize the value of the Litigation Trust Assets and the distribution to the Beneficiaries.

Section 3.2     Distribution of Litigation Trust Assets.

(a)     Distributions.  The Litigation Trustee shall distribute the proceeds or property derived from the Specified Causes of Action, if any, as, when, and to the extent provided for under the Plan and in a manner consistent with this Litigation Trust Agreement as soon as is practicable after the receipt of such proceeds or property.  Distributions from the Litigation Trust, if any, shall be made by the Litigation Trustee or a Third Party Disbursing Agent according to the following priorities:

First, to repay any Litigation Trust Expenses, including fees and expenses incurred by the Litigation Trustee and any Professionals retained by the Litigation Trustee, all in accordance with Section 4.5 herein;

Second, to the Litigation Trust Board members, in accordance with Section 5.8, for reasonable and necessary expenses (but not third party professional fees) incurred in carrying out his or her duties as a member of the Litigation Trust Board; and

Third, any remaining proceeds shall distributions to the Beneficiaries as follows and otherwise pursuant to the terms of this Litigation Trust Agreement:

(i)     the first $2,500,000 of such proceeds shall be distributed 75% to the Litigation Trust GUC Beneficiaries and 25% to the Litigation Trust Noteholder Beneficiaries;

(ii)    the next $2,500,000 of such proceeds shall be distributed 50% to Litigation Trust GUC Beneficiaries and 50% to the Litigation Trust Noteholder Beneficiaries; and

(iii)   any remaining proceeds shall be distributed 25% to the Litigation Trust GUC Beneficiaries and 75% to the Litigation Trust Noteholder Beneficiaries.

For the avoidance of doubt, the Reorganized Debtors shall not receive any distributions from the Litigation Trust and shall have no liability to any party with respect to any distributions from the Litigation Trust or any entitlements thereto.

(b)     Time of Distributions.  Distributions to the Beneficiaries, in accordance with their respective interests in the Litigation Trust and in this Litigation Trust Agreement, shall be made on such dates selected by the Litigation Trustee in consultation with the Litigation Trust Board (each such date, an "Initial or Subsequent Distribution Date", or a "Distribution Date").

(c)     Disputed Reserve Account.  On the Initial Distribution Date, and after making

- 5 -

all distributions to the Beneficiaries required under this Litigation Trust Agreement, the Litigation Trustee shall establish a reserve (the "Disputed Reserve") to account for General Unsecured Claims that have not been Allowed as of the Initial Distribution Date (the "Disputed Claims").  The Litigation Trustee shall deposit into the Disputed Reserve on the Initial Distribution Date and each Subsequent Distribution Date, pending resolution of Disputed Claims, the distribution that would otherwise be distributable in accordance with the Plan in respect of such Disputed Claims, if such Disputed Claim had then constituted an Allowed Claim entitled to receive a distribution in accordance with the Plan.  The Litigation Trustee shall reserve in Cash or other property, for distribution on account of each applicable Disputed Claim, the full amount distributable with respect to the asserted amount (or such lesser amount as may be estimated by the Court).  The Litigation Trustee shall make a distribution from the Disputed Reserve for Disputed Claims to the holder of any Disputed Claim included in such Disputed Reserve whose Claim becomes an Allowed Claim (and therefore becomes a Beneficiary hereunder to the extent of the amount of such Allowed Claim) on the Subsequent Distribution Date after the date such Disputed Claim becomes an Allowed Claim.  The Disputed Reserve shall be treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9.

Section 3.3     Delivery of Distributions.  Distributions shall be made to the Beneficiaries at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 by the Record Date (or at the last known addresses of such holders if the Litigation Trustee has been notified in writing of a change of address).  The Litigation Trustee shall have the discretion to determine how to make distributions in the most efficient and cost-effective manner possible; provided, however, that its discretion may not be exercised in a manner inconsistent with any express requirements of this Litigation Trust Agreement.

Section 3.4     No Partial Distributions.  The Litigation Trustee shall not be required to make any partial distributions to any holder of any Disputed Claims pending resolution of such Disputed Claims, provided that, the foregoing shall not limit, impair or otherwise affect the right of such holder to receive, in accordance with the Plan and this Litigation Trust Agreement, a distribution in respect of any other claims of such holder that are Allowed Claims.

Section 3.5     Undeliverable Distributions.  If any distribution is returned as undeliverable, the Litigation Trustee may but is not obligated to, make such efforts to determine the current address of the Beneficiary to whom such the distribution was made as the Litigation Trustee deems appropriate, but no distribution to any Beneficiary shall be made unless and until the Litigation Trustee has determined the then-current address of such Beneficiary, at which time the distribution to such Beneficiary shall be made to such Beneficiary without interest.  Any distribution that is returned as undeliverable shall become the property of the Litigation Trust, and the entitlement by the Beneficiary to such distribution or any subsequent distribution on account of such Beneficiary's interests therein shall be extinguished and forever barred.  All funds or other property that vests or revests in the Litigation Trust pursuant to this Article shall be distributed by the Litigation Trustee to the other Beneficiaries in accordance with the provisions of this Litigation Trust Agreement.

Section 3.6     Fractional Cents.  The Litigation Trustee shall not be required to make distributions or payments of fractions of cents.  Whenever any payment of a fraction of a cent under

this Litigation Trust Agreement would otherwise be called for, the actual payment shall reflect a rounded down of such fraction to the nearest whole cent.

Section 3.7    Minimum Distributions.  The Litigation Trustee shall not be required to, but may in its sole and absolute discretion, make distributions to any Beneficiary in an amount less than $25.  In addition, the Litigation Trustee shall not be required to, but may in its sole and absolute discretion, make any payment to a Beneficiary in the event that the cost of making such payment exceeds the amount of such payment.  In the event there are funds remaining after final distributions, the Litigation Trustee is authorized to donate any such remaining funds to a recognized tax-exempt charity in consultation with the Litigation Trust Board.

Section 3.8    Compliance with Tax Requirements.  In connection with making distributions under this Litigation Trust Agreement, the Litigation Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions shall be subject to such withholding and reporting requirements.  The Litigation Trustee may withhold all or the appropriate portion of any distribution due to any Beneficiary until such time as such Beneficiary provides the necessary information to comply with any withholding requirements of any governmental unit.  Any amounts so withheld will then be paid by the Litigation Trust to the appropriate authority, but deemed to have been distributed to and received by the applicable Beneficiary for all purposes of this Litigation Trust Agreement and the Plan.  If the Beneficiary fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six (6) months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such Beneficiary's distribution may be treated as an unclaimed distribution in accordance with Section 3.9 of this Litigation Trust Agreement or the amount required to be withheld may be so withheld and turned over to the applicable authority.

Section 3.9    Unclaimed Property.  Any distribution of Cash under this Litigation Trust Agreement that is unclaimed after six (6) months after it has been delivered (or attempted to be delivered) shall become the property of the Litigation Trust, notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the Beneficiary to such distribution or any subsequent distribution on account of such Beneficiary's interest therein shall be extinguished and forever barred.  Nothing contained in the Plan or this Litigation Trust Agreement shall require the Litigation Trustee to attempt to locate any Beneficiary.  All funds or other property that vests or revests in the Litigation Trust pursuant to this Article shall be distributed by the Litigation Trustee to the other Beneficiaries in accordance with the provisions of this Litigation Trust Agreement.

## ARTICLE IV
## RIGHTS, POWERS AND DUTIES OF LITIGATION TRUSTEE

Section 4.1    Appointment.  Pursuant to Article III.H of the Plan, the Litigation Trustee shall become the Litigation Trustee as of the Effective Date.

Section 4.2    Legal Title.  The Litigation Trust shall hold legal title to the Litigation Trust Assets except that the Litigation Trustee may cause legal title or evidence of title to any of the Litigation Trust Assets to be held by any nominee or person, on such terms, in such manner and with such power as the Litigation Trustee may determine advisable.

- 7 -

Section 4.3    General Powers.

(a)    Except as otherwise provided in the Plan or in this Litigation Trust Agreement, and subject to the retained jurisdiction of the Court as provided for herein, in the Plan or the Confirmation Order, but without prior or further authorization, the Litigation Trustee may control and exercise authority over the Litigation Trust Assets, over the acquisition, management and disposition thereof and over the management and conduct of the affairs of the Litigation Trust to the same extent as if the Litigation Trustee were the sole owner of the Litigation Trust Assets in its own right, provided, however, that such control and authority over the Litigation Trust Assets shall be subject to the provisions of Section 4.3(c) of this Litigation Trust Agreement. No Person dealing with the Litigation Trust shall be obligated to inquire into the Litigation Trustee's authority in connection with the acquisition, management or disposition of the Litigation Trust Assets. The Litigation Trustee shall execute all agreements and other documents with the signature "[name of Litigation Trustee], in [his][her][its] capacity as the Litigation Trustee of the AAI Litigation Trust" and shall commence or appear in any civil action or proceeding in [his][her][its] own name, in [his][her][its] capacity as the Litigation Trustee of the AAI Litigation Trust.

(b)    Except as provided in the Plan or otherwise specified in the Litigation Trust Agreement, the Litigation Trustee need not obtain the order or approval of the Court in the exercise of any power, rights, or discretion conferred hereunder, or account to the Court. The Litigation Trustee shall exercise its business judgment for the benefit of the Beneficiaries in order to maximize the value of the Litigation Trust Assets and distributions, giving due regard to the cost, risk and delay of any course of action.

(c)    Notwithstanding the foregoing, the Litigation Trustee shall have the right to submit to the Court any questions the Litigation Trustee may desire to have explicit approval of the Court for the taking of any specific action proposed to be taken by the Litigation Trustee with respect to the Litigation Trust Assets, the Litigation Trust, this Litigation Trust Agreement, the Plan, or the administration and distribution of the Litigation Trust Assets.

(d)    With respect to all Litigation Trust Assets, the Litigation Trustee shall be deemed the Estates' "representative" in accordance with section 1123(b)(3)(B) of the Bankruptcy Code and shall have all the rights and powers set forth herein, including without limitation, the right to: (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan applicable to the Litigation Trust and of the Litigation Trust Agreement; (2) investigate, and if appropriate, commence, prosecute, appeal, settle, abandon or compromise any and all of the Specified Causes of Action; (3) administer, maintain and ultimately make distributions to the Beneficiaries as contemplated by the Plan and this Litigation Trust Agreement; (4) establish and administer any necessary Disputed Reserve that may be required; (5) employ and compensate Professionals and other agents or consultants; and (6) file all federal, state and local tax returns required to be filed by the Litigation Trust or with respect to its assets or income.

(e)    In connection with the management of the Litigation Trust Assets, except as otherwise expressly limited in this Litigation Trust Agreement, the Litigation Trustee shall have, in addition to any powers conferred on the Litigation Trustee by any other provision of this Litigation Trust Agreement, the power to take any and all actions as are necessary or advisable to effectuate the

- 8 -

purposes of the Litigation Trust, including, without limitation, the power and authority:

(i)    to accept, collect, hold, liquidate, and distribute all Litigation Trust Assets pursuant to the Plan and this Litigation Trust Agreement and to engage in all acts that would constitute ordinary performance of all obligations of a trustee of a liquidating trust; provided that the Litigation Trustee shall not sue any of the Reorganized Debtors, any of the Released Parties or any of the foregoing parties' respective Representatives, except as otherwise provided in the Plan or Confirmation Order;

(ii)    to establish and maintain one or more depository, escrow, or other accounts to hold Cash or cash equivalents constituting Litigation Trust Assets;

(iii)    to adopt, execute, deliver or file all plans, agreements, certificates and other document and instruments necessary or appropriate to implement the Litigation Trust;

(iv)    to accept, preserve, receive, collect, manage, investigate, supervise, prosecute, settle, compromise, abandon, release and otherwise protect the Specified Causes of Action;

(v)    to calculate and make distributions to the Beneficiaries pursuant to this Litigation Trust Agreement;

(vi)    to retain any Professionals the Litigation Trustee may deem advisable in connection with the administration of the Litigation Trust or the exercise of his/her other powers set out herein and to compensate and reimburse such Professionals from the Litigation Trust Assets for the charges incurred by the Litigation Trust on or after the Effective Date for services of Professionals, disbursements, expenses or related support services relating to the implementation of this Litigation Trust Agreement, in each case without any supervision of, or approval by, the Court or the United States Trustee, subject in all respect to the terms of this Litigation Trust Agreement;

(vii)    to maintain appropriate books and records;

(viii)    if authorized in writing by the Litigation Trust Board, to purchase insurance indemnifying the Litigation Trustee and the members of the Litigation Trust Board and to indemnify (and purchase insurance indemnifying) the employees, agents, Professionals and representatives of the Litigation Trust, the Litigation Board, or the Litigation Trustee, to the fullest extent that a corporation organized under the laws of the Litigation Trust's domicile is from time to time entitled to indemnify its directors, officers, employees, agents and representatives;

(ix)    to delegate any or all of the discretionary power and authority herein conferred at any time with respect to all or any portion of the Litigation Trust to any one or more reputable individuals without liability for any action taken or omission made because of such delegation, except for such liability as is expressly provided for in this Litigation Trust Agreement;

(x)    to make investments as permitted in Section 4.6 hereof, and as deemed appropriate by the Litigation Trustee in consultation with the Litigation Trust Board;

(xi)    file appropriate tax returns and other reports on behalf of the Litigation Trust

- 9 -

or with respect to its assets or income and pay Taxes or other obligations owed by the Litigation Trust or with respect to its assets or income;

(xii)    exercise such other powers and duties as necessary or appropriate, in the discretion of the Litigation Trustee to accomplish the purposes of the Litigation Trust as set out herein; provided that the Litigation Trustee shall obtain the prior written consent of the Reorganized Debtors before publicly disclosing any press releases or publicity materials related to the Litigation Trust or the Litigation Trust Assets; and

(xiii)    dissolve the Litigation Trust.

Section 4.4    Retention of Attorneys, Accountants and Other Professionals. The Litigation Trustee and the Litigation Trust Board may each retain the following professionals (the "Professionals") to aid in the performance of their responsibilities pursuant to the terms of the Plan and this Litigation Trust Agreement (the Professionals of the Litigation Trustee and the Litigation Trust Board may be the same):

(a)    Such law firm(s) as the Litigation Trustee and the Litigation Trust Board, as applicable, determine are necessary to perform such functions as may be appropriate to carry out the primary purposes of the Litigation Trust. The Litigation Trustee and/or the Litigation Trust Board may also engage such law firm(s) on a contingent fee basis as permitted by applicable law.

(b)    An independent public accounting firm to, if necessary, audit the financial books and records of the Litigation Trust, to prepare and file all federal, state and local tax returns and related tax forms on behalf of the Litigation Trust that the Litigation Trustee is obligated to prepare, provide and file, and to perform such other reviews and/or audits as the Litigation Trustee may deem advisable to carry out the primary purposes of the Litigation Trust.

(c)    Such forensic accountants, experts, advisors, consultants, investigators, appraisers, auctioneers or other professionals as are advisable to carry out the purposes of the Litigation Trust.

(d)    The Litigation Trustee may commit the Litigation Trust to and shall pay all such Professionals reasonable compensation from the Litigation Trust Assets or other available funds for services rendered and expenses incurred in accordance with this Litigation Trust Agreement.

Section 4.5    Compensation of Litigation Trustee.

(a)    Prior to execution of this Litigation Agreement, the Creditors' Committee counsel negotiated with and authorized the payment of reasonable compensation from the Litigation Trust Assets to the Litigation Trustee for services rendered and expenses incurred in fulfilling its duties pursuant to this Litigation Trust Agreement. In accordance with the foregoing, the Litigation Trustee will be entitled to the following fees, which shall be paid solely from the Litigation Trust Assets: [TBD]. The Litigation Trustee shall also be entitled to reimbursement, solely from the Litigation Trust Assets, of reasonable and documented expenses, including, but not limited to, reasonable and necessary travel expenses, long distance telephone tolls, messenger and delivery

- 10 -

service, the costs of terminal time for computer research, postage, and the cost of outside photocopying of materials.

(b)    On or before the last day of each month: (i) the Litigation Trustee shall provide a monthly statement to the Litigation Trust Board, the Litigation Trustee's counsel, and the Litigation Trust Board's counsel of the compensation and reimbursement of expenses that has been, or will be paid, to the Litigation Trustee in the preceding month for services provided under the Litigation Trust Agreement; and (ii) each Professional shall provide a monthly statement to the Litigation Trustee and the Litigation Trust Board of the compensation and reimbursement of expenses incurred; *provided, however*, that failure of any of the Professionals to serve a monthly statement on the Litigation Trustee and the Litigation Trust Board for any one or more months shall not waive or impair the right of such Professionals to subsequently seek compensation for all or any number of such months in a later statement delivered to the Litigation Trustee and the Litigation Trust Board. The Litigation Trust Board and the Litigation Trustee, and their respective counsel, as applicable, will have ten (10) days from the date such statement(s) are received to review the statement(s) and object to any payments by serving a written objection on the Litigation Trustee or Professional, as applicable, which objection shall set forth the precise nature of the objection and the amount at issue. The parties shall attempt to resolve objections consensually, if any, to any monthly statement. If the parties are unable to reach a consensual resolution of any such objection, either party may bring such dispute before the Court upon proper notice to the other party, and the disputed portion of the invoice shall not be paid until the dispute is resolved. The undisputed portion of such fees and expenses shall be paid as provided above.

Section 4.6    <u>Limitation on Investment Powers of Litigation Trustee</u>. Other than funds maintained in operating accounts in an amount deemed appropriate by the Litigation Trust to pay the current costs, expenses and obligations of the Litigation Trust, the Litigation Trustee may invest any monies held at any time as a part of the Litigation Trust, *provided, however,* that any such investments shall be only in interest-bearing deposits, certificates of deposit, or repurchase obligations of any federally insured banking institution or short term investments and obligations of, and unconditionally guaranteed as to payment by, the United States of America and its agencies or instrumentalities, pending the need to make disbursements thereof in payment of costs, expenses, and liabilities of the Litigation Trust or to make a distribution to the Beneficiaries and shall in any event be limited to such permissible investments described in IRS Revenue Procedure 94-45 (or successor guidance) of a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d).

Section 4.7    <u>Liability</u>.

(a)    <u>No Liability for Acts of Predecessors</u>. No successor Litigation Trustee shall be in any way responsible for the acts or omissions of any Litigation Trustee in office prior to the date on which such successor becomes the Litigation Trustee, unless a successor Litigation Trustee expressly assumes such responsibility.

(b)    <u>No Implied Obligations</u>. The Litigation Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into this Litigation Trust Agreement against the Litigation Trustee.

- 11 -

(c) <u>No Liability for Good Faith Error of Judgment</u>.  The Litigation Trustee shall not be liable for any error of judgment made in good faith, unless it shall be proved that the Litigation Trustee was grossly negligent or acting with willful misconduct in ascertaining the pertinent facts.

(d) <u>Reliance by Litigation Trustee on Documents of Advice of Legal Counsel or Other Persons</u>.  Except as otherwise provided herein, the Litigation Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Litigation Trustee to be genuine and to have been signed or presented by the proper party or parties.  The Litigation Trustee also may engage and consult with legal counsel for the Litigation Trust and other agents and advisors and shall not be liable for any action taken or suffered by the Litigation Trustee in reliance upon the advice of such counsel, agents or advisors.

(e) <u>Limitation on Liability</u>.  Except for acts of reckless or willful misconduct, fraud or gross negligence, willful disregard of the Litigation Trustee's duties or material breach of this Litigation Trust Agreement, Persons dealing with the Litigation Trustee, or seeking to assert claims against the Litigation Trust, shall look only to the Litigation Trust Assets to satisfy any liability incurred by the Litigation Trustee to any such person in carrying out the terms of this Litigation Trust Agreement, and the Litigation Trustee and any of his/her designees, partners, affiliates, agents, employees, representatives and Professionals shall have no personal, individual obligation or recourse of any nature or kind whatsoever to satisfy any such liability.

Section 4.8 <u>Indemnification, Exculpation and Reimbursement</u>.  The Litigation Trustee shall perform the duties and obligations imposed on the Litigation Trustee by this Litigation Trust Agreement with reasonable diligence and care under the circumstances.  The Litigation Trustee shall not be personally liable to the Litigation Trust, to any Beneficiary, holder of a Claim or any other Person (or any predecessor or successor thereto) for any reason whatsoever, except for such of its own acts as shall constitute reckless or willful misconduct, fraud, gross negligence, willful disregard of the Litigation Trustee's duties or material breach of this Litigation Trust Agreement.  Except as aforesaid, the Litigation Trustee shall be defended, held harmless and indemnified from time to time from the Litigation Trust Assets (but not from or by the Beneficiaries or any of the parties released under the Plan), against any and all losses, claims, costs, expenses and liabilities to which the Litigation Trustee may be subject by reason of the Litigation Trustee's execution in good faith of the Litigation Trustee's duties under this Litigation Trust Agreement.  The Litigation Trustee's officers, employees, agents, if any (including, without limitation, the Litigation Trustee's Professionals) may be likewise defended, held harmless and indemnified.  Without limiting the generality of the foregoing, the Litigation Trustee shall have no liability to any Beneficiary or holder of a Claim against the Debtors or Reorganized Debtors on account of the Litigation Trustee's investment or non-investment of any Litigation Trust Assets or any losses with respect to any such investments of Litigation Trust Assets, provided such investments are made, or the Litigation Trustee's decision not to invest any Litigation Trust Assets in any case is made, in accordance with the terms of this Litigation Trust Agreement.  The Litigation Trustee shall not be obligated to give any bond or surety or other security for the performance of any of its duties, unless ordered by the Court.  All amounts payable pursuant to this Section 4.8 to the Litigation Trustee or any of its officers, employees, agents, if any (including, without limitation, the Litigation Trustee's Professionals) shall be paid

- 12 -

solely from the Litigation Trust Assets.

Section 4.9    Action Upon Instructions. If in performing the Litigation Trustee's duties under this Litigation Trust Agreement, the Litigation Trustee is required to decide between alternate courses of action, or the Litigation Trustee is unsure of the application of any provision of the Litigation Trust Agreement or the Plan, then the Litigation Trustee may promptly deliver a notice to the Litigation Trust Board requesting written instructions as to the course of action to be taken by the Litigation Trustee. If the Litigation Trustee does not receive such written directions within five (5) Business Days after the Litigation Trustee has delivered such notice, the Litigation Trustee may, but shall be under no duty to, take or refrain from taking such action not inconsistent with the Litigation Trust Agreement as the Litigation Trustee shall deem advisable. If the Litigation Trustee does not receive direction from the Litigation Trust Board within such five (5) Business Day period or the Litigation Trustee believes that a Court order is necessary to determine the Litigation Trustee's rights or duties in any respect under the Litigation Trust Agreement, then the Litigation Trustee may apply to the Court for such order.

Section 4.10    Tax Matters.

(a)    Tax Filings and Notices. The Litigation Trustee shall prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns for the Litigation Trust, as may be required under the Bankruptcy Code, the Plan, or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income ("Tax Reports"). The Litigation Trustee shall be responsible for payment, solely out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets. The Litigation Trustee may request an expedited determination of the taxes owed by the Litigation Trust under section 505(b) of the Bankruptcy Code for any tax return for which such determination may be requested. To the extent required by applicable law and, if not so required, then when specifically requested by a Beneficiary in writing, the Litigation Trustee shall provide such Beneficiary with such tax information as is necessary for the preparation by such Beneficiary of such Beneficiary's income tax return. If such tax information is provided at the specific request of a Beneficiary (and not as required by applicable law), then such Beneficiary shall pay a reasonable fee to the Litigation Trustee, in an amount to be then determined by the Litigation Trustee, together with all costs and expenses incurred by the Litigation Trustee in providing such tax information to such Beneficiary. In connection with the Litigation Trustee's performance of its duties pursuant to this Litigation Trust Agreement, the Litigation Trustee may require any Beneficiary to furnish to the Litigation Trustee its employer or taxpayer identification number as assigned by the Internal Revenue Service, together with such other information, returns or forms as the Litigation Trustee may determine are required, and the Litigation Trustee may condition any distribution to any Beneficiary upon such receipt of such identification number, any other information and returns and forms as are required for the Litigation Trustee to comply with Internal Revenue Service requirements. Notwithstanding anything to the contrary herein, the Litigation Trustee or its Professionals shall distribute at least annually to the Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for taxes), except for amounts retained as reasonably necessary to maintain the value of the Litigation Trust Assets.

- 13 -

(b)     Liquidating Trust.  The Litigation Trustee will file tax returns pursuant to Treasury Regulations section 1.671-4(a) on the basis that Litigation Trust is a grantor trust that is a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) and related regulations.  Pursuant to such provisions, for federal income tax purposes the Litigation Trustee will allocate to the Beneficiaries their applicable shares of any income, gain, deduction, loss and credit of such grantor trust, and such Beneficiaries will be subject to tax thereon on a current basis.  As soon as reasonably practicable after the close of each calendar year, the Litigation Trustee will send each affected Beneficiary a statement setting forth such Beneficiary's share of the Litigation Trust's income, gain, deduction, loss and credit for the year and will instruct the holder to report all such items on his, her or its tax return for such year and pay any tax due with respect thereto.

(c)     Disputed Reserve.  The Litigation Trustee will file all applicable tax and other returns and statements for the Disputed Reserve as a "disputed ownership fund" in accordance with the requirements of Treasury Regulations section 1.468B-9 and any other applicable law.  In addition, the Litigation Trustee will pay from the applicable Litigation Trust Assets on a current basis any taxes owed on any net income or gain of such Disputed Reserve.

(d)     Withholdings.  The Litigation Trustee shall (i) withhold, deduct, and pay over to the appropriate taxing authority any amount required to be withheld under tax laws with respect to any distribution pursuant to this Litigation Trust Agreement and (ii) comply with any reporting requirements imposed by any federal, state, local, or foreign taxing authority.  Any tax withheld shall be treated as distributed to the distributee for purposes of this Litigation Trust Agreement.

(e)     Tax Year.  The taxable year of the Litigation Trust shall, unless otherwise required by the Internal Revenue Code, be the calendar year.

(f)     Valuation of Litigation Trust Assets.  As soon as reasonably practicable after the Effective Date, (a) the Litigation Trustee (in consultation with the Litigation Trust Board) will determine the fair market value of the Litigation Trust Assets (other than Cash) as of the Effective Date, based on a good faith determination and the advice of any professional retained by the Litigation Trustee for such purpose and (b) the Litigation Trustee shall establish appropriate means to apprise the Beneficiaries of the grantor trust portion of the Litigation Trust of the valuation of such holder's interest in the Litigation Trust.  The Debtors, the Litigation Trust, the Litigation Trustee, the Litigation Trust Board and the Beneficiaries will use such values consistently for all federal income tax purposes.

Section 4.11   Records of Litigation Trustee.  The Litigation Trustee shall maintain accurate records of receipts and disbursements and other activity of the Litigation Trust.  The books and records maintained by the Litigation Trustee, as well as any and all other books and records obtained from the Debtors or the Reorganized Debtors may be disposed of by the Litigation Trustee at such time as the Litigation Trustee determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Litigation Trust or the Beneficiaries, or upon the dissolution of the Litigation Trust, all after consultation with (i) the parties who provided the books and records; and (ii) the Litigation Trust Board.

Section 4.12   Timely Performance.  The Litigation Trustee will make continuing efforts to prosecute, collect, compromise and settle the Specified Causes of Action and administer, maintain

- 14 -

and make timely distributions to the Beneficiaries, and not unduly prolong the duration of the Litigation Trust.

Section 4.13    Consultation with the Litigation Trust Board.  The Litigation Trustee shall consult with the Litigation Trust Board regularly and at all such times when the Litigation Trustee deems it necessary or appropriate in connection with carrying out the purposes of the Litigation Trust and shall obtain approvals from the Litigation Trust Board as required under this Litigation Trust Agreement.

Section 4.14    Resignation.  The Litigation Trustee may resign as Litigation Trustee by giving written notice of its resignation to the Reorganized Debtors and the Litigation Trust Board. The Litigation Trustee shall continue to serve as trustee for the shorter of (i) ninety (90) days following the tender of the notice of resignation; and (ii) until the appointment of a successor Litigation Trustee shall become effective in accordance with Section 4.16 of this Litigation Trust Agreement.

Section 4.15    Removal of Litigation Trustee.  The Litigation Trustee may be removed by the Court for cause shown on a motion by any party in interest or as set forth in Section 5.6(a) herein.

Section 4.16    Appointment of Successor Litigation Trustee.  In the event of the death (in the case of a Litigation Trustee that is a natural person), dissolution (in the case of a Litigation Trustee that is not a natural person), resignation, incompetency or removal of the Litigation Trustee, the Litigation Trust Board shall designate a successor Litigation Trustee.  Such appointment shall specify the date when such appointment shall be effective.  Every successor Litigation Trustee appointed hereunder shall execute, acknowledge and deliver to the Court and to the retiring Litigation Trustee and its Professionals an instrument accepting the appointment and shall additionally file with the Court an affidavit demonstrating that such Person is disinterested, as defined by section 101(14) of the Bankruptcy Code, and thereupon the successor Litigation Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Litigation Trustee.

## ARTICLE V
## LITIGATION TRUST BOARD

Section 5.1    Establishment of Litigation Trust Board.  On the Effective Date, the Litigation Trust Board shall be established, using the procedures described herein.

Section 5.2    Composition; Replacement.  The Litigation Trust Board shall be comprised of up to five (5) members and the initial members shall be designated by the Creditors' Committee prior to the Effective Date.  In the case of an inability or unwillingness of any member of the Litigation Trust Board to serve, such member may be replaced by designation of the remaining members of the Litigation Trust Board.  If any position on the Litigation Trust Board remains vacant for more than thirty (30) days, such vacancy may be filled within fifteen (15) days thereafter by the designation of the Litigation Trustee without the requirement of a vote by the other members of the Litigation Trust Board.  Each replacement member of the Litigation Trust Board must be a Beneficiary or a past or current party in interest.  The Litigation Trust Board will continue to fully

- 15 -

function even while a position on the Litigation Trust Board remains vacant. The Litigation Trust Board may appoint *ex officio* members to the Litigation Trust Board.

Section 5.3    By-Laws. The Litigation Trust Board shall govern its proceedings through the adoption of by-laws, which the Litigation Trust Board shall adopt by majority vote.

Section 5.4    Litigation of Specified Causes of Action. The Litigation Trust Board may, by majority vote, authorize the Litigation Trustee to file judicial or administrative proceedings on any and all of the Specified Causes of Action as proposed by the Litigation Trustee or any member of the Litigation Trust Board.

Section 5.5    Settlement of Specified Causes of Action. The Litigation Trustee shall not settle or compromise any of the Specified Causes of Action in excess of an amount in controversy of $[100,000] (such $[100,000] monetary threshold may be increased or decreased at the discretion of the Litigation Trust Board), without either the approval of the Litigation Trust Board (which shall act by majority vote) or an order of the Court. Subject to the approval of the Litigation Trust Board and the requirements of this Section 5.5, the Litigation Trustee may settle or compromise any of the Specified Causes of Action without an order of the Court. Notwithstanding the foregoing: (i) no member of the Litigation Trust Board may cast a vote with respect to any matter to which it is a party (if applicable); and (ii) the Litigation Trustee may seek Court approval of a settlement if the Litigation Trust Board fails to act on a proposed settlement within thirty (30) days of receiving notice of such proposed settlement, including a deadlocked vote of the Litigation Trust Board.

Section 5.6    Removal of Trustee; Removal of Trust Advisory Board Member.

(a)    The Litigation Trust Board may, by majority vote, remove the Litigation Trustee in its discretion. If the requisite approval is not obtained, the Litigation Trustee may be removed by the Court for cause shown as set forth in Section 4.15 herein.

(b)    The Litigation Trust Board may, by majority vote, remove any member of the Litigation Trust Board, in its discretion. If the requisite approval is not obtained, any member of the Litigation Trust Board may be removed by the Court for cause shown.

Section 5.7    General Powers and Duties. The Litigation Trust Board shall have the rights, powers and duties set forth in this Litigation Trust Agreement, including: (i) to review all financial information with respect to the Litigation Trust and the Litigation Trust Assets; (ii) to authorize the commencement, prosecution, settlement, abandonment or sale of any of the Specified Causes Actions as set forth herein; (iii) to approve payment of Litigation Trustee fees, Professional fees and other expenses of the Litigation Trust; (iv) to replace the Litigation Trustee; (v) to extend the term of the Litigation Trust; (vi) to monitor distributions to the Beneficiaries; and (vii) to take other actions as necessary or appropriate with respect to the implementation of this Litigation Trust Agreement and provisions of the Plan and the Confirmation Order related to the Litigation Trust and the Litigation Trust Assets.

Section 5.8    Expenses.

(a)    Each member of the Litigation Trust Board shall be entitled to the

- 16 -

reimbursement of the member's reasonable and necessary expenses (but not third party professional fees) in carrying out his or her duties as a member of the Litigation Trust Board. The reimbursement of expenses of the Litigation Trust Board members shall be paid out of the Litigation Trust Assets.

(b)    On or before the last date of each month following the month for which reimbursement is sought, each member of the Litigation Trust Board shall serve upon the Litigation Trustee, its counsel and the other members of the Litigation Trust Board a monthly statement of expenses incurred in carrying out the member's duties, *provided, however*, that failure of any of the members of the Litigation Trust Board to serve a monthly statement for any one or more months shall not waive or impair the right of such Litigation Trust Board to subsequently seek compensation for all or any number of such months in a later statement. The Litigation Trustee, its counsel and the other members of the Litigation Trust Board will have ten (10) days from the date such statement is received to review the statement and object to such statement by serving a written objection on the member of the Litigation Trust Board making the request, which objection shall set forth the precise nature of the objection and the amount at issue. At the expiration of the ten (10) day period, the Litigation Trustee shall promptly pay 100% of the amounts requested, except for the portion of such expenses to which an objection has been made. The parties shall attempt to consensually resolve objections, if any. If the parties are unable to reach a consensual resolution of any such objection, the party which received an objection may seek payment by filing a motion with the Court on proper notice to the Litigation Trustee and its counsel.

Section 5.9    Standard of Care; Exculpation. Neither the Litigation Trust Board nor any of its members, designees, Professionals or any duly designated agent or representatives of any such party shall be liable for the act, default or misconduct of any other member of the Litigation Trust Board, nor shall any member be liable for anything other than such member's own gross negligence or willful misconduct. The Litigation Trust Board may, in connection with the performance of its duties, and in its sole and absolute discretion, consult with its counsel, accountants or other Professionals, and shall not be liable for anything done or omitted or suffered to be done in accordance with the advice or opinions. If the Litigation Trust Board determines not to consult with counsel, accountants or other Professionals, it shall not be deemed to impose any liability on the Litigation Trust Board, or its members and/or designees.

Section 5.10    Termination of the Litigation Trust Board. Upon the final resolution of the Specified Causes of Action and the distributions to the Beneficiaries, and the completion of the Litigation Trustee's responsibilities as set forth herein, the members of the Litigation Trust Board shall be deemed to resign their positions, whereupon they shall be discharged from further duties and responsibilities.

- 17 -

## ARTICLE VI
## JURISDICTION

Section 6.1    Retention of Jurisdiction.  The Court shall retain such jurisdiction as is legally permissible as set forth in this Litigation Trust Agreement, the Plan and in the Confirmation Order, including, but not limited to, jurisdiction to authorize Rule 2004 discovery and to hear and determine disputes arising in connection with the interpretation, implementation, administration or enforcement of the Litigation Trust Agreement.

Section 6.2    Aid and Recognition.  The Litigation Trust shall, as needed to effect the terms hereof, request the aid and recognition of any court or judicial, regulatory or administrative body in any nation or state.

Section 6.3    Waiver of Jury Trial.  ANY AND ALL RIGHT(S) TO TRIAL BY JURY IS HEREBY WAIVED, AND THERE SHALL BE NO RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS LITIGATION TRUST AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS LITIGATION TRUST AGREEMENT, PROVIDED, HOWEVER, THAT NOTHING IN THIS SECTION 6.3 SHALL PREVENT THE LITIGATION TRUSTEE FROM SEEKING A JURY TRIAL FOR ANY OF THE SPECIFIED CAUSES OF ACTION.

## ARTICLE VII
## TERMINATION

Section 7.1    Termination.  The Litigation Trust shall continue for a term of five (5) years after the Effective Date and shall automatically terminate at the end of such term, without prejudice to the rights of the Litigation Trustee or Litigation Trust Board to seek Court approval to extend such term for an additional finite term subject to obtaining Court approval of such extension based upon a finding that it is necessary of the Litigation Trust to complete its liquidating purpose, provided that, notwithstanding any such extension, the Litigation Trust remains a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d).  The Litigation Trustee shall at all times endeavor to administer the Litigation Trust expeditiously, and in no event shall the Litigation Trustee unduly prolong the duration of the Litigation Trust.  On termination of this Litigation Trust, the Litigation Trustee shall advise the Court in writing of its termination. Notwithstanding the foregoing, after the termination of the Litigation Trust, the Litigation Trustee shall have the power to exercise all the powers, authorities and discretions herein conferred solely for the purpose of winding up the affairs of the Litigation Trust.  The Litigation Trustee shall retain the books, records and files that shall have been delivered to or created by the Litigation Trustee.  At the Litigation Trustee's discretion, all of such records and documents may be destroyed at any time after two (2) years from the date of the termination of the Litigation Trust after providing 30 days' notice of such intent to destroy to the Reorganized Debtors to the extent the Debtors or Reorganized Debtors delivered such records or documents to the Litigation Trust or Litigation Trustee.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1    Notices.  All notices, requests or other communications required or permitted to be made in accordance with this Litigation Trust Agreement shall be in writing and shall be delivered personally or by facsimile transmission or mailed by first class mail or by overnight delivery service:

If to the Litigation Trustee, at:

[TBD]

with copies to:

[TBD]

If to the Debtors or Reorganized Debtors, at:

[American Apparel LLC]
747 Warehouse Street
Los Angeles, CA 90021
Tel.: 213-488-0226
Attn.: Chelsea Grayson, Esq.

with copies to:

Jones Day
222 E. 41st Street
New York, NY 10017
Tel.: 212-326-3939
Attn.:  Scott J. Greenberg, Esq. (sgreenberg@jonesday.com)
        Michael J. Cohen, Esq. (mcohen@jonesday.com)

Notices sent out by facsimile transmission shall be deemed delivered when actually received, and notices sent by first-class mail shall be deemed delivered three (3) Business Days after mailing and notices sent by overnight delivery service shall be deemed delivered the next Business Day after mailing.

Section 8.2    Effectiveness.  This Litigation Trust Agreement shall become effective on the Effective Date.

Section 8.3    Investment Company Act.  The Litigation Trust is organized as a liquidating entity in the process of liquidation, and therefore should not be considered, and the Litigation Trust does not and will not hold itself out as, an "investment company" or an entity "controlled" by an "investment company", as such terms are defined in the Investment Company Act.

Section 8.4    Taxation.  For United States federal income tax purposes, it is intended that the Litigation Trust be classified as a liquidating trust under Treasury Regulations section 301.7701-

- 19 -

4 and as a grantor trust subject to the provisions of Subchapter J, Subpart E of the Code that is owned by its beneficiaries as grantors. Accordingly, the parties hereto intend that, for United States federal income tax purposes, the Beneficiaries be treated as if they had received a distribution of undivided interests in the Litigation Trust Assets in exchange for their Allowed Claims and then contributed such interests in the Litigation Trust Assets to the Litigation Trust. In addition, the Litigation Trust will file tax returns as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). Accordingly, the Beneficiaries will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the Litigation Trust Assets and any income or earnings thereon as of the date of the transfer of such Litigation Trust Assets to the Litigation Trust. The Litigation Trustee will allocate to each holder its share of each item of income, gain, deduction, loss and credit recognized by the Litigation Trust (including interest or dividend income earned on bank accounts and other investments) using any reasonable allocation method. [The Disputed Reserve will be treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9(b)(1), as determined by the Litigation Trustee in its reasonable discretion. Any income or earnings on the Litigation Trust Assets allocated to such a Disputed Reserve will be taxed accordingly. The Litigation Trustee will act as the "administrator" of such disputed ownership funds within the meaning of Treasury Regulations section 1.468B-9(b)(2).]

Section 8.5    Counterparts.  This Litigation Trust Agreement may be executed in one or more counterparts (via facsimile or otherwise), each of which shall be deemed an original but which together shall constitute but one and the same instrument.

Section 8.6    Governing Law.  This Litigation Trust Agreement shall be governed by, construed under and interpreted in accordance with the laws of the State of New York, including all matters of construction, validity and performance, and without taking into consideration the conflict of laws provisions of such state.

Section 8.7    Headings.  Sections, subheadings and other headings used in this Litigation Trust Agreement are for convenience only and shall not affect the construction of this Litigation Trust Agreement.

Section 8.8    Interpretative Provisions.

(a)    All references to the plural herein shall also mean the singular and to the singular shall also mean the plural unless the context otherwise requires.

(b)    All references to the Debtors, the Reorganized Debtors and the Litigation Trustee pursuant to the definitions set forth in the recitals hereto, or to any other Person herein, shall include their respective successors and assigns.

(c)    The words "hereof", "herein", "hereunder", "this Trust Litigation Agreement" and words of similar import when used in this Litigation Trust Agreement shall refer to this Litigation Trust Agreement as a whole and not any particular provision of this Litigation Trust Agreement and as this Litigation Trust Agreement now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(d)    The word "including" when used in this Litigation Trust Agreement shall

- 20 -

mean "including, without limitation".

Section 8.9    Severability.  Any provision of this Litigation Trust Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions of this Litigation Trust Agreement, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable any such provision in any other jurisdiction.

Section 8.10    Amendments.  This Litigation Trust Agreement may be amended from time to time by written instrument executed by the Litigation Trust Board and upon notice to the Beneficiaries, provided that (i) the Litigation Trust Board shall have reasonably determined in good faith that such amendment is in the best interests of the Beneficiaries and (ii) any amendment of this Litigation Trust Agreement that adversely affects the rights or obligations, or increases the burdens hereunder, of the Reorganized Debtors shall require the written consent of the Reorganized Debtors. Notwithstanding this Section 8.10, any amendments to this Litigation Trust Agreement shall not be inconsistent with the purpose and intention of the Litigation Trust to liquidate in an orderly manner the Litigation Trust Assets in accordance with Treasury Regulations section 301.7701-4(d).  In the event that the Litigation Trust shall fail or cease to qualify as a liquidating trust in accordance with Treasury Regulations section 301.7701-4(d), this Litigation Trust Agreement may be amended by the Litigation Trustee to the extent necessary for the Litigation Trustee to take such action as it shall deem appropriate to have the Litigation Trust classified as a partnership for federal tax purposes under Treasury Regulations section 301.7701-3 (but not a publicly traded partnership under section 7704 of the Internal Revenue Code).

Section 8.11    Non-transferability of Beneficial Interests; Interests Beneficial Only; No Voting Rights; Successors.

(a)    All interests of the Beneficiaries of this Litigation Trust shall be uncertificated and non-transferable, except upon the death of a Beneficiary that is a natural Person or by operation of law.

(b)    The rights to a beneficial interest hereunder shall not entitle any Beneficiary to (i) any title in or to the Litigation Trust Assets as such (which title is vested in the Litigation Trustee) or to any right to call for a partition or division of the Litigation Trust Assets or to require an accounting, except for tax purposes pursuant to treatment as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d), or (ii) any voting rights with respect to the administration of the Litigation Trust and the actions of the Litigation Trustee in connection therewith.

(c)    This Litigation Trust Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns hereunder.

Section 8.12    Binding Effect; No Third Party Beneficiaries.  This Litigation Trust Agreement shall be binding upon and inure to the benefit of each of the parties hereto and, additionally, shall inure to the benefit of the Litigation Trust Board and its successors and assigns and the Beneficiaries and each of their respective successors[ and assigns and, except as provided hereunder, nothing herein is intended or shall be construed to give any other Person any right, remedy or claim under, to or in respect of this Litigation Trust Agreement, the Litigation Trust

- 21 -

Assets or the Litigation Trust or any part thereof].

Section 8.13   <u>No Suits by Beneficiaries and Claimholder</u>.  No Beneficiary or holder of a Claim shall have any right by virtue of any provision of this Litigation Trust Agreement to institute any action or proceeding in law or in equity against any party other than the Litigation Trustee on or under or with respect to the Litigation Trust Assets.

Section 8.14   <u>Irrevocability</u>.   The Litigation Trust is irrevocable, but is subject to amendment as provided for herein.

Section 8.15   <u>Trust Continuance</u>.  The death, dissolution, resignation, incompetency or removal of the Litigation Trustee shall not operate to terminate the Litigation Trust created by this Litigation Trust Agreement or to revoke any existing agency created under the terms of this Litigation Trust Agreement or invalidate any action theretofore taken by the Litigation Trustee.  In the event of the resignation or removal of the Litigation Trustee, the Litigation Trustee shall promptly (i) execute and deliver such documents, instruments and other writings as may be requested by the Court or reasonably requested by a successor Litigation Trustee to effect the termination of the Litigation Trustee's capacity under this Litigation Trust Agreement and the conveyance of the Litigation Trust Assets then held by the Litigation Trustee to the successor, (ii) deliver to the Court or the successor Litigation Trustee all documents, instruments, records and other writings related to the Litigation Trust as may be in the possession of the Litigation Trustee and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Trustee.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties have executed this Litigation Trust Agreement as of the date first above written.

[AMERICAN APPAREL LLC]

By: _____
Name:
Title:


AMERICAN APPAREL (USA), LLC

By: _____
Name:
Title:


AMERICAN APPAREL RETAIL, INC.

By: _____
Name:
Title:


FRESH AIR FREIGHT, INC.

By: _____
Name:
Title:


KCL KNITTING, LLC

By: _____
Name:
Title:


AMERICAN APPAREL DYEING & FINISHING, INC.

By: _____
Name:
Title:

[_____], in [his][her[its] capacity
as Litigation Trustee of the AAI Litigation
Trust

By:    _____

## **EXHIBIT D-1**

**Blackline of Litigation Trust Agreement**

## LITIGATION TRUST AGREEMENT

**THIS LITIGATION TRUST AGREEMENT** (the "Litigation Trust Agreement"), dated as of January __, 2016, by and among American Apparel, Inc. and its undersigned subsidiaries (collectively, the "Reorganized Debtors") and **[_____]** (the "Litigation Trustee"), is hereby executed in order to establish a litigation trust (the "Litigation Trust") pursuant to the *First Amended Joint Plan of Reorganization of the Debtors and Debtors in Possession* [Docket No. ~~368~~__] (the "Plan"). Unless the context otherwise provides, capitalized terms used in this Litigation Trust Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## RECITALS

WHEREAS, on October 5, 2015, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court");

WHEREAS, on ~~November 20, 2015~~January __, 2016, the Debtors filed the Plan with the Court;

WHEREAS, on _____, 2016, the Court entered the Confirmation Order [Docket No. [__]];

WHEREAS, the Litigation Trust is established pursuant to the Plan, which provides for the appointment of the Litigation Trustee to pursue the Specified Causes of Action and distribute the proceeds from any judgments, settlements, or recoveries therefrom (the "Litigation Trust Proceeds" and, together with the Specified Causes of Action and the Litigation Trust Funds, the "Litigation Trust Assets") to each Holder of an Allowed Class 4 General Unsecured Claim and each of their respective successors, assigns, and heirs (collectively, the "Beneficiaries");

WHEREAS, the Litigation Trustee shall be the exclusive trustee of the assets of the Litigation Trust for purposes of 31 U.S.C. § 3713(b) and Internal Revenue Code section 6012(b)(3);

WHEREAS, the Litigation Trustee has agreed to serve as such upon the terms and subject to the conditions set forth in this Litigation Trust Agreement;

WHEREAS, the Litigation Trustee shall have the exclusive authority to prosecute the Specified Causes of Action, and neither the Debtors nor the Reorganized Debtors shall have any control over the Litigation Trust or the Litigation Trust Assets;

WHEREAS, the Litigation Trust is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) and as a "grantor trust" pursuant to the Internal Revenue Code section 671-677 for United States federal income tax purposes, with the Beneficiaries treated as the grantors and owners of the Litigation Trust Assets; and

- 1 -

NOW, THEREFORE, in accordance with the Plan and in consideration of the promises and mutual covenants and agreements contained herein, the validity and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## ESTABLISHMENT OF TRUST

Section 1.1    Name of Trust.  The trust created by the Litigation Trust Agreement under Delaware law shall be known as the "AAI Litigation Trust" and shall be referred to herein as the Litigation Trust.  The Litigation Trust shall have a separate existence from all of the Reorganized Debtors.  In no circumstance shall the Litigation Trust or Litigation Trustee be the representative of any Reorganized Debtor, and the Litigation Trustee shall use [its][his][her] best efforts to conspicuously show that the Litigation Trustee represents the Litigation Trust, which should not be confused with the Reorganized Debtors.  The Litigation Trust is the trust created pursuant to Article III.H of the Plan.

Section 1.2    Declaration of Trust.    In consideration of the confirmation and consummation of the Plan under the Bankruptcy Code, the Debtors, the Reorganized Debtors and the Litigation Trustee have executed this Litigation Trust Agreement and, effective on the Effective Date of the Plan, in accordance with Section III.H of the Plan, the Debtors and the Debtors' Estates are hereby deemed to have irrevocably assigned, transferred, conveyed and delivered, to the Litigation Trust (i) all the right, title and interests of the Debtors and the Debtors' Estates in and to the Litigation Trust Assets with no reversionary interest whatsoever therein of the Debtors and the Reorganized Debtors, to have and to hold forever, in trust nevertheless, under and subject to the terms and conditions set forth in this Litigation Trust Agreement and in the Plan for the benefit of the Beneficiaries and their successors and assigns permitted under the Plan and this Litigation Trust Agreement; and (ii) the Litigation Trustee shall be vested with and succeed to all privileges and immunities of the Debtors in and to the Litigation Trust Assets, and the Debtors' evidentiary privileges, including the attorney-client privilege, with respect to the Litigation Trust Assets.  The use and distribution of the Litigation Trust Assets shall be made in accordance with this Litigation Trust Agreement and the Plan.

Section 1.3    Purpose.    The Litigation Trust is established for the purposes of liquidating the Litigation Trust Assets and making distributions (if any) to the Beneficiaries in accordance with Treasury Regulations section 301.7701-4(d) with no objective to continue or engage in the conduct of a trade or business.  In furtherance of such purposes, the Litigation Trustee shall be responsible for pursuing, litigating, settling or abandoning the Specified Causes of Action including, without limitation, any counterclaims and defenses related thereto which are transferred to the Litigation Trust.  In the event of any inconsistency between the recitation of the duties and powers of the Litigation Trustee as set forth in the Litigation Trust Agreement and as set forth in the Plan, the provisions of this Litigation Trust Agreement shall govern.

Section 1.4    Transfer of Litigation Trust Assets.

(a)    In accordance with the provisions of the Plan, on the Effective Date, the Debtors and the Reorganized Debtors hereby irrevocably and absolutely transfer, assign, convey, and deliver and are deemed to have irrevocably and absolutely transferred, assigned, conveyed,

- 2 -

and delivered to the Litigation Trust, without recourse, all of their respective rights, title, and interest (whether legal, beneficial, or otherwise) in and to all of the Litigation Trust Assets (including any such assets comprising or subject to the attorney-client privilege with respect to the Litigation Trust Assets), all of which assets are, and are hereby deemed, transferred to the Litigation Trust effective as of the Effective Date, and in each case all of the foregoing in which case such transferred assets shall automatically vest solely in the Litigation Trust free and clear of all Claims, Liens, encumbrances or Interests, subject only to the Plan. For the avoidance of doubt, the Litigation Trust Assets shall not include the Retained Causes of Action.

(b)    To the extent any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable nonbankruptcy law that is not superseded by Bankruptcy Code section 1123 or any other provision of the Bankruptcy Code, the Litigation Trustee shall specifically identify such Litigation Trust Assets (the "Retained Assets") and deliver in writing to the Reorganized Debtors a list of the Retained Assets.  The applicable Reorganized Debtors shall use commercially reasonable efforts to retain the Retained Assets; [provided that the Reorganized Debtors are not required to incur any expenses in connection with its obligation to retain Litigation Trust Assets and shall not be required to take any action in connection with such obligation except at the sole cost and expense of the Litigation Trust]. [1] —The Litigation Trustee shall be deemed to have been designated as a representative of the Reorganized Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue the Retained Assets on behalf of the Reorganized Debtors.

Section 1.5    <u>Vesting of Causes of Action</u>.  Subject to the provisions of this Litigation Trust Agreement, on and after the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall have the exclusive right to investigate, prosecute, abandon, settle, or compromise any of the Specified Causes Actions, subject to the provisions of this Litigation Trust Agreement and without further order of the Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

Section 1.6    <u>Acceptance by the Litigation Trustee.</u>  The Litigation Trustee is willing and hereby accepts the appointment to serve as Litigation Trustee pursuant to this Litigation Trust Agreement and the Plan, and agrees to observe and perform all duties and obligations imposed upon the Litigation Trustee by this Litigation Trust Agreement and under the Plan, including, without limitation, to accept, hold, and liquidate the Litigation Trust Assets, make distributions (if any) to the Beneficiaries and to otherwise carry out the purpose of the Litigation Trust in accordance with the terms and subject to the conditions set forth herein and in the Plan. Under no circumstance shall the Litigation Trustee be authorized or contend [it][he][she] is authorized to incur liability on behalf of the Debtors' Estates or the Reorganized Debtors, and any and all liability incurred by the Litigation Trustee, whether for expenses of prosecution, payment of sanctions, or otherwise, shall be the exclusive liability of the Litigation Trust and not the liability of the Debtors' Estates or the Reorganized Debtors.

---

[1] NTD: Reorganized Debtors' reimbursement rights and respective allocation of costs TBD.

Section 1.7    Books and Records.

(a)    The Debtors' and the Creditors' Committee's counsel and financial advisors will provide to the Litigation Trustee documents and other information gathered, and relevant work product developed, during the Chapter 11 Cases in connection with its investigation of the Specified Causes of Action.

(b)    The Reorganized Debtors shall preserve and maintain their books and records related to the Specified Causes of Action ("Specified Books and Records") until six years from the date of this Litigation Trust Agreement.  The Reorganized Debtors will, on the reasonable request of the Litigation Trustee, deliver copies of Specified Books and Records that are responsive to such reasonable requests, subject to appropriate confidentiality and privilege arrangements and restrictions.

(c)    The Debtors, the Reorganized Debtors and the Litigation Trustee agree that they all share a common interest with regard to information related to Litigation Trust Assets (which shall include the Specified Books and Records) (the "Common Interest Information"), and they desire, intend and mutually agree that the exchange of Common Interest Information is not intended to, and shall not, waive any evidentiary privileges, protections or immunities, including without limitation the attorney-client privilege, work-product privilege or other privilege or immunity attaching to any such documents or information (whether written or oral).

(d)    The Litigation Trustee agrees to keep confidential all Common Interest Information and shall not disclose Common Interest Information to any third party without the prior written consent of the Reorganized Debtors, which consent shall not be unreasonably withheld.

(e)    Notwithstanding anything to the contrary herein: (i) the Litigation Trustee does not have possession, custody or control over any of the books and records of the Reorganized Debtors within the meaning of the Federal Rules of Civil Procedure and shall have no power over the books and records of the Debtors or Reorganized Debtors beyond the rights granted herein; (ii) [the Reorganized Debtors will not be required to incur any expenses and shall be entitled to reimbursement from the Litigation Trust for the reasonable and documented expenses (including legal fees) incurred in discharging their commitments or satisfying any requests of the Litigation Trustee hereunder][2]; and (iii) the Litigation Trust or Litigation Trustee shall not solicit or approach any employee of the Debtors or Reorganized Debtors absent prior written consent of the Reorganized Debtors.

---

[2] NTD: Reorganized Debtors' reimbursement rights and respective allocation of costs TBD.

## ARTICLE II
## FUNDING OF THE LITIGATION TRUST

Section 2.1    _Litigation Trust Funding_.  All Litigation Trust Expenses, including all fees and expenses of the Litigation Trustee and the Professionals (as defined in Section 4.4 herein), shall be funded solely from the Litigation Trust Assets.  The Debtors and the Reorganized Debtors shall not have any liability or obligation whatsoever with respect to the funding or payment of any Litigation Trust Expenses.

Section 2.2    _Litigation Trust Expenses_.  The Litigation Trustee and all Professionals shall have no personal liability in the event there are insufficient funds to pay the Litigation Trust Expenses.

## ARTICLE III
## LITIGATION TRUST ASSETS

Section 3.1    _Liquidation of Litigation Trust Assets_.  The Litigation Trustee shall take such steps as the Litigation Trustee deems necessary to investigate, pursue, litigate, settle, compromise, transfer, sell, dispose of and/or abandon all or any of the Specified Causes of Action, to reduce the Specified Causes of Action to cash proceeds and to make distributions of the cash proceeds to the Beneficiaries as required under the Plan and this Litigation Trust Agreement.  The Litigation Trustee's actions with respect to disposition of the Litigation Trust Assets shall in all events be taken in a manner so as reasonably to maximize the value of the Litigation Trust Assets and the distribution to the Beneficiaries.

Section 3.2    _Distribution of Litigation Trust Assets_.

(a)    _Distributions_.  The Litigation Trustee shall distribute the proceeds or property derived from the Specified Causes of Action, if any, as, when, and to the extent provided for under the Plan and in a manner consistent with this Litigation Trust Agreement as soon as is practicable after the receipt of such proceeds or property.  Distributions from the Litigation Trust, if any, shall be made by the Litigation Trustee or a Third Party Disbursing Agent according to the following priorities:

_First_, to repay any Litigation Trust Expenses, including fees and expenses incurred by the Litigation Trustee and any Professionals retained by the Litigation Trustee, all in accordance with Section 4.5 herein;

_Second_, to the Litigation Trust Board members, in accordance with Section 5.8, for reasonable and necessary expenses (but not third party professional fees) incurred in carrying out his or her duties as a member of the Litigation Trust Board; and

_Third_, any remaining proceeds shall ~~be used for making~~ distributions to the Beneficiaries ~~in accordance with their respective interests in the Litigation Trust and~~as follows and otherwise pursuant to the terms of this Litigation Trust Agreement~~.~~:

(i)    the first $2,500,000 of such proceeds shall be distributed 75% to the Litigation Trust GUC Beneficiaries and 25% to the Litigation Trust Noteholder Beneficiaries;

(ii)    the next $2,500,000 of such proceeds shall be distributed 50% to the Litigation Trust GUC Beneficiaries and 50% to the Litigation Trust Noteholder Beneficiaries; and

(iii)    any remaining proceeds shall be distributed 25% to the Litigation Trust GUC Beneficiaries and 75% to the Litigation Trust Noteholder Beneficiaries.

For the avoidance of doubt, the Reorganized Debtors shall not receive any distributions from the Litigation Trust and shall have no liability to any party with respect to any distributions from the Litigation Trust or any entitlements thereto.

(b)    Time of Distributions.  Distributions to the Beneficiaries, in accordance with their respective interests in the Litigation Trust and in this Litigation Trust Agreement, shall be made on such dates selected by the Litigation Trustee in consultation with the Litigation Trust Board (each such date, an "Initial or Subsequent Distribution Date", or a "Distribution Date").

(c)    Disputed Reserve Account.  On the Initial Distribution Date, and after making all distributions to the Beneficiaries required under this Litigation Trust Agreement, the Litigation Trustee shall establish a reserve (the "Disputed Reserve") to account for General Unsecured Claims that have not been Allowed as of the Initial Distribution Date (the "Disputed Claims").  The Litigation Trustee shall deposit into the Disputed Reserve on the Initial Distribution Date and each Subsequent Distribution Date, pending resolution of Disputed Claims, the distribution that would otherwise be distributable in accordance with the Plan in respect of such Disputed Claims, if such Disputed Claim had then constituted an Allowed Claim entitled to receive a distribution in accordance with the Plan.  The Litigation Trustee shall reserve in Cash or other property, for distribution on account of each applicable Disputed Claim, the full amount distributable with respect to the asserted amount (or such lesser amount as may be estimated by the Court).  The Litigation Trustee shall make a distribution from the Disputed Reserve for Disputed Claims to the holder of any Disputed Claim included in such Disputed Reserve whose Claim becomes an Allowed Claim (and therefore becomes a Beneficiary hereunder to the extent of the amount of such Allowed Claim) on the Subsequent Distribution Date after the date such Disputed Claim becomes an Allowed Claim.  The Disputed Reserve shall be treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9.

Section 3.3    Delivery of Distributions.  Distributions shall be made to the Beneficiaries at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 by the Record Date (or at the last known addresses of such holders if the Litigation Trustee has been notified in writing of a change of address).  The Litigation Trustee shall have the discretion to determine how to make distributions in the most efficient and cost-effective manner possible; provided, however, that its discretion may not be exercised in a manner inconsistent with any express requirements of this Litigation Trust Agreement.

- 6 -

Section 3.4     No Partial Distributions.  The Litigation Trustee shall not be required to make any partial distributions to any holder of any Disputed Claims pending resolution of such Disputed Claims, provided that, the foregoing shall not limit, impair or otherwise affect the right of such holder to receive, in accordance with the Plan and this Litigation Trust Agreement, a distribution in respect of any other claims of such holder that are Allowed Claims.

Section 3.5     Undeliverable Distributions.     If any distribution is returned as undeliverable, the Litigation Trustee may but is not obligated to, make such efforts to determine the current address of the Beneficiary to whom such the distribution was made as the Litigation Trustee deems appropriate, but no distribution to any Beneficiary shall be made unless and until the Litigation Trustee has determined the then-current address of such Beneficiary, at which time the distribution to such Beneficiary shall be made to such Beneficiary without interest.  Any distribution that is returned as undeliverable shall become the property of the Litigation Trust, and the entitlement by the Beneficiary to such distribution or any subsequent distribution on account of such Beneficiary's interests therein shall be extinguished and forever barred.  All funds or other property that vests or revests in the Litigation Trust pursuant to this Article shall be distributed by the Litigation Trustee to the other Beneficiaries in accordance with the provisions of this Litigation Trust Agreement.

Section 3.6     Fractional Cents.  The Litigation Trustee shall not be required to make distributions or payments of fractions of cents.  Whenever any payment of a fraction of a cent under this Litigation Trust Agreement would otherwise be called for, the actual payment shall reflect a rounded down of such fraction to the nearest whole cent.

Section 3.7     Minimum Distributions.  The Litigation Trustee shall not be required to, but may in its sole and absolute discretion, make distributions to any Beneficiary in an amount less than $25.  In addition, the Litigation Trustee shall not be required to, but may in its sole and absolute discretion, make any payment to a Beneficiary in the event that the cost of making such payment exceeds the amount of such payment.  In the event there are funds remaining after final distributions, the Litigation Trustee is authorized to donate any such remaining funds to a recognized tax-exempt charity in consultation with the Litigation Trust Board.

Section 3.8     Compliance with Tax Requirements.     In connection with making distributions under this Litigation Trust Agreement, the Litigation Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions shall be subject to such withholding and reporting requirements.  The Litigation Trustee may withhold all or the appropriate portion of any distribution due to any Beneficiary until such time as such Beneficiary provides the necessary information to comply with any withholding requirements of any governmental unit.  Any amounts so withheld will then be paid by the Litigation Trust to the appropriate authority, but deemed to have been distributed to and received by the applicable Beneficiary for all purposes of this Litigation Trust Agreement and the Plan.  If the Beneficiary fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six (6) months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such Beneficiary's distribution may be treated as an unclaimed distribution in accordance with Section 3.9 of this Litigation Trust Agreement or the amount required to be withheld may be so withheld and turned over to the

US2008 7883822 2
NAI-1500741325v12

applicable authority.

Section 3.9    Unclaimed Property.  Any distribution of Cash under this Litigation Trust Agreement that is unclaimed after six (6) months after it has been delivered (or attempted to be delivered) shall become the property of the Litigation Trust, notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the Beneficiary to such distribution or any subsequent distribution on account of such Beneficiary's interest therein shall be extinguished and forever barred.   Nothing contained in the Plan or this Litigation Trust Agreement shall require the Litigation Trustee to attempt to locate any Beneficiary.  All funds or other property that vests or revests in the Litigation Trust pursuant to this Article shall be distributed by the Litigation Trustee to the other Beneficiaries in accordance with the provisions of this Litigation Trust Agreement.

**ARTICLE IV**
**RIGHTS, POWERS AND DUTIES OF LITIGATION TRUSTEE**

Section 4.1    Appointment.  Pursuant to Article III.H of the Plan, the Litigation Trustee shall become the Litigation Trustee as of the Effective Date.

Section 4.2    Legal Title.  The Litigation Trust shall hold legal title to the Litigation Trust Assets except that the Litigation Trustee may cause legal title or evidence of title to any of the Litigation Trust Assets to be held by any nominee or person, on such terms, in such manner and with such power as the Litigation Trustee may determine advisable.

Section 4.3    General Powers.

(a)    Except as otherwise provided in the Plan or in this Litigation Trust Agreement, and subject to the retained jurisdiction of the Court as provided for herein, in the Plan or the Confirmation Order, but without prior or further authorization, the Litigation Trustee may control and exercise authority over the Litigation Trust Assets, over the acquisition, management and disposition thereof and over the management and conduct of the affairs of the Litigation Trust to the same extent as if the Litigation Trustee were the sole owner of the Litigation Trust Assets in its own right, provided, however, that such control and authority over the Litigation Trust Assets shall be subject to the provisions of Section 4.3(c) of this Litigation Trust Agreement.  No Person dealing with the Litigation Trust shall be obligated to inquire into the Litigation Trustee's authority in connection with the acquisition, management or disposition of the Litigation Trust Assets.  The Litigation Trustee shall execute all agreements and other documents with the signature "[name of Litigation Trustee], in [his][her][its] capacity as the Litigation Trustee of the AAI Litigation Trust" and shall commence or appear in any civil action or proceeding in [his][her][its] own name, in [his][her][its] capacity as the Litigation Trustee of the AAI Litigation Trust.

(b)    Except as provided in the Plan or otherwise specified in the Litigation Trust Agreement, the Litigation Trustee need not obtain the order or approval of the Court in the exercise of any power, rights, or discretion conferred hereunder, or account to the Court.  The Litigation Trustee shall exercise its business judgment for the benefit of the Beneficiaries in order to maximize the value of the Litigation Trust Assets and distributions, giving due regard to

- 8 -

the cost, risk and delay of any course of action.

(c)     Notwithstanding the foregoing, the Litigation Trustee shall have the right to submit to the Court any questions the Litigation Trustee may desire to have explicit approval of the Court for the taking of any specific action proposed to be taken by the Litigation Trustee with respect to the Litigation Trust Assets, the Litigation Trust, this Litigation Trust Agreement, the Plan, or the administration and distribution of the Litigation Trust Assets.

(d)     With respect to all Litigation Trust Assets, the Litigation Trustee shall be deemed the Estates' "representative" in accordance with section 1123(b)(3)(B) of the Bankruptcy Code and shall have all the rights and powers set forth herein, including without limitation, the right to: (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan applicable to the Litigation Trust and of the Litigation Trust Agreement; (2) investigate, and if appropriate, commence, prosecute, appeal, settle, abandon or compromise any and all of the Specified Causes of Action; (3) administer, maintain and ultimately make distributions to the Beneficiaries as contemplated by the Plan and this Litigation Trust Agreement; (4) establish and administer any necessary Disputed Reserve that may be required; (5) employ and compensate Professionals and other agents or consultants; and (6) file all federal, state and local tax returns required to be filed by the Litigation Trust or with respect to its assets or income.

(e)     In connection with the management of the Litigation Trust Assets, except as otherwise expressly limited in this Litigation Trust Agreement, the Litigation Trustee shall have, in addition to any powers conferred on the Litigation Trustee by any other provision of this Litigation Trust Agreement, the power to take any and all actions as are necessary or advisable to effectuate the purposes of the Litigation Trust, including, without limitation, the power and authority:

(i)     to accept, collect, hold, liquidate, and distribute all Litigation Trust Assets pursuant to the Plan and this Litigation Trust Agreement and to engage in all acts that would constitute ordinary performance of all obligations of a trustee of a liquidating trust; provided that the Litigation Trustee shall not sue any of the Reorganized Debtors, any of the Released Parties or any of the foregoing parties' respective Representatives, except as otherwise provided in the Plan or Confirmation Order;

(ii)     to establish and maintain one or more depository, escrow, or other accounts to hold Cash or cash equivalents constituting Litigation Trust Assets;

(iii)      to adopt, execute, deliver or file all plans, agreements, certificates and other document and instruments necessary or appropriate to implement the Litigation Trust;

(iv)     to accept, preserve, receive, collect, manage, investigate, supervise, prosecute, settle, compromise, abandon, release and otherwise protect the Specified Causes of Action;

(v)     to calculate and make distributions to the Beneficiaries pursuant to this Litigation Trust Agreement;

- 9 -

(vi)    to retain any Professionals the Litigation Trustee may deem advisable in connection with the administration of the Litigation Trust or the exercise of his/her other powers set out herein and to compensate and reimburse such Professionals from the Litigation Trust Assets for the charges incurred by the Litigation Trust on or after the Effective Date for services of Professionals, disbursements, expenses or related support services relating to the implementation of this Litigation Trust Agreement, in each case without any supervision of, or approval by, the Court or the United States Trustee, subject in all respect to the terms of this Litigation Trust Agreement;

(vii)    to maintain appropriate books and records;

(viii)    if authorized in writing by the Litigation Trust Board, to purchase insurance indemnifying the Litigation Trustee and the members of the Litigation Trust Board and to indemnify (and purchase insurance indemnifying) the employees, agents, Professionals and representatives of the Litigation Trust, the Litigation Board, or the Litigation Trustee, to the fullest extent that a corporation organized under the laws of the Litigation Trust's domicile is from time to time entitled to indemnify its directors, officers, employees, agents and representatives;

(ix)    to delegate any or all of the discretionary power and authority herein conferred at any time with respect to all or any portion of the Litigation Trust to any one or more reputable individuals without liability for any action taken or omission made because of such delegation, except for such liability as is expressly provided for in this Litigation Trust Agreement;

(x)    to make investments as permitted in <u>Section 4.6</u> hereof, and as deemed appropriate by the Litigation Trustee in consultation with the Litigation Trust Board;

(xi)    file appropriate tax returns and other reports on behalf of the Litigation Trust or with respect to its assets or income and pay Taxes or other obligations owed by the Litigation Trust or with respect to its assets or income;

(xii)    exercise such other powers and duties as necessary or appropriate, in the discretion of the Litigation Trustee to accomplish the purposes of the Litigation Trust as set out herein; provided that the Litigation Trustee shall obtain the prior written consent of the Reorganized Debtors before publicly disclosing any press releases or publicity materials related to the Litigation Trust or the Litigation Trust Assets; and

(xiii)    dissolve the Litigation Trust.

Section 4.4    <u>Retention of Attorneys, Accountants and Other Professionals</u>.    The Litigation Trustee and the Litigation Trust Board may each retain the following professionals (the "Professionals") to aid in the performance of their responsibilities pursuant to the terms of the Plan and this Litigation Trust Agreement (the Professionals of the Litigation Trustee and the Litigation Trust Board may be the same):

(a)    Such law firm(s) as the Litigation Trustee and the Litigation Trust Board, as applicable, determine are necessary to perform such functions as may be appropriate to carry

- 10 -

out the primary purposes of the Litigation Trust. The Litigation Trustee and/or the Litigation Trust Board may also engage such law firm(s) on a contingent fee basis as permitted by applicable law.

(b)     An independent public accounting firm to, if necessary, audit the financial books and records of the Litigation Trust, to prepare and file all federal, state and local tax returns and related tax forms on behalf of the Litigation Trust that the Litigation Trustee is obligated to prepare, provide and file, and to perform such other reviews and/or audits as the Litigation Trustee may deem advisable to carry out the primary purposes of the Litigation Trust.

(c)     Such forensic accountants, experts, advisors, consultants, investigators, appraisers, auctioneers or other professionals as are advisable to carry out the purposes of the Litigation Trust.

(d)     The Litigation Trustee may commit the Litigation Trust to and shall pay all such Professionals reasonable compensation from the Litigation Trust Assets or other available funds for services rendered and expenses incurred in accordance with this Litigation Trust Agreement.

Section 4.5    Compensation of Litigation Trustee.

(a)     Prior to execution of this Litigation Agreement, the Creditors' Committee counsel negotiated with and authorized the payment of reasonable compensation from the Litigation Trust Assets to the Litigation Trustee for services rendered and expenses incurred in fulfilling its duties pursuant to this Litigation Trust Agreement.   In accordance with the foregoing, the Litigation Trustee will be entitled to the following fees, which shall be paid solely from the Litigation Trust Assets:   [TBD].   The Litigation Trustee shall also be entitled to reimbursement, solely from the Litigation Trust Assets, of reasonable and documented expenses, including, but not limited to, reasonable and necessary travel expenses, long distance telephone tolls, messenger and delivery service, the costs of terminal time for computer research, postage, and the cost of outside photocopying of materials.

(b)     On or before the last day of each month: (i) the Litigation Trustee shall provide a monthly statement to the Litigation Trust Board, the Litigation Trustee's counsel, and the Litigation Trust Board's counsel of the compensation and reimbursement of expenses that has been, or will be paid, to the Litigation Trustee in the preceding month for services provided under the Litigation Trust Agreement; and (ii) each Professional shall provide a monthly statement to the Litigation Trustee and the Litigation Trust Board of the compensation and reimbursement of expenses incurred; *provided, however*, that failure of any of the Professionals to serve a monthly statement on the Litigation Trustee and the Litigation Trust Board for any one or more months shall not waive or impair the right of such Professionals to subsequently seek compensation for all or any number of such months in a later statement delivered to the Litigation Trustee and the Litigation Trust Board.   The Litigation Trust Board and the Litigation Trustee, and their respective counsel, as applicable, will have ten (10) days from the date such statement(s) are received to review the statement(s) and object to any payments by serving a written objection on the Litigation Trustee or Professional, as applicable, which objection shall set forth the precise nature of the objection and the amount at issue.   The parties shall attempt to

- 11 -

resolve objections consensually, if any, to any monthly statement.   If the parties are unable to reach a consensual resolution of any such objection, either party may bring such dispute before the Court upon proper notice to the other party, and the disputed portion of the invoice shall not be paid until the dispute is resolved.  The undisputed portion of such fees and expenses shall be paid as provided above.

Section 4.6    Limitation on Investment Powers of Litigation Trustee.  Other than funds maintained in operating accounts in an amount deemed appropriate by the Litigation Trust to pay the current costs, expenses and obligations of the Litigation Trust, the Litigation Trustee may invest any monies held at any time as a part of the Litigation Trust, *provided, however,* that any such investments shall be only in interest-bearing deposits, certificates of deposit, or repurchase obligations of any federally insured banking institution or short term investments and obligations of, and unconditionally guaranteed as to payment by, the United States of America and its agencies or instrumentalities, pending the need to make disbursements thereof in payment of costs, expenses, and liabilities of the Litigation Trust or to make a distribution to the Beneficiaries and shall in any event be limited to such permissible investments described in IRS Revenue Procedure 94-45 (or successor guidance) of a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d).

Section 4.7    Liability.

(a)    No Liability for Acts of Predecessors.  No successor Litigation Trustee shall be in any way responsible for the acts or omissions of any Litigation Trustee in office prior to the date on which such successor becomes the Litigation Trustee, unless a successor Litigation Trustee expressly assumes such responsibility.

(b)    No Implied Obligations.  The Litigation Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into this Litigation Trust Agreement against the Litigation Trustee.

(c)    No Liability for Good Faith Error of Judgment.  The Litigation Trustee shall not be liable for any error of judgment made in good faith, unless it shall be proved that the Litigation Trustee was grossly negligent or acting with willful misconduct in ascertaining the pertinent facts.

(d)    Reliance by Litigation Trustee on Documents of Advice of Legal Counsel or Other Persons.  Except as otherwise provided herein, the Litigation Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Litigation Trustee to be genuine and to have been signed or presented by the proper party or parties.  The Litigation Trustee also may engage and consult with legal counsel for the Litigation Trust and other agents and advisors and shall not be liable for any action taken or suffered by the Litigation Trustee in reliance upon the advice of such counsel, agents or advisors.

(e)    Limitation on Liability. Except for acts of reckless or willful misconduct, fraud or gross negligence, willful disregard of the Litigation Trustee's duties or material breach

- 12 -

of this Litigation Trust Agreement, Persons dealing with the Litigation Trustee, or seeking to assert claims against the Litigation Trust, shall look only to the Litigation Trust Assets to satisfy any liability incurred by the Litigation Trustee to any such person in carrying out the terms of this Litigation Trust Agreement, and the Litigation Trustee and any of his/her designees, partners, affiliates, agents, employees, representatives and Professionals shall have no personal, individual obligation or recourse of any nature or kind whatsoever to satisfy any such liability.

Section 4.8    Indemnification, Exculpation and Reimbursement. The Litigation Trustee shall perform the duties and obligations imposed on the Litigation Trustee by this Litigation Trust Agreement with reasonable diligence and care under the circumstances.  The Litigation Trustee shall not be personally liable to the Litigation Trust, to any Beneficiary, holder of a Claim or any other Person (or any predecessor or successor thereto) for any reason whatsoever, except for such of its own acts as shall constitute reckless or willful misconduct, fraud, gross negligence, willful disregard of the Litigation Trustee's duties or material breach of this Litigation Trust Agreement.  Except as aforesaid, the Litigation Trustee shall be defended, held harmless and indemnified from time to time from the Litigation Trust Assets (but not from or by the Beneficiaries or any of the parties released under the Plan), against any and all losses, claims, costs, expenses and liabilities to which the Litigation Trustee may be subject by reason of the Litigation Trustee's execution in good faith of the Litigation Trustee's duties under this Litigation Trust Agreement.  The Litigation Trustee's officers, employees, agents, if any (including, without limitation, the Litigation Trustee's Professionals) may be likewise defended, held harmless and indemnified.  Without limiting the generality of the foregoing, the Litigation Trustee shall have no liability to any Beneficiary or holder of a Claim against the Debtors or Reorganized Debtors on account of the Litigation Trustee's investment or non-investment of any Litigation Trust Assets or any losses with respect to any such investments of Litigation Trust Assets, provided such investments are made, or the Litigation Trustee's decision not to invest any Litigation Trust Assets in any case is made, in accordance with the terms of this Litigation Trust Agreement.  The Litigation Trustee shall not be obligated to give any bond or surety or other security for the performance of any of its duties, unless ordered by the Court.  All amounts payable pursuant to this Section 4.8 to the Litigation Trustee or any of its officers, employees, agents, if any (including, without limitation, the Litigation Trustee's Professionals) shall be paid solely from the Litigation Trust Assets.

Section 4.9    Action Upon Instructions.  If in performing the Litigation Trustee's duties under this Litigation Trust Agreement, the Litigation Trustee is required to decide between alternate courses of action, or the Litigation Trustee is unsure of the application of any provision of the Litigation Trust Agreement or the Plan, then the Litigation Trustee may promptly deliver a notice to the Litigation Trust Board requesting written instructions as to the course of action to be taken by the Litigation Trustee.  If the Litigation Trustee does not receive such written directions within five (5) Business Days after the Litigation Trustee has delivered such notice, the Litigation Trustee may, but shall be under no duty to, take or refrain from taking such action not inconsistent with the Litigation Trust Agreement as the Litigation Trustee shall deem advisable.  If the Litigation Trustee does not receive direction from the Litigation Trust Board within such five (5) Business Day period or the Litigation Trustee believes that a Court order is necessary to determine the Litigation Trustee's rights or duties in any respect under the Litigation Trust Agreement, then the Litigation Trustee may apply to the Court for such order.

- 13 -

Section 4.10    <u>Tax Matters</u>.

(a)    <u>Tax Filings and Notices</u>.  The Litigation Trustee shall prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns for the Litigation Trust, as may be required under the Bankruptcy Code, the Plan, or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income ("Tax Reports").  The Litigation Trustee shall be responsible for payment, solely out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets.  The Litigation Trustee may request an expedited determination of the taxes owed by the Litigation Trust under section 505(b) of the Bankruptcy Code for any tax return for which such determination may be requested.  To the extent required by applicable law and, if not so required, then when specifically requested by a Beneficiary in writing, the Litigation Trustee shall provide such Beneficiary with such tax information as is necessary for the preparation by such Beneficiary of such Beneficiary's income tax return.  If such tax information is provided at the specific request of a Beneficiary (and not as required by applicable law), then such Beneficiary shall pay a reasonable fee to the Litigation Trustee, in an amount to be then determined by the Litigation Trustee, together with all costs and expenses incurred by the Litigation Trustee in providing such tax information to such Beneficiary.  In connection with the Litigation Trustee's performance of its duties pursuant to this Litigation Trust Agreement, the Litigation Trustee may require any Beneficiary to furnish to the Litigation Trustee its employer or taxpayer identification number as assigned by the Internal Revenue Service, together with such other information, returns or forms as the Litigation Trustee may determine are required, and the Litigation Trustee may condition any distribution to any Beneficiary upon such receipt of such identification number, any other information and returns and forms as are required for the Litigation Trustee to comply with Internal Revenue Service requirements.  Notwithstanding anything to the contrary herein, the Litigation Trustee or its Professionals shall distribute at least annually to the Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for taxes), except for amounts retained as reasonably necessary to maintain the value of the Litigation Trust Assets.

(b)    <u>Liquidating Trust</u>.  The Litigation Trustee will file tax returns pursuant to Treasury Regulations section 1.671-4(a) on the basis that Litigation Trust is a grantor trust that is a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) and related regulations.  Pursuant to such provisions, for federal income tax purposes the Litigation Trustee will allocate to the Beneficiaries their applicable shares of any income, gain, deduction, loss and credit of such grantor trust, and such Beneficiaries will be subject to tax thereon on a current basis.  As soon as reasonably practicable after the close of each calendar year, the Litigation Trustee will send each affected Beneficiary a statement setting forth such Beneficiary's share of the Litigation Trust's income, gain, deduction, loss and credit for the year and will instruct the holder to report all such items on his, her or its tax return for such year and pay any tax due with respect thereto.

(c)    <u>Disputed Reserve</u>.  The Litigation Trustee will file all applicable tax and other returns and statements for the Disputed Reserve as a "disputed ownership fund" in accordance with the requirements of Treasury Regulations section 1.468B-9 and any other applicable law.  In addition, the Litigation Trustee will pay from the applicable Litigation Trust

- 14 -

Assets on a current basis any taxes owed on any net income or gain of such Disputed Reserve.

        (d)    <u>Withholdings</u>**.**  The Litigation Trustee shall (i) withhold, deduct, and pay over to the appropriate taxing authority any amount required to be withheld under tax laws with respect to any distribution pursuant to this Litigation Trust Agreement and (ii) comply with any reporting requirements imposed by any federal, state, local, or foreign taxing authority.  Any tax withheld shall be treated as distributed to the distributee for purposes of this Litigation Trust Agreement.

        (e)    <u>Tax Year</u>.  The taxable year of the Litigation Trust shall, unless otherwise required by the Internal Revenue Code, be the calendar year.

        (f)    <u>Valuation of Litigation Trust Assets</u>.  As soon as reasonably practicable after the Effective Date, (a) the Litigation Trustee (in consultation with the Litigation Trust Board) will determine the fair market value of the Litigation Trust Assets (other than Cash) as of the Effective Date, based on a good faith determination and the advice of any professional retained by the Litigation Trustee for such purpose and (b) the Litigation Trustee shall establish appropriate means to apprise the Beneficiaries of the grantor trust portion of the Litigation Trust of the valuation of such holder's interest in the Litigation Trust.  The Debtors, the Litigation Trust, the Litigation Trustee, the Litigation Trust Board and the Beneficiaries will use such values consistently for all federal income tax purposes.

      Section 4.11   <u>Records of Litigation Trustee</u>.  The Litigation Trustee shall maintain accurate records of receipts and disbursements and other activity of the Litigation Trust.  The books and records maintained by the Litigation Trustee, as well as any and all other books and records obtained from the Debtors or the Reorganized Debtors may be disposed of by the Litigation Trustee at such time as the Litigation Trustee determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Litigation Trust or the Beneficiaries, or upon the dissolution of the Litigation Trust, all after consultation with (i) the parties who provided the books and records; and (ii) the Litigation Trust Board.

      Section 4.12   <u>Timely Performance</u>.  The Litigation Trustee will make continuing efforts to prosecute, collect, compromise and settle the Specified Causes of Action and administer, maintain and make timely distributions to the Beneficiaries, and not unduly prolong the duration of the Litigation Trust.

      Section 4.13   <u>Consultation with the Litigation Trust Board</u>.  The Litigation Trustee shall consult with the Litigation Trust Board regularly and at all such times when the Litigation Trustee deems it necessary or appropriate in connection with carrying out the purposes of the Litigation Trust and shall obtain approvals from the Litigation Trust Board as required under this Litigation Trust Agreement.

      Section 4.14   <u>Resignation</u>.  The Litigation Trustee may resign as Litigation Trustee by giving written notice of its resignation to the Reorganized Debtors and the Litigation Trust Board.  The Litigation Trustee shall continue to serve as trustee for the shorter of (i) ninety (90) days following the tender of the notice of resignation; and (ii) until the appointment of a successor Litigation Trustee shall become effective in accordance with <u>Section 4.16</u> of this

- 15 -

Litigation Trust Agreement.

Section 4.15    Removal of Litigation Trustee.    The Litigation Trustee may be removed by the Court for cause shown on a motion by any party in interest or as set forth in Section 5.6(a) herein.

Section 4.16    Appointment of Successor Litigation Trustee.    In the event of the death (in the case of a Litigation Trustee that is a natural person), dissolution (in the case of a Litigation Trustee that is not a natural person), resignation, incompetency or removal of the Litigation Trustee, the Litigation Trust Board shall designate a successor Litigation Trustee.    Such appointment shall specify the date when such appointment shall be effective.    Every successor Litigation Trustee appointed hereunder shall execute, acknowledge and deliver to the Court and to the retiring Litigation Trustee and its Professionals an instrument accepting the appointment and shall additionally file with the Court an affidavit demonstrating that such Person is disinterested, as defined by section 101(14) of the Bankruptcy Code, and thereupon the successor Litigation Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Litigation Trustee.

## ARTICLE V
## LITIGATION TRUST BOARD

Section 5.1    Establishment of Litigation Trust Board.    On the Effective Date, the Litigation Trust Board shall be established, using the procedures described herein.

Section 5.2    Composition; Replacement.    The Litigation Trust Board shall be comprised of up to five (5) members and the initial members shall be designated by the Creditors' Committee prior to the Effective Date.    In the case of an inability or unwillingness of any member of the Litigation Trust Board to serve, such member may be replaced by designation of the remaining members of the Litigation Trust Board.    If any position on the Litigation Trust Board remains vacant for more than thirty (30) days, such vacancy may be filled within fifteen (15) days thereafter by the designation of the Litigation Trustee without the requirement of a vote by the other members of the Litigation Trust Board.    Each replacement member of the Litigation Trust Board must be a Beneficiary or a past or current party in interest.    The Litigation Trust Board will continue to fully function even while a position on the Litigation Trust Board remains vacant.    The Litigation Trust Board may appoint *ex officio* members to the Litigation Trust Board.

Section 5.3    By-Laws.    The Litigation Trust Board shall govern its proceedings through the adoption of by-laws, which the Litigation Trust Board shall adopt by majority vote.

Section 5.4    Litigation of Specified Causes of Action.    The Litigation Trust Board may, by majority vote, authorize the Litigation Trustee to file judicial or administrative proceedings on any and all of the Specified Causes of Action as proposed by the Litigation Trustee or any member of the Litigation Trust Board.

Section 5.5    Settlement of Specified Causes of Action.    The Litigation Trustee shall not settle or compromise any of the Specified Causes of Action in excess of an amount in controversy of $[100,000] (such $[100,000] monetary threshold may be increased or decreased at

- 16 -

the discretion of the Litigation Trust Board), without either the approval of the Litigation Trust Board (which shall act by majority vote) or an order of the Court.  Subject to the approval of the Litigation Trust Board and the requirements of this Section 5.5, the Litigation Trustee may settle or compromise any of the Specified Causes of Action without an order of the Court. Notwithstanding the foregoing: (i) no member of the Litigation Trust Board may cast a vote with respect to any matter to which it is a party (if applicable); and (ii) the Litigation Trustee may seek Court approval of a settlement if the Litigation Trust Board fails to act on a proposed settlement within thirty (30) days of receiving notice of such proposed settlement, including a deadlocked vote of the Litigation Trust Board.

Section 5.6    Removal of Trustee; Removal of Trust Advisory Board Member.

(a)    The Litigation Trust Board may, by majority vote, remove the Litigation Trustee in its discretion.  If the requisite approval is not obtained, the Litigation Trustee may be removed by the Court for cause shown as set forth in Section 4.15 herein.

(b)    The Litigation Trust Board may, by majority vote, remove any member of the Litigation Trust Board, in its discretion.  If the requisite approval is not obtained, any member of the Litigation Trust Board may be removed by the Court for cause shown.

Section 5.7    General Powers and Duties.  The Litigation Trust Board shall have the rights, powers and duties set forth in this Litigation Trust Agreement, including: (i) to review all financial information with respect to the Litigation Trust and the Litigation Trust Assets; (ii) to authorize the commencement, prosecution, settlement, abandonment or sale of any of the Specified Causes Actions as set forth herein; (iii) to approve payment of Litigation Trustee fees, Professional fees and other expenses of the Litigation Trust; (iv) to replace the Litigation Trustee; (v) to extend the term of the Litigation Trust; (vi) to monitor distributions to the Beneficiaries; and (vii) to take other actions as necessary or appropriate with respect to the implementation of this Litigation Trust Agreement and provisions of the Plan and the Confirmation Order related to the Litigation Trust and the Litigation Trust Assets.

Section 5.8    Expenses.

(a)    Each member of the Litigation Trust Board shall be entitled to the reimbursement of the member's reasonable and necessary expenses (but not third party professional fees) in carrying out his or her duties as a member of the Litigation Trust Board. The reimbursement of expenses of the Litigation Trust Board members shall be paid out of the Litigation Trust Assets.

(b)    On or before the last date of each month following the month for which reimbursement is sought, each member of the Litigation Trust Board shall serve upon the Litigation Trustee, its counsel and the other members of the Litigation Trust Board a monthly statement of expenses incurred in carrying out the member's duties, *provided, however*, that failure of any of the members of the Litigation Trust Board to serve a monthly statement for any one or more months shall not waive or impair the right of such Litigation Trust Board to subsequently seek compensation for all or any number of such months in a later statement.  The Litigation Trustee, its counsel and the other members of the Litigation Trust Board will have ten

- 17 -

(10) days from the date such statement is received to review the statement and object to such statement by serving a written objection on the member of the Litigation Trust Board making the request, which objection shall set forth the precise nature of the objection and the amount at issue. At the expiration of the ten (10) day period, the Litigation Trustee shall promptly pay 100% of the amounts requested, except for the portion of such expenses to which an objection has been made. The parties shall attempt to consensually resolve objections, if any. If the parties are unable to reach a consensual resolution of any such objection, the party which received an objection may seek payment by filing a motion with the Court on proper notice to the Litigation Trustee and its counsel.

Section 5.9    Standard of Care; Exculpation. Neither the Litigation Trust Board nor any of its members, designees, Professionals or any duly designated agent or representatives of any such party shall be liable for the act, default or misconduct of any other member of the Litigation Trust Board, nor shall any member be liable for anything other than such member's own gross negligence or willful misconduct. The Litigation Trust Board may, in connection with the performance of its duties, and in its sole and absolute discretion, consult with its counsel, accountants or other Professionals, and shall not be liable for anything done or omitted or suffered to be done in accordance with the advice or opinions. If the Litigation Trust Board determines not to consult with counsel, accountants or other Professionals, it shall not be deemed to impose any liability on the Litigation Trust Board, or its members and/or designees.

Section 5.10    Termination of the Litigation Trust Board. Upon the final resolution of the Specified Causes of Action and the distributions to the Beneficiaries, and the completion of the Litigation Trustee's responsibilities as set forth herein, the members of the Litigation Trust Board shall be deemed to resign their positions, whereupon they shall be discharged from further duties and responsibilities.

# ARTICLE VI
# JURISDICTION

Section 6.1    Retention of Jurisdiction. The Court shall retain such jurisdiction as is legally permissible as set forth in this Litigation Trust Agreement, the Plan and in the Confirmation Order, including, but not limited to, jurisdiction to authorize Rule 2004 discovery and to hear and determine disputes arising in connection with the interpretation, implementation, administration or enforcement of the Litigation Trust Agreement.

Section 6.2    Aid and Recognition. The Litigation Trust shall, as needed to effect the terms hereof, request the aid and recognition of any court or judicial, regulatory or administrative body in any nation or state.

Section 6.3    Waiver of Jury Trial. ANY AND ALL RIGHT(S) TO TRIAL BY JURY IS HEREBY WAIVED, AND THERE SHALL BE NO RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS LITIGATION TRUST AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS LITIGATION TRUST AGREEMENT, PROVIDED, HOWEVER, THAT NOTHING IN THIS SECTION 6.3 SHALL PREVENT THE LITIGATION TRUSTEE FROM SEEKING A JURY TRIAL FOR ANY OF THE SPECIFIED CAUSES OF ACTION.

- 18 -

## ARTICLE VII
## TERMINATION

Section 7.1    Termination.  The Litigation Trust shall continue for a term of five (5) years after the Effective Date and shall automatically terminate at the end of such term, without prejudice to the rights of the Litigation Trustee or Litigation Trust Board to seek Court approval to extend such term for an additional finite term subject to obtaining Court approval of such extension based upon a finding that it is necessary of the Litigation Trust to complete its liquidating purpose, provided that, notwithstanding any such extension, the Litigation Trust remains a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d). The Litigation Trustee shall at all times endeavor to administer the Litigation Trust expeditiously, and in no event shall the Litigation Trustee unduly prolong the duration of the Litigation Trust.  On termination of this Litigation Trust, the Litigation Trustee shall advise the Court in writing of its termination.  Notwithstanding the foregoing, after the termination of the Litigation Trust, the Litigation Trustee shall have the power to exercise all the powers, authorities and discretions herein conferred solely for the purpose of winding up the affairs of the Litigation Trust.  The Litigation Trustee shall retain the books, records and files that shall have been delivered to or created by the Litigation Trustee.  At the Litigation Trustee's discretion, all of such records and documents may be destroyed at any time after two (2) years from the date of the termination of the Litigation Trust after providing 30 days' notice of such intent to destroy to the Reorganized Debtors to the extent the Debtors or Reorganized Debtors delivered such records or documents to the Litigation Trust or Litigation Trustee.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1    Notices.   All notices, requests or other communications required or permitted to be made in accordance with this Litigation Trust Agreement shall be in writing and shall be delivered personally or by facsimile transmission or mailed by first class mail or by overnight delivery service:

If to the Litigation Trustee, at:

[TBD]

with copies to:

[TBD]

If to the Debtors or Reorganized Debtors, at:

[American Apparel LLC]
747 Warehouse Street
Los Angeles, CA 90021
Tel.: 213-488-0226
Attn.: Chelsea Grayson, Esq.

- 19 -

with copies to:

Jones Day
222 E. 41st Street
New York, NY 10017
Tel.: 212-326-3939
Attn.:  Scott J. Greenberg, Esq. (sgreenberg@jonesday.com)
        Michael J. Cohen, Esq. (mcohen@jonesday.com)

Notices sent out by facsimile transmission shall be deemed delivered when actually received, and notices sent by first-class mail shall be deemed delivered three (3) Business Days after mailing and notices sent by overnight delivery service shall be deemed delivered the next Business Day after mailing.

Section 8.2    Effectiveness.  This Litigation Trust Agreement shall become effective on the Effective Date.

Section 8.3    Investment Company Act.  The Litigation Trust is organized as a liquidating entity in the process of liquidation, and therefore should not be considered, and the Litigation Trust does not and will not hold itself out as, an "investment company" or an entity "controlled" by an "investment company", as such terms are defined in the Investment Company Act.

Section 8.4    Taxation.  For United States federal income tax purposes, it is intended that the Litigation Trust be classified as a liquidating trust under Treasury Regulations section 301.7701-4 and as a grantor trust subject to the provisions of Subchapter J, Subpart E of the Code that is owned by its beneficiaries as grantors.  Accordingly, the parties hereto intend that, for United States federal income tax purposes, the Beneficiaries be treated as if they had received a distribution of undivided interests in the Litigation Trust Assets in exchange for their Allowed Claims and then contributed such interests in the Litigation Trust Assets to the Litigation Trust.  In addition, the Litigation Trust will file tax returns as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  Accordingly, the Beneficiaries will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the Litigation Trust Assets and any income or earnings thereon as of the date of the transfer of such Litigation Trust Assets to the Litigation Trust.  The Litigation Trustee will allocate to each holder its share of each item of income, gain, deduction, loss and credit recognized by the Litigation Trust (including interest or dividend income earned on bank accounts and other investments) using any reasonable allocation method.  [The Disputed Reserve will be treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9(b)(1), as determined by the Litigation Trustee in its reasonable discretion.  Any income or earnings on the Litigation Trust Assets allocated to such a Disputed Reserve will be taxed accordingly.  The Litigation Trustee will act as the "administrator" of such disputed ownership funds within the meaning of Treasury Regulations section 1.468B-9(b)(2).]

Section 8.5    Counterparts.  This Litigation Trust Agreement may be executed in one or more counterparts (via facsimile or otherwise), each of which shall be deemed an original but which together shall constitute but one and the same instrument.

- 20 -

Section 8.6    <u>Governing Law</u>.  This Litigation Trust Agreement shall be governed by, construed under and interpreted in accordance with the laws of the State of New York, including all matters of construction, validity and performance, and without taking into consideration the conflict of laws provisions of such state.

Section 8.7    <u>Headings</u>.    Sections, subheadings and other headings used in this Litigation Trust Agreement are for convenience only and shall not affect the construction of this Litigation Trust Agreement.

Section 8.8    <u>Interpretative Provisions</u>.

(a)    All references to the plural herein shall also mean the singular and to the singular shall also mean the plural unless the context otherwise requires.

(b)    All references to the Debtors, the Reorganized Debtors and the Litigation Trustee pursuant to the definitions set forth in the recitals hereto, or to any other Person herein, shall include their respective successors and assigns.

(c)    The words "hereof", "herein", "hereunder", "this Trust Litigation Agreement" and words of similar import when used in this Litigation Trust Agreement shall refer to this Litigation Trust Agreement as a whole and not any particular provision of this Litigation Trust Agreement and as this Litigation Trust Agreement now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(d)    The word "including" when used in this Litigation Trust Agreement shall mean "including, without limitation".

Section 8.9    <u>Severability</u>.  Any provision of this Litigation Trust Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions of this Litigation Trust Agreement, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable any such provision in any other jurisdiction.

Section 8.10    <u>Amendments</u>.  This Litigation Trust Agreement may be amended from time to time by written instrument executed by the Litigation Trust Board and upon notice to the Beneficiaries, provided that (i) the Litigation Trust Board shall have reasonably determined in good faith that such amendment is in the best interests of the Beneficiaries and (ii) any amendment of this Litigation Trust Agreement that adversely affects the rights or obligations, or increases the burdens hereunder, of the Reorganized Debtors shall require the written consent of the Reorganized Debtors. Notwithstanding this Section 8.10, any amendments to this Litigation Trust Agreement shall not be inconsistent with the purpose and intention of the Litigation Trust to liquidate in an orderly manner the Litigation Trust Assets in accordance with Treasury Regulations section 301.7701-4(d).  In the event that the Litigation Trust shall fail or cease to qualify as a liquidating trust in accordance with Treasury Regulations section 301.7701-4(d), this Litigation Trust Agreement may be amended by the Litigation Trustee to the extent necessary for the Litigation Trustee to take such action as it shall deem appropriate to have the Litigation Trust classified as a partnership for federal tax purposes under Treasury Regulations section 301.7701-3 (but not a publicly traded partnership under section 7704 of the Internal Revenue Code).

- 21 -

Section 8.11    Non-transferability of Beneficial Interests; Interests Beneficial Only; No Voting Rights; Successors.

(a)    All interests of the Beneficiaries of this Litigation Trust shall be uncertificated and non-transferable, except upon the death of a Beneficiary that is a natural Person or by operation of law.

(b)    The rights to a beneficial interest hereunder shall not entitle any Beneficiary to (i) any title in or to the Litigation Trust Assets as such (which title is vested in the Litigation Trustee) or to any right to call for a partition or division of the Litigation Trust Assets or to require an accounting, except for tax purposes pursuant to treatment as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d), or (ii) any voting rights with respect to the administration of the Litigation Trust and the actions of the Litigation Trustee in connection therewith.

(c)    This Litigation Trust Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns hereunder.

Section 8.12    Binding Effect; No Third Party Beneficiaries.    This Litigation Trust Agreement shall be binding upon and inure to the benefit of each of the parties hereto and, additionally, shall inure to the benefit of the Litigation Trust Board and its successors and assigns and the Beneficiaries and each of their respective successors[ and assigns and, except as provided hereunder, nothing herein is intended or shall be construed to give any other Person any right, remedy or claim under, to or in respect of this Litigation Trust Agreement, the Litigation Trust Assets or the Litigation Trust or any part thereof].

Section 8.13    No Suits by Beneficiaries and Claimholder.  No Beneficiary or holder of a Claim shall have any right by virtue of any provision of this Litigation Trust Agreement to institute any action or proceeding in law or in equity against any party other than the Litigation Trustee on or under or with respect to the Litigation Trust Assets.

Section 8.14    Irrevocability.    The Litigation Trust is irrevocable, but is subject to amendment as provided for herein.

Section 8.15    Trust Continuance.    The death, dissolution, resignation, incompetency or removal of the Litigation Trustee shall not operate to terminate the Litigation Trust created by this Litigation Trust Agreement or to revoke any existing agency created under the terms of this Litigation Trust Agreement or invalidate any action theretofore taken by the Litigation Trustee. In the event of the resignation or removal of the Litigation Trustee, the Litigation Trustee shall promptly (i) execute and deliver such documents, instruments and other writings as may be requested by the Court or reasonably requested by a successor Litigation Trustee to effect the termination of the Litigation Trustee's capacity under this Litigation Trust Agreement and the conveyance of the Litigation Trust Assets then held by the Litigation Trustee to the successor, (ii) deliver to the Court or the successor Litigation Trustee all documents, instruments, records and other writings related to the Litigation Trust as may be in the possession of the Litigation Trustee and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Trustee.

- 22 -

**[SIGNATURE PAGES FOLLOW]**

US2008 7883822 2
NAI-1500741325v12

IN WITNESS WHEREOF, the parties have executed this Litigation Trust Agreement as of the date first above written.

[AMERICAN APPAREL LLC]

By: _____
Name:
Title:


AMERICAN APPAREL (USA), LLC

By: _____
Name:
Title:


AMERICAN APPAREL RETAIL, INC.

By: _____
Name:
Title:

FRESH AIR FREIGHT, INC.

By: _____
Name:
Title:


KCL KNITTING, LLC

By: _____
Name:
Title:


AMERICAN APPAREL DYEING & FINISHING, INC.

By: _____
Name:
Title:

[_____], in [his][her[its] capacity as Litigation Trustee of the AAI Litigation Trust

By: _____

| Summary report: Litéra® Change-Pro TDC 7.5.0.96 Document comparison done on 1/10/2016 1:19:45 PM | |
|---|---|
| **Style name:** JD Color | |
| **Intelligent Table Comparison:** Inactive | |
| **Original DMS:**iw://NAI/NAI/1500741325/1 | |
| **Modified DMS:** iw://NAI/NAI/1500741325/2 | |
| **Changes:** | |
| Add | 10 |
| Delete | 17 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 27 |

# EXHIBIT E

## New Exit Financing Agreement

FILING VERSION

**CREDIT AGREEMENT**

Dated as of February [_], 2016

among

**AMERICAN APPAREL (USA), LLC,**

as a Borrower and as Borrower Representative,

**AMERICAN APPAREL RETAIL, INC.,**
**AMERICAN APPAREL DYEING & FINISHING, INC.,**
**KCL KNITTING, LLC,**

as the other Borrowers Party Hereto,

the Other Credit Parties Party Hereto,

the Lenders Party Hereto,

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**

as Administrative Agent

# TABLE OF CONTENTS

ARTICLE I  DEFINITIONS AND ACCOUNTING TERMS ................................................................ 2

    1.01    Defined Terms .................................................................................................. 2
    1.02    Other Interpretive Provisions ......................................................................... 25
    1.03    Accounting Terms .......................................................................................... 25
    1.04    Rounding ........................................................................................................ 26
    1.05    Times of Day ................................................................................................. 26
    1.06    Certain Currency Translations ...................................................................... 26

ARTICLE II  THE COMMITMENTS AND CREDIT EXTENSIONS ...................................................... 27

    2.01    Commitments to Lend; Loans ........................................................................ 27
    2.02    Borrowing and Continuation of Loans; Notice of Borrowing and Continuation ............ 27
    2.03    [Intentionally Omitted] .................................................................................. 28
    2.04    [Intentionally Omitted] .................................................................................. 28
    2.05    Mandatory Prepayments ................................................................................ 28
    2.06    Voluntary Prepayments .................................................................................. 29
    2.07    Repayment of Loans. ..................................................................................... 29
    2.08    Interest .......................................................................................................... 29
    2.09    Call Protection; Fees ..................................................................................... 30
    2.10    Computation of Interest and Fees ................................................................. 31
    2.11    Evidence of Debt ........................................................................................... 31
    2.12    Payments Generally; Administrative Agent's Clawback ................................ 31
    2.13    Sharing of Payments by Lenders ................................................................... 33
    2.14    Collateral and Guarantees; Joint and Several Liabilities ............................... 33
    2.15    Defaulting Lenders ........................................................................................ 35
    2.16    Loan Account ................................................................................................. 35
    2.17    Borrower Representative ................................................................................ 36

ARTICLE III  TAXES, YIELD PROTECTION AND ILLEGALITY .................................................... 36

    3.01    Taxes ............................................................................................................. 36
    3.02    Illegality ........................................................................................................ 40
    3.03    Inability to Determine Rates .......................................................................... 41
    3.04    Increased Costs .............................................................................................. 41
    3.05    Compensation for Losses .............................................................................. 42
    3.06    Mitigation Obligations; Replacement of Lenders .......................................... 43
    3.07    Survival ......................................................................................................... 43

ARTICLE IV  CONDITIONS PRECEDENT ...................................................................................... 43

    4.01    Conditions to Effectiveness, the Closing Date and Credit Extension ............. 43

ARTICLE V  REPRESENTATIONS AND WARRANTIES .................................................................. 47

    5.01    Corporate Authority, Etc. ............................................................................. 47
    5.02    Financial Statements ..................................................................................... 48
    5.03    [Intentionally Omitted] .................................................................................. 48
    5.04    No Material Adverse Change ......................................................................... 49

## TABLE OF CONTENTS
### (Cont'd)

| | | |
|---|---|---|
| 5.05 | Ownership of Property; Liens | 49 |
| 5.06 | Franchises, Patents, Copyrights, etc | 49 |
| 5.07 | Litigation | 49 |
| 5.08 | No Default | 49 |
| 5.09 | Compliance with Laws | 49 |
| 5.10 | Tax Status | 49 |
| 5.11 | Insurance | 50 |
| 5.12 | Holding Company and Investment Company Acts | 50 |
| 5.13 | ERISA Compliance | 50 |
| 5.14 | Regulations U and X | 51 |
| 5.15 | True Copies of Governing Documents | 51 |
| 5.16 | Fiscal Year | 51 |
| 5.17 | Subsidiaries, etc | 51 |
| 5.18 | Environmental Compliance | 51 |
| 5.19 | Bank Accounts | 51 |
| 5.20 | Labor Contracts | 51 |
| 5.21 | Disclosure | 51 |
| 5.22 | OFAC | 52 |
| 5.23 | Other Debt Documents | 52 |
| 5.24 | Solvency | 52 |

ARTICLE VI  AFFIRMATIVE COVENANTS ... 52

| | | |
|---|---|---|
| 6.01 | [Intentionally Omitted] | 52 |
| 6.02 | Maintenance of Office; Certain Changes | 52 |
| 6.03 | Records and Accounts | 52 |
| 6.04 | Financial Statements, Certificates and Information | 52 |
| 6.05 | Notices | 55 |
| 6.06 | Legal Existence; Maintenance of Properties | 56 |
| 6.07 | Insurance | 57 |
| 6.08 | Taxes | 57 |
| 6.09 | Compliance with Laws, Contracts, Licenses, Permits; Leaseholds and Payment of Obligations Generally | 57 |
| 6.10 | [Intentionally Omitted] | 58 |
| 6.11 | Use of Proceeds | 58 |
| 6.12 | Covenant to Guarantee Obligations and Give Security | 58 |
| 6.13 | Further Assurances | 61 |
| 6.14 | Inspections | 61 |
| 6.15 | Cash Management | 61 |
| 6.16 | Post-Closing Covenant | 61 |

ARTICLE VII  NEGATIVE COVENANTS ... 61

| | | |
|---|---|---|
| 7.01 | Investments | 61 |
| 7.02 | Restrictions on Indebtedness | 63 |
| 7.03 | Restrictions on Liens | 65 |
| 7.04 | Restricted Payments; Prepayments | 67 |
| 7.05 | Merger, Consolidation and Disposition of Assets | 68 |
| 7.06 | Sale and Leaseback | 69 |
| 7.07 | Accounting Changes; Change of Fiscal Year | 70 |
| 7.08 | Transactions with Affiliates | 70 |

ii

# TABLE OF CONTENTS
## (Cont'd)

| | | |
|---|---|---|
| 7.09 | No Speculative Transactions | 70 |
| 7.10 | Change in Terms of Governing Documents; Material Agreements | 70 |
| 7.11 | Change in Nature of Business | 70 |
| 7.12 | Margin Regulations | 70 |
| 7.13 | Sanctions | 70 |

ARTICLE VIII  EVENTS OF DEFAULT AND REMEDIES ........................................................... 71

| | | |
|---|---|---|
| 8.01 | Events of Default | 71 |
| 8.02 | Remedies Upon Event of Default | 73 |
| 8.03 | Application of Funds | 74 |

ARTICLE IX  ADMINISTRATIVE AGENT ............................................................................... 74

| | | |
|---|---|---|
| 9.01 | Appointment and Authority | 74 |
| 9.02 | Rights as a Lender | 75 |
| 9.03 | Exculpatory Provisions | 75 |
| 9.04 | Reliance by Administrative Agent | 76 |
| 9.05 | Delegation of Duties | 77 |
| 9.06 | Resignation of Administrative Agent | 77 |
| 9.07 | Non-Reliance | 77 |
| 9.08 | Administrative Agent May File Proofs of Claim | 78 |
| 9.09 | Collateral and Guarantee Matters; Credit Bidding | 78 |

ARTICLE X  MISCELLANEOUS ............................................................................................. 79

| | | |
|---|---|---|
| 10.01 | Amendments, Etc | 79 |
| 10.02 | Notices; Effectiveness; Electronic Communication | 80 |
| 10.03 | No Waiver; Cumulative Remedies | 82 |
| 10.04 | Expenses; Indemnity; Damage Waiver | 83 |
| 10.05 | Payments Set Aside | 84 |
| 10.06 | Successors and Assigns | 85 |
| 10.07 | Treatment of Certain Information; Confidentiality | 88 |
| 10.08 | Right of Setoff | 89 |
| 10.09 | Interest Rate Limitation | 90 |
| 10.10 | Counterparts; Integration; Effectiveness | 90 |
| 10.11 | Survival of Representations and Warranties | 90 |
| 10.12 | Severability | 90 |
| 10.13 | Replacement of Lenders | 91 |
| 10.14 | Governing Law; Jurisdiction; Etc | 91 |
| 10.15 | USA PATRIOT Act Notice | 93 |
| 10.16 | ENTIRE AGREEMENT | 93 |
| 10.17 | No Advisory or Fiduciary Responsibility | 93 |
| 10.18 | ORIGINAL ISSUE DISCOUNT LEGEND | 94 |

## SCHEDULES

| | |
|---|---|
| Schedule 1.01 | Existing Letters of Credit |
| Schedule 1.02 | Disqualified Lenders |

**TABLE OF CONTENTS**
**(Cont'd)**

Schedule 2.01          Commitments, Converted Loans and Applicable Percentages

Schedule 5.07          Litigation

Schedule 5.17          Subsidiaries

Schedule 5.18          Environmental Compliance

Schedule 5.20          Labor Matters

Schedule 6.16          Post-Closing Obligations

Schedule 7.01          Existing Investments

Schedule 7.02          Existing Indebtedness

Schedule 7.03          Existing Liens

Schedule 7.06          Sale-Leasebacks

Schedule 7.08          Transactions with Affiliates

Schedule 11.02         Administrative Agent's Office; Certain Addresses for Notices

#4848-5684-9449v15

**TABLE OF CONTENTS**
**(Cont'd)**

<u>EXHIBITS</u>

| | |
|---|---|
| Exhibit A | Form of Borrowing Request Notice |
| Exhibit B | Form of Notice of Continuation |
| Exhibit C | Form of Note |
| Exhibit D | Form of Compliance Certificate |
| Exhibit E | Form of Assignment and Assumption |
| Exhibit F | Form of PIK Election |
| Exhibit G | Form of U.S. Tax Compliance Certificates |

v

# CREDIT AGREEMENT

This **CREDIT AGREEMENT** (this "Agreement") is entered into as of February [_], 2016, among:

    (a)    **AMERICAN APPAREL (USA), LLC**, a California limited liability company ("AA USA"), as a Borrower (as defined below) and as the Borrower Representative (as defined in Section 2.17) for the other Borrowers party hereto;

    (b)    **AMERICAN APPAREL RETAIL, INC.**, a California corporation ("AA Retail"), **AMERICAN APPAREL DYEING & FINISHING, INC.**, a California corporation ("AA Dyeing & Finishing"), and **KCL KNITTING, LLC**, a California limited liability company ("KCL Knitting" and together with AA USA, AA Retail and AA Dyeing & Finishing, each individually, a "Borrower" and, collectively, the "Borrowers");

    (c)    the other Credit Parties party hereto;

    (d)    each Lender from time to time party hereto; and

    (e)    **WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent.

## RECITALS

**WHEREAS**, on October 5, 2015 (the "Petition Date"), the Borrowers and the other Credit Parties commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Borrowers and the other Credit Parties have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Capitalized terms used in these Recitals shall have the meaning set forth for such terms in Section 1.01 hereof.

**WHEREAS**, the Borrowers (each as debtor and debtor-in-possession under the Chapter 11 Cases), the other Credit Parties (each as debtor and debtor-in-possession under the Chapter 11 Cases), the Lenders and Wilmington Trust, National Association, as administrative agent entered into a secured super-priority debtor-in-possession term loan facility dated as of October 4, 2015 (as amended, supplemented or otherwise modified from time to time, the "DIP Facility").

**WHEREAS**, (i) on January [__], 2016, the Bankruptcy Court entered the Confirmation Order and (ii) in connection with the implementation and Consummation of the Plan of Reorganization, in full satisfaction of the DIP Facility, each of the holders of the DIP Facility shall become party to this Agreement as Lenders on the Closing Date.

**WHEREAS**, (i) upon the effectiveness of the Plan of Reorganization, all DIP Facility Obligations shall be converted into Converted Loans hereunder and each initial Lender shall be deemed to have made, in the aggregate, $[_____] of Converted Loans and (ii) the Borrowers have requested, and the Lenders have agreed, to provide Closing Date Loans to the Borrowers hereunder in an aggregate principal amount of $[_____] (collectively, the "Exit Term Loan Facility").

**NOW THEREFORE**: for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, such parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"AA Dyeing & Finishing" shall have the meaning specified in the introductory paragraph hereto.

"AA Retail" shall have the meaning specified in the introductory paragraph hereto.

"AA USA" shall have the meaning specified in the introductory paragraph hereto.

"Acquisition" shall mean any transaction or series of related transactions resulting in the (a) acquisition of all or substantially all of the assets or business of any Person, or of any business unit, line of business or division of any Person or assets constituting a business unit, line of business or division of any other Person, (b) acquisition of in excess of 50% of the Capital Stock of any Person or otherwise causing a person to become a Subsidiary of the acquiring Person or (c) merger, consolidation, amalgamation or other combination, whereby a Person becomes a Subsidiary of the acquiring Person.

"Act" shall have the meaning specified in Section 10.15.

"Adjusted Earnings" shall mean, for any period with respect to Holdings and its Subsidiaries on a consolidated basis, net income (as that term is determined in accordance with GAAP) for such period, plus, without duplication and to the extent already deducted (and not added back) in arriving at such consolidated net income, the sum of the following amounts for such period:

(a)    the amount of depreciation and amortization deducted in determining such net income for such period;

(b)    all interest expense and all fees for the use of money or the availability of money, including commitment, facility, letter of credit and like fees and charges upon indebtedness (including indebtedness to the Administrative Agent and Lenders) paid or payable during such period and amortization of discounts and financing fees, all amounts paid in respect of Swap Contracts permitted hereunder, whether constituting periodic, upfront or termination payments and all prepayment premiums and similar redemption premiums relating to the repayment or redemption of indebtedness;

(c)    all tax liabilities paid or accrued during such period;

(d)    all non-cash charges, including non-cash charges resulting from losses on asset dispositions incurred during such period, non-cash compensation charges or other non-cash expenses or charges arising from the grant of or issuance or repricing of stock, stock options or other equity-based awards incurred during such period and non-cash charges relating to impairment of warrants or derivative instruments, non-cash charges related to hedging agreements and any non-cash charges related to impairment of assets;

(e)    transaction costs incurred and paid during such period (including for the Revolving Facility, the Exit Term Loan Facility, the Chapter 11 Cases, the Consummation of the Plan of Reorganization and the transactions contemplated by the foregoing);

(f)    currency translation charges;

2

(g)     lease termination charges; and

(h)     extraordinary, unusual or non-recurring losses, charges or expenses, including restructuring charges and severance costs, not to exceed $10,000,000 in any Reference Period or as otherwise approved by the Required Lenders.

"Administrative Agent" shall mean Wilmington Trust, National Association, acting as administrative agent for the Secured Parties, or any successor administrative agent appointed in accordance with this Agreement.

"Administrative Agent's Letter Agreement" shall mean the fee letter, dated as of February [_], 2016, by and between the Borrower Representative and the Administrative Agent.

"Administrative Agent's Office" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 11.02, or such other address or account as the Administrative Agent may from time to time notify the Borrowers and/or the Lenders.

"Administrative Questionnaire" shall mean an administrative questionnaire in a form supplied by the Administrative Agent.

"Affiliate" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided that none of the parties to the Holdings LLC Agreement (or their permitted transferees thereunder) shall be deemed to be an Affiliate of Holdings or any of its Subsidiaries.

"Agency Account Agreement" shall mean any deposit account control agreement, lockbox control agreement, blocked account agreement or other similar agreement entered into by a Credit Party, the Administrative Agent and the applicable financial institution, in form and substance reasonably satisfactory to the Administrative Agent.

"Agreement" shall have the meaning specified in the introductory paragraph hereto.

"Applicable Liquidity Amount" means (a) at any time on or prior to the first anniversary of the Closing Date, $20,000,000, (b) at any time after the first anniversary of the Closing Date and on or prior to the second anniversary of the Closing Date, $15,000,000, and (c) at any time thereafter, $10,000,000.

"Applicable Percentage" shall mean, with respect to any Lender at any time, as applicable, (i) with respect to such Lender's Commitment, the percentage (carried out to the ninth decimal place) of the aggregate principal amount of all Commitments represented by such Lender's Commitment at such time and (ii) with respect to such Lender's Loans, the percentage (carried out to the ninth decimal place) of the aggregate outstanding principal amount of all Loans represented by such Lender's Loans at such time. The initial Applicable Percentage of each Lender with respect to its Commitment as of the date hereof is set forth opposite the name of such Lender on Schedule 2.01. For each Lender that becomes a party hereto pursuant to an Assignment and Assumption, the initial Applicable Percentage of such Lender shall be set forth in such Assignment and Assumption Agreement.

"Applicable Rate" shall mean (a) with respect to any Loans comprising Eurodollar Rate Loans, 10.00% *per annum* and (b) with respect to any Loans comprising Base Rate Loans, 9.00% *per annum*.

"Approved Fund" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

#4848-5684-9449v15

"Assignee Group" shall mean two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in substantially the form of Exhibit E or any other form approved by the Administrative Agent.

"Attributable Indebtedness" shall mean, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP (subject to Section 1.03(b)) and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP (subject to Section 1.03(b)) if such lease were accounted for as a capital lease.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy," as applicable to the Chapter 11 Cases, now and hereafter in effect or any successors to such statute.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals hereto; provided that "Bankruptcy Court" shall also mean any other court having competent jurisdiction over the Chapter 11 Cases.

"Base Rate" shall mean, for any day, a per annum rate equal to the higher of (a) the Prime Rate for such day and (b) the Eurodollar Rate for a 30-day interest period as determined on such day plus 1.00%. Any change in the Base Rate due to a change in any of the foregoing shall take effect at the opening of business on the day specified in the public announcement of such change.

"Borrowed Money" shall mean, with respect to any Person, without duplication, its (a) Indebtedness that (i) is an obligation of such Person for borrowed money, (ii) is evidenced by notes, drafts, bonds, debentures, credit documents or similar instruments, (iii) accrues interest or is a type upon which interest charges are customarily paid (excluding trade payables) or (iv) was issued or assumed as full or partial payment for property; (b) Capitalized Leases and (c) reimbursement obligations owing with respect to amounts drawn under letters of credit that are not cash collateralized in full.

"Borrower" and "Borrowers" shall have the meaning specified in the introductory paragraph hereto.

"Borrower Materials" shall mean information, reports, financial statements and other materials delivered by the Borrowers hereunder, as well as other reports and information provided by the Administrative Agent to the Lenders.

"Borrower Representative" shall mean AA USA in its capacity as borrower agent pursuant to Section 2.17.

"Borrowing" shall mean a borrowing of Loans made simultaneously by each of the Lenders pursuant to Section 2.01(a) and Section 2.02.

"Borrowing Request Notice" shall mean a notice of a Borrowing, which, if in writing, shall be substantially in the form of Exhibit A.

"Breakage Costs" shall have the meaning specified in Section 3.05.

4

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located and, if such day relates to the calculation of the Eurodollar Rate, shall mean any such day that is a London Banking Day.

"Capital Stock" shall mean any and all shares, limited liability company interests, partnership interests, other interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock, and any and all warrants, rights or options to purchase any of the foregoing.

"Capitalized Leases" shall mean leases under which any Credit Party is the lessee or obligor, the discounted future rental payment obligations under which are required to be capitalized on the balance sheet of the lessee or obligor in accordance with GAAP (subject to Section 1.03(b)) and the amount of Indebtedness represented by such obligations shall be the Attributable Indebtedness in respect thereof.

"Cash Equivalents" shall mean any of the following types of Investments, to the extent owned by a Credit Party or a Subsidiary thereof:

(a)      marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency thereof maturing within one year from the date of acquisition thereof;

(b)      commercial paper maturing no more than 270 days from the date of creation thereof and having the highest or next highest rating obtainable from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc. determined at the time of investment;

(c)      certificates of deposit, banker's acceptances and time deposits maturing no more than 180 days from the date of creation thereof issued or guaranteed by, or placed with, and demand deposit and money market deposit accounts issued or offered by, (i) any Lender or (ii) any commercial bank, that at the time of investment, (x) has combined capital, surplus and undivided profits of not less than $500,000,000, (y) a senior unsecured rating of "A" or better by a nationally recognized rating agency and (z) is organized under the laws of the United States of America, any state thereof or is the principal banking subsidiary of a bank holding company organized under the laws of the United States or any state thereof; and

(d)      money market mutual funds that invest solely in one or more of the investments described in clauses (a) through (c) above.

"Casualty Event" shall mean, with respect to any property (including any interest in property) of any Credit Party, any loss of, damage to, or condemnation or other taking of, such property for which any Credit Party receives insurance proceeds, proceeds of a condemnation award or other compensation.

"CERCLA" shall have the meaning specified in the definition of "Environmental Laws".

"CFC" shall mean a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"Change in Law" shall mean the occurrence, after the date of this Agreement (or with respect to any Lender, if later, the date on which such Lender becomes a Lender), of any of the following:  (a) the

adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u> that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"<u>Change of Control</u>" shall mean the occurrence of any of the following:

(a)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than a Permitted Holder becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "<u>option right</u>")), directly or indirectly, of 50% or more of the equity securities of Holdings entitled to vote for members of the board of directors or equivalent governing body of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right); or

(b)     Holdings shall cease to own directly or indirectly 100% of the Capital Stock of AA USA.

For purposes of this definition, notwithstanding anything to the contrary set forth above, a Person shall not be deemed to have beneficial ownership of Capital Stock subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement and, until the consummation of such transactions, a Change of Control will be deemed not to have occurred with respect to any such stock purchase agreement, merger agreement or similar agreement.

"<u>Chapter 11 Cases</u>" shall have the meaning assigned to such term in the recitals hereto.

"<u>Closing Date</u>" shall mean the first date all conditions in <u>Section 4.01</u> have been satisfied or waived.

"<u>Closing Date Loan</u>" shall have the meaning specified in <u>Section 2.01(a)</u>.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>" shall mean all of the assets, property, rights and interests of the Credit Parties that are or are intended to be subject to the Liens created by or pursuant to the Security Documents.

"<u>Commitment</u>" shall mean, as to each Lender, its obligation to make a Closing Date Loan to the Borrowers pursuant to <u>Section 2.01(a)</u> in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on <u>Schedule 2.01</u> or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be

adjusted from time to time in accordance with this Agreement.  The aggregate amount of the Commitments as of the Closing Date is $[_____].[1]

"Compliance Certificate" shall mean a certificate substantially in the form of Exhibit C.

"Confirmation Order" shall mean an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Required Lenders (and with respect to any provisions that affect the rights and duties of the Administrative Agent, the Administrative Agent), confirming the Plan of Reorganization.

"Connection Income Taxes" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated" or "consolidated" shall mean, with reference to any term defined herein, consolidated in accordance with GAAP.

"Consummation of the Plan of Reorganization" shall mean the occurrence of the Plan Effective Date and the substantial consummation of the Plan of Reorganization within the meaning of Section 1101(2) of the Bankruptcy Code.

"Contractual Obligation" shall mean, as to any Person, any provision of any security issued by such Person or any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" shall have meanings correlative thereto.

"Converted Loan" shall have the meaning specified in Section 2.01(b).

"Credit Extension" shall mean the Borrowing.

"Credit Parties" shall mean the Borrowers, Holdings, Fresh Air and the other Guarantors.

"Credit Party Guarantees" shall mean, collectively, (a) the Guaranty Agreement dated as of the Closing Date among the Guarantors (other than the Borrowers) in favor of the Administrative Agent and (b) any other guaranty in form and substance reasonably satisfactory to the Administrative Agent and executed by any Guarantor in favor of the Administrative Agent and the other Secured Parties in respect of the Obligations.

"Debtor" shall have the meaning assigned to the term in the recitals hereto.

"Debtor Relief Laws" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium (by way of voluntary arrangement, scheme or arrangement or otherwise), rearrangement, receivership, insolvency, reorganization, or similar

---

[1] NTD: **Final amount to be determined.** The Commitment is $30,000,000 subject to reduction for the following: (i) a dollar-for-dollar reduction in the amount of the funds in the DIP Funding Account as of the Closing Date (net of administrative expenses and other wind-down costs) and (ii) a reduction to the extent that the Requisite Commitment Parties (as defined in that certain Equity Commitment Letter dated as of October 4, 2015 between American Apparel (USA), LLC and the other parties thereto) increase their equity investment in the Borrowers above $10,000,000.

7

debtor relief Laws of the United States, Canada, England and Wales or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" shall mean any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" shall mean when used with respect to Obligations, an interest rate or rate equal to the interest rate or rate otherwise applicable thereto plus 2.00% per annum.

"Defaulting Lender" shall mean, subject to Section 2.15(b), any Lender that (a) has failed to (i) fund all or any portion of its Loan within two Business Days of the Closing Date unless such Lender notifies the Administrative Agent and the Borrowers in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied or (ii) pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrowers or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund Loans hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent, to confirm in writing to the Administrative Agent that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal or foreign regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Capital Stock in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.15(b)) upon delivery of written notice of such determination to the Borrowers and each other Lender.

"Designated Jurisdiction" shall mean any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"DIP Facility" shall have the meaning assigned to the term in the recitals hereto.

"DIP Facility Agreement" shall mean that certain Debtor-in-Possession Credit Agreement dated as of October 4, 2015 among the Credit Parties and the Administrative Agent.

"DIP Facility Documents" shall mean "Loan Documents" as defined in the DIP Facility Agreement.

"DIP Facility Obligations" shall mean "Obligations" as defined in the DIP Facility Agreement.

"Disclosure Statement" shall mean any disclosure statement that is filed in connection with the Plan of Reorganization, which disclosure statement is in form and substance reasonably acceptable to the Required Lenders.

"Disqualified Capital Stock" shall mean that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof, in each case on or prior to the Maturity Date, for cash or is convertible into or exchangeable for, in each case at the option of the holder thereof, debt or debt securities of Holdings or its Subsidiaries, at any time prior to the Maturity Date; provided, however, that (a) only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Capital Stock and (b) any Capital Stock that would constitute Disqualified Capital Stock solely because the holders thereof have the right to require Holdings to repurchase such Capital Stock upon the occurrence of a change of control or asset sale (howsoever defined or referred to) shall not constitute Disqualified Capital Stock if the terms of such Capital Stock provide that Holdings may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with Section 7.04; provided, however, that if such Capital Stock is issued to any plan for the benefit of employees of Holdings or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by Holdings or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"Disqualified Lender" shall mean any bank, financial institution or other lender or investor and any competitor of the Borrower, in each case, as set forth in Schedule 1.02. The Borrower may supplement Schedule 1.02 with additional competitors from time to time by providing notice in writing to the Administrative Agent.

"Dollar" and "$" shall mean lawful money of the United States.

"Domestic Subsidiary" shall mean any Subsidiary that is organized under the laws of any political subdivision of the United States.

"Electronic Medium" shall mean the electronic medium through which notices and other communications are sent (including e-mail) pursuant to procedures approved by the Administrative Agent and otherwise in accordance with Section 10.02(b).

"Eligible Assignee" shall mean any Person (other than a natural Person) that is (i) a Lender, an Affiliate of any Lender or an Approved Fund with respect to such Lender or (ii) a commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans in the ordinary course of business; provided that no Disqualified Lender, Credit Party or Subsidiary of a Credit Party shall be an Eligible Assignee.

"Environmental Laws" shall mean any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems and including those arising

9

under the Resource Conservation and Recovery Act ("RCRA"), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended ("CERCLA") and the Superfund Amendments and Reauthorization Act of 1986 ("SARA").

"Environmental Liability" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Credit Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) under common control with any Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" shall mean (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of any Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate.

"Eurodollar Rate" shall mean, for any Interest Period, the per annum rate of interest determined by the Administrative Agent at approximately 11:00 a.m. (London time) two London Banking Days prior to commencement of such Interest Period, for a term comparable to such Interest Period, equal to (a) the rate for Dollar deposits as reported on Reuters screen LIBOR01 Page (or any successor thereto or similar source determined by the Administrative Agent from time to time, "LIBOR01"); or (b) if LIBOR01 is not available for any reason, the interest rate determined by the Administrative Agent to be the arithmetic mean of the rates at which Dollar deposits in the approximate amount of the Loan are offered by the principal London office of major banks in the London interbank Eurodollar market selected by the Administrative Agent; provided that, if fewer than two quotations are provided by the Administrative Agent by such major banks as requested, the Eurodollar Rate shall be the arithmetic mean of the rates quoted to the Administrative Agent by major banks in New York City, selected by the Administrative Agent, at approximately 11:00 a.m. (New York City time) for loans in Dollars to leading European banks for a term comparable to such Interest Period commencing on the first day of such Interest Period and in an amount equal to the principal amount of the Loans. In no event shall the Eurodollar Rate be less than 1.0%.

"<u>Event of Default</u>" shall have the meaning specified in <u>Section 8.01</u>.

"<u>Excluded Accounts</u>" shall mean any (a) deposit account or securities account specially and exclusively used in the ordinary course of business for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Credit Party's salaried employees, which accounts are funded only in the ordinary course of business and not in excess of any amounts necessary to fulfill payroll obligations that are then currently owing,  (b) pension fund accounts, 401(k) accounts and trust accounts, (c) other deposit accounts, securities accounts and commodities accounts having a  balance of less than $500,000 at all times in the aggregate for all such accounts, or (d) any deposit accounts the entire balance of which is swept each Business Day to a deposit account or securities account subject to an Agency Account Agreement, provided that not more than a maximum aggregate amount of $2,500,000 of cash and Cash Equivalents shall be maintained in deposit accounts not subject to an Agency Account Agreement pursuant to this <u>clause (d)</u> at any time.

"<u>Excluded Debt Incurrence</u>" shall mean the incurrence or any issuance by any Credit Party or any of its Subsidiaries of any Indebtedness permitted by <u>Section 7.02</u>.

"<u>Excluded Taxes</u>" shall mean any of the following Taxes imposed on or with respect to ny Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Taxes (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender or any other Recipient of a payment hereunder, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Recipient on the date such Recipient becomes a party to this Agreement or to or for the account of a Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the any Borrower under <u>Section 3.06</u>) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to <u>Section 3.01(a)</u>, such amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with <u>Section 3.01(e)</u> and <u>(d)</u> any U.S. federal withholding Taxes imposed pursuant to FATCA.

"<u>Existing Letters of Credit</u>" shall mean those letters of credit set forth on  <u>Schedule 1.01</u>.

"<u>Exit Term Loan Facility</u>" shall have the meaning assigned to the term in the recitals hereto.

"<u>Extraordinary Receipt</u>" shall mean any cash received by or paid to or for the account of any Credit Party not in the ordinary course of business, including, tax refunds, pension plan reversions, proceeds of insurance, condemnation awards (and payments in lieu thereof), indemnity payments (including in connection with any acquisition) and any purchase price adjustments (including in connection with any acquisition); provided that an Extraordinary Receipt shall not include cash receipts from proceeds of insurance, or condemnation awards (or payments in lieu thereof) to the extent that such proceeds or awards or payments arose as a result of a Casualty Event and are applied to prepay the Obligations in accordance with of Section 2.05(b) .

"<u>FATCA</u>" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any intergovernmental agreements entered into in connection therewith, any agreements

entered into pursuant to Section 1471(b)(1) of the Code and any current or future regulations or official interpretations of the foregoing.

"Federal Funds Rate" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to major financial institutions reasonably acceptable to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"Financial Officer" shall mean, with respect to any Person, its chief financial officer, treasurer, controller or assistant controller or other officer reasonably acceptable to the Administrative Agent.

"Fiscal Month" shall mean any fiscal month of any Fiscal Year, which month shall generally end on the last day of each calendar month in accordance with the fiscal accounting calendar of the Borrowers.

"Fiscal Quarter" shall mean any fiscal quarter of any Fiscal Year of Holdings, which quarters shall generally end on the last day of each March, June, September or December of such Fiscal Year in accordance with the fiscal accounting calendar of Holdings.

"Fiscal Year" shall mean any period of twelve (12) consecutive months ending on December 31 of any calendar year.

"Foreign Lender" shall mean any Lender that is not a U.S. Person.

"Foreign Plan" shall mean any employee benefit plan or arrangement (a) maintained or contributed to by any Credit Party or Subsidiary that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of any Credit Party or Subsidiary.

"Foreign Subsidiary" shall mean (a) any Subsidiary that is not a Domestic Subsidiary and any Subsidiary of such Subsidiary and (b) any Subsidiary substantially all the assets of which are CFCs.

"FRB" shall mean the Board of Governors of the Federal Reserve System of the United States.

"Fresh Air" shall mean Fresh Air Freight, Inc., a California corporation.

"Fund" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" shall mean generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the

United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governing Documents" shall mean, with respect to any Person, its certificate or articles of incorporation, certificate of change of name (if any), certificate of formation, or, as the case may be, certificate of limited partnership, its by-laws, memorandum and articles of association, operating agreement or, as the case may be, partnership agreement or other constitutive documents and all shareholder agreements, voting trusts and similar arrangements applicable to any of its Capital Stock.

"Governmental Authority" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" shall mean, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" shall mean Holdings, the Borrowers, Fresh Air, each other Person party to any of the Credit Party Guarantees as a guarantor thereunder and each other Person, if any, that executes a guaranty or other similar agreement in favor of the Administrative Agent in connection with the transactions contemplated by this Agreement and the other Loan Document; provided that no Foreign Subsidiary shall be required to be a Guarantor.

"Hazardous Materials" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" shall mean American Apparel, LLC, a Delaware limited liability company.

"Holdings LLC Agreement" shall mean that certain Limited Liability Company Operating Agreement of Holdings dated as of the Closing Date, among Holdings and the equityholders of Holdings party thereto from time to time.

"Indebtedness" shall mean, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)  all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)  all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)  net obligations of such Person under any Swap Contract;

(d)  all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business consistently with past practices);

(e)  indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)  Capitalized Leases and Synthetic Lease Obligations;

(g)  all Disqualified Capital Stock issued by such Person with the amount of Indebtedness represented by such Disqualified Capital Stock being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any; and

(h)  all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person or unless such Person expressly does not have liability for such obligations of a joint venture.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of any Capitalized Lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.  The "maximum fixed repurchase price" of any Disqualified Capital Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to this Agreement, and if such price is based upon, or measured by, the fair market value of such Disqualified Capital Stock, such fair market value shall be determined reasonably and in good faith by the board of directors of the issuer of such Disqualified Capital Stock.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payments hereunder or any other Loan Documents and (b) to the extent not otherwise described in clause (a) herein, Other Taxes.

"Indemnitee" shall have the meaning specified in Section 10.04(b).

"Information" shall have the meaning specified in Section 10.07.

"Insolvency Proceeding" shall mean (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors or (b) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case in clauses (a) and (b) above, undertaken under U.S. federal, state or foreign law, including the Bankruptcy Code.

"Intercompany Note" shall mean, collectively, (a) that certain Intercompany Note dated as of the Closing Date, among the Credit Parties, as payors, and the Credit Parties, as payees, subject to the terms of a Subordination Agreement, (b) that certain Intercompany Note dated Closing Date, among certain Foreign Subsidiaries of the Credit Parties, as payors, and the Credit Parties, as payees and (c) any other intercompany note among any of the Credit Parties, as payors or payees, on the one hand, and their Subsidiaries, on the other hand, entered into after the date hereof.

"Intercreditor Agreement" shall mean an  intercreditor agreement to be entered into between the Revolving Facility Agent and the Administrative Agent that is in form and substance reasonably satisfactory to Administrative Agent and Required Lenders.

"Interest Payment Date" shall mean, as to any Loan, (a) the first day of each month, (b) the date of any prepayment with respect to the principal amount of Loans being prepaid and (c) the Maturity Date.

"Interest Period" shall mean, as to each Eurodollar Rate Loan, the period commencing on the date such Loan is disbursed and ending on the date one, two, three or six months thereafter, as selected by the Borrower Representative in the Borrowing Request Notice or Notice of Continuation, as applicable.

"Investment" shall mean, all expenditures made and all liabilities incurred (contingently or otherwise) for the acquisition of Capital Stock, assets that constitute a business unit or Indebtedness of, or for loans, advances or capital contributions to, or in respect of any Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person (including any Acquisition). In determining the aggregate amount of Investments outstanding at any particular time:  (a) the amount of any Investment represented by a guaranty shall be taken at not less than the principal amount of the obligations guaranteed and still outstanding, (b) there shall be deducted in respect of each such Investment all cash returns, cash dividends and cash distributions received with respect thereto and (c) there shall not be deducted from the aggregate amount of Investments any decrease in the value, write-downs or write-offs with respect thereof.

"IP Security Agreement" shall mean, collectively, (a) the Intellectual Property Security Agreement dated as of the Closing Date made by each Credit Party party thereto in favor of the Administrative Agent, on behalf of itself and the other Secured Parties and (b) each other intellectual property security agreement, patent security agreement, trademark security agreement and copyright security agreement required to be delivered pursuant to Section 6.12 in form and substance reasonably satisfactory to the Administrative Agent.

"IRS" shall mean the United States Internal Revenue Service.

"KCL Knitting" shall have the meaning specified in the introductory paragraph hereto.

"Laws" shall mean, collectively, all international, foreign, Federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative

orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lenders" shall mean each Lender with a Commitment or which has Loans outstanding and any other Person who becomes an assignee of the rights and obligations of a Lender pursuant to terms of this Agreement.

"Lending Office" shall mean, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrowers and the Administrative Agent.

"Leverage Ratio" shall mean the ratio, as of any date of determination, of (a) Borrowed Money of Holdings and its Subsidiaries as of such date to (b) Adjusted Earnings for the Reference Period then ending.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement for security, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and the filing of or agreement to authorize, any financing statement under the UCC or comparable law of any jurisdiction (other than precautionary filing of UCC financing statements with respect to obligations that do not constitute Indebtedness).

"Liquidity" shall mean, as of any date of determination, the sum of (i) the aggregate unused amount of the commitments as of such date under the Revolving Facility (or such lesser amount that is available as of such date under any borrowing base with respect to the Revolving Facility, if applicable), but only to the extent that the Credit Parties are permitted to borrow such amounts thereunder as of such date, plus (ii) the aggregate amount of cash and Cash Equivalents of the Credit Parties as of such date that would not appear as "restricted" on a consolidated balance sheet of Holdings.

"Loans" shall mean the Closing Date Loans made to the Borrowers pursuant to Section 2.01(a) and the Converted Loans deemed made to the Borrowers pursuant to Section 2.01(b).

"Loan Account" shall have the meaning specified in Section 2.16(a).

"Loan Documents" shall mean this Agreement, each Note, each Security Document, the Administrative Agent's Letter Agreement, each Subordination Agreement and each other agreement or instrument delivered by any Credit Party in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"London Banking Day" shall mean any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"Material Adverse Effect" shall mean (a) a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Credit Parties, taken as a whole (excluding (i) any matters publicly disclosed prior to the filing of the Chapter 11 Cases, (ii) any matters disclosed in the schedules to the DIP Facility Agreement or the schedules hereto, (iii) any matters disclosed in any first day pleadings or declarations in connection with the Chapter 11 Cases and (iv) the effect of filing the Chapter 11 Cases, the events and conditions related and/or leading up thereto and the effects thereof and any action required

to be taken under the DIP Facility Documents or the Loan Documents); (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document, or of the ability of the Credit Parties, taken as a whole, to pay any Obligations under the Loan Documents, when due; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Credit Party of any Loan Documents to which it is a party.

"Maturity Date" shall mean February [_], 2020.[2]

"Maximum Rate" shall have the meaning specified in Section 10.09.

"Mortgages" shall mean each mortgage or deed of trust with respect to each fee interest of each Credit Party in Real Estate executed and delivered to the Administrative Agent after the Closing Date pursuant to Section 6.12 hereof, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

"Multiemployer Plan" shall mean any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" shall mean a Plan which has two or more contributing sponsors (including any Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Cash Proceeds" shall mean, with respect to any event or transaction described in Sections 2.05(a) through (c), (a) the cash proceeds received in respect of such event or transaction, including (i) any cash received in respect of any non-cash proceeds (including the monetization of notes receivables), but only as and when received or (ii) in the case of a Casualty Event, insurance proceeds, proceeds of a condemnation award or other compensation payments, in each case net of (b) the sum of (x) all reasonable fees and out-of-pocket expenses (including appraisals, and brokerage, legal, advisory, banking, title and recording tax expenses and commissions) paid by any Credit Party or a Subsidiary to third parties (other than Affiliates) in connection with such event, (y) in the case of a sale or other disposition of an asset described in Section 2.05(a), income or other taxes paid or reasonably estimated by the Borrower Representative (determined in good faith by a Financial Officer) to be actually payable in connection therewith and (z) in the case of a sale or other disposition of an asset described in Sections 2.05(a) and (b), the amount of all payments required to be made by any Credit Party (or to establish an escrow) for the repayment of any Indebtedness by the terms thereof (other than the Obligations) secured by such asset to the extent the lien in favor of the holder of such Indebtedness is permitted by Section 7.03(a)(vi); provided that such payments made shall not exceed the amount of cash proceed received by such Credit Party or the aggregate amount of such Indebtedness.

"Non-Consenting Lender" shall mean any Lender (other than the Administrative Agent) that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 10.01 and (b) has been approved by the Required Lenders (or to the extent there are only two (2) Lenders, would have been approved by the Required Lenders if such Lender had approved of such consent, waiver or amendment).

"Non-Defaulting Lender" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

---

[2] NTD: Insert date that is four years from the Closing Date.

"Note" shall mean a promissory note made by the Borrowers in favor of a Lender evidencing the Loans made (or deemed made) by such Lender, substantially in the form of Exhibit C.

"Notice of Continuation" shall mean a notice of a continuation of a Loan, which shall be substantially in the form of Exhibit B.

"Obligations" shall mean all advances to, and debts, liabilities and obligations of, any Credit Party arising under any Loan Document or otherwise with respect to any Loan whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, premium (including the Prepayment Premium), fees and expenses that accrue after the commencement by or against any Credit Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees or expenses are allowed claims in such proceeding.

"OFAC" shall mean the Office of Foreign Assets Control of the United States Department of the Treasury.

"Other Connection Taxes" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment or sale of a participation (other than an assignment made pursuant to Section 3.06).

"Participant" shall have the meaning specified in Section 10.06(d).

"Participant Register" shall have the meaning specified in Section 10.06(d).

"PBGC" shall mean the Pension Benefit Guaranty Corporation.

"Pension Act" shall mean the Pension Protection Act of 2006.

"Pension Funding Rules" shall mean the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" shall mean any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by any Borrower and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Perfection Certificates" shall mean, collectively, (a) each Perfection Certificate delivered by the Credit Parties to the Administrative Agent on the Closing Date and (b) each other Perfection Certificate from time to time delivered by the Credit Parties following the Closing Date to the Administrative Agent in accordance with this Agreement.

"Permitted Acquisition" shall mean each Acquisition with respect to which: (a) the Credit Parties and any such newly created or acquired Subsidiary shall comply with the requirements of Section 6.12(a); (b) the lines of business of the Person to be (or the property and assets of which are to be) so purchased or otherwise acquired shall be a business permitted by Section 7.11; (c) the aggregate consideration (including any purchase price adjustment, earn-out provision, payments in respect of non-competition or consulting agreements or deferred compensation agreements) paid or payable for all such Acquisitions shall not exceed $10,000,000; (d) the Leverage Ratio for the Reference Period most recently ended prior to such Acquisition, calculated on a pro forma basis giving effect to such Acquisition, and any related incurrence of Indebtedness, as if it had occurred on the first day of such Reference Period, shall not be greater than 5.00 to 1.00; (e) immediately before (including on a pro forma basis giving effect to the Acquisition) and immediately after giving effect to any such Acquisition, no Default or Event of Default shall have occurred and be continuing; and (f) the Borrower Representative shall have (i) provided at least fifteen (15) Business Days' (or such shorter period as agreed by the Required Lenders) prior written notice to the Administrative Agent of such Acquisition along with copies of the acquisition agreements and documentation relating thereto or drafts thereof (with copies of the final agreements and documents to be provided thereafter when completed), which shall be reasonably satisfactory to the Required Lenders, along with a summary of due diligence undertaken by the Credit Parties in connection with such Acquisition, historical financial statements for the most recent fiscal year end (or, if less, for the period of such Person's existence) of the Person or business to be acquired (audited if available) to the extent available and unaudited financial statements thereof for the interim periods, which are available, pro forma projected financial statements for the twelve (12) month period following such Acquisition after giving effect to such Acquisition (including balance sheets, cash flows and income statements by month for the acquired Person, individually, and on a consolidated basis with all Credit Parties) and such other information readily available to the Credit Parties as the Administrative Agent shall reasonably request and (ii) delivered to the Administrative Agent at least ten (10) Business Days prior to the date on which any such Acquisition is to be consummated or such shorter time as the Required Lenders may allow, a certificate of a member of Senior Management of the Borrower Representative, in form and substance reasonably satisfactory to the Administrative Agent, certifying as to the requirements set forth in clauses (b), (c) and (d) above as of the date of such certificate and stating that the Borrower Representative reasonably believes that all of the requirements set forth above will be satisfied on or prior to the consummation of such Acquisition, together with all supporting documentation and other financial information that the Administrative Agent may reasonably request.

"Permitted Holders" shall mean (a) Monarch Master Funding Ltd., (b) Coliseum Capital Partners, L.P., (c) Blackwell Partners, LLC, Series A, (d) Coliseum Capital Partners II, L.P., (e) Goldman Sachs Trust, on behalf of the Goldman Sachs High Yield Floating Rate Fund, (f) Goldman Sachs LUX Investment Funds for the benefit of Goldman Sachs High Yield Floating Rate Portfolio (LUX), (g) Goldman Sachs LUX Investment Funds for the benefit of Goldman Sachs Global Multi-Sector Credit Portfolio (LUX), (h) Global Opportunities, LLC, (i) Global Opportunities Offshore, Ltd., (j) PWCM Master Fund Ltd., (k) Oceana Master Fund Ltd., (l) Standard General Master Fund, L.P. and (m) P Standard General Ltd., and the affiliates of each of the foregoing.

"Permitted Liens" shall mean those Liens permitted by Section 7.03.

"Permitted Refinancing" shall mean, with respect to any Indebtedness, any extension, renewal or refinancing of such Indebtedness so long as (a) the aggregate principal amount thereof does not exceed

the outstanding principal amount of the then outstanding Indebtedness, plus all accrued and unpaid interest and premiums owing thereon, plus all fees, premiums and expenses incurred in connection with the closing of such refinancing, (b) its weighted average life is no shorter than that of the Indebtedness being renewed, refinanced or extended (measured as of the date of the renewal, refinancing or extension), (c) the amortization thereof is not changed (other than to extend the same), (d) the maturity date thereof is no earlier than the maturity date of the Indebtedness being renewed, refinanced or extended, (e) no additional Person which is not obligated on such Indebtedness being renewed, refinanced or extended or required to be so obligated is obligated on such Indebtedness, (f) no additional Lien which is not securing the Indebtedness being refinanced, extended or renewed or required thereunder is granted to secure such Indebtedness and (g) upon giving effect to it, no Default or Event of Default exists.

"Permitted Senior Liens" shall mean those Permitted Liens under Section 7.03(a)(i) (solely to the extent encumbering tangible assets in the possession of such Persons or tangible assets previously in the possession of such Persons to the extent such Persons could assert a valid and enforceable Lien on such Collateral), Section 7.03(a)(ii), Section 7.03(a)(iii), Section 7.03(a)(v), Section 7.03(a)(vi) (solely to the extent encumbering equipment and/or fixed assets being leased or being acquired through the incurrence of such purchase money Indebtedness and the proceeds thereof), Section 7.03(a)(viii), Section 7.03(a)(ix), Section 7.03(a)(xi) (solely to the extent encumbering tangible assets in the possession of such Persons or tangible assets previously in the possession of such Persons to the extent such Persons could assert a valid and enforceable Lien on such Collateral), Section 7.03(a)(xii), Section 7.03(a)(xiv) (solely to the extent encumbering the Revolving Facility Priority Collateral in accordance with the Intercreditor Agreement and Section 7.03(a)(xiv); in each case, solely to the extent such Permitted Liens are valid, enforceable, and prior to the Liens of the Administrative Agent under applicable Law.

"Person" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" shall have the meaning assigned to the term in the recitals hereto.

"PIK Election" shall have the meaning assigned to such term in Section 2.08(b)(i).

"PIK Interest" shall have the meaning assigned to such term in Section 2.08(b)(i).

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of any Borrower or any ERISA Affiliate or any such Plan to which any Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Plan Effective Date" shall have the meaning assigned to the term "Effective Date" in the Plan of Reorganization.

"Plan of Reorganization" shall mean the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated [_____], 2016 (as amended, supplemented or otherwise modified from time to time), in accordance with section 1129 of the Bankruptcy Code, as amended, supplemented or otherwise modified from time to time (whether any such further amendment, supplement or other modification is effected through an amendment, supplement or other modification to the Plan of Reorganization itself or through the Confirmation Order), so long as any such further amendment, supplement or other modification does not adversely affect the Lenders.

"Platform" shall have the meaning specified in Section 10.02(e).

"Pledge Agreements" shall mean any pledge agreement or share charge granted by any Credit Party as required by Section 6.12 which shall be in form and substance reasonably satisfactory to the Administrative Agent.

"Prepayment Premium" shall have the meaning specified in Section 2.09(a).

"Prepetition ABL Documents" means the Prepetition ABL Facility and all instruments and documents executed at any time in connection therewith.

"Prepetition ABL Facility" means that certain Amended and Restated Credit Agreement dated as of August 17, 2015 as amended and supplemented from time to time by and among AA USA as a borrower and as borrower representative for itself and the other borrowers party thereto, the guarantors party thereto, the lenders party thereto from time to time, and Wilmington Trust, National Association, as administrative agent.

"Prepetition Lion Documents" means the Prepetition Lion Facility and all instruments and documents executed at any time in connection therewith.

"Prepetition Lion Facility" means that certain Lion Credit Agreement dated as of May 22, 2013, among American Apparel, LLC, the other Credit Parties party thereto as facility guarantors, Lion/Hollywood L.L.C., as the initial lender, and the other lenders from time to time party thereto.

"Prepetition Senior Notes" means the 13.0% senior secured notes due 2020 issued pursuant to the Prepetition Senior Notes Facility.

"Prepetition Senior Notes Documents" means the Prepetition Senior Notes Facility, the Prepetition Senior Notes and any other related documents or instruments from time to time executed in favor of the U.S. Bank National Association, as trustee and collateral agent for the holders of the Prepetition Senior Notes, or all or any of the holders of the Prepetition Senior Notes.

"Prepetition Senior Notes Facility" means that certain Indenture dated April 4, 2013, by and among American Apparel, LLC, the guarantors party thereto, the holders of the Prepetition Senior Notes from time to time and U.S. Bank National Association, as trustee and collateral agent.

"Prime Rate" shall mean the highest of the rate of interest announced by Citibank, N.A. or Bank of America, N.A. from time to time as its prime rate, which rate may be set by such banks on the basis of various factors, including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such rate. Any change in such rate shall take effect at the opening of business on the day specified in the public announcement or publication, as applicable, of such change.

"Qualified Capital Stock" shall mean, with respect to any Person, any Capital Stock of such Person that is not Disqualified Capital Stock.

"RCRA" shall have the meaning specified in the definition of "Environmental Laws".

"Real Estate" shall mean all real property at any time owned or leased (as lessee or sublessee) by any Credit Party.

"Recipient" shall mean the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party hereunder.

"Reference Period" shall mean, as of any date of determination, the most recently completed period of four (4) consecutive Fiscal Quarters.

"Register" shall have the meaning specified in Section 10.06(c).

"Related Parties" shall mean, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers and advisors of such Person and of such Person's Affiliates.

"Reportable Event" shall mean any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Required Lenders" shall mean, as of any date of determinations, Lenders holding more than 50% of the sum of the (a) outstanding Loans and (b) aggregate unused Commitments; provided that the unused Commitment of, and the Loans held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Restricted Payment" shall mean any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of any Credit Party or any Subsidiary, (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Capital Stock, or on account of any return of capital to the stockholders, partners or members (or the equivalent Person thereof) of any Credit Party or any Subsidiary or (c) any payment (whether in cash, securities or other property) of management fees (or other fees of a similar nature) by such Credit Party or such Subsidiary to any equity holder or Affiliate of such Credit Party or such Subsidiary.

"Revolving Facility" shall the meaning set forth in Section 7.02(j).

"Revolving Facility Agent" shall mean, collectively, the administrative agent and collateral agent under the Revolving Facility.

"Revolving Facility Documents" shall mean the documents evidencing the Revolving Facility.

"Revolving Facility Pledge Account" shall have the meaning specified in Section 2.05(a).

"Revolving Facility Priority Collateral" shall mean the Collateral subject to a first priority Lien in favor of the Revolving Facility Agent pursuant to the Intercreditor Agreement.

"Sanction(s)" shall mean any international economic sanction administered or enforced by the United States Government (including OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"SEC" shall mean the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" shall mean, collectively, the Administrative Agent, the Lenders and each Sub-Agent and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Security Documents.

"Security Agreements" shall mean, collectively, (a) Security Agreement dated as of the date hereof entered into by the Credit Parties and the Administrative Agent and (b) any other security

agreement granted by any Credit Party as required by <u>Section 6.12</u> which shall be in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Security Documents</u>" shall mean the Credit Party Guarantees, the Security Agreements, the IP Security Agreement, the Pledge Agreements, the Mortgages (if any), the Agency Account Agreements, intercreditor agreements (including, from and after the date that a Revolving Facility is in effect, the Intercreditor Agreement) and all other guarantees, security agreements, intellectual property security agreements, pledge agreements, mortgages, deeds of trust, control agreements, instruments and documents, including Uniform Commercial Code financing statements and other equivalent registrations and personal property security filings with respect to any other applicable jurisdiction, control agreements, required to be executed or delivered pursuant to, or in connection with, this Agreement or any other Loan Document, all in form and substance reasonably acceptable to the Administrative Agent.

"<u>Senior Management</u>" shall mean, with respect to the any of the Credit Parties, its chairman, president, Financial Officer, chief executive officer or general counsel.

"<u>SG Credit Agreement</u>" means that certain Credit Agreement dated as of March 25, 2015, among American Apparel (Carnaby) Limited, the other borrowers named therein, America Apparel, Inc., and the lenders party thereto.

"<u>SG Debt Documents</u>" means the SG Credit Agreement and any other related material documents or instruments from time to time executed in favor of the lenders under the SG Credit Agreement and their respective successors and assigns.

"<u>SG Facility</u>" means that facility created by the SG Credit Agreement.

"<u>Solvent</u>" and "<u>Solvency</u>" shall mean, with respect to the Credit Parties, on a consolidated basis, taken as a whole, on any date of determination, that on such date (a) the fair value of the assets of the Credit Parties, on a consolidated basis, taken as a whole (calculated on a going concern basis), is greater than the total amount of debt, including contingent liabilities, of the Credit Parties, taken as a whole, (b) the present fair saleable value of the assets of such Person is greater than the total amount that will be required to pay the probable liabilities (including contingent liabilities) of such Person as they become absolute and matured, (c) the capital of the Credit Parties, taken as a whole, is not unreasonably small in relation to the business of the Credit Parties, taken as a whole, contemplated as of such date and (d) the Credit Parties, taken as a whole, do not intend to incur, or believe that they will incur, debts including current obligations beyond their ability to pay such debt as they mature in the ordinary course of business. For the purpose hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, representing the amount that can reasonably be expected to become an actual or matured liability.

"<u>Sub-Agent</u>" shall mean any co-agent, sub-agent, attorney-in-fact, bailee or other designee appointed by the Administrative Agent from time to time pursuant to <u>Section 9.05</u> and approved by the Required Lenders.

"<u>Subordinated Debt</u>" shall mean unsecured Indebtedness of any Credit Party or any Subsidiary that is expressly subordinated and made junior to the payment and performance in full of the Obligations, and evidenced as such by a Subordination Agreement.

"<u>Subordinated Debt Documents</u>" shall mean all documents, agreements and instruments evidencing any Subordinated Debt and/or executed and/or delivered in connection with the incurrence of any Subordinated Debt, including each Subordination Agreement.

"Subordination Agreement" shall mean a subordination and intercreditor agreement or such other written instrument containing subordination provisions, each in form and substance reasonably acceptable to the Required Lenders.

"Subsidiary" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"Swap Contract" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement, including any such obligations or liabilities under any master agreement.

"Swap Termination Value" shall mean, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts.

"Synthetic Lease Obligation" shall mean the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Assets Proceeds Account" shall mean an account of a Credit Party subject to an Agency Account Agreement in favor of the Collateral Agent, which is intended to exclusively contain the identifiable proceeds of the Term Priority Collateral pursuant to Sections 2.05(a) and (b).

"Term Priority Collateral" shall mean the Collateral subject to a first priority Lien in favor of the Administrative Agent pursuant to the Intercreditor Agreement.

"Trade Date" shall have the meaning specified in Section 10.06(b)(i).

"U.S. Person" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" shall have the meaning specified in Section 3.01(e)(ii)(B)(III).

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" and "U.S." mean the United States of America.

**1.02    Other Interpretive Provisions.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Governing Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.03    Accounting Terms.**

(a)    <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein.

(b)    <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio, negative covenant or requirement set forth in any Loan Document, and either the Borrowers or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that until so amended, (i) such ratio, negative covenant or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrowers shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio, covenant or requirement made before and after giving effect to such change in GAAP.  Without limiting the foregoing, leases shall continue to be classified and accounted for on a basis consistent with GAAP as in effect on December 31, 2012 for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto and regardless of whether such leases are in effect as of the date hereof or entered into as of the date hereof, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes, as provided for above.

**1.04    Rounding**.  Any financial ratios required to be maintained by any of the Credit Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06    Certain Currency Translations**.  For purposes of the incurrence of Indebtedness by Foreign Subsidiaries under <u>Section 7.02</u> or where the permissibility of a transaction depends upon compliance with an amount limitation stated in Dollars, any requisite currency translation shall be based on the exchange rate in effect on the date of incurrence of any amounts to be tested against the limitation of such transaction and shall not be affected by subsequent fluctuations in exchange rates; <u>provided</u> that, if any such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable Dollar-denominated limitation to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.  The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currency in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

## ARTICLE II

## THE COMMITMENTS AND CREDIT EXTENSIONS

**2.01    Commitments to Lend; Loans**.

(a)    <u>Closing Date Loans</u>.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make, on the Closing Date, a Loan to the Borrowers (each such Loan, a "<u>Closing Date Loan</u>") in an aggregate amount not to exceed such Lender's Commitment. The Commitments shall terminate automatically immediately after the making of the Closing Date Loans on the Closing Date. All Loans and all other Obligations in respect thereof shall be paid in full not later than the Maturity Date.  Proceeds of the Loans shall be used solely as permitted herein.

(b)    <u>Conversion of DIP Facility Obligations</u>.  Subject to the terms and conditions set forth herein and to give effect to the conversion of the DIP Facility Obligations owing to each Lender, each Lender severally agrees to make and shall be deemed to have made, on the Closing Date, a term loan denominated in Dollars to the Borrowers (each such loan, a "<u>Converted Loan</u>") in a principal amount equal to the DIP Facility Obligations owing to such Lender on the Closing Date, and the DIP Facility Obligations owing to the Lenders under the DIP Facility Agreement shall be substituted and exchanged for (and prepaid by) the Converted Loans.  The principal amount of the Converted Loan of each Lender as of the Closing Date is set forth in <u>Schedule 2.01</u>.  The Converted Loans deemed made or issued pursuant this <u>Section 2.01(b)</u> shall be made without any actual funding.

Any Loans borrowed and subsequently repaid or prepaid, in whole or in part, may not be reborrowed.

**2.02    Borrowing and Continuation of Loans; Notice of Borrowing and Continuation**.

(a)    The Borrowing shall be made upon the Borrower Representative's irrevocable notice to the Administrative Agent via a Borrowing Request Notice and each continuation of Eurodollar Rate Loans shall be made upon the Borrower Representative's irrevocable notice to the Administrative Agent via a Notice of Continuation, in each case appropriately completed and signed by a member of Senior Management of the Borrower Representative, which may be given by any Electronic Medium.  Each such notice must be received by the Administrative Agent not later than 1:00 p.m. Eastern time (10:00 a.m. Pacific time) at least three (3) Business Days prior to the requested date of the Borrowing of or continuation of the Eurodollar Rate Loans (or such shorter time as agreed by the Administrative Agent and Requisite Lenders).  The Borrowing Request Notice and each Notice of Continuation shall specify (i) the Borrower requesting the Borrowing or such continuation, (ii) the requested date of the Borrowing or continuation (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed or continued and (iv) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower Representative fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)    Following receipt of the Borrowing Request Notice by the Administrative Agent, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the Closing Date Loans and each Lender shall make the amount of its Applicable Percentage available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 3:00 p.m. Eastern time (12:00 p.m. Pacific time) (or

27

such shorter time as may be agreed by the Administrative Agent) on the Business Day specified in the Borrowing Request Notice.  Upon satisfaction of the applicable conditions set forth in Sections 4.01, the Administrative Agent shall pay all fees and expenses then due and payable under Section 2.09 and the amount net of such applied amount shall be deposited by the Administrative Agent in the account specified by the Borrower Representative in the Borrowing Request Notice.

**2.03**    **[Intentionally Omitted]**.

**2.04**    **[Intentionally Omitted]**.

**2.05**    **Mandatory Prepayments**.

(a)    Asset Dispositions.  Within two (2) business days of receipt by any Credit Party of Net Cash Proceeds from any asset disposition (excluding (i) dispositions of inventory in the ordinary course of business, (ii) dispositions of obsolete inventory, and (iii) Revolving Facility Priority Collateral, so long as a Revolving Facility is in effect), the Borrowers shall prepay the Obligations in an amount equal to 100% of such Net Cash Proceeds; provided that, so long as no Event of Default has occurred and is continuing, no prepayment shall be required under this Section 2.05(a) to the extent that such Net Cash Proceeds are reinvested in long term productive assets of the general type useful in the business of Holdings and its Subsidiaries within twelve (12) months after receipt of such Net Cash Proceeds; provided, further that (x) from and after the date that a Revolving Facility is in effect, pending any such reinvestment all such Net Cash Proceeds exceeding $2,000,000 shall be held in the Term Loan Assets Proceeds Account  (which Net Cash Proceeds shall be released to or at the direction of the Borrower Representative from the Term Loan Assets Proceeds Account for purposes of or in connection with such reinvestment within three (3) Business Days of the Administrative Agent's receipt of a written request for such release from the Borrower Representative), and (y) any portion of such Net Cash Proceeds not actually reinvested within such twelve (12) month period shall be prepaid in accordance with this Section 2.05 on or before the last day of such twelve (12) month period.

(b)    Casualty Events and Extraordinary Receipts.  Within two (2) business days of receipt thereof, the Borrowers shall prepay the Obligations in an amount equal to (i) 100% of the Net Cash Proceeds received by any Credit Party from Casualty Events with respect to the Term Priority Collateral and (ii) 100% of all Net Cash Proceeds received by any Credit Party with respect to Extraordinary Receipts, provided that (A) so long as no Event of Default has occurred and is continuing, no prepayment shall be required under Section 2.05(b)(i) to the extent that such Net Cash Proceeds are reinvested in long term productive assets of the general type useful in the business of Holdings and its Subsidiaries within twelve (12) months after receipt of such Net Cash Proceeds; provided, further that (x) from and after the date that a Revolving Facility is in effect, pending any such reinvestment all such Net Cash Proceeds exceeding $5,000,000 in the aggregate shall be held in 6.15

the Term Loan Assets Proceeds Account (which Net Cash Proceeds shall be released to or at the direction of the Borrower Representative from the Term Loan Assets Proceeds Account for purposes of or in connection with such reinvestment within three (3) Business Days of the Administrative Agent's receipt of a written request for such release from the Borrower Representative), and (y) any portion of such Net Cash Proceeds not actually reinvested within such twelve (12) month period shall be prepaid in accordance with this Section 2.05 on or before the last day of such twelve (12) month period, and (B) from and after the date that a Revolving

28

Facility is in effect, no prepayment shall be required under <u>Section 2.05(b)(ii)</u> to the extent such prepayment would not be permitted under the Revolving Facility Loan Documents .

(c)    <u>Incurrence of Indebtedness</u>.  Immediately upon the incurrence or issuance by any Credit Party or any of its Subsidiaries of any Indebtedness (other than Excluded Debt Incurrences), the Borrowers shall prepay the Obligations in an amount equal to 100% of such Net Cash Proceeds so received.

(d)    <u>Application of Mandatory Prepayments</u>.  Each prepayment of Loans pursuant to this <u>Section 2.05</u> shall be applied ratably among the Lenders in proportion to their Applicable Percentages.  Each prepayment of Loans pursuant to <u>Sections 2.05(c)</u> shall be accompanied by the applicable Prepayment Premium, if any, pursuant to <u>Section 2.09(a)</u>.

**2.06    Voluntary Prepayments**.  At any time and from time to time, upon not less than three (3) Business Days' prior written notice to the Administrative Agent, the Borrowers may prepay the Loans on any Business Day in whole or in part (subject to payment of Breakage Costs pursuant to <u>Section 3.05</u> and payment of any applicable Prepayment Premium pursuant to <u>Section 2.09(a)</u>).  Any such voluntary prepayment pursuant to this <u>Section 2.06</u> shall be applied ratably among the Lenders in proportion to their Applicable Percentages.

**2.07    Repayment of Loans**.  The Borrowers shall repay the Lenders, on the Maturity Date, the aggregate principal amount of all Loans outstanding on such date, together with all other Obligations in respect thereof.

**2.08    Interest**.

(a)    Subject to the provisions of <u>Section 2.08(b)(iii)</u>, <u>Section 2.08(c)</u>, <u>Section 3.02</u> and <u>Section 3.03</u>, the Loans shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period <u>plus</u> the Applicable Rate.

(b)    <u>PIK Interest</u>

(i)    The Borrowers may, for any Interest Payment Date (other than the Maturity Date), elect (such election, a "<u>PIK Election</u>") to pay up to one hundred percent (100%) of the interest on the Loans due and payable on such Interest Payment Date in-kind by having such interest capitalized and added to the aggregate outstanding principal amount of the Loans on such Interest Payment Date (any such interest that is capitalized and added to the aggregate outstanding principal amount of the Loans on an Interest Payment Date being referred to herein as "<u>PIK Interest</u>") and pay the balance, if any, of such interest in cash on the such Interest Payment Date; <u>provided</u> that (A) no Default or Event of Default shall have occurred and be continuing on the date of such PIK Election and (B) the amount of interest elected by the Borrowers to be paid as PIK Interest on any Interest Payment Date shall not exceed the amount by which Liquidity would be less than the Applicable Liquidity Amount on such Interest Payment Date if the Borrowers were to instead make such PIK Interest payment in cash on such Interest Payment Date.  Each PIK Election shall apply ratably to all outstanding Loans.  Any interest so added to the principal amount of the Loans shall bear interest as provided in this Section 2.08 from the date on which such interest has been so added.  Unless the context otherwise requires, for all purposes hereof, references to "principal amount" of the Loans refers to the face amount of the Loans and not gross proceeds funded hereunder and includes any interest

29

so capitalized and added to the principal amount of the Loans from the date on which such interest has been so added.

(ii)    The Borrower Representative shall make a PIK Election with respect to any Interest Payment Date (other than the Maturity Date) by delivering a notice to the Administrative Agent not later than five Business Days prior to the applicable Interest Payment Date in the form of Exhibit F, which notice shall specify the portion of the principal amount of the Loans as to which interest shall be payable as PIK Interest. The Administrative Agent shall promptly deliver a corresponding notice to each Lender. In the absence of any PIK Election for any Interest Period, interest on the Loans shall be payable in cash.

(iii)    Notwithstanding anything herein to the contrary, interest shall be payable on any principal portion of the Loans that was converted as such pursuant to a PIK Election at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate plus 2.00% per annum.

(iv)    The obligation of the Borrower to pay PIK Interest shall be automatically evidenced by this Agreement.  Upon the request of the Administrative Agent or any Lender, the Borrower shall confirm in writing the principal amount of the Loans, including all PIK Interest added to the principal amount thereof pursuant to this Section 2.08.

(c)    Following the occurrence and during the continuance of an Event of Default, if the Administrative Agent or the Required Lenders in their discretion so elect, the Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(d)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable (i) on demand by the Administrative Agent during the continuance of an Event of Default or (ii) otherwise, within 10 Business Days of receipt of invoice or statement; provided that the Credit Parties acknowledge and agree that the Administrative Agent may charge such Obligations to the Loan balance (as deemed Loans) immediately to satisfy such Obligations.  Interest accruing at the Default Rate shall be due and payable on demand by the Administrative Agent.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09    Call Protection; Fees.**  All fees payable to the Administrative Agent and described in this Section 2.09 shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(a)    Prepayment Premium.  In the event that all or any portion of the Loans are repaid or prepaid for any reason (including as a result of any mandatory prepayments, voluntary prepayments, payments made following acceleration of the Loans or after an Event of Default) prior to the third anniversary of the Closing Date, such repayments or prepayments will be made at (i) 103.0% of the amount repaid or prepaid, if such repayment or prepayment occurs on or prior to the first anniversary of the Closing Date, (ii) 102.0% of the amount repaid or prepaid, if such repayment or prepayment occurs after the first anniversary of the Closing Date, but on or prior to the second anniversary of the Closing Date and (iii) 101.0% of the amount repaid or prepaid if

such repayment or prepayment occurs after the second anniversary of the Closing Date but on or prior to the third anniversary of the Closing Date (the foregoing premiums, the "Prepayment Premium"); provided that the Prepayment Premium shall not apply to mandatory prepayments by Borrower pursuant to Section 2.05(a) and Section 2.05(b).

(b)     Agency Fees.  The Borrowers shall pay to the Administrative Agent the fees in the amounts and at the times specified in the Administrative Agent's Letter Agreement.

(c)     Closing Fees.  The Borrowers agrees to pay on the Closing Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for the funding of such Lender's Closing Date Loan, a closing fee in an amount equal to 2.00% of the stated principal amount of such Lender's Closing Date Loan, payable to such Lender from the proceeds of its Closing Date Loan as and when funded on the Closing Date.  Such closing fee will be in all respects fully earned, due and payable on the Closing Date and non-refundable and non-creditable thereafter.

2.10    **Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of a year of a 360-day year and actual days elapsed (which results in more interest being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.11    **Evidence of Debt**.  The Loans of each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  Consistent with Section 11.06, in the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

2.12    **Payments Generally; Administrative Agent's Clawback**.

(a)     General.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 12:00 p.m. Eastern time (9:00 a.m. Pacific time) on the date specified herein.  The Administrative Agent may promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office or upon the weekly settlement date.  All payments received by the Administrative Agent after 12:00 p.m. Eastern time (9:00 a.m. Pacific time) may be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to

accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day (unless otherwise provided herein), and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i) Funding by Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Loans that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at the interest rate applicable to such Loans made.  If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    Payments by Borrowers; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon in an amount equal to the interest owing by the Borrowers on such payment (for the account of the Administrative Agent), for each day from and including the date such amount was distributed to the Lenders but excluding the date of payment to the Administrative Agent.

A notice of the Administrative Agent to any Lender or the Borrowers with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds promptly (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans applicable to it and to make payments pursuant to Section 10.04(c) are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make

any payment under <u>Section 10.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loans, to purchase its participation or to make its payment under <u>Section 10.04(c)</u>.

(e)    <u>Funding Source</u>.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13    Sharing of Payments by Lenders**.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them <u>provided</u> that:

(i)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to (A) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrowers or any Subsidiary of the Borrowers (as to which the provisions of this Section shall apply).

The Borrowers consent to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.

**2.14    Collateral and Guarantees; Joint and Several Liabilities**.

(a)    <u>Collateral</u>.  The Loans and the other Obligations shall be secured by valid, first priority (subject in priority only to any Permitted Senior Liens), perfected and enforceable Liens in favor of the Administrative Agent, for the benefit of the holders of the Obligations, in all of the Collateral subject to the terms of the Security Documents and, from and after the date that a Revolving Facility is in effect, the Intercreditor Agreement.

(b)    <u>Guarantees</u>.  Payment of the Loans and the other Obligations shall be irrevocably and unconditionally Guaranteed by each Guarantor, jointly and severally with the other Guarantors as a primary obligor and not merely as a surety (whether at the stated maturity, by prepayment, by acceleration or otherwise) subject to the terms of the Credit Party Guarantees.

(c)    <u>Further Assurances</u>.  Each Credit Party covenants and agrees that it shall, and shall cause each of its Subsidiaries party to the Security Documents to, comply with all terms and conditions of each of the Security Documents and that each Credit Party shall, and shall cause

each of its Subsidiaries party to the Security Documents to, at any time and from time to time at the request of the Administrative Agent or the Required Lenders execute and deliver such instruments and documents and do such acts and things as the Administrative Agent or the Required Lenders may reasonably request in order to provide for or protect or perfect the Lien of the Administrative Agent in the Collateral subject to the terms of the Security Documents.

(d)    Joint and Several Liabilities.  Each Borrower hereby irrevocably and unconditionally agrees that it is jointly and severally liable for all of the liabilities, covenants and Obligations whether now or hereafter existing or due or to become due.  The Obligations may be enforced by the Administrative Agent and the Lenders against any Borrower or all Borrowers in any manner or order selected by the Administrative Agent or the Required Lenders in their sole discretion.  Each Borrower hereby irrevocably waives (i) any rights of subrogation and (ii) any rights of contribution, indemnity or reimbursement, in each case, that it may acquire or that may arise against any other Borrower due to any payment or performance made under this Agreement, in each case until all Obligations shall have been fully satisfied.  Without limiting the foregoing provisions of this Section 2.14(d), each Borrower acknowledges and agrees that:

(A)    its obligations under this Agreement shall remain enforceable against it even though such obligations may be unenforceable or not allowable against any other Credit Party due to the existence of any proceeding under any Debtor Relief Law involving any other Credit Party;

(B)    its obligations under this Agreement are independent of the obligations of any other Credit Party, and a separate action or actions may be brought and prosecuted against it in respect of such obligations irrespective of whether any action is brought against any other Credit Party or any other Credit Party is joined in any such action or actions;

(C)    it hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(I)    any lack of validity or enforceability of this Agreement or any other Loan Document or any agreement or instrument relating thereto in respect of any other Credit Party;

(II)    any change in the time, manner or place of payment of, or in any other term of, all or any of the obligations of any other Credit Party under or in respect of this Agreement or any other Loan Document, or any other amendment or waiver of or any consent to departure from this Agreement, in respect of any other Credit Party;

(III)    any change, restructuring or termination of the structure or existence of any other Credit Party;

(IV)    the failure of any other Person to execute or deliver any other agreement or the release or reduction of liability of any other Person with respect to any obligations of the Credit Parties under this Agreement; or

(V)    any other circumstance (including any statute of limitations but other than the Obligations having been fully satisfied) or any existence of or

34

reliance on any representation by any other Person that might otherwise constitute a defense available to, or a discharge of, any other Borrower;

(D)      its obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any such obligations is rescinded or must otherwise be returned by any Person upon the institution of any proceeding under any Debtor Relief Law of any other Credit Party, all as though such payment had not been made; and

(E)      it hereby unconditionally and irrevocably waives any right to revoke its joint and several liability under the Loan Documents and acknowledges that such liability is continuing in nature and applies to all Obligations, whether existing now or in the future.

**2.15    Defaulting Lenders**.

(a)      <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)      <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and <u>Section 10.01</u>.

(ii)      <u>Defaulting Lender Waterfall</u>.  The Administrative Agent may, in its discretion, receive and retain any amounts payable to a Defaulting Lender under the Loan Documents, and a Defaulting Lender shall be deemed to have assigned to the Administrative Agent such amounts until all Obligations owing to the Administrative Agent, Non-Defaulting Lenders and other Secured Parties have been paid in full.  The Administrative Agent may apply such amounts to the Defaulting Lender's defaulted obligations or re-advance the amounts to the Borrowers hereunder.

(b)      <u>Defaulting Lender Cure</u>.  If the Borrowers and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**2.16    Loan Account**.

(a)      The Administrative Agent shall maintain in accordance with its usual and customary practices an account or accounts ("<u>Loan Account</u>") evidencing the Indebtedness of the Borrowers resulting from each Loan.  Any failure of the Administrative Agent to record anything

in the Loan Account, or any error in doing so, shall not limit or otherwise affect the obligation of the Borrowers to pay any amount owing hereunder.

(b)    Entries made in the Loan Account shall constitute presumptive evidence of the information contained therein.  If any information contained in the Loan Account is provided to or inspected by any Person, then such information shall be conclusive and binding on such Person for all purposes absent manifest error, except to the extent such Person notifies the Administrative Agent in writing within thirty (30) days after receipt or inspection that specific information is subject to dispute.

**2.17    Borrower Representative**.  Each Credit Party hereby designates AA USA as its representative and agent on its behalf for the purposes of issuing the Borrowing Request Notice,  giving instructions with respect to the disbursement of the proceeds of the Loans, selecting interest rate options, delivering financial statements and other financial information, delivering Compliance Certificates, giving and receiving all other notices, communications and consents hereunder or under any of the other Loan Documents, executing Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Credit Party under the Loan Documents.  The Borrower Representative hereby accepts such appointment.  The Administrative Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from the Borrower Representative as a notice or communication from all Credit Parties, and may give any notice or communication required or permitted to be given to any Credit Party hereunder to the Borrower Representative on behalf of such Credit Party or Credit Parties.  Each Credit Party agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Borrower Representative shall be deemed for all purposes to have been made by such Credit Party and shall be binding upon and enforceable against such Credit Party to the same extent as if the same had been made directly by such Credit Party.

## ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

**3.01    Taxes**.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.  Any and all payments by or on account of any obligation of any Credit Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any Credit Party or the Administrative Agent shall be required to withhold or deduct any Taxes from any payment, then (A) the Administrative Agent or Credit Party shall withhold or make such deductions as are determined by the Administrative Agent or Credit Party to be required taking into account the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent or Credit Party shall timely pay the full amount withheld or deducted to the relevant Governmental Authority, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Credit Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including withholdings and deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    Payment of Other Taxes by the Credit Parties.  Without limiting the provisions of subsection (a) above, the Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law (without duplication of the provisions of subsection (a) above),

or at the option of the Administrative Agent timely reimburse the Administrative Agent for the payment of, any Other Taxes.

        (c)      <u>Tax Indemnifications</u>.

        (i)      Without duplicating the provisions of <u>subsection (a)</u> above, each of the Credit Parties shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 3.01</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount (and describing the basis) of such payment or liability delivered to the Borrower Representative by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

        (ii)      Each Lender does hereby, severally indemnify, the Administrative Agent and shall make payment in respect thereof within 10 days after demand therefor, (x)  any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (y)  against any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 11.06(d)</u> relating to the maintenance of a Participant Register and (z)  any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this <u>clause (ii)</u>.

        (d)      <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by the Borrowers to a Governmental Authority as provided in this <u>Section 3.01</u>, the Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

        (e)      <u>Status of Lenders; Tax Documentation</u>.

        (i)      Any Recipient that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower Representative and the Administrative Agent, at the time or times prescribed by applicable Laws and at the time or times reasonably requested by the Borrower Representative or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or reasonably requested by the Borrower Representative or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any

Recipient, if reasonably requested by the Borrower Representative or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower Representative or the Administrative Agent as will enable the Borrower Representative or the Administrative Agent to determine whether or not such Recipient is subject to any withholding (including backup withholding) or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), (ii)(B), (ii)(D) and (ii)(E) below) shall not be required if in the Recipient's reasonable judgment, such completion, execution or submission would subject such Recipient to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Recipient.

(ii)    Without limiting the generality of the foregoing,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower Representative and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax (or any substantively comparable subsequent versions thereof or successors thereto);

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), whichever of the following is applicable:

(I)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E (or any substantively comparable subsequent versions thereof or successors thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E (or any substantively comparable subsequent versions thereof or successors thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    executed originals of IRS Form W-8ECI (or any substantively comparable subsequent versions thereof or successors thereto);

(III)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or 881(c)

38

of the Code with respect to payments of "portfolio interest" a statement substantially in the form of <u>Exhibit G-1</u> (a "<u>U.S. Tax Compliance Certificate</u>"), as applicable, and duly executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E (or any substantively comparable subsequent versions thereof or successors thereto); or

(IV)    to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY (or any substantively comparable subsequent versions thereof or successors thereto), accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E (or any substantively comparable subsequent versions thereof or successors thereto), a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit G-2</u> or <u>Exhibit G-3</u>, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that, if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit G-4</u> on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made;

(D)    the Administrative Agent shall deliver to the Borrower Representative on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the request of the Borrowers) two copies of IRS Form W-9 (or any substantively comparable subsequent versions thereof or successors thereto) certifying that the Administrative Agent is exempt from United States federal backup withholding tax and such other documentation as will enable the Borrowers to determine whether or not the Administrative Agent is subject to United States federal backup withholding tax or information reporting requirements; and

(E)    if a payment made to a Recipient under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or other Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or other Recipient shall deliver to the Borrower Representative and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower Representative or the Administrative Agent such documentation

39

prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower Representative or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (E), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)    Each Recipient agrees that if any change in circumstances would render a form or certification it previously delivered pursuant to this Section 3.01 invalid or inaccurate in any respect, it shall promptly notify the Borrower Representative and Administrative agent in writing and update such form or certification or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so.

(f)    Treatment of Certain Refunds.    If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Credit Party or with respect to which any Credit Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the Borrower Representative an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Credit Party under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient in connection with such refund, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Credit Party, upon the request of the Recipient, agrees to repay the amount paid over to the Credit Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Credit Party pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.  This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Credit Party or any other Person.

(g)    Survival.  Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**3.02    Illegality.**  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans, or to determine or charge interest rates, in each case, based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, (a) any obligation of such Lender to make Loans by reference to the Eurodollar Rate or to continue Eurodollar Rate Loans shall be suspended and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such

40

illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate, in each case, until such Lender notifies the Administrative Agent and the Borrower Representative that the circumstances giving rise to such determination no longer exist.  Until such circumstances giving rise to the determination no longer exist, as set forth in a written notice provided by such Lender to the Administrative Agent and the Borrower Representative, all outstanding Loans of such Lender and Loans thereafter made by such Lender shall bear interest at the Base Rate (determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate if necessary to avoid such illegality) plus the Applicable Rate (or at the Default Rate if an Event of Default has occurred that is continuing) in the amount specified therein.

   **3.03**  **Inability to Determine Rates**.  If the Required Lenders determine that for any reason in connection with any request for a Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and/or Interest Period, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period or (c) the Eurodollar Rate with respect to a proposed Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrowers and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Loans at an interest rate based on the Eurodollar Rate shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component of the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice and during such time, all such outstanding Loans shall bear interest at the Base Rate (determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate if necessary pursuant to clause (y) above) plus the Applicable Rate per annum (or at the Default Rate if an Event of Default has occurred that is continuing).  Upon receipt of such notice, the Borrowers may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans (to the extent of the affected Eurodollar Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

   **3.04**  **Increased Costs**.

    (a)  Increased Costs Generally.  If any Change in Law shall:

      (i)  impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

      (ii)  subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in subsection (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

      (iii)  impose on any Lender or the London interbank market any other condition (other than any condition related to Taxes), cost or expense affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender, by an amount that such Lender deems to be material, of making, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender, by an amount that such Lender, as the case may be, deems to be material, of participating in, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon

request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), by an amount that such Lender deems to be material, then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.05    Compensation for Losses**.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of (a) any continuation, payment or prepayment of any Eurodollar Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration or otherwise), (b) any failure by any Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow or continue any Eurodollar Rate Loan on the date or in the amount notified by the Borrower Representative or (c) any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrowers pursuant to Section 10.13, excluding any loss of anticipated profits but including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained (all of such losses, costs or expenses, together with any administrative fees referred to in the following sentence, are referred to herein collectively as the "Breakage Costs").  The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.  The Lenders shall not be required to purchase Dollar deposits in any interbank or offshore Dollar market to fund any Eurodollar Rate Loan.

**3.06    Mitigation Obligations; Replacement of Lenders**.

(a)    <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or requires any Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender gives a notice pursuant to <u>Section 3.02</u>, then at the request of the Borrower Representative such Lender shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>3.04</u>, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02.</u> as applicable and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender (it being understood that the Borrowers shall be given a reasonable opportunity to reimburse such costs or expenses).  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u> and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with <u>Section 3.06(a)</u>, the Borrowers may replace such Lender in accordance with <u>Section 10.13</u>.

**3.07    Survival**.  All of the Borrowers' obligations under this <u>Article III</u> shall survive termination of the Exit Term Loan Facility and repayment of all other Obligations hereunder.

## ARTICLE IV

## CONDITIONS PRECEDENT

**4.01    Conditions to Effectiveness, the Closing Date and Credit Extension**.  The effectiveness of this Agreement, the obligation of each Lender to make a Closing Date Loan on the Closing Date under <u>Section 2.01(a)</u> and the deemed making of the Converted Loans on the Closing Date under <u>Section 2.01(b)</u> are subject to the satisfaction (or waiver in accordance with <u>Section 10.01</u>) of the following conditions precedent:

(a)    The Administrative Agent shall have received UCC, tax and judgment lien searches and other appropriate evidence in form and substance reasonably satisfactory to the Required Lenders evidencing the absence of any other liens or mortgages on the Collateral other than Permitted Liens and other existing liens acceptable to the Required Lenders in their sole discretion.

(b)    The Security Documents shall be effective to create in favor of the Administrative Agent, for its benefit and the benefit of each Lender, a legal, valid and enforceable first priority security interest in and Lien upon the Collateral (subject in priority only to Permitted Senior Liens).

(c)    The Administrative Agent shall have received appropriate UCC-1 financing statements for filing under the UCC of each jurisdiction of organization of each Credit Party.

43

(d)    The Administrative Agent's receipt of the following, each of which shall be originals or facsimile or other electronic image transmission (e.g. "PDF" or "TIF" via electronic mail), unless otherwise specified, each properly executed by a member of the Senior Management of the signing Credit Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Lenders:

(i)    (A) executed counterparts of this Agreement, (B) executed counterparts of each Security Document, (C) a Note executed by the Borrowers in favor of each Lender that shall have requested a Note prior to the date hereof, (D) an executed Borrowing Request Notice and (E) executed Credit Party Guarantees from the Guarantors;

(ii)    an officer's certificate of each Credit Party executing a Loan Document, (A) certifying and attaching true, correct and complete copies of:  (I) the certificate or articles of incorporation (or such equivalent thereof) of such Credit Party, certified as of a recent date from the Secretary of State (or applicable Governmental Authority) of the state in which such Credit Party is incorporated or formed and (II) the by-laws, limited liability company agreement, partnership agreement or other applicable Governing Document of such Credit Party and (B) certifying the incumbency of members of the Senior Management of such Credit Party authorized to act in connection with this Agreement and the other Loan Documents to which such Credit Party is a party and providing a specimen signature of such members of the Senior Management of such Credit Party who will be signing Loan Documents on the Closing Date and thereafter;

(iii)    such documents and certifications as the Administrative Agent and the Required Lenders may require to evidence that each Credit Party executing a Loan Document is validly existing, in good standing and qualified to engage in business (A) in its jurisdiction of incorporation or formation, as applicable and (B) in each other jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification (other than any jurisdiction to the extent the failure to so qualify could not reasonably be expected to have a Material Adverse Effect) (and in any event excluding any jurisdiction to the extent the Credit Parties ownership, lease or operation of properties or the conduct of business consists solely of the operation of retail stores numbering four or fewer) in such jurisdiction;

(iv)    a certificate of a member of the Senior Management of the Borrower Representative certifying that (A) the conditions specified in this Section 4.01 have been satisfied and (B) all consents, licenses and approvals required in connection with the execution, delivery and performance by each Credit Party and the validity against each Credit Party of the Loan Documents to which such Credit Party is a party have been obtained, and that such consents, licenses and approvals shall be in full force and effect (including consents, approvals and/or amendments necessary under any document or instrument evidencing any Indebtedness of any Credit Party);

(v)    an executed Perfection Certificate; and

(vi)    favorable legal opinions of counsel to the Credit Parties addressed to the Administrative Agent and each Lender as to matters concerning the Credit Parties and the Loan Documents as the Lenders may reasonably request.

(e)      [Reserved].

(f)      [Reserved].

(g)      The Administrative Agent shall have received all Intercompany Notes, together with alonges (executed in blank) with respect to each such Intercompany Note, each duly executed and a signed original and in form and substance reasonably satisfactory to the Required Lenders, together with a Subordination Agreement with respect to the Intercompany Note among the Credit Parties, as payors, and the Credit Parties, as payees.

(h)      Payment by the Borrowers on the Closing Date of (i) the administrative and collateral agency fee and expenses (including the reasonable and documented fees and expenses of counsel to the Administrative Agent) pursuant to the Administrative Agent's Letter Agreement, (ii) the reasonable and documented fees of Milbank, Tweed Hadley & McCloy LLP, designated local counsel,  Debevoise & Plimpton LLP and Ducera Partners LLC in connection with the transactions hereunder and (iii) all fees and expenses payable on the Closing Date pursuant to the terms hereof.

(i)      The Administrative Agent shall have received reasonably satisfactory evidence that the principal of and interest on, and all other amounts owing in respect of, all Indebtedness under the DIP Facility Agreement, shall have been paid in full or have been deemed to continue hereunder, that any commitments to extend credit under the DIP Facility Agreement shall have been cancelled or terminated and that all Guarantees in respect of, and all Liens securing, any such Indebtedness shall have been released (or arrangements for such release satisfactory to the Administrative Agent and the Required Lenders shall have been made).

(j)      The Administrative Agent shall have received reasonably satisfactory evidence that the obligations under each of the Prepetition ABL Facility, the Prepetition Lion Facility and the Prepetition Senior Notes have been satisfied in the manner contemplated by the Plan of Reorganization and the Confirmation Order, together with a termination of security interest in intellectual property for each assignment for security recorded pursuant to the Prepetition ABL Documents, the Prepetition Lion Documents and the Prepetition Senior Notes Documents, UCC-3 termination statements for all UCC-1 financing statements filed in connection with the Prepetition ABL Documents, the Prepetition Lion Documents and the Prepetition Senior Notes Documents and covering any portion of the Collateral and termination of any control agreements covering any deposit account or security account subject to the Liens under the Prepetition ABL Documents, the Prepetition Lion Documents and the Prepetition Senior Notes Documents.

(k)      Each of (i) the Plan of Reorganization, (ii) the Disclosure Statement and (iii) the Confirmation Order shall be satisfactory to the Required Lenders (and with respect to any provisions that affect the rights and duties of the Administrative Agent, the Administrative Agent).

(l)      The Confirmation Order shall have been entered in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any applicable orders of the Bankruptcy Court and any applicable local rules.

(m)      The Confirmation Order shall be in full force and effect and shall not, without the consent of the Required Lenders, have been stayed, reversed, modified or amended, shall not be subject to a motion to stay.

(n)    All conditions to the effectiveness of the Plan of Reorganization shall have been satisfied or waived (the waiver thereof having been approved by the Required Lenders) and the Consummation of the Plan of Reorganization in accordance with its terms shall occur on the Closing Date, substantially simultaneously with the making of the Closing Date Loans pursuant to Section 2.01(a) and the deemed making of the Loan pursuant to Section 2.01(b) (and in no case later than April 5, 2016).

(o)    The Administrative Agent and the Required Lenders shall have received the business plan of the Credit Parties, which shall be reasonably satisfactory to the Required Lenders.

(p)    The Required Lenders shall be reasonably satisfied that, on the Closing Date, immediately after giving effect to the Consummation of the Plan of Reorganization, the making of the Closing Date Loans and any other transactions to occur on the Closing Date, the Credit Parties and their subsidiaries shall have outstanding no indebtedness other than Indebtedness outstanding under the Loan Documents, the SG Credit Agreement, Indebtedness set forth on Schedule 7.02 and any additional indebtedness on terms and conditions (including as to amount) satisfactory to the Required Lenders.

(q)    Each Credit Party shall have obtained all Governmental Authorizations, consents of other Persons and approvals, in each case that are necessary in connection with the transactions contemplated by the Loan Documents and the Plan of Reorganization, and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to Administrative Agent and the Required Lenders.  No action shall have been taken or threatened by any Governmental Authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Loan Documents or the Plan of Reorganization or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending.

(r)    The Administrative Agent shall have received all documentation or other information that the Administrative Agent or any Lender shall have requested not less than three (3) Business Days prior to the Closing Date in order to comply with its ongoing obligations under "know your customer" and anti-money laundering rules and regulations, including the Act, with results satisfactory to the Administrative Agent and such Lender.

(s)    The Administrative Agent shall have received a funds flow memorandum with respect to the transactions contemplated hereby on the Closing Date in form, scope and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

(t)    The representations and warranties of the Borrowers and each other Credit Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (but without any duplication of any materiality qualifications) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (but without any duplication of any materiality qualifications) as of such earlier date, and except that for purposes of this Section 4.01, the representations and warranties contained in Section 5.02 shall be deemed to refer to the most recent statements furnished pursuant to subsections (a) and (b) respectively, of Section 6.04.

(u)     No Default or Event of Default shall exist, or would result from the proposed Borrowing on the Closing Date or from the application of the proceeds thereof.

(w)     The Required Lenders shall be satisfied that since October 5, 2015, there shall not have occurred any event, occurrence, development or state of circumstances or fact that has had or could reasonably be expected to have a Material Adverse Effect.

(x)     The Administrative Agent shall have received such other assurances, certificates, documents, consents or opinions as the Administrative Agent or Required Lenders reasonably may require.

(y)     The Borrower shall have paid to the Lenders a non-refundable fee payable in the form of the right, and the obligation, to purchase new equity interests in the Borrower in the amounts and as calculated pursuant to Section 2.1 and the definition of "Purchase Price" in the Equity Commitment Agreement (as defined in the Plan of Reorganization), which shall be earned and payable on the Closing Date.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or reasonably acceptable or satisfactory to such Person unless the Administrative Agent shall have received notice from such Person prior to the proposed Closing Date specifying its objection thereto.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Each Credit Party signatory hereto represents and warrants to the Lenders and the Administrative Agent for itself and on behalf of its Subsidiaries after giving effect to the Plan of Reorganization and the Confirmation Order as follows:

**5.01     Corporate Authority, Etc**.

(a)     **Existence**, **Qualification and Power.**  Each Credit Party and each Subsidiary thereof (i) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (ii)  has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (A) own or lease its assets and carry on its business and (B) execute, deliver and perform its obligations under the Loan Documents to which it is a party and (iii) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c) of this Section 5.01, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)     **Authorization; No Contravention.**  The execution, delivery and performance by each Credit Party of each Loan Document to which such Person is party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (i) contravene the terms of any of such Person's Governing Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be

made under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject or (iii) violate any Law; except in each case referred to in clause (ii) or (iii) of this Section 5.01(b) to the extent that such conflict, breach, contravention, creation, payment or violation could not reasonably be expected to have a Material Adverse Effect

(c)  **Governmental Authorization; Other Consents.**  Each Credit Party and Subsidiary has, is in compliance with, and is in good standing, with respect to all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and required reports to, all Governmental Authorities necessary to conduct its business and to own, lease and operate its properties except as could not reasonably be expected to have a Material Adverse Effect.  Except where noncompliance could not reasonably be expected to have a Material Adverse Effect, all necessary import, export or other licenses, permits or certificates for the import or handling of any goods or other Collateral have been procured and are in effect, and the Credit Parties and their Subsidiaries have complied with all foreign and domestic laws with respect to the shipment and importation of any goods or Collateral, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Credit Party of this Agreement or any other Loan Document or (ii) the grant by any Credit Party of the Liens created under the Security Documents and the perfection thereof (including the first priority nature thereof subject in priority only to Permitted Senior Liens), except for approvals, consents, exemptions, authorizations, actions, notice and filing which have been duly obtained, taken, given or made and are in full force and effect and the filing of UCC financing statements.

(d)  **Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Credit Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Credit Party, enforceable against each Credit Party that is party thereto in accordance with its terms, subject to applicable Debtor Relief Laws and general principles of equity relating to enforceability (whether considered in a proceeding at law or in equity) but such principles do not make the remedies afforded by the Loan Documents inadequate for the practical realization of the principal benefits intended to be provided thereby.

**5.02  Financial Statements**.    There has been furnished to the Lenders an unaudited consolidated balance sheet of Holdings and its Subsidiaries as of the close of the Fiscal Month ending November 30, 2015 and unaudited consolidated statements of income or operations and cash flow of Holdings and its Subsidiaries as of the close of such Fiscal Month, in each case, certified by a Financial Officer of Holdings.  Such balance sheet and statement of income or operations and cash flows have been prepared in accordance with GAAP and fairly present the financial condition of Holdings and its Subsidiaries as at the close of business on the date thereof and the results of operations subject to year-end and quarterly adjustments and the absence of footnotes.  There are no contingent liabilities of Holdings or any Subsidiary as of such date involving material amounts, known to the officers of Holdings or any Subsidiary required to be disclosed in such balance sheet and the notes related thereto in accordance with GAAP which were not disclosed in such balance sheet and the notes related thereto.

**5.03  [Intentionally Omitted]**.

**5.04    No Material Adverse Change**.  Since October 5, 2015, there not having occurred any event, occurrence, development or state of circumstances or facts that has had or could reasonably be expected to have, individually or in the aggregate a Material Adverse Effect.

**5.05    Ownership of Property; Liens**.  Each of the Credit Parties and each Subsidiary has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business and good title to all of its personal property, in each case, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The property of the Credit Parties and their Subsidiaries is subject to no Liens, other than Liens permitted by Section 7.03.

**5.06    Franchises, Patents, Copyrights, etc**.  Each Credit Party possesses all franchises, patents, copyrights, trademarks, trade names, licenses and permits, and rights in respect of the foregoing, adequate for the conduct of its business without known material conflict with any rights of others.  The Perfection Certificate delivered on the Closing Date sets forth a true, correct and complete list of all patents, patent applications, federally registered copyrights and copyright applications, trademarks and trademark applications owned by any Credit Party as of the Closing Date.

**5.07    Litigation**.  Except for actions, suits, proceedings, investigations, claims or disputes set forth in Schedule 5.07 there are no actions, suits, proceedings, investigations, claims or disputes pending or, to the knowledge of the Credit Parties or any of its Domestic Subsidiaries, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Credit Parties, any of their Domestic Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document or (b) could reasonably be expected to result in a Material Adverse Effect.

**5.08    No Default**.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.09    Compliance with Laws**.  Each Credit Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  No material inventory has been produced in violation of the Fair Labor Standards Act of 1938.

**5.10    Tax Status**.  The Credit Parties (i) have filed or caused to be filed all material federal, material provincial, material state, material local and material foreign tax returns, reports and declarations required by any jurisdiction to which any of them is subject and (ii) have paid all material Taxes (including withholdings) required to have been paid including in their capacity as tax withholding agents, except (a) those being contested in good faith and by appropriate proceedings and for which the Credit Parties have set aside on their books reasonably adequate provisions therefor in accordance with GAAP (unless foreclosure or other similar enforcement action has been commenced in respect thereof or any Lien has been filed or otherwise perfected therefor, in which case such exception does not apply) or (b) those that have been excused or prohibited from being paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code in connection with the Chapter 11 Cases.  Proper and accurate amounts have been withheld by each Credit Party from its respective employees for all periods in material compliance with all material applicable, federal, provincial, state, local and foreign laws and such withholdings have been timely paid to the respective Governmental Authorities.

49

**5.11    Insurance**.  The properties of the Credit Parties are insured with financially sound and reputable insurance companies that are not Affiliates of the Borrowers, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Credit Parties operate.

**5.12    Holding Company and Investment Company Acts**.  None of any Credit Party, any Person Controlling any Credit Party, or any Subsidiary of any Credit Party, (a) is subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code or (b) is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.13    ERISA Compliance**.

(a)    Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state laws.  Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the IRS.  To the best knowledge of each Credit Party, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)    There are no pending or, to the best knowledge of each Credit Party, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or would reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred, and neither any Credit Party nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan, (ii) each Credit Party and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained, (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and neither any Credit Party nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date, (iv) neither any Credit Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid, (v) neither any Credit Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

(d)    Neither any Credit Party nor any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan.

(e)    With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been made, or, if applicable, accrued, in

accordance with normal accounting practices, (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

     **5.14**    **Regulations U and X**.  The proceeds of the Loans shall be used solely for the purposes specified in <u>Section 6.11</u>.  No portion of any Loan is to be used for the purpose of purchasing or carrying any "margin security" or "margin stock" as such terms are used in Regulations U and X of the FRB 12 C.F.R. Parts 221 and 224.

     **5.15**    **True Copies of Governing Documents**.  As of the Closing Date, the Credit Parties have furnished or caused to be furnished to each of the Lenders true and complete copies of the Governing Documents (together with any amendments thereto) of each Credit Party.

     **5.16**    **Fiscal Year**.  The Credit Parties have a fiscal year ending December 31 of each year.

     **5.17**    **Subsidiaries, etc**.  As of the Closing Date, Holdings does not have any Subsidiaries except as set forth on <u>Schedule 5.17</u> hereto and, as of the Closing Date, all of the outstanding Capital Stock in such Subsidiaries has been validly issued, fully paid and nonassessable and are owned by Holdings (or a Subsidiary of Holdings) in the amounts specified on <u>Schedule 5.17</u> free and clear of all Liens (other than Liens in favor of the Administrative Agent granted under the Security Documents).

     **5.18**    **Environmental Compliance**.  Based upon the actual knowledge of the Chief Executive Officer and Chief Financial Officer of Holdings, and except as specifically disclosed in <u>Schedule 5.18</u>, existing Environmental Laws and claims, as they relate to the Credit Parties and their Subsidiaries, could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

     **5.19**    **Bank Accounts**.  The Perfection Certificate delivered on the Closing Date sets forth the true, correct and complete account numbers and location of all bank accounts of the Credit Parties as of the Closing Date.

     **5.20**    **Labor Contracts**.  Except as set forth on <u>Schedule 5.20</u>, as of the Closing Date, none of the Credit Parties is party to any collective bargaining agreement.  Except as otherwise disclosed to the Administrative Agent there are no material grievances, disputes or controversies with any union or other organization of any Credit Party's employees, or threats of strikes or work stoppages that would reasonably be expected to result in a Material Adverse Effect.

     **5.21**    **Disclosure**.  Each Credit Party has disclosed to the Administrative Agent all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Credit Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading.

#4848-5684-9449v15

**5.22    OFAC**.  No Credit Party, nor, to the knowledge of any Credit Party, any Related Party, (a) is currently the subject of any Sanctions, (b) is located, organized or residing in any Designated Jurisdiction or (c) is or has been (within the previous five (5) years) engaged in any transaction with any Person who is now or was then the subject of Sanctions or who is located, organized or residing in any Designated Jurisdiction.  No Loan, nor the proceeds from any Loan, has been used, directly or indirectly, to lend, contribute, provide or has otherwise made available to fund any activity or business in any Designated Jurisdiction or to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject of any Sanctions, or in any other manner that will result in any violation by any Person (including any Lender or the Administrative Agent) of Sanctions.

**5.23    Other Debt Documents**.  Except for Indebtedness under the SG Credit Agreement and as set forth in Schedule 7.02, the Borrowers do not have any other Indebtedness for borrowed money outstanding on the Closing Date.

**5.24    Solvency**.  On the Closing Date, after giving effect to the Plan of Reorganization and the Confirmation Order, the Credit Parties on a consolidated basis, taken as a whole, are Solvent.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

Each Credit Party signatory hereto covenants and agrees for itself and on behalf of its Subsidiaries that, so long as any Lender shall have any Commitment hereunder or any Loan or other Obligation remains outstanding:

**6.01    [Intentionally Omitted]**.

**6.02    Maintenance of Office; Certain Changes**.  Each Credit Party will maintain its chief executive office, distribution center, warehouse, shipping center, plant, factory, or other similar location at the locations identified in the Perfection Certificate delivered by such Credit Party to the Administrative Agent, or at such other place as the Borrower Representative shall designate upon not less than thirty (30) days' prior written notice to the Administrative Agent (or such shorter period as may be acceptable to the Administrative Agent).  Each Credit Party shall notify the Administrative Agent, in writing, not less than thirty (30) days prior to any change in its name or the type of its organization, jurisdiction or organization, organizational identification number, or tax identification number (or such shorter period as may be acceptable to the Administrative Agent).

**6.03    Records and Accounts**.  Each Credit Party will (a) keep true and accurate records and books of account in which full, true and correct entries will be made in accordance with, and all financial statements provided for herein shall be prepared in accordance with GAAP consistently applied, (b) maintain adequate accounts and reserves for all material unpaid taxes (including income taxes) and (c) at all times, maintain independent certified public accountants as the Credit Parties' accountants which shall be reasonably satisfactory to the Required Lenders (it being understood that Marcum LLP, PricewaterhouseCoopers, Deloitte Touche Tohmatsu, Ernst & Young, KPMG and BDO Seidman shall be satisfactory to the Required Lenders).

**6.04    Financial Statements, Certificates and Information**.  The Credit Parties will deliver to the Administrative Agent and the Lenders:

(a)    as soon as practicable, but in any event not later than one hundred and twenty (120) days for the Fiscal Year ending on December 31, 2015 and ninety (90) days after the end of

each Fiscal Year thereafter, the consolidated balance sheet of Holdings and its Subsidiaries, as at the end of such Fiscal Year, and the related consolidated statements of income or operations, cash flows and shareholders' equity for such Fiscal Year, each setting forth in comparative form the figures for the previous Fiscal Year and all such consolidated financial statements to be in reasonable detail, prepared in accordance with GAAP consistently applied and such consolidated financial statements to be audited and accompanied by a report and opinion prepared in accordance with generally accepted auditing standards by Marcum LLP or by other independent certified public accountants reasonably satisfactory to the Required Lenders and certified without qualification and without expression of uncertainty as to the ability of Holdings and its Subsidiaries to continue as going concerns, together with (w) a written statement from such accountants (to the extent then available on commercially reasonable terms) to the effect that, in making the examination necessary to said certification, nothing has come to their attention to cause them to believe that any Default or Event of Default has occurred or specifying those Defaults or Events of Defaults that they have become aware of, (x) a copy of their accountants' management letter (if any) for such Fiscal Year, and (y) a Compliance Certificate duly executed by a Financial Officer of Holdings, which, among other things, (A) attaches and certifies to the foregoing consolidated financial statements, accountants statements, and management letters, (B) certifies that the information contained in such financial statements fairly presents in all material respects the financial condition of the Holdings and its Subsidiaries on the dates indicated therein and (C) states that such Financial Officer has reviewed this Agreement and the other Loan Documents and has no knowledge of any Default or Event of Default during such Fiscal Year, or if such Financial Officer has such knowledge, specifying each Default or Event of Default and the nature thereof;

(b)       as soon as practicable, but in any event not later than forty five (45) days after the end of each of the first three Fiscal Quarters of each Fiscal Year (i) the unaudited quarterly consolidated financial statements of Holdings and its Subsidiaries for such Fiscal Quarter, including the consolidated balance sheet of Holdings and its Subsidiaries, as at the end of such Fiscal Quarter, the related consolidated statements of income or operations, cash flows and shareholders' equity for such Fiscal Quarter and for the portion of the Fiscal Year then ended, each setting forth in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, each, prepared in accordance with GAAP consistently applied, and (ii) a Compliance Certificate duly executed by a Financial Officer of Holdings, which, among other things, (A) attaches and certifies to the foregoing financial statements, (B) certifies that the information contained in such financial statements fairly presents in all material respects the financial condition of Holdings and its Subsidiaries on the dates indicated therein (subject to quarter-end adjustments and the absence of footnotes), (C) sets forth in comparative form the results for and through such Fiscal Quarter with the most recent projections delivered to the Administrative Agent pursuant to Section 6.04(c), (D) sets forth (if applicable) reconciliations to reflect changes in GAAP since the date of the last audited financial statements of Holdings and its Subsidiaries and (E) states that such Financial Officer has reviewed this Agreement and the other Loan Documents and has no knowledge of any Default or Event of Default during such Fiscal Quarter, or if such Financial Officer has such knowledge, specifying each Default or Event of Default and the nature thereof to the Administrative Agent's reasonable satisfaction;

(c)       not later than January 31 of each Fiscal Year (commencing with the 2017 Fiscal Year), an annual business plan and projections for Holdings and its Subsidiaries for the following Fiscal Year on a monthly basis (such projections to include consolidated balance sheets, statements of cash flows, statements of income or operations of Holdings and its Subsidiaries prepared on a month-by-month basis);

(d)        promptly upon receipt thereof, copies of any detailed audit reports, financial control reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Credit Parties by independent accountants or internal auditors in connection with any audit of any of them;

(e)        at the election of the Credit Parties or at the request of the Administrative Agent, copies of all annual, regular, periodic and special reports and registration statements which any Credit Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, and not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(f)        at the election of the Credit Parties or at the request of the Administrative Agent, copies of each notice or other correspondence received from the SEC or any other Governmental Authority concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Credit Party or any Subsidiary;

(g)        promptly after being furnished or received, copies of all notices, reports, certificates, documents and other information furnished to or received by any Credit Party in connection with the Revolving Facility Documents or the Subordinated Debt Documents (including any amendments, waivers, supplements, modifications, notices or other documents relating to any default or potential default thereunder, but in any event excluding routine notices, reports and certificates of an administrative nature);

(h)        (a) promptly following the reasonable request of the Administrative Agent, a report summarizing the insurance coverage in effect for each Credit Party and (b) promptly following the modification, renewal, replacement of any insurance policy of any Credit Party, updated insurance certificates and endorsements evidencing such coverage;

(i)        as soon as practicable, but in any event not later than ten (10) days (or such longer period as agreed by the Administrative Agent in its discretion) following the end of each Fiscal Year (or more frequently at the election of the Credit Parties), (a) an updated Perfection Certificate as to each Credit Party in substantially the same form as the Perfection Certificate most recently delivered to the Administrative Agent (with such scope and detail as the Administrative Agent's may reasonably require) or a certificate confirming that there has been no change in such information since the Perfection Certificate delivered on the Closing Date or the most recent Perfection Certificate delivered pursuant to this Section 6.04(i) and (b) updated Schedules 5.07, 5.17, 5.18, 5.20 and 7.08 in substantially the same form as the most recent schedule of the same delivered to the Administrative Agent to the Administrative Agent's reasonable satisfaction; and

(j)        promptly following a request therefor, from time to time such other financial data and information as the Administrative Agent or any Lender may reasonably request with respect to the Credit Parties, including updates and such other information and copies of documents with respect to pending litigation or the settlement or compromise thereof.

Documents required to be delivered pursuant to this Section 6.04 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the applicable Credit Party posts such documents and provides a link thereto on such Credit Party's website on the Internet at the website address listed on Schedule 11.02 or (ii) on which such documents are posted on the applicable Credit Party's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by

the Administrative Agent); provided that (x) upon the request of the Administrative Agent, the applicable Credit Party shall deliver paper copies of such documents to the Administrative Agent until a written request to cease delivering paper copies is given by the Administrative Agent and (y) the Borrower Representative shall notify the Administrative Agent and each Lender (by facsimile or electronic mail) of the posting of any such documents and provide to the Administrative Agent and each Lender by electronic mail electronic versions (i.e., soft copies) of such documents.  The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by any Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

**6.05    Notices**.

(a)    Defaults.  The Credit Parties will promptly (but in any event within two (2) Business Days) notify the Administrative Agent and each Lender in writing of the occurrence of (i) any Default or Event of Default or (ii) any "default", "event of default" or material breach under any Revolving Facility Document or any Subordinated Debt Document.

(b)    Material Adverse Effect.  The Credit Parties shall promptly (but in any event within two (2) Business Days) disclose in writing to the Administrative Agent (for distribution to each Lender) of any matter that has resulted or would reasonably be expected to result in a Material Adverse Effect.

(c)    ERISA Events.  The Credit Parties shall promptly disclose in writing to the Administrative Agent the occurrence of any ERISA Event;

(d)    Change in Accounting Policies or Financial Reporting.  The Credit Parties shall promptly disclose in writing to the Administrative Agent notice of (i) any material change in accounting policies or financial reporting practices by Holdings or any Subsidiary or (ii) discharge by any Credit Party of its independent accountants or any withdrawal or resignation by such independent accountants.

(e)    Notice of Tax Claims, Litigation and Judgments.  The Credit Parties will give notice to the Administrative Agent in writing within three (3) Business Days of any written notice of proposed assessment or written notice of the commencement of any material audit by any Governmental Authority for unpaid Taxes of any Credit Party or any Subsidiary that are due and payable, any commencement of any litigation or proceedings affecting any Credit Party, any Subsidiary or any member of the Senior Management of any Credit Party or any of its Subsidiaries or to which any Credit Party, any Subsidiary or any member of the Senior Management of any Credit Party or any of its Subsidiaries is or becomes a party that (i) involves any claim that has resulted in or would reasonably be expected to result in liabilities of more than $350,000 that are not covered by insurance policies maintained in accordance with Section 6.07, (ii) to the knowledge of the general counsel or chief financial officer of Holdings, involves any adverse claim or proceeding against any member of the Senior Management of Holdings, which has resulted in or would reasonably be expected to result in material publicity with respect to the Credit Parties or such member of the Senior Management of Holdings, (iii) has resulted in or would reasonably be expected to result in a Material Adverse Effect or (iv) is a criminal investigation or involves a criminal penalty for any felony.  The Credit Parties will give notice to the Administrative Agent and each Lender, in writing, in form and detail reasonably satisfactory to the Administrative Agent, within five (5) Business Days of any judgment not covered by insurance, final or otherwise, against any Credit Party in an amount in excess of $350,000 or of

the entry of any non-monetary judgment that would reasonably be expected to have a Material Adverse Effect.

(f)    Notification of Additional Intellectual Property Rights.  Concurrently with the delivery of financial statements with respect to any Fiscal Quarter, the Credit Parties will notify the Administrative Agent in writing of any patents, patent applications, patent application disclosures filed with any patent office during such Fiscal Quarter, registered copyrights or mask works registered during such Fiscal Quarter, applications for registration of copyrights or mask works filed during such Fiscal Quarter and trademark and service mark registrations during such Fiscal Quarter, and trademark and service mark registration applications filed during such Fiscal Quarter, all of the foregoing whether a foreign or United States right, to the extent not listed on the Perfection Certificate most recently delivered to the Administrative Agent in accordance with this Agreement.

(g)    Environmental Events.  The Credit Parties will promptly give notice to the Administrative Agent and each Lender (i) of any violation of any Environmental Law that any Credit Party reports in writing or is reportable by such Person in writing (or for which any written report supplemental to any oral report is made) to any Governmental Authority and (ii) upon any member of Senior Management of any Credit Party becoming aware thereof of any inquiry, proceeding, investigation, or other action, including a notice from any agency of potential Environmental Liability, of any Governmental Authority that, in the case of clause (i) or (ii) of this paragraph, would reasonably be expected to result in a Material Adverse Effect.

(h)    Prepayment Events.  Promptly following the occurrence of any event for which the Borrowers are required to make a prepayment under Sections 2.05(a) through (c), together with all supporting information reasonably requested by the Administrative Agent or the Required Lenders.

(i)    Labor Relations.  The Credit Parties shall provide to the Administrative Agent prompt written notice of any collective bargaining agreement or other labor contract to which a Credit Party becomes a party, or the application for the certification of a collective bargaining agent.

(j)    Amendments to Revolving Facility Documents.  From and after the date that a Revolving Facility is in effect, the Credit Parties shall promptly (but in any event within two (2) Business Days) disclose in writing to the Administrative Agent (for distribution to each Lender) any amendment, restatement, material supplement or other modification to any Revolving Facility Document.

Delivery by the Credit Parties to the Administrative Agent of any and all notices required to be delivered to the Lenders as herein required shall be deemed made upon receipt of such notices by the Administrative Agent.

**6.06    Legal Existence; Maintenance of Properties**.

(a)    Except as permitted by Section 7.05, each Credit Party will do all things necessary to (i) maintain in full force and effect its legal existence and good standing under the laws of its jurisdiction of organization or incorporation, (ii) maintain its qualification to do business in each state or other jurisdiction in which the failure to do so would result in a Material Adverse Effect and (iii) maintain all of its rights and franchises, except where the failure to maintain such right or franchise would not result in a Material Adverse Effect.

(b)     Each Credit Party (i) will cause all of its properties used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment, subject to ordinary wear and tear and except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, (ii) will cause to be made all necessary repairs, renewals and replacement thereof, all as in the judgment of the Credit Parties may be necessary so that the business carried on in connection therewith may be properly conducted at all times and (iii) will continue to engage in the material lines of businesses conducted by them on the date hereof; provided that nothing in this Section 6.06(b) shall prevent any Credit Party from discontinuing the operation and maintenance of any of its properties if such discontinuance is permitted by Section 7.05(b).

6.07     **Insurance**.  Each Credit Party will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with the general practices of businesses engaged in similar activities in similar geographic areas and in amounts, containing such terms, in such forms and for such periods as may be reasonable and prudent and in accordance with the terms of the Security Documents.  Such policies of insurance shall name the Administrative Agent as an additional insured or lender's loss payee, as applicable and provide for such notice to the Administrative Agent of termination, lapse or cancellation of such insurance as is acceptable to the Administrative Agent (and Administrative Agent acknowledges that thirty (30) days' prior written notice (or ten (10) days' prior notice in the case of non-payment of the premium) is acceptable to the Administrative Agent).

6.08     **Taxes**.  Each Credit Party will duly pay and discharge, or cause to be paid and discharged, before the same shall become overdue, all material federal, provincial, state, local and other Taxes, assessments and other governmental charges imposed upon it and its real properties, sales and activities, or any part thereof, or upon the income or profits therefrom, as well as all materials claims for labor, materials, or supplies that if unpaid might by law become a Lien or charge upon any of its property; provided that any such Taxes, assessment, charge, levy or claim need not be paid if (a) the validity or amount thereof shall be contested in good faith by appropriate proceedings and such Credit Party shall have set aside on its books adequate reserves in accordance with GAAP with respect thereto or (b) it shall have been excused or prohibited from being paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code in connection with Chapter 11 Cases.  Each Credit Party shall file or cause to be filed all material federal, material state, material provincial, material local and material foreign income tax returns, and all other material tax returns, reports, and declarations required by any jurisdiction to which it is subject as required by applicable Law.

6.09     **Compliance with Laws, Contracts, Licenses, Permits; Leaseholds and Payment of Obligations Generally**.

(a)     Compliance with Laws, Contracts, Licenses and Permits.  Each of the Credit Parties will comply with (i) the applicable Laws wherever its business is conducted, including all Environmental Laws, (ii) the provisions of its Governing Documents, (iii) all agreements and instruments by which it or any of its properties may be bound, (iv) the Plan of Reorganization and the Confirmation Order and (v) all applicable decrees, orders, and judgments, provided that in each case, such compliance shall be required by this Agreement only where noncompliance with this Section 6.09(a)(i)-(v) would result in a Material Adverse Effect.  If any authorization, consent, approval, permit or license from any Governmental Authority or any central bank or other fiscal or monetary authority shall become necessary or required in order that any Credit Party may fulfill any of its obligations hereunder or any of the other Loan Documents to which such Credit Party is a party, each Credit Party will promptly take or cause to be taken all reasonable steps within the power of such Credit Party to obtain such authorization, consent,

approval, permit or license, and upon request of the Administrative Agent, to furnish the Administrative Agent and the Lenders with evidence thereof.

(b)     Compliance with Terms of Leaseholds.  Each Credit Party will make all payments and otherwise perform all material obligations in respect of all leases and licenses of real property (including with respect to any concession units) to which such Credit Party is a party within any grace period provided therefor under such lease, notify the Administrative Agent of any default by any party with respect to such leases or licenses and cooperate with the Administrative Agent in all respects to cure any such default by a Credit Party, and cause each of its Domestic Subsidiaries to do so, except, (i) to the extent such obligations shall be contested in good faith by appropriate proceedings and for which the Credit Parties have set aside on their books reasonably adequate provisions therefor in accordance with GAAP and (ii) the failure to make payments in respect of leases for no more than five (5) retail stores of the Credit Parties at any time.

(c)     Payment of Obligations Generally.  Except to the extent prohibited by Article VII, each of the Credit Parties will pay and discharge, as the same shall become due and payable, all its other obligations and liabilities, including all lawful claims which, if unpaid, would by law become a Lien that is not a Permitted Lien upon its property or otherwise would reasonably be expected to result in a Material Adverse Effect.

**6.10     [Intentionally Omitted]**.

**6.11     Use of Proceeds**.  Subject to the terms and conditions herein, the proceeds of the Loans will be used: (i) to repay on the Closing Date an amount equal to, and used to refinance, all amounts due and owing under the DIP Facility as of the Closing Date and (ii) with respect to the Closing Date Loans, (A) to pay related transaction costs, fees and expenses with respect to this Agreement, (B) to fund certain disbursements, costs and expenses in connection with the Consummation of the Plan of Reorganization and (C) to provide working capital, and for other general corporate purposes of the Credit Parties (including for Permitted Acquisitions, other Investments and Restricted Payments permitted hereunder).

**6.12     Covenant to Guarantee Obligations and Give Security**.

(a)     Upon the formation or Acquisition of any new direct or indirect Subsidiary after the Closing Date (other than any Foreign Subsidiaries) by any Credit Party, then the Credit Parties shall, at the Credit Parties' expense:

(i)     within ten (10) days (or such longer period as agreed by the Administrative Agent in its discretion) after such formation or Acquisition, cause such Subsidiary, and cause each direct and indirect parent and Subsidiary of such Subsidiary (if it has not already done so and is not a Foreign Subsidiary), to be joined as a Guarantor and duly execute and deliver to the Administrative Agent a Credit Party Guaranty guaranteeing the other Credit Parties' obligations under the Loan Documents,

(ii)     within ten (10) days (or such longer period as agreed by the Administrative Agent in its discretion) after such formation or Acquisition, furnish to the Administrative Agent a description of the real and personal properties of such Subsidiary, in detail reasonably satisfactory to the Administrative Agent,

(iii)     within fifteen (15) days (or such longer period as agreed by the Administrative Agent in its discretion) after such formation or Acquisition, cause such

58

Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to duly execute and deliver to the Administrative Agent Security Documents and a joinder to the Intercreditor Agreement, if applicable, as specified by and in form and substance reasonably satisfactory to the Administrative Agent (including delivery of all certificates representing the Capital Stock in and of such Subsidiary), securing payment of all the Obligations of such Subsidiary or such parent, as the case may be, under the Loan Documents and constituting Liens on all such real and personal properties,

(iv)    within fifteen (15) days (or forty-five (45) days with respect to fee owned real property required to be subject to a Mortgage unless substantially all of such property is subject to a Lien permitted by Section 7.03(a)(viii)) (in each case, or such longer period as agreed by the Administrative Agent in its discretion) after such formation or Acquisition, cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents or such other actions as are necessary or desirable under any applicable Law) may be necessary or advisable in the reasonable opinion of the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on the properties purported to be subject to the Security Documents delivered pursuant to this Section 6.12, enforceable against all third parties in accordance with their terms, and

(v)    as promptly as practicable after such formation or Acquisition, deliver, upon the request of the Administrative Agent in its sole discretion, to the Administrative Agent with respect to each parcel of fee owned real property having a fair market value greater than $2,500,000 (unless substantially all of such property is subject to a Lien permitted by Section 7.03(a)(viii)) owned or held by the entity that is the subject of such formation or Acquisition and that is to be subject to a Mortgage as provided in this Section 6.12, title reports, surveys and to the extent in the Credit Party's possession or to the extent required by applicable Law, engineering, soils and other reports, and environmental assessment reports, each in scope, form and substance reasonably satisfactory to the Administrative Agent, provided, however, that to the extent that any Credit Party or any of its Subsidiaries shall have otherwise received any of the foregoing items with respect to such real property, such items shall, promptly after the receipt thereof, be delivered to the Administrative Agent.

(b)    Upon the acquisition of any property by any Credit Party following the Closing Date, if such property, in the reasonable judgment of the Administrative Agent, shall not already be subject to a perfected first priority security interest (subject in priority only to Permitted Senior Liens) in favor of the Administrative Agent for the benefit of the Secured Parties (unless such property is specifically excluded as Collateral by the terms of the Security Documents or is subject to a Lien permitted by Section 7.03(a)(viii)), then the Credit Parties shall, at the Credit Parties' expense:

(i)    within ten (10) days (or such longer period as agreed by the Administrative Agent in its discretion) after such acquisition, furnish to the Administrative Agent a description of the property so acquired in detail reasonably satisfactory to the Administrative Agent,

(ii)      within fifteen (15) days (or such longer period as agreed by the Administrative Agent in its discretion) after such acquisition, cause the applicable Credit Party to duly execute and deliver to the Administrative Agent Security Documents (to the extent not already delivered), as specified by and in form and substance reasonably satisfactory to the Administrative Agent, securing payment of all the Obligations of the applicable Credit Party under the Loan Documents and constituting Liens on all such properties,

(iii)     within fifteen (15) days (or forty-five (45) days with respect to fee owned real property required to be subject to a Mortgage) after such acquisition, cause the applicable Credit Party to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents or such action necessary or desirable under applicable Law) may be necessary or advisable in the opinion of the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on such property, enforceable against all third parties,

(iv)     within fifteen (15) days (or forty-five (45) days with respect to fee owned real property required to be subject to a Mortgage unless substantially all of such property is subject to a Lien permitted by Section 7.03(a)(viii)) after such acquisition, deliver to the Administrative Agent, upon the request of the Administrative Agent in its sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Credit Parties reasonably acceptable to the Administrative Agent as to the matters contained in clauses (ii) and (iii) above and as to such other matters as the Administrative Agent may reasonably request, and

(v)      as promptly as practicable after any acquisition of fee owned real property having a fair market value greater than $2,500,000 (unless substantially all of such property is subject to a Lien permitted by Section 7.03(a)(viii), deliver, upon the request of the Administrative Agent in its sole discretion to the Administrative Agent with respect to such real property that is to be subject to a Mortgage as provided in this Section 6.12, flood zone determination forms, flood insurance certificates, to the extent applicable, (and to the extent provided or required to be provided to the Senior Notes Trustee) title reports, surveys and engineering, soils and other reports, and environmental assessment reports, each in scope, form and substance reasonably satisfactory to the Administrative Agent, provided, however, that to the extent that any Credit Party or any of its Subsidiaries shall have otherwise received any of the foregoing items with respect to such real property, such items shall, promptly after the receipt thereof, be delivered to the Administrative Agent;

provided that notwithstanding anything contained in this Section 6.12(b) or any Loan Document to the contrary, (A) no more than 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of any Foreign Subsidiary formed or acquired by any Credit Party shall be required to be subject to the security interest of the Administrative Agent and (B) notwithstanding clause (A) or anything in any Loan Document to the contrary, no property (including Capital Stock) which is directly or indirectly owned by any CFC shall be subject to the security interest of the Administrative Agent.

(c)      Notwithstanding anything herein to the contrary, upon the request of the Required Lenders, from and after the date that a Revolving Facility is in effect, the Credit Parties shall execute and deliver to the Administrative Agent, for the benefit of the Secured Parties, mortgages,

charges, deeds of trust, deposit account control agreements, collateral access agreements and other security documents to the extent provided to Revolving Facility Agent or executed in respect of the obligations securing the Revolving Facility, in each case, subject to and in accordance with the priorities set forth in the Intercreditor Agreement.

(d)    At any time upon request of the Administrative Agent or the Required Lenders, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent or the Required Lenders may deem necessary or desirable in obtaining the full benefits of or (as applicable) in perfecting and preserving the Liens of, such Security Documents.

**6.13    Further Assurances**.  Each Credit Party will cooperate with the Lenders and the Administrative Agent and execute such further instruments and documents as the Lenders or the Administrative Agent shall reasonably request to carry out to their reasonable satisfaction the transactions contemplated by this Agreement and the other Loan Documents.

**6.14    Inspections**.  Each Credit Party shall permit the Lenders and the Administrative Agent, at the Credit Parties' expense, to visit and inspect any of the properties of any Credit Party accompanied by a representative of the Credit Party to the extent such representative does not interfere with such inspection, to examine the books of account of such Credit Party (and to make copies thereof and extracts therefrom), and to discuss the affairs, finances and accounts of such Credit Party with, and to be advised as to the same by, its and their officers, in each case, except when an Event of Default shall have occurred and be continuing, at such reasonable times and intervals and with reasonable prior notice as the Administrative Agent or any Lender may reasonably request.

**6.15    Cash Management**.  Subject to Section 6.16, unless otherwise agreed by the Required Lenders, the Credit Parties shall cause all deposit accounts, all securities accounts and all commodities accounts (other than Excluded Accounts) of the Credit Parties to be subject to Agency Account Agreements at all times.

**6.16    Post-Closing Obligations**  Each Credit Party shall comply with each of the covenants contained in Schedule 6.16 on or before the time periods specified therein.

## ARTICLE VII

## NEGATIVE COVENANTS

Each Credit Party signatory hereto covenants and agrees for itself and on behalf of its Subsidiaries that, so long as any Lender shall have any Commitment hereunder or any Loan or other Obligation remains outstanding:

**7.01    Investments**.  None of the Credit Parties nor any of its Subsidiaries will make any Investment in any Person, except for Investments which consist of:

(a)    Investments comprised of notes payable, or stock or other securities issued by non-Affiliated account debtors to such Credit Parties (or issued by account debtors to Subsidiaries that are not Credit Parties) pursuant to negotiated agreements with respect to settlement of such account debtor's accounts in the ordinary course of business or following delinquency or financial distress of such account debtor;

(b)    Capital Stock (i) issued and outstanding on the Closing Date in its Subsidiaries in existence on the Closing Date, (ii) issued following the Closing Date by a Credit Party to another

Credit Party, (iii) issued following the Closing Date by a Subsidiary that is not a Credit Party in favor of a Credit Party, (iv) issued following the Closing Date by a Subsidiary that is not (and that is not required to be) a Credit Party in favor of another Subsidiary that is not (and this is not required to be) a Credit Party or (v) issued to a Credit Party following the Closing Date by another Person that will become a Credit Party promptly following such issuance or capital contribution between such Persons;

(c)     Investments consisting of capital contributions by (i) a Credit Party to another Credit Party or (ii) a Subsidiary that is not a Credit Party in favor of a Credit Party or a Subsidiary that is not a Credit Party;

(d)     Investments consisting of (i) unsecured, intercompany loans by and among the Credit Parties so long as the Administrative Agent has a first priority, perfected Lien in such intercompany loans and has received the Intercompany Note evidencing such intercompany loans, together with transfer powers executed in blank and a Subordination Agreement in connection therewith and (ii) intercompany loans made by any Subsidiary to any Credit Party on terms and conditions reasonably acceptable to the Required Lenders, including the Administrative Agent's receipt of a Subordination Agreement;

(e)     Investments by a Subsidiary that is not a Credit Party in a Credit Party or a Subsidiary that is not a Credit Party;

(f)     Investments consisting of any Credit Party or any Subsidiary Guaranteeing (i) the Obligations of the Credit Parties and (ii) any obligations or other Indebtedness if such Credit Party or such Subsidiary would be permitted to directly incur such Indebtedness under Section 7.02 or if such obligations would be permitted to be incurred under this Agreement, except in each case, the Guarantee by a Credit Party of Indebtedness or trade payables of Foreign Subsidiaries other than as permitted under clause (k) of this Section 7.01;

(g)     Investments in cash or Cash Equivalents;

(h)     Investments consisting of loans to its respective employees on an arm's-length basis in the ordinary course of business consistent with past practices for travel expenses, relocation costs and similar purposes up to a maximum of $50,000 per employee at any one time outstanding and $500,000 in the aggregate at any one time outstanding;

(i)     Investments existing as of the Closing Date and set forth on Schedule 7.01;

(j)     Investments in Foreign Subsidiaries after the Closing Date in an aggregate amount outstanding at any time not to exceed $2,500,000; provided that to the extent such Investments are in the form of loans, advances or other extensions of credit to a Foreign Subsidiary, such Investments are evidenced by the Intercompany Note pledged to the Administrative Agent, together with transfer powers executed in blank in connection therewith;

(k)     Investments by the Credit Parties in their Foreign Subsidiaries consisting of extensions of credit in the nature of intercompany accounts receivables from the sale of inventory; provided that (i) the aggregate book value of all outstanding accounts receivable of all Subsidiaries that are not Credit Parties owing to any Credit Party, whether or not arising out of the sale of inventory, shall not exceed $40,000,000 at any time, (ii) the amount of cash held at all Foreign Subsidiaries of the Credit Parties (excluding cash on deposit with third parties as security under a lease agreement) shall not exceed $12,500,000 in the aggregate as of the last day of any

62

Fiscal Month, (iii) such Investments may not be converted into Capital Stock or a capital contribution, no payments with respect to such Investments may be waived by the Credit Parties and such Investments are repayable in cash by the Foreign Subsidiaries; provided that returns of inventory by any Foreign Subsidiary to any Credit Party in the ordinary course of business may be credited to any outstanding accounts receivable of such Foreign Subsidiary owing to such Credit Party and (iv) such Investments are evidenced by the Intercompany Note pledged to the Administrative Agent, together with transfer powers executed in blank in connection therewith;

(l)     advances of payroll payments to employees in the ordinary course of business consistent with past practices in an amount not to exceed payments for one (1) payroll period for any employee;

(m)     Investments held solely by Foreign Subsidiaries denominated in any foreign currency that is the local foreign currency of such Foreign Subsidiary customarily used by similar foreign companies for cash management purposes in any jurisdiction outside the United States to the extent reasonably required or desirable in connection with any business conducted by any Foreign Subsidiary organized in such jurisdiction;

(n)     Investments consisting of any Credit Party Guaranteeing (i) from and after the date that a Revolving Facility is in effect, pursuant to the Revolving Facility Documents, the Indebtedness evidenced by the Revolving Facility Documents incurred by another Credit Party to the extent such incurrence is permitted by Section 7.02(j) and (ii) pursuant to the SG Debt Documents, the Indebtedness evidenced by the SG Credit Agreement incurred by American Apparel (Carnaby) Limited or other Foreign Subsidiaries party thereto as a borrower to the extent such incurrence is permitted by Section 7.02(p) and such Guaranteeing Credit Party is a guarantor of such Indebtedness under the SG Debt Documents on the Closing Date;

(o)     Permitted Acquisitions;

(p)     Investments of any person that becomes a Subsidiary of Holdings after the Closing Date pursuant to a Permitted Acquisition or other Investment permitted hereunder; provided that (i) such Investments exist at the time such person becomes a Subsidiary of Holdings, (ii) such Investments are not made in anticipation or contemplation of such person becoming a Subsidiary of Holdings and (iii) such Investments are not directly or indirectly recourse to any of Holdings or its Subsidiaries or any of their respective assets, other than to the person that becomes a Subsidiary of Holdings; and

(q)     Investments in an aggregate amount not to exceed $2,500,000 at any time outstanding, so long as no Default or Event of Default has occurred and is continuing immediately prior to and after giving effect to such Investment.

**7.02     Restrictions on Indebtedness**.  None of the Credit Parties nor any of its Subsidiaries will incur, assume, guarantee or be or remain liable, contingently or otherwise, with respect to any Indebtedness other than:

(a)     Indebtedness secured by purchase money security interests and Capitalized Leases permitted by Section 7.03(a)(vi) and any Permitted Refinancing thereof or amendments or modifications thereof that do not have the effect of increasing the principal amount thereof (except by an amount not in excess of accrued and unpaid interest and premiums owing thereon and fees and expenses incurred in connection with such refinancing), changing the amortization

thereof (other than to extend the same), accelerating the maturity date thereof or decreasing the weighted average life thereof;

(b)       Indebtedness of the Credit Parties consisting of the Obligations under the Loan Documents;

(c)       Indebtedness in respect of Swap Contracts entered into not for speculative purposes specifically permitted under Section 7.09;

(d)       unsecured Subordinated Debt on terms and conditions acceptable to the Required Lenders in their sole discretion, provided that the maturity date of such Subordinated Debt shall be at least one hundred and eighty (180) days following the Maturity Date (after taking into account any extension thereof);

(e)       Indebtedness consisting of intercompany loans and advances permitted by Section 7.01;

(f)       Guarantees by (i) any Credit Party of Indebtedness of any Credit Party permitted by this Section 7.02, (ii) any Subsidiary that is not a Credit Party of any Indebtedness of any Credit Party permitted by this Section 7.02, (iii) any Subsidiary that is not a Credit Party of any Indebtedness of any other Subsidiary that is also not a Credit Party permitted by this Section 7.02 and (iv) a Credit Party of any Indebtedness of any other Subsidiary that is not a Credit Party permitted by Section 7.01(k);

(g)       Indebtedness consisting of contingent liabilities under surety bonds and similar instruments incurred in the ordinary course of business;

(h)       Indebtedness in respect of netting services, automatic clearing house arrangements and similar arrangement in the ordinary course of business in each case in connection with deposit and securities account;

(i)       to the extent constituting Indebtedness, obligations in respect of agreements for the deferred payment of premiums or to finance the deferred payment of premiums owing by any Credit Party under any insurance policies entered into in the ordinary course of business that are either (i) unsecured or (ii) secured by a Lien permitted under Section 7.03(a)(xiv);

(j)       Indebtedness under a revolving credit facility (or, with the consent of the Required Lenders, a term loan facility subject to a minimum collateral coverage requirement) in an aggregate principal amount (including loans and letters of credit) not to exceed $40,000,000 in the aggregate at any time outstanding (a "Revolving Facility"); provided that (i) the terms of such Revolving Facility shall be reasonably acceptable to the Required Lenders and (ii) such Revolving Facility shall be subject to the Intercreditor Agreement.

(k)       Attributable Indebtedness incurred following the Closing Date pursuant to sale-leaseback transactions permitted by Section 7.06;

(l)       Indebtedness of the Foreign Subsidiaries (whether unsecured or secured assets of the Foreign Subsidiaries incurring such Indebtedness) in an aggregate amount outstanding at any time not to exceed $17,000,000;

(m)      assumed Indebtedness of any person that becomes a Subsidiary of Holdings (or is merged or consolidated with and into a Subsidiary of Holdings) after the Closing Date in connection with a Permitted Acquisition or other Investment permitted hereunder in an aggregate principal amount not to exceed $5,000,000 at any time outstanding for all such Indebtedness, provided that such Indebtedness (i) exists at the time of such Permitted Acquisition or other Investment and (ii) is not created in anticipation or contemplation of such Permitted Acquisition or other Investment;

(n)      Indebtedness under the Existing Letters of Credit to the extent cash collateralized;

(o)      unsecured Indebtedness of the Credit Parties incurred after the Closing Date in an aggregate principal amount not to exceed $3,000,000 at any time outstanding, so long no Default or Event of Default shall have occurred and be continuing or would be caused by the incurrence of such Indebtedness;

(p)      unsecured Indebtedness of the borrowers under the SG Debt Documents on the Closing Date in an aggregate principal amount not to exceed the amount outstanding on the Closing Date plus the amount of any increase in principal for the purpose of paying interest in kind or as a result of accretion thereof; and

(q)      Indebtedness of any Credit Party outstanding as of the Closing Date and specified in Schedule 7.02 hereto and any Permitted Refinancing thereof.

**7.03    Restrictions on Liens**.

(a)      **Permitted Liens**.  None of the Credit Parties nor any of its Subsidiaries will create or incur or suffer to be created or incurred or to exist any Lien upon any of their respective property or assets of any character whether now owned or hereafter acquired, or upon the income or profits therefrom other than:

(i)      Liens of landlords, carriers, warehousemen, mechanics and materialmen and other like Liens created in the ordinary course of business, for amounts not yet due or which are being contested in good faith by appropriate proceedings and as to which adequate reserves or other appropriate provisions are being maintained in accordance with GAAP;

(ii)      pledges or deposits made in connection with worker's compensation, employee benefit plans, unemployment or other insurance, old age pensions, or other Social Security benefits, and good faith deposits in connection with tenders, contracts, bids, statutory obligations or leases to which it is a party or deposits to secure, or in lieu of, surety, penalty or appeal bonds, performance bonds, letters of credit and other similar obligations or arising as a result of progress payments under government contracts or contracts with public utilities, in each case, in the ordinary course of business;

(iii)      such minor defects, irregularities, encumbrances, easements, rights of way, and clouds on title as normally exist with respect to similar properties which do not materially interfere with the present or proposed use of the applicable real property;

(iv)      Liens in favor of the Administrative Agent and the other Secured Parties securing the Obligations;

(v)      Liens in existence on the Closing Date and listed on <u>Schedule 7.03</u>; <u>provided</u> that (i) the Lien does not extend to any additional property (other than accessions to equipment and proceeds thereof) and (ii) to the extent such amount secured constitutes Indebtedness, such Indebtedness is permitted by <u>Section 7.02</u>;

(vi)     Liens created after the Closing Date by conditional sale or other title retention agreements (including Capitalized Leases and sale-leaseback transactions permitted by this Agreement) or in connection with purchase money Indebtedness, in each case, with respect to equipment and fixed assets acquired by any Credit Party or any Subsidiary of a Credit Party, involving the incurrence of an aggregate amount of purchase money Indebtedness and obligations with respect to conditional sale or title retention agreements of not more than $15,000,000  outstanding at any one time for all such Liens (<u>provided</u> that such Liens attach only to the assets subject to such purchase money debt and such Indebtedness is incurred within one hundred twenty (120) days following such purchase and does not exceed 100% of the purchase price of the subject assets);

(vii)    judgment Liens for the payment of money not constituting an Event of Default so long as the enforcement of such Lien has been effectively stayed and so long as such Lien is junior to the Lien in favor of the Administrative Agent granted under the Security Documents;

(viii)   Liens in favor of a banking institution encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry to secure usual and customary fees, returned items and other like exposure with respect to such account relating to deposit or securities accounts maintained by Holdings or any of its Subsidiaries with such banking institution;

(ix)     Liens arising by operation of law under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(x)      Liens for Taxes not yet due and payable or which are being contested in good faith by appropriate proceedings, <u>provided</u> that the applicable Credit Party or Subsidiary shall have set aside on its books adequate reserves in accordance with GAAP with respect thereto;

(xi)     Liens in favor of customs and revenue authorities to secure payment of customs duties in connection with the importation of goods;

(xii)    Liens on unearned insurance premiums securing the payment of financed insurance premiums so long as such financed amounts are promptly paid; <u>provided</u> that such Liens extend only to such insurance premiums or loss payment or similar payment from any insurance provider in an amount not in excess of any unpaid financed premiums;

(xiii)   Liens on assets of a Subsidiary that is not a Credit Party in favor of a Credit Party or Subsidiary thereof, <u>provided</u> that, if such Liens relate to obligations under the Intercompany Note, such Liens are assigned to the Administrative Agent (or, in the Administrative Agent's discretion, subject to a Subordination Agreement) pursuant to documentation and agreements in form and substance reasonably satisfactory to the Administrative Agent;

(xiv)     first-priority Liens on the Revolving Facility Priority Collateral and second-priority Liens on other Collateral, each in favor of the Revolving Facility Agent and subject to the Intercreditor Agreement, securing Indebtedness under a Revolving Facility permitted under Section 7.02(j);

(xv)     Liens on assets of Foreign Subsidiaries; provided that (i) such Liens do not extend to, or encumber, assets that constitute Collateral or the Equity Interests of the AA USA or any Domestic Subsidiary (or the Equity Interests of any first-tier Foreign Subsidiary) and (ii) such Liens secure only Indebtedness permitted to be incurred by Foreign Subsidiaries pursuant to Section 7.02(l);

(xvi)     Liens on property of a person existing at the time such person is acquired or merged with or into or consolidated with any Subsidiary of Holdings to the extent permitted hereunder, provided that (A) such Liens (I) do not extend to property not subject to such Liens at the time of such acquisition, merger or consolidation (other than improvements thereon) and (II) are not created in anticipation or contemplation of such acquisition, merger or consolidation and (B) any Indebtedness that is secured by such Liens is permitted by Section 7.02(m);

(xvii)     Liens in favor of the issuer of the Existing Letters of Credit on the cash constituting cash collateral (and the deposit account holding such cash) in respect of the Existing Letters of Credit; provided that the amount of such cash collateral shall not exceed 105% of the face amount of the Existing Letters of Credit at such time; and

(xviii)     Liens securing Indebtedness and other obligations in an aggregate principal amount not to exceed $2,500,000 at any time outstanding.

(b)     **Restrictions on Negative Pledges and Upstream Limitations**.  No Credit Party shall nor shall any Subsidiary (i) enter into or permit to exist any arrangement or agreement which directly or indirectly prohibits any Credit Party from creating, assuming or incurring any of the Obligations or any Lien upon its properties, revenues or assets whether now owned or hereafter acquired, as security for the Obligations, or from making Guarantees of, or payments on, the Obligations or (ii) enter into any agreement, contract or arrangement (excluding this Agreement and the other Loan Documents and any Revolving Facility Document) restricting the ability of any Subsidiary of any Credit Party to pay or make dividends or distributions in cash or kind to any Credit Party, to make loans, advances or other payments of whatsoever nature to any Credit Party, or to make transfers or distributions of all or any part of its assets to any Credit Party in each case other than customary anti-assignment provisions contained in leases, licensing agreement and other agreements restricting the assignment thereof entered into by any Credit Party or any Subsidiary in the ordinary course of its business; provided that this Section 7.03(b) shall not apply with respect to (x) prohibitions and restrictions contained in this Agreement, the other Loan Documents, any Revolving Facility Document and the SG Debt Documents and (y) Indebtedness permitted under Section 7.02(a) solely to the extent related to the property financed thereby or the property subject thereto.

**7.04     Restricted Payments; Prepayments**.

(a)     **Restricted Payments**.  No Credit Party nor any Subsidiary shall make any Restricted Payment, except (i) Restricted Payments to a Credit Party, (ii) Restricted Payments solely in shares of common stock or preferred stock (other than Disqualified Capital Stock) or warrants or rights to purchase common stock or preferred stock (other than Disqualified Capital

Stock) so long as no Change of Control would result therefrom, (iii) Restricted Payments in the form of splits of Capital Stock or reclassifications of Capital Stock into additional shares of common stock, (iv) Restricted Payments by a Subsidiary of a Credit Party that is not a Credit Party made ratably to the holders of its Capital Stock, (v) repurchases of Capital Stock in any Credit Party or any Subsidiary deemed to occur upon "cashless" exercise of stock options or warrants, (vi) so long as no Event of Default shall have occurred and be continuing or would result therefrom, Holdings may make Restricted Payments to any present, former or future director, officer, employee, member of management or consultant of Holdings (or any direct or indirect parent thereof) or any of its Subsidiaries (or their respective estates, heirs, family members, spouses or former spouses) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or arrangement or upon such person's death, disability, retirement or termination of employment, in an aggregate amount not to exceed $1,000,000 in any Fiscal Year; provided that any portion of such amount that is not used in any fiscal year may be applied in any subsequent fiscal year, (vii) Holdings may purchase, repurchase, defease, acquire or retire for value the capital stock of Holdings or options, warrants or other rights to acquire such capital stock solely in exchange for, or out of the proceeds of the sale of (so long as such purchase, repurchase, redemption, defeasance, acquisition or retirement is consummated within sixty (60) days of such sale) Qualified Capital Stock of Holdings or options, warrants or other rights to acquire such Qualified Capital Stock and (viii) other Restricted Payments in an aggregate amount not to exceed the sum of (x) $25,000,000 plus (y) from and after the first anniversary from the Closing Date, $25,000,000 so long as (A) in the case of each of clauses (x) and (y), no Default or Event of Default has occurred and is continuing immediately prior to and after giving effect to such Restricted Payment, and (B) in the case of clause (y), the Leverage Ratio for the Reference Period most recently ended prior to giving effect to such Restricted Payment, calculated on a pro forma basis giving effect to such Restricted Payment as if it had occurred on the first day of such Reference Period, shall not be greater than 5.00 to 1.00.

(b)    **Prepayments of Other Indebtedness**.  No Credit Party nor any Subsidiary shall pay, prepay, redeem, purchase, defease or otherwise satisfy in any manner any Indebtedness under any of the Subordinated Debt Documents other than those payments expressly permitted to be made under the Subordination Agreement applicable thereto.

**7.05    Merger, Consolidation and Disposition of Assets**.

(a)    **Mergers and Consolidations.**  None of the Credit Parties nor any Subsidiary will become a party to any merger, dissolution, liquidation or consolidation, except for, so long as no Default or Event of Default is continuing or would result therefrom:

(i)    the merger or consolidation of one or more of the Domestic Subsidiaries of AA USA with and into a Credit Party (other than Holdings); provided that such Credit Party shall be the surviving entity;

(ii)    the merger or consolidation of any Subsidiary that is not a Credit Party with any other Subsidiary that is not a Credit Party;

(iii)    Holdings may cause any Subsidiary of AA USA to be liquidated or dissolved if Holdings determines in good faith that such liquidation or dissolution is in the best interests of Holdings and is not materially disadvantageous to the Lenders (and any dispositions in connection therewith are permitted by Section 7.05(b)); and

(iv)    Permitted Acquisitions.

(b)    **Disposition of Assets.**  No Credit Party nor any Subsidiary shall dissolve, liquidate or sell, transfer, convey, assign or otherwise dispose of any of its properties or other assets, including any Capital Stock of any of its Subsidiary (whether in a public or a private offering or otherwise), any of its receivables or any of its other Investments, other than:

(i)    the sale of inventory in the ordinary course of business;

(ii)    dispositions of assets (other than receivables owned by Credit Parties) (A) among Credit Parties, (B) by Subsidiaries that are not Credit Parties to (x) Credit Parties and (y) other Subsidiaries that are not Credit Parties, (C) among Foreign Subsidiaries or (D) by Foreign Subsidiaries to Credit Parties;

(iii)    dispositions of obsolete or worn out equipment, inventory or fixtures no longer used or useful in the business, whether now owned or hereafter acquired, in the ordinary course of business;

(iv)    sales pursuant to sale-leaseback transactions permitted under Section 7.06;

(v)    non-exclusive licenses of intellectual property in the ordinary course of business (other than to the extent such licenses would restrict the ability of the Credit Party or the Administrative Agent to sell or license the subject intellectual property or impair the security interests granted to the Administrative Agent); provided that to the extent approved by the Required Lenders  in their sole discretion, such licenses are permitted to be exclusive to the extent such licenses relate to specific lines or products or specific geographic locations;

(vi)    the abandonment or termination of intellectual property rights in the ordinary course of business which are not material to the operation of the business of the Credit Parties;

(vii)    dispositions of cash and Cash Equivalents except with respect to transactions prohibited hereunder so long as such dispositions are not in violation of the Agency Account Agreements to which they are subject;

(viii)    dispositions not otherwise permitted hereunder; provided that (A) at the time of such disposition, no Event of Default shall have occurred and be continuing or would result from such Disposition, (B) not less than 75% of the aggregate sale price from such disposition shall be paid in cash, (C) the aggregate Net Cash Proceeds of all Dispositions pursuant to this clause (viii) shall not exceed $5,000,000 in any Fiscal Year of Holdings and (D) all such dispositions shall be for at least the fair market value of the assets or property subject to such disposition (as determined by a Financial Officer of Holdings in good faith); and

(ix) so long as no Default or Event of Default is continuing or would result therefrom, sales of equipment now owned or hereafter acquired by any Credit Party or any Subsidiary thereof in an aggregate amount not to exceed $5,000,000.

**7.06    Sale and Leaseback**.  No Credit Party nor any Subsidiary shall engage in any sale-leaseback of or similar transaction or incur any Synthetic Lease Obligations involving any of its assets, except (i) sale-leaseback transactions consummated prior to the Closing Date and described on Schedule

7.06 and (ii) sale-leaseback transactions consummated after the Closing Date with respect to real property or equipment having a fair market value in the aggregate not to exceed $5,000,000, so long as no Event of Default is continuing or would result therefrom.

**7.07    Accounting Changes; Change of Fiscal Year**.  No Credit Party nor any Subsidiary will make any change in (i) accounting policies or reporting practices, except as permitted by GAAP or (ii) their Fiscal Year (except to make the Fiscal Year of a Subsidiary end on December 31).

**7.08    Transactions with Affiliates**.  No Credit Party nor any Subsidiary will engage in any transaction with any Affiliate or its or any of its Affiliate's employees, officers or directors, whether or not in the ordinary course of business, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any such Affiliate, on terms more favorable to such Person than would have been obtainable on an arm's-length basis in the ordinary course of business, provided that the foregoing restriction shall not apply to (a) transactions solely among the Credit Parties otherwise permitted hereunder, (b) transactions solely among Subsidiaries that are not Credit Parties, (c) any Restricted Payment permitted under Section 7.04, (d) Investments permitted by Section 7.01, (e) Indebtedness permitted under Section 7.02(e) and (f), (f) employment, benefit, indemnification and severance arrangements between the Credit Parties, their Subsidiaries and their respective officers, directors and employees in the ordinary course of business and consistent with past practices and (g) transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 7.08 or any amendment thereto that is not materially adverse to any Lender or any Credit Party.

**7.09    No Speculative Transactions**.  No Credit Party shall engage in any transaction involving commodity options, futures contracts or similar transactions, except in connection with Swap Contracts entered into solely to hedge against fluctuations in the prices of commodities owned or purchased by it and the values of foreign currencies receivable or payable by it and interest swaps, caps or collars; provided that, such Swap Contract does not contain any provision exonerating the non-defaulting party from its obligation to make payments on outstanding transactions to the defaulting party and is not for speculative purposes.

**7.10    Change in Terms of Governing Documents; Material Agreements**.  No Credit Party nor any Subsidiary shall change or amend, modify, supplement or waive the terms of any (a) of its Governing Documents, except amendments, modifications, supplements or waivers that do not materially adversely affect the rights or interests of the Administrative Agent or the Lenders, or (b) any Subordinated Debt Document, except to the extent permitted by the Subordination Agreement applicable thereto.

**7.11    Change in Nature of Business**.  No Credit Party nor any Subsidiary shall engage in any line of business substantially different from those lines of business conducted by such Credit Party on the Closing Date other than lines of business reasonably related or ancillary to such lines of business conducted on the Closing Date.

**7.12    Margin Regulations**.  No Credit Party shall use the proceeds of the Closing Date Loans, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

**7.13    Sanctions**.  No Credit Party nor any Subsidiary shall permit any Loan or the proceeds of any Loan, directly or indirectly, (a) to be lent, contributed or otherwise made available to fund any

activity or business in any Designated Jurisdiction, (b) to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject of any Sanctions or (c) in any other manner that will result in any violation by any Person (including any Lender or Administrative Agent) of any Sanctions.

## ARTICLE VIII

### EVENTS OF DEFAULT AND REMEDIES

    **8.01**    **Events of Default**.  If any of the following events ("Events of Default") shall occur:

    (a)    Non-Payment.

    (i)    Any Credit Party shall fail to pay any principal of the Loans when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment; or

    (ii)    Any Credit Party shall fail to pay any interest on the Loans, any fees, premium (including the Prepayment Premium) or other sums due hereunder or under any of the other Loan Documents (other than an amount referred to in clause (i) above), when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment, and such default shall continue unremedied for a period of five (5) Business Days; or

    (b)    Specific Covenants.  Any Credit Party shall fail to comply with any of its covenants contained in Section 6.05(a), Section 6.06(a), Section 6.07, Section 6.11, Section 6.15 or Article VII; or

    (c)    Other Defaults.  Any Credit Party shall fail (or, to the extent applicable, fail to cause its Subsidiaries) to perform any term, covenant or agreement contained herein or in any of the other Loan Documents (other than those specified elsewhere in this Section 8.01) and such failure continues for thirty (30) days; or

    (d)    Representations and Warranties.  Any representation or warranty of any Credit Party in this Agreement or any of the other Loan Documents or in any other document or instrument delivered pursuant to or in connection with this Agreement shall prove to have been false in any material respect (but without any duplication of any materiality qualifications) upon the date when made or deemed to have been made or repeated; or

    (e)    Inability to Pay Debt; Insolvency Proceedings; Etc.  Any Credit Party or any of its Subsidiaries shall make a composition, compromise, arrangement or assignment for the benefit of creditors, or shall petition or apply for the appointment of a trustee or other custodian, liquidator, receiver administrative receiver, compulsory manager or other similar officer of such Credit Party or such Subsidiary or of any substantial part of the assets of any Credit Party or such Subsidiary or shall commence any case or other proceeding relating to any Credit Party or such Subsidiary under any Debtor Relief Law, now or hereafter in effect, or shall take any action to authorize or in furtherance of any of the foregoing, or if any such petition or application (including a bankruptcy application) shall be filed or any such case or other proceeding shall be commenced against any Credit Party or such Subsidiary and such Credit Party or such Subsidiary shall indicate its approval thereof, consent thereto or acquiescence therein or such petition or application shall not have been dismissed or stayed within sixty (60) days following the filing

thereof; a decree or order (including a bankruptcy order) is entered appointing any such trustee, custodian, liquidator, receiver, compulsory or other similar officer or adjudicating any Credit Party or any Subsidiary bankrupt or insolvent, or approving a petition or a bankruptcy application in any such case or other proceeding, or a decree or order (including a bankruptcy order) for relief is entered in respect of any Credit Party or any Subsidiary in an involuntary case under federal bankruptcy laws or applicable bankruptcy laws in any jurisdiction as now or hereafter constituted; a moratorium is declared in respect of any indebtedness of any Credit Party or any of its Subsidiaries (and if a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium); or

(f)    Judgments.  There shall remain in force for more than thirty (30) days, whether or not consecutive, any final judgment against any Credit Party (considered collectively) that exceeds in the aggregate $5,000,000 which are not covered by insurance policies unless such judgment has been discharged, satisfied, bonded or stayed pending appeal; or

(g)    ERISA Event.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of the Credit Parties under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $5,000,000 or (ii) any Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $5,000,000; or

(h)    Indebtedness.  Any Credit Party shall fail to pay at maturity, or within any applicable period of grace, any obligation for Indebtedness in excess of $5,000,000, or fail to observe or perform any material term, covenant or agreement contained in any agreement by which it is bound, evidencing or securing Indebtedness in excess of $1,000,000 for such period of time as would permit (assuming the lapse of time and/or giving of appropriate notice if required and assuming such breach has not been cured within the applicable grace period thereunder) the holder or holders thereof or of any obligations issued thereunder to accelerate the maturity thereof; or

(i)    Invalidity of Loan Documents; Etc.  If any of the Loan Documents shall be cancelled, terminated, revoked, rescinded or otherwise ceases to be in full force and effect other than in accordance with their terms; or the Administrative Agent's security interests, mortgages or Liens in all or a material portion of the Collateral shall cease to be perfected, or shall cease to have the priority contemplated by the Security Documents and, from and after the date that a Revolving Facility is in effect, the Intercreditor Agreement, in each case other than in accordance with the terms thereof or with a consent or approval obtained in accordance with Section 10.01; or any action at law, suit or in equity or other legal proceeding to cancel, revoke, rescind or declare void any of the Loan Documents shall be commenced by or on behalf of any Credit Party, any Subsidiary or any of their respective equity holders; or any court or any other Governmental Authority shall make a determination that, or issue a judgment, order, decree or ruling to the effect that, any one or more of the Loan Documents is illegal, invalid or unenforceable in accordance with the terms thereof; or

(j)    Change of Control.  A Change of Control shall occur; or

(k)    Conduct of Business.  Any Credit Party shall be enjoined, restrained or in any way prevented by the order of any Governmental Authority from conducting any part of their business unless such order would not have a Material Adverse Effect; or there shall otherwise be,

except to the extent permitted by Section 7.05(b), a suspension of the conduct of any material portion of the Credit Parties business, taken as a whole in the ordinary course, a liquidation of any material portion of the Credit Parties' assets or store locations, a retention of an agent or other third party to conduct any store closings, store liquidations or "Going-Out-Of Business" sales with respect to any material portion of the Credit Parties' assets or store locations (or any Credit Party shall take any action in furtherance of the foregoing, whether by vote of its board of directors (or equivalent governing body) or otherwise); or

(m)     Licenses, Permits, Etc.  There shall occur the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Credit Party if such loss, suspension, revocation or failure to renew would have a Material Adverse Effect; or

(n)     Subordinated Debt. (i) Any "event of default" under any Subordinated Debt Document shall occur, (ii) the holders of all or any part of the Subordinated Debt shall accelerate the maturity of all or any part of the Subordinated Debt, (iii) other than in accordance with the express terms of Section 7.04(b), the Subordinated Debt shall be prepaid, redeemed or repurchased in whole or in part or an offer to prepay, redeem or repurchase the Subordinated Debt in whole or in part shall be required to be made or (iv) the Obligations shall cease for any reason to rank senior in right of payment to any Subordinated Debt; or

(o)     Liens.  (i) Any lien or security interest created by Loan Documents with respect to Collateral shall, for any reason, cease to be valid or (ii) any action is commenced by the Credit Parties which contests the validity, perfection or enforceability of any of the liens and security interests of the Administrative Agent and/or the Lenders created by the Loan Documents; or

(p)     Chapter 11. The Plan of Reorganization or Confirmation Order fails to be in full force and effect or fails to be valid, subsisting and continuing, or has been vacated, modified, stayed, reversed, or amended in any material respect (or any proceeding is commenced to effect that same), in each case, without the consent of the Required Lenders.

**8.02     Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, the Administrative Agent may, or at the request of the Required Lenders, shall take any or all of the following actions:

(a)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, all premium (including the Prepayment Premium) and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Credit Parties; and

(b)     exercise on behalf of itself and the other Secured Parties all rights and remedies available to it and the other Secured Parties under the Loan Documents or any other remedies provided by applicable law;

provided that, upon the occurrence of an Event of Default under Section 8.01(e), the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.  No termination of the commitments hereunder shall relieve any Credit Party of any of the Obligations.

**8.03    Application of Funds**.  In the event that, following the occurrence and during the continuance of any Event of Default, the Administrative Agent or any Lender, as the case may be, receives any monies in connection with the enforcement of any of the Loan Documents, or otherwise with respect to the realization upon any of the Collateral, the Administrative Agent may apply (and shall apply at (a) the request of the Required Lenders or (b) following the exercise of remedies pursuant to Section 8.02, including without limitation, pursuant to the proviso thereof) such monies as follows (and each Lender shall comply with the instructions of the Administrative Agent in the case of any such monies received by any Lender):

(i)    First, to payment of that portion of Obligations owing to the Administrative Agent constituting (A) indemnities and expenses due and payable under this Agreement and the other Loan Documents (including fees, charges and disbursements of counsel to the Administrative Agent) and (B) the fees due and payable under the Administrative Agent's Letter Agreement;

(ii)    Second, to payment of that portion of the Obligations constituting indemnities and expenses (including fees, charges and disbursements of counsel to Lenders and amounts payable under Article III) due and payable to the Lenders under this Agreement and the other Loan Documents, ratably among such Persons in proportion to the respective amounts described in this clause Second payable to them;

(iii)    Third, to payment of that portion of the Obligations constituting accrued and unpaid interest, fees and premium (including the Prepayment Premium) and payable to the Lenders under this Agreement and the other Loan Documents ratably among such Persons in proportion to the respective amounts described in this clause Third payable to them;

(iv)    Fourth, to the payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the holders thereof in proportion to the respective amounts described in this clause Fourth held by them;

(v)    Fifth, to the payment of all other Obligations ratably among the holders thereof in proportion to the respective amounts described in this clause Fifth; and

(vi)    Sixth, the balance, if any, after all of the Obligations have been indefeasible paid in full, to the Borrowers or as otherwise required by Law.

All payments applied to the Loans pursuant to this Section 8.03 shall be applied to the Loans owing to the Lenders in accordance with their respective Applicable Percentages.

## ARTICLE IX

## ADMINISTRATIVE AGENT

**9.01    Appointment and Authority**.

(a)    Each of the Lenders hereby irrevocably appoints Wilmington Trust, National Association to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this

Article IX are solely for the benefit of the Administrative Agent and the Lenders, and neither any Borrower nor any other Credit Party shall have rights as a third party beneficiary of any of such provisions other than as provided in Section 9.09.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties.

(b)      The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the collateral agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any Sub-Agent for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and Article X (including Section 10.04(c) as though such Sub-Agent were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

9.02      **Rights as a Lender**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Credit Parties or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

9.03      **Exculpatory Provisions**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Credit Parties or any of their Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable order. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent in writing by a Credit Party or a Lender.  The Administrative Agent shall promptly notify the Lenders upon receipt of any such notice.  The Administrative Agent shall hold all security for itself and for and on behalf of the Secured Parties, in accordance with this Agreement and the other Loan Documents.  The Administrative Agent shall provide copies of all Security Documents requested by any Lender and follow the instructions of the Required Lenders with respect to perfecting and maintaining the security granted to the Administrative Agent under this Agreement or Security Documents, provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Notwithstanding anything to the contrary set forth herein, the Administrative Agent shall not be required to take, or to omit to take, any action hereunder or under the Loan Documents unless, upon demand, the Administrative Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to the Administrative Agent, any other Secured Party) against all liabilities, costs and expenses that, by reason of such action or omission, may be imposed on, incurred by or asserted against such Administrative Agent or any of its directors, officers, employees and agents.

**9.04    Reliance by Administrative Agent**.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  The

#4848-5684-9449v15

Administrative Agent may consult with legal counsel (who may be counsel for the Credit Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05    Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more Sub-Agents appointed by the Administrative Agent.  The Administrative Agent and any such Sub-Agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article IX shall apply to any such Sub-Agent and to the Related Parties of the Administrative Agent and any such Sub-Agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any Sub-Agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such Sub-Agents.

**9.06    Resignation of Administrative Agent**.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrowers, to appoint a successor from among the Lenders (or an Affiliate of a Lender) or a financial institution or other entity that provides agency or trustee services, in each case, having an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders), then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor meeting the qualifications set forth above; provided that, if the Administrative Agent shall notify the Borrowers and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender, until such time as the Required Lenders appoint a successor as provided for above in this Section 9.06.  Upon the acceptance of a successor's appointment hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.06).  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Section 10.04 shall continue in effect for the benefit of such retiring Administrative Agent any Sub-Agent and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them prior to such resignation.

**9.07    Non-Reliance**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own

decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**9.08    Administrative Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**9.09    Collateral and Guarantee Matters; Credit Bidding**.  Each of the Lenders irrevocably authorizes the Administrative Agent to and upon the commercially reasonable request of the Borrower Representative (and at its sole cost and expense) with reasonable advance notice, the Administrative Agent hereby agrees,

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Exit Term Loan Facility and payment in full in cash of all Obligations (other than contingent indemnification obligations for which no claim has then been asserted), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder (other than sales among Credit Parties) or (iii) subject to Section 10.01, if approved, authorized or ratified in writing by the Required Lenders; and

(b)    to release any Guarantor from its obligations under the Security Documents and release any related Collateral if such Person ceases to be a Subsidiary as a result of a transaction permitted by Section 7.05.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property,

or to release any Guarantor from its obligations under the Credit Party Guarantees pursuant to this <u>Section 9.09</u>.

The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

The Credit Parties and the Secured Parties hereby irrevocably authorize the Administrative Agent, based upon the instruction of the Required Lenders, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Section 363 of the Bankruptcy Code of the United States or any similar Laws in any other jurisdictions to which a Credit Party is subject or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of the Administrative Agent to credit bid and purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of the Administrative Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Secured Parties whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Capital Stock of the acquisition vehicle or vehicles that are used to consummate such purchase).  Upon request by the Administrative Agent or the Borrower Representative at any time, the Secured Parties will confirm in writing the Administrative Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this <u>Section 9.09</u>.

## ARTICLE X

## MISCELLANEOUS

**10.01    Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrowers or any other Credit Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrowers or the applicable Credit Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

(a)    extend, increase or decrease the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 8.02)</u> without the written consent of such Lender;

(b)    postpone any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; <u>provided</u> that for the avoidance of doubt, mandatory prepayments pursuant to

Section 2.05 may be postponed, delayed, reduced, waived or modified with the consent of the Required Lenders;

(c)     reduce the principal of, or the rate of interest specified herein on any Loan, or any fees, premiums or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender directly affected thereby; provided, however, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;

(d)     (i) change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby or the order of the application of payments thereunder, in each case, without the written consent of each Lender or (ii) change Section 2.05 in a manner that would alter the pro rata sharing of Commitments reductions required thereby without the written consent of each Lender affected thereby;

(e)     change any provision of this Section 10.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender; or

(f)     (i) release all or substantially all of the Collateral in any transaction or series of related transactions, (ii) release all or substantially all of the Guarantors party to the Credit Party Guarantees, (iii) subordinate the Obligations hereunder to any other Indebtedness or (iv) except as provided by operation of applicable law, subordinate the Liens on all or substantially all of the Collateral granted in favor of the Administrative Agent for itself and the other Secured Parties under the Security Documents to any other Lien, in each case, without the written consent of each Lender;

and, provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (ii) the Administrative Agent's Letter Agreement may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to exercise any voting, consent, elective or request right as a Lender, approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of all applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

**10.02    Notices; Effectiveness; Electronic Communication**.

(a)     Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to any Borrower, any other Credit Party or the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 11.02; and

(ii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including through any Electronic Medium) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrowers may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement) and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) upon notification that such notice or communication is available and identifying the website address therefor; provided that for both clauses (i) and (ii), if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    Change of Address, Etc. Each of the Borrowers and the Administrative Agent, may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrowers and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(d)    Reliance by Administrative Agent and Lenders. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The

Borrowers shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

(e)    Platform.  Borrower Materials may be delivered pursuant to procedures approved by the Administrative Agent, including electronic delivery (if possible) upon request by the Administrative Agent to an electronic system maintained by the Administrative Agent ("Platform").  The Borrower Representative shall notify the Administrative Agent of each posting of Borrower Materials on the Platform and the materials shall be deemed received by the Administrative Agent only upon its receipt of such notice.  Borrower Materials and other information relating to this credit facility may be made available to the Lenders on the Platform.  The Platform is provided "as is" and "as available."  The Administrative Agent does not warrant the accuracy or completeness of any information on the Platform nor the adequacy or functioning of the Platform, and expressly disclaims liability for any errors or omissions in the Borrower Materials or any issues involving the Platform.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE ADMINISTRATIVE AGENT WITH RESPECT TO BORROWER MATERIALS OR THE PLATFORM.  The Lenders acknowledge that Borrower Materials may include material non-public information of the Credit Parties and should not be made available to any personnel who do not wish to receive such information or who may be engaged in investment or other market-related activities with respect to any Credit Party's securities.  None of the Administrative Agent or any Related Party thereof shall have any liability to the Credit Parties, the Lenders or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform or delivery of Borrower Materials and other information through the Platform

**10.03   No Waiver; Cumulative Remedies**.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided and provided under each other Loan Document are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 10.08 (subject to the terms of Section 2.13) or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters

set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**10.04    Expenses; Indemnity; Damage Waiver**.

(a)    Costs and Expenses.  The Borrowers shall pay (i) all reasonable and documented out-of-pocket expenses incurred by any of the Administrative Agent, the Lenders and their respective Affiliates (including, in each case, the reasonable fees, charges and disbursements of counsel and advisors for any of such Persons, including local counsel to any of such Persons in any relevant jurisdiction), in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by any of the Administrative Agent, the Lenders and their respective Affiliates (including, in each case, the fees, charges and disbursements of counsel (including local counsel to any of such Persons in any relevant jurisdiction) and advisors for the Lenders) in connection with the enforcement or protection of its rights (A) relating to or arising out of, in connection with or the result of this Agreement and the other Loan Documents, including its rights under this Section 10.04, (B) relating to or arising out of, in connection with, or as a result of, the Loans made hereunder, including all such reasonable documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or (C) relating to or arising out of, in connection with or the result of the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or document request) related to this Agreement, the other Loan Documents, or the Loans in any action, litigation, investigation, or proceeding.

(b)    Indemnification by the Borrowers.  The Borrowers shall indemnify the Administrative Agent (and any Sub-Agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, obligations, liabilities, costs and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any of the Borrowers or any other Credit Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any Sub-Agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any of the Borrowers or any other Credit Party, or any Environmental Liability related in any way to any of the Borrowers or any other Credit Party or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by or on behalf of any Person (including any of the Borrowers or any other Credit Party), and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, obligations, liabilities, costs or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross

83

negligence or willful misconduct of such Indemnitee.  Without limiting the provisions of Section 3.01(c), this Section 10.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     Reimbursement by Lenders.  To the extent that any Borrower for any reason fails to pay any amount required under subsection (a) or (b) of this Section 10.04 to be paid by it to the Administrative Agent (and any Sub-Agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (and any Sub-Agent thereof) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Applicable Percentage) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), such payment to be made severally among them based on such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (and any Sub-Agent thereof).  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, the Borrowers shall not assert, and the Borrowers hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence, bad faith, willful misconduct or material breach of this Agreement or the other Loan Documents by such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)     Payments.  All amounts due under this Section 10.04 shall be payable not later than ten (10) Business Days after demand therefor.

(f)     Survival.  The agreements in this Section 10.04 and the indemnity provisions of Section 10.02(d) shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all the other Obligations.

**10.05   Payments Set Aside**.  To the extent that any payment by or on behalf of any Credit Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the

Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06    Successors and Assigns**.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Credit Party (except to the extent permitted by Section 7.05(a) to the extent a transaction permitted thereby would constitute an assignment) may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section 10.06, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section 10.06 or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section 10.06 (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section 10.06 and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $2,000,000 in the case of any assignment, unless the Administrative Agent consents (such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)    Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(iii)    No consent shall be required for any assignment except to the extent required by subsection (b)(i)) of this Section 10.06 and, in addition, the consent of the Administrative Agent and the Borrower (such consent not to be unreasonably withheld or

85

delayed) shall be required for assignments in respect of any Commitment or Loans if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; provided that (i) the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Administrative Agent within ten (10) Business Days after having received notice thereof and (B) consent from the Borrower pursuant to this clause (iii) shall not be required if an Event of Default shall have occurred and be continuing.

(iv)  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500 payable to the Administrative Agent; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)  Notwithstanding anything to the contrary in this Section 10.06(b), no such assignment shall be made (A) to any Credit Party or Subsidiary of any Credit Party, (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B),  (C) to a natural person or (D) any Person that is not an Eligible Assignee.

(vi)  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrowers and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent) to (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (B) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section 10.06, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits and obligations of Sections 3.01, 3.04, 3.05, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute waiver or release of any claim of

86

any party hereunder arising from that Lender having been a Defaulting Lender.  Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section 10.06.

(c)    Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than a natural Person, a Defaulting Lender, any Credit Party, any Affiliate or Subsidiary of any Credit Party or a Disqualified Lender) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 10.04(c) without regard to the existence of any participation.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant.  The Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 10.06 (it being understood that the documentation required under Section 3.01(e) shall be delivered to the Lender who sells the participation) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section (subject to the requirements and limitations therein, including the documentation required under Section 3.01(e)); provided that such Participant (i) agrees to be subject to the provisions of Sections 3.06 and 10.13 as if it were an assignee under subsection (b) of this Section 10.06 and (ii) shall not be entitled to receive any greater payment under Section 3.01 or 3.04, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation

87

agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 3.06 with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers (solely for tax purposes), maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as such) shall have no responsibility for maintaining a Participant Register.

(e)      Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)      Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.07    Treatment of Certain Information; Confidentiality**.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to Exit Term Loan Facility or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 10.07, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations, (g) on a confidential basis

88

to any rating agency in connection with rating the Credit Parties or this Agreement, (h) with the consent of the Borrowers or (i) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section 10.07 or (B) becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a non-confidential basis from a source other than the Borrowers.

For purposes of this Section 10.07, "Information" means all information received from the Borrowers or any Credit Party relating to the Borrowers or any Credit Party or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrowers or any Credit Party, provided that in the case of information received from the Borrowers or any Credit Party after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.07 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrowers or a Credit Party, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

Notwithstanding anything to the contrary contained in this Section 10.07, each Credit Party consents to the publication by the Administrative Agent or the Lenders of any press releases, tombstones, advertising or other promotional materials (including via any Electronic Medium) relating to the financing transactions contemplated by this Agreement using such Credit Party's name, product photographs, logo or trademark.  No party hereto shall or shall permit any of its Affiliates to, issue any press release or other public disclosure relating to the closing of the credit facilities provided for herein (other than any document required to be filed by the Credit Party with the SEC) using the name, logo or otherwise referring to any Lender, the Administrative Agent or the Sub-Agent or of any of their Affiliates or the Loan Documents to which any such Person is a party without the prior written consent (including via e-mail) of such Person (not to be unreasonably withheld) except to the extent required to do so under applicable Requirements of Law and then, only after consulting with such Persons.

**10.08    Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender and their respective Affiliates is hereby authorized at any time and from time to time after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Credit Party against any and all of the obligations of any Credit Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or its respective Affiliates, irrespective of whether or not such Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Credit Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness, provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.12 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of

each Lender and its respective Affiliates under this Section 10.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have.  Each Lender agrees to notify the Borrower Representative and the Administrative Agent, promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09   Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10   Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto and in accordance with Section 4.01.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

**10.11   Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at Closing Date, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

**10.12   Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions of this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

#4848-5684-9449v15

**10.13    Replacement of Lenders**.  If the Borrowers are entitled to replace a Lender pursuant to the provisions of Section 3.06, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then (a) the Borrowers may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent and (b) the Administrative Agent may upon notice to such Lender, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights (other than its existing rights to payments pursuant to Sections 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(i)    the Borrowers shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.06(b);

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)    such assignment does not conflict with applicable Laws; and

(v)    in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the Administrative Agent shall have consented to such assignment and the applicable assignee shall have consented to the applicable amendment, waiver or consent;

provided that the failure by any Lender to execute and deliver an Assignment and Assumption in connection with any of the foregoing assignments shall not impair the validity of the removal of such Lender and the mandatory assignment of such Lender's Commitments and outstanding Loans and participations pursuant to this Section 10.13 shall nevertheless be effective without the execution by such Lender of an Assignment and Assumption.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling any Borrower to require such assignment and delegation cease to apply.

**10.14    Governing Law; Jurisdiction; Etc**.

(a)    GOVERNING LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW (OTHER THAN THE NEW YORK GENERAL OBLIGATIONS LAW §§ 5-1401 AND 5-1402)).

(b)      SUBMISSION TO JURISDICTION.  EACH PARTY HERETO EACH
IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO
THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK
SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE
SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF,
IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT
OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY
JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND
UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR
PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR,
TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.
EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION
OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER
JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY
LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL
AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY LENDER OR THE L/C
ISSUER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO
THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER, THE
OTHER CREDIT PARTIES SIGNATORY HERETO OR THEIR RESPECTIVE PROPERTIES IN THE
COURTS OF ANY JURISDICTION.

(c)      WAIVER OF VENUE.  EACH PARTY HERETO EACH IRREVOCABLY AND
UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE
LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF
VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS
AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN
SUBSECTION (b) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY
IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW,
THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION
OR PROCEEDING IN ANY SUCH COURT.

(d)      SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO
SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.
NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO
SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)      WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY
WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT
MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY
ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT
OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON
CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT
NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN
THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B)
ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO
ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER
THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.14.

(f)      Judicial Reference.  If any action or proceeding relating to any Obligations or Loan
Documents is filed in a court sitting in or applying the Laws of California, the court shall, and is hereby

directed to, make a general reference pursuant to Cal. Civ. Proc. Code §638 to a referee (who shall be an active or retired judge) to hear and determine all issues in such case (whether fact or law) and to report a statement of decision.  Nothing in this <u>Section 10.14</u> shall limit any right of the Administrative Agent or any other Secured Party to exercise self-help remedies, such as setoff, foreclosure or sale of any Collateral, or to obtain provisional or ancillary remedies from a court of competent jurisdiction before, during or after any judicial reference.  The exercise of a remedy does not waive the right of any party to resort to judicial reference.  At the Administrative Agent's option, foreclosure under a mortgage or deed of trust may be accomplished either by exercise of power of sale thereunder or by judicial foreclosure.

**10.15    USA PATRIOT Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined), the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Credit Parties and their Subsidiaries, which information includes the name and address of the Credit Parties and their Subsidiaries and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Credit Parties and their Subsidiaries in accordance with the Act.  The Credit Parties shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" an anti-money laundering rules and regulations, including the Act.

**10.16    ENTIRE AGREEMENT**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

**10.17    No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Credit Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a) (i) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Credit Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (ii) each Credit Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate and (iii) each Credit Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) the Administrative Agent and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Credit Party or any of its Affiliates, or any other Person and (ii) none of the Administrative Agent or any Lender has any obligation to any Credit Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents and (c) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Credit Parties and their Affiliates, and neither the Administrative Agent nor any Lender have any obligation to disclose any of such interests to the Credit Parties or any of their Affiliates.  To the fullest extent permitted by law, the Credit Parties hereby waive and release any claims that they may have against the Administrative Agent with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**10.18    ORIGINAL ISSUE DISCOUNT LEGEND**.  THE CLOSING DATE LOANS HAVE BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES.  THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY OF THE LOANS MAY BE OBTAINED BY WRITING TO THE ADMINISTRATIVE AGENT AT ITS ADDRESS SET FORTH ON SCHEDULE 11.02.

*[The Remainder of this Page Left Intentionally Blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**The Borrowers:**

**AMERICAN APPAREL (USA), LLC**

By: _____
     Name:
     Title:

**AMERICAN APPAREL RETAIL, INC.**

By: _____
     Name:
     Title:

**AMERICAN APPAREL DYEING & FINISHING. INC.**

By: _____
     Name:
     Title:

**KCL KNITTING, LLC,**

By: _____
     Name:
     Title

CREDIT AGREEMENT

Signature Page

**The Guarantors:**

**AMERICAN APPAREL, LLC**

By: _____
     Name:
     Title:

**FRESH AIR FREIGHT, INC.**

By: _____
     Name:
     Title:

CREDIT AGREEMENT

Signature Page

**The Administrative Agent:**

**WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Administrative Agent**

By: _____
     Name:
     Title:

CREDIT AGREEMENT

Signature Page

**The Lenders:**

**MONARCH MASTER FUNDING LTD.**

By: Monarch Alternative Capital LP
Its: Advisor

By: _____
    Name:
    Title:

CREDIT AGREEMENT

Signature Page

**GOLDMAN SACHS TRUST, on behalf of the
GOLDMAN SACHS HIGH YIELD FLOATING
RATE FUND**

By:    Goldman Sachs Asset Management, L.P.,
       as investment advisor and not as principal

By: _____
    Name:
    Title:

**GOLDMAN SACHS LUX INVESTMENT FUNDS
for the benefit of
GOLDMAN SACHS HIGH YIELD FLOATING
RATE PORTFOLIO (LUX)**

By:    Goldman Sachs Asset Management, L.P.,
       solely as its investment advisor and not as
       principal

By: _____
    Name:
    Title:

**GOLDMAN SACHS LUX INVESTMENT FUNDS
for the benefit of
GOLDMAN SACHS GLOBAL MULTI-SECTOR
CREDIT PORTFOLIO (LUX)**

By:    Goldman Sachs Asset Management, L.P.,
       solely as its investment advisor and not as
       principal

By: _____
    Name:
    Title:

**GLOBAL OPPORTUNITIES, LLC**

By:    Goldman Sachs Asset Management, L.P.,
       not in its individual capacity, but solely as
       investment adviser

By: _____
    Name:
    Title:

CREDIT AGREEMENT

Signature Page

**GLOBAL OPPORTUNITIES OFFSHORE, LTD.**

By:    Goldman Sachs Asset Management, L.P.,
           not in its individual capacity, but solely as
           investment adviser

By: _____
     Name:
     Title:

CREDIT AGREEMENT

Signature Page

**COLISEUM CAPITAL PARTNERS, L.P.**

By:     Coliseum Capital, LLC, General Partner


By:_____


**BLACKWELL PARTNERS, LLC, SERIES A**

By:     Coliseum Capital Management, LLC,
         Attorney-in-fact


By:_____


**COLISEUM CAPITAL PARTNERS II, L.P.**

By:     Coliseum Capital, LLC, General Partner


By:_____


CREDIT AGREEMENT

Signature Page

**PWCM MASTER FUND LTD.**


By: _____
    Name:
    Title:



**OCEANA MASTER FUND LTD.**


By: _____
    Name:
    Title:

CREDIT AGREEMENT

Signature Page

**STANDARD GENERAL MASTER FUND L.P.**

By: _____
  Name:
  Title:

**P STANDARD GENERAL LTD.**

By: _____
  Name:
  Title:

CREDIT AGREEMENT

Signature Page

**SCHEDULE 2.01**

<u>**Commitments and Applicable Percentages**</u>

| Lender | Commitment | Applicable Percentage |
|---|---|---|
| Standard General Master Fund L.P. | | |
| P Standard General Ltd. | | |
| Monarch Master Funding Ltd | | |
| Coliseum Capital Partners, L.P. | | |
| Coliseum Capital Partners II, L.P. | | |
| Blackwell Partners, LLC, Series A | | |
| Goldman Sachs Trust - Goldman Sachs High Yield Floating Rate Fund | | |
| Goldman Sachs Lux Investment Funds - Goldman Sachs High Yield Floating Rate Portfolio (LUX) | | |
| Goldman Sachs Lux Investment Funds - Global Multi-Sector Credit Portfolio (LUX) | | |
| Global Opportunities LLC | | |
| Global Opportunities Offshore Ltd | | |
| Oceana Master Fund Ltd. | | |
| PWCM Master Fund Ltd. | | |
| **Total** | | |

CREDIT AGREEMENT

Signature Page

CREDIT AGREEMENT

Signature Page

## **EXHIBIT E-1**

**Blackline of New Exit Financing Agreement**

**FILING VERSION**

**CREDIT AGREEMENT**

Dated as of **February** [————], 2016

among

**AMERICAN APPAREL (USA), LLC,**

as a Borrower and as Borrower Representative,

**AMERICAN APPAREL RETAIL, INC.,**

**AMERICAN APPAREL DYEING & FINISHING, INC.,**

**KCL KNITTING, LLC,**

as the other Borrowers Party Hereto,

the Other Credit Parties Party Hereto,

the Lenders Party Hereto,

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**

as Administrative Agent

# TABLE OF CONTENTS

ARTICLE I  DEFINITIONS AND ACCOUNTING TERMS .......................................... 2

    1.01    Defined Terms .................................................................................. 2
    1.02    Other Interpretive Provisions ........................................................ 25
    1.03    Accounting Terms ......................................................................... 26
    1.04    Rounding ....................................................................................... 26
    1.05    Times of Day ................................................................................ 26
    1.06    Certain Currency Translations ...................................................... 26

ARTICLE II  THE COMMITMENTS AND CREDIT EXTENSIONS ...................... 27

    2.01    Commitments to Lend; Loans ....................................................... 27
    2.02    Borrowing and Continuation of Loans; Notice of Borrowing and Continuation ... 27
    2.03    [Intentionally Omitted] ................................................................. 28
    2.04    [Intentionally Omitted] ................................................................. 28
    2.05    Mandatory Prepayments ............................................................... 28
    2.06    Voluntary Prepayments ................................................................ 29
    2.07    Repayment of Loans. .................................................................... 29
    2.08    Interest .......................................................................................... 29
    2.09    Call Protection; Fees .................................................................... 30
    2.10    Computation of Interest and Fees ................................................. 31
    2.11    Evidence of Debt .......................................................................... 31
    2.12    Payments Generally; Administrative Agent's Clawback .............. 31
    2.13    Sharing of Payments by Lenders .................................................. 33
    2.14    Collateral and Guarantees; Joint and Several Liabilities ............. 33
    2.15    Defaulting Lenders ....................................................................... 35
    2.16    Loan Account ................................................................................ 36
    2.17    Borrower Representative ............................................................... 36

ARTICLE III  TAXES, YIELD PROTECTION AND ILLEGALITY ...................... 36

    3.01    Taxes ............................................................................................ 36
    3.02    Illegality ....................................................................................... 40
    3.03    Inability to Determine Rates ......................................................... 41
    3.04    Increased Costs ............................................................................. 41
    3.05    Compensation for Losses ............................................................. 42
    3.06    Mitigation Obligations; Replacement of Lenders ........................ 43
    3.07    Survival ........................................................................................ 43

ARTICLE IV  CONDITIONS PRECEDENT .......................................................... 43

    4.01    Conditions to Effectiveness, the Closing Date and Credit Extension ... 43

ARTICLE V  REPRESENTATIONS AND WARRANTIES ................................... 47

    5.01    Corporate Authority, Etc ............................................................. 47
    5.02    Financial Statements .................................................................... 48
    5.03    [Intentionally Omitted] ................................................................. 49
    5.04    No Material Adverse Change ........................................................ 49

#4848-5684-9449v14#4848-5684-9449v15

**TABLE OF CONTENTS**
**(Cont'd)**

| | | |
|---|---|---|
| 5.05 | Ownership of Property; Liens | 49 |
| 5.06 | Franchises, Patents, Copyrights, etc | 49 |
| 5.07 | Litigation | 49 |
| 5.08 | No Default | 49 |
| 5.09 | Compliance with Laws | 49 |
| 5.10 | Tax Status | 49 |
| 5.11 | Insurance | 50 |
| 5.12 | Holding Company and Investment Company Acts | 50 |
| 5.13 | ERISA Compliance | 50 |
| 5.14 | Regulations U and X | 51 |
| 5.15 | True Copies of Governing Documents | 51 |
| 5.16 | Fiscal Year | 51 |
| 5.17 | Subsidiaries, etc | 51 |
| 5.18 | Environmental Compliance | 51 |
| 5.19 | Bank Accounts | 51 |
| 5.20 | Labor Contracts | 51 |
| 5.21 | Disclosure | ~~52~~51 |
| 5.22 | OFAC | 52 |
| 5.23 | Other Debt Documents | 52 |
| 5.24 | Solvency | 52 |

**ARTICLE VI    AFFIRMATIVE COVENANTS**                                      52

| | | |
|---|---|---|
| 6.01 | [Intentionally Omitted] | 52 |
| 6.02 | Maintenance of Office; Certain Changes | 52 |
| 6.03 | Records and Accounts | ~~53~~52 |
| 6.04 | Financial Statements, Certificates and Information | 53 |
| 6.05 | Notices | 55 |
| 6.06 | Legal Existence; Maintenance of Properties | 57 |
| 6.07 | Insurance | 57 |
| 6.08 | Taxes | 57 |
| 6.09 | Compliance with Laws, Contracts, Licenses, Permits; Leaseholds and Payment of Obligations Generally | 58 |
| 6.10 | [Intentionally Omitted] | 58 |
| 6.11 | Use of Proceeds | ~~59~~58 |
| 6.12 | Covenant to Guarantee Obligations and Give Security | ~~59~~58 |
| 6.13 | Further Assurances | 61 |
| 6.14 | Inspections | ~~62~~61 |
| 6.15 | Cash Management | ~~62~~61 |
| **6.16** | **Post-Closing Covenant** | **61** |

**ARTICLE VII    NEGATIVE COVENANTS**                                      62

| | | |
|---|---|---|
| 7.01 | Investments | 62 |
| 7.02 | Restrictions on Indebtedness | 64 |
| 7.03 | Restrictions on Liens | ~~66~~65 |
| 7.04 | Restricted Payments; Prepayments | 68 |
| 7.05 | Merger, Consolidation and Disposition of Assets | 69 |
| 7.06 | Sale and Leaseback | 70 |
| 7.07 | Accounting Changes; Change of Fiscal Year | 70 |
| 7.08 | Transactions with Affiliates | 70 |

# TABLE OF CONTENTS
## (Cont'd)

| | | |
|---|---|---|
| 7.09 | No Speculative Transactions | ~~71~~**70** |
| 7.10 | Change in Terms of Governing Documents; Material Agreements | 71 |
| 7.11 | Change in Nature of Business | 71 |
| 7.12 | Margin Regulations | 71 |
| 7.13 | Sanctions | 71 |

ARTICLE VIII  EVENTS OF DEFAULT AND REMEDIES .................................................. 71

| | | |
|---|---|---|
| 8.01 | Events of Default | 71 |
| 8.02 | Remedies Upon Event of Default | 74 |
| 8.03 | Application of Funds | 74 |

ARTICLE IX  ADMINISTRATIVE AGENT .................................................................... 75

| | | |
|---|---|---|
| 9.01 | Appointment and Authority | 75 |
| 9.02 | Rights as a Lender | ~~76~~**75** |
| 9.03 | Exculpatory Provisions | 76 |
| 9.04 | Reliance by Administrative Agent | 77 |
| 9.05 | Delegation of Duties | 77 |
| 9.06 | Resignation of Administrative Agent | 77 |
| 9.07 | Non-Reliance | 78 |
| 9.08 | Administrative Agent May File Proofs of Claim. | 78 |
| 9.09 | Collateral and Guarantee Matters; Credit Bidding | 79 |

ARTICLE X  MISCELLANEOUS .................................................................................. 80

| | | |
|---|---|---|
| 10.01 | Amendments, Etc | 80 |
| 10.02 | Notices; Effectiveness; Electronic Communication | 81 |
| 10.03 | No Waiver; Cumulative Remedies | ~~83~~**82** |
| 10.04 | Expenses; Indemnity; Damage Waiver | 83 |
| 10.05 | Payments Set Aside | 85 |
| 10.06 | Successors and Assigns | 85 |
| 10.07 | Treatment of Certain Information; Confidentiality | 89 |
| 10.08 | Right of Setoff | 90 |
| 10.09 | Interest Rate Limitation | 90 |
| 10.10 | Counterparts; Integration; Effectiveness | ~~91~~**90** |
| 10.11 | Survival of Representations and Warranties | ~~91~~**90** |
| 10.12 | Severability | 91 |
| 10.13 | Replacement of Lenders | 91 |
| 10.14 | Governing Law; Jurisdiction; Etc | 92 |
| 10.15 | USA PATRIOT Act Notice | 93 |
| 10.16 | ENTIRE AGREEMENT | ~~94~~**93** |
| 10.17 | No Advisory or Fiduciary Responsibility | ~~94~~**93** |
| 10.18 | ORIGINAL ISSUE DISCOUNT LEGEND | 94 |

SCHEDULES

~~[~~Schedule 1.01          Existing Letters of Credit~~]~~

**TABLE OF CONTENTS**
**(Cont'd)**

Schedule 1.02          Disqualified Lenders

Schedule 2.01          Commitments, Converted Loans and Applicable Percentages

Schedule 5.07          Litigation

Schedule 5.17          Subsidiaries

Schedule 5.18          Environmental Compliance

Schedule 5.20          Labor Matters

**Schedule 6.16          Post-Closing Obligations**

Schedule 7.01          Existing Investments

Schedule 7.02          Existing Indebtedness

Schedule 7.03          Existing Liens

Schedule 7.06          Sale-Leasebacks

Schedule 7.08          Transactions with Affiliates

Schedule 11.02         Administrative Agent's Office; Certain Addresses for Notices

#4848-5684-9449v14#4848-5684-9449v15

**TABLE OF CONTENTS**
**(Cont'd)**

<u>EXHIBITS</u>

Exhibit A                    Form of Borrowing Request Notice

Exhibit B                    Form of Notice of Continuation

Exhibit C                    Form of Note

Exhibit D                    Form of Compliance Certificate

Exhibit E                    Form of Assignment and Assumption

Exhibit F                    Form of PIK Election

Exhibit G                    Form of U.S. Tax Compliance Certificates

#4848-5684-9449v14#4848-5684-9449v15

## CREDIT AGREEMENT

This **CREDIT AGREEMENT** (this "Agreement") is entered into as of **February** [————], 2016, among:

(a)     **AMERICAN APPAREL (USA), LLC**, a California limited liability company ("AA USA"), as a Borrower (as defined below) and as the Borrower Representative (as defined in Section 2.17) for the other Borrowers party hereto;

(b)     **AMERICAN APPAREL RETAIL, INC.**, a California corporation ("AA Retail"), **AMERICAN APPAREL DYEING & FINISHING, INC.**, a California corporation ("AA Dyeing & Finishing"), and **KCL KNITTING, LLC**, a California limited liability company ("KCL Knitting" and together with AA USA, AA Retail and AA Dyeing & Finishing, each individually, a "Borrower" and, collectively, the "Borrowers");

(c)     the other Credit Parties party hereto;

(d)     each Lender from time to time party hereto; and

(e)     **WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent.

## RECITALS

**WHEREAS**, on October 5, 2015 (the "Petition Date"), the Borrowers and the other Credit Parties commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Borrowers and the other Credit Parties have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Capitalized terms used in these Recitals shall have the meaning set forth for such terms in Section 1.01 hereof.

**WHEREAS**, the Borrowers (each as debtor and debtor-in-possession under the Chapter 11 Cases), the other Credit Parties (each as debtor and debtor-in-possession under the Chapter 11 Cases), the Lenders and Wilmington Trust, National Association, as administrative agent entered into a secured super-priority debtor-in-possession term loan facility dated as of October 4, 2015 (as amended, supplemented or otherwise modified from time to time, the "DIP Facility").

**WHEREAS**, (i) on January [__], 2016, the Bankruptcy Court entered the Confirmation Order and (ii) in connection with the implementation and Consummation of the Plan of Reorganization, in full satisfaction of the DIP Facility, each of the holders of the DIP Facility shall become party to this Agreement as Lenders on the Closing Date.

**WHEREAS**, (i) upon the effectiveness of the Plan of Reorganization, all DIP Facility Obligations shall be converted into Converted Loans hereunder and each initial Lender shall be deemed to have made, in the aggregate, $[_____] of Converted Loans and (ii) the Borrowers have requested, and the Lenders have agreed, to provide Closing Date Loans to the Borrowers hereunder in an aggregate principal amount of $[_____] (collectively, the "Exit Term Loan Facility").

**NOW THEREFORE**: for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, such parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"AA Dyeing & Finishing" shall have the meaning specified in the introductory paragraph hereto.

"AA Retail" shall have the meaning specified in the introductory paragraph hereto.

"AA USA" shall have the meaning specified in the introductory paragraph hereto.

"Acquisition" shall mean any transaction or series of related transactions resulting in the (a) acquisition of all or substantially all of the assets or business of any Person, or of any business unit, line of business or division of any Person or assets constituting a business unit, line of business or division of any other Person, (b) acquisition of in excess of 50% of the Capital Stock of any Person or otherwise causing a person to become a Subsidiary of the acquiring Person or (c) merger, consolidation, amalgamation or other combination, whereby a Person becomes a Subsidiary of the acquiring Person.

"Act" shall have the meaning specified in Section 10.15.

"Adjusted Earnings" shall mean, for any period with respect to Holdings and its Subsidiaries on a consolidated basis, net income (as that term is determined in accordance with GAAP) for such period, plus, without duplication and to the extent already deducted (and not added back) in arriving at such consolidated net income, the sum of the following amounts for such period:

(a)    the amount of depreciation and amortization deducted in determining such net income for such period;

(b)    all interest expense and all fees for the use of money or the availability of money, including commitment, facility, letter of credit and like fees and charges upon indebtedness (including indebtedness to the Administrative Agent and Lenders) paid or payable during such period and amortization of discounts and financing fees, all amounts paid in respect of Swap Contracts permitted hereunder, whether constituting periodic, upfront or termination payments and all prepayment premiums and similar redemption premiums relating to the repayment or redemption of indebtedness;

(c)    all tax liabilities paid or accrued during such period;

(d)    all non-cash charges, including non-cash charges resulting from losses on asset dispositions incurred during such period, non-cash compensation charges or other non-cash expenses or charges arising from the grant of or issuance or repricing of stock, stock options or other equity-based awards incurred during such period and non-cash charges relating to impairment of warrants or derivative instruments, non-cash charges related to hedging agreements and any non-cash charges related to impairment of assets;

(e)    transaction costs incurred and paid during such period (including for the Revolving Facility, the Exit Term Loan Facility, the Chapter 11 Cases, the Consummation of the Plan of Reorganization and the transactions contemplated by the foregoing);

(f)    currency translation charges;

(g)    lease termination charges; and

(h)    extraordinary, unusual or non-recurring losses, charges or expenses, including restructuring charges and severance costs, not to exceed $10,000,000 in any Reference Period or as otherwise approved by the Required Lenders.

"Administrative Agent" shall mean Wilmington Trust, National Association, acting as administrative agent for the Secured Parties, or any successor administrative agent appointed in accordance with this Agreement.

"Administrative Agent's Letter Agreement" shall mean the fee letter, dated as of **February** [⸺, ⸺], 2016, by and between the Borrower Representative and the Administrative Agent.

"Administrative Agent's Office" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 11.02, or such other address or account as the Administrative Agent may from time to time notify the Borrowers and/or the Lenders.

"Administrative Questionnaire" shall mean an administrative questionnaire in a form supplied by the Administrative Agent.

"Affiliate" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided that none of the parties to the Holdings LLC Agreement (or their permitted transferees thereunder) shall be deemed to be an Affiliate of Holdings or any of its Subsidiaries.

"Agency Account Agreement" shall mean any deposit account control agreement, lockbox control agreement, blocked account agreement or other similar agreement entered into by a Credit Party, the Administrative Agent and the applicable financial institution, in form and substance reasonably satisfactory to the Administrative Agent.

"Agreement" shall have the meaning specified in the introductory paragraph hereto.

**"Applicable Liquidity Amount" means (a) at any time on or prior to the first anniversary of the Closing Date, $20,000,000, (b) at any time after the first anniversary of the Closing Date and on or prior to the second anniversary of the Closing Date, $15,000,000, and (c) at any time thereafter, $10,000,000.**

"Applicable Percentage" shall mean, with respect to any Lender at any time, as applicable, (i) with respect to such Lender's Commitment, the percentage (carried out to the ninth decimal place) of the aggregate principal amount of all Commitments represented by such Lender's Commitment at such time and (ii) with respect to such Lender's Loans, the percentage (carried out to the ninth decimal place) of the aggregate outstanding principal amount of all Loans represented by such Lender's Loans at such time.  The initial Applicable Percentage of each Lender with respect to its Commitment as of the date hereof is set forth opposite the name of such Lender on Schedule 2.01.  For each Lender that becomes a party hereto pursuant to an Assignment and Assumption, the initial Applicable Percentage of such Lender shall be set forth in such Assignment and Assumption Agreement.

"Applicable Rate" shall mean (a) with respect to any Loans comprising Eurodollar Rate Loans, 10.00% *per annum* and (b) with respect to any Loans comprising Base Rate Loans, 9.00% *per annum*.

"Approved Fund" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignee Group" shall mean two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in substantially the form of Exhibit E or any other form approved by the Administrative Agent.

"Attributable Indebtedness" shall mean, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP (subject to Section 1.03(b)) and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP (subject to Section 1.03(b)) if such lease were accounted for as a capital lease.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy," as applicable to the Chapter 11 Cases, now and hereafter in effect or any successors to such statute.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals hereto; provided that "Bankruptcy Court" shall also mean any other court having competent jurisdiction over the Chapter 11 Cases.

"Base Rate" shall mean, for any day, a per annum rate equal to the higher of (a) the Prime Rate for such day and (b) the Eurodollar Rate for a 30-day interest period as determined on such day plus 1.00%. Any change in the Base Rate due to a change in any of the foregoing shall take effect at the opening of business on the day specified in the public announcement of such change.

"Borrowed Money" shall mean, with respect to any Person, without duplication, its (a) Indebtedness that (i) is an obligation of such Person for borrowed money, (ii) is evidenced by notes, drafts, bonds, debentures, credit documents or similar instruments, (iii) accrues interest or is a type upon which interest charges are customarily paid (excluding trade payables) or (iv) was issued or assumed as full or partial payment for property; (b) Capitalized Leases and (c) reimbursement obligations owing with respect to amounts drawn under letters of credit that are not cash collateralized in full.

"Borrower" and "Borrowers" shall have the meaning specified in the introductory paragraph hereto.

"Borrower Materials" shall mean information, reports, financial statements and other materials delivered by the Borrowers hereunder, as well as other reports and information provided by the Administrative Agent to the Lenders.

"Borrower Representative" shall mean AA USA in its capacity as borrower agent pursuant to Section 2.17.

"Borrowing" shall mean a borrowing of Loans made simultaneously by each of the Lenders pursuant to Section 2.01(a) and Section 2.02.

"Borrowing Request Notice" shall mean a notice of a Borrowing, which, if in writing, shall be substantially in the form of Exhibit A.

"Breakage Costs" shall have the meaning specified in Section 3.05.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located and, if such day relates to the calculation of the Eurodollar Rate, shall mean any such day that is a London Banking Day.

"Capital Stock" shall mean any and all shares, limited liability company interests, partnership interests, other interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock, and any and all warrants, rights or options to purchase any of the foregoing.

"Capitalized Leases" shall mean leases under which any Credit Party is the lessee or obligor, the discounted future rental payment obligations under which are required to be capitalized on the balance sheet of the lessee or obligor in accordance with GAAP (subject to Section 1.03(b)) and the amount of Indebtedness represented by such obligations shall be the Attributable Indebtedness in respect thereof.

"Cash Equivalents" shall mean any of the following types of Investments, to the extent owned by a Credit Party or a Subsidiary thereof:

(a)       marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency thereof maturing within one year from the date of acquisition thereof;

(b)       commercial paper maturing no more than 270 days from the date of creation thereof and having the highest or next highest rating obtainable from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc. determined at the time of investment;

(c)       certificates of deposit, banker's acceptances and time deposits maturing no more than 180 days from the date of creation thereof issued or guaranteed by, or placed with, and demand deposit and money market deposit accounts issued or offered by, (i) any Lender or (ii) any commercial bank, that at the time of investment, (x) has combined capital, surplus and undivided profits of not less than $500,000,000, (y) a senior unsecured rating of "A" or better by a nationally recognized rating agency and (z) is organized under the laws of the United States of America, any state thereof or is the principal banking subsidiary of a bank holding company organized under the laws of the United States or any state thereof; and

(d)       money market mutual funds that invest solely in one or more of the investments described in clauses (a) through (c) above.

5

"Casualty Event" shall mean, with respect to any property (including any interest in property) of any Credit Party, any loss of, damage to, or condemnation or other taking of, such property for which any Credit Party receives insurance proceeds, proceeds of a condemnation award or other compensation.

"CERCLA" shall have the meaning specified in the definition of "Environmental Laws".

"CFC" shall mean a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"Change in Law" shall mean the occurrence, after the date of this Agreement (or with respect to any Lender, if later, the date on which such Lender becomes a Lender), of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" shall mean the occurrence of any of the following:

(a)        any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than a Permitted Holder becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of 50% or more of the equity securities of Holdings entitled to vote for members of the board of directors or equivalent governing body of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right); or

(b)        Holdings shall cease to own directly or indirectly 100% of the Capital Stock of AA USA.

For purposes of this definition, notwithstanding anything to the contrary set forth above, a Person shall not be deemed to have beneficial ownership of Capital Stock subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement and, until the consummation of such transactions, a Change of Control will be deemed not to have occurred with respect to any such stock purchase agreement, merger agreement or similar agreement.

"Chapter 11 Cases" shall have the meaning assigned to such term in the recitals hereto.

"Closing Date" shall mean the first date all conditions in Section 4.01 have been satisfied or waived.

"Closing Date Loan" shall have the meaning specified in Section 2.01(a).

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean all of the assets, property, rights and interests of the Credit Parties that are or are intended to be subject to the Liens created by or pursuant to the Security Documents.

"Commitment" shall mean, as to each Lender, its obligation to make a Closing Date Loan to the Borrowers pursuant to Section 2.01(a) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of the Commitments as of the Closing Date is $[_____].[1]

"Compliance Certificate" shall mean a certificate substantially in the form of Exhibit C.

"Confirmation Order" shall mean an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Required Lenders (and with respect to any provisions that affect the rights and duties of the Administrative Agent, the Administrative Agent), confirming the Plan of Reorganization.

"Connection Income Taxes" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated" or "consolidated" shall mean, with reference to any term defined herein, consolidated in accordance with GAAP.

"Consummation of the Plan of Reorganization" shall mean the occurrence of the Plan Effective Date and the substantial consummation of the Plan of Reorganization within the meaning of Section 1101(2) of the Bankruptcy Code.

"Contractual Obligation" shall mean, as to any Person, any provision of any security issued by such Person or any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" shall have meanings correlative thereto.

"Converted Loan" shall have the meaning specified in Section 2.01(b).

"Credit Extension" shall mean the Borrowing.

---

[1] NTD: Final amount to be determined. The Commitment is $30,000,000 subject to reduction for the following: (i) a dollar-for-dollar reduction in the amount of the funds in the DIP Funding Account as of the Closing Date (net of administrative expenses and other wind-down costs) and (ii) a reduction to the extent that the Requisite Commitment Parties (as defined in that certain Equity Commitment Letter dated as of October 4, 2015 between American Apparel (USA), LLC and the other parties thereto) increase their equity investment in the Borrowers above $10,000,000.

"Credit Parties" shall mean the Borrowers, Holdings, Fresh Air and the other Guarantors.

"Credit Party Guarantees" shall mean, collectively, (a) the Guaranty Agreement dated as of the Closing Date among the Guarantors (other than the Borrowers) in favor of the Administrative Agent and (b) any other guaranty in form and substance reasonably satisfactory to the Administrative Agent and executed by any Guarantor in favor of the Administrative Agent and the other Secured Parties in respect of the Obligations.

"Debtor" shall have the meaning assigned to the term in the recitals hereto.

"Debtor Relief Laws" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium (by way of voluntary arrangement, scheme or arrangement or otherwise), rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States, Canada, England and Wales or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" shall mean any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" shall mean when used with respect to Obligations, an interest rate or rate equal to the interest rate or rate otherwise applicable thereto plus 2.00% per annum.

"Defaulting Lender" shall mean, subject to Section 2.15(b), any Lender that (a) has failed to (i) fund all or any portion of its Loan within two Business Days of the Closing Date unless such Lender notifies the Administrative Agent and the Borrowers in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied or (ii) pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrowers or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund Loans hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent, to confirm in writing to the Administrative Agent that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal or foreign regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Capital Stock in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent

manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to <u>Section 2.15(b)</u>) upon delivery of written notice of such determination to the Borrowers and each other Lender.

"<u>Designated Jurisdiction</u>" shall mean any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"<u>DIP Facility</u>" shall have the meaning assigned to the term in the recitals hereto.

"<u>DIP Facility Agreement</u>" shall mean that certain Debtor-in-Possession Credit Agreement dated as of October 4, 2015 among the Credit Parties and the Administrative Agent.

"<u>DIP Facility Documents</u>" shall mean "Loan Documents" as defined in the DIP Facility Agreement.

"<u>DIP Facility Obligations</u>" shall mean "Obligations" as defined in the DIP Facility Agreement.

"<u>Disclosure Statement</u>" shall mean any disclosure statement that is filed in connection with the Plan of Reorganization, which disclosure statement is in form and substance reasonably acceptable to the Required Lenders.

"<u>Disqualified Capital Stock</u>" shall mean that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof, in each case on or prior to the Maturity Date, for cash or is convertible into or exchangeable for, in each case at the option of the holder thereof, debt or debt securities of Holdings or its Subsidiaries, at any time prior to the Maturity Date; <u>provided</u>, <u>however</u>, that (a) only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Capital Stock and (b) any Capital Stock that would constitute Disqualified Capital Stock solely because the holders thereof have the right to require Holdings to repurchase such Capital Stock upon the occurrence of a change of control or asset sale (howsoever defined or referred to) shall not constitute Disqualified Capital Stock if the terms of such Capital Stock provide that Holdings may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with <u>Section 7.04</u>; <u>provided</u>, <u>however</u>, that if such Capital Stock is issued to any plan for the benefit of employees of Holdings or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by Holdings or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"<u>Disqualified Lender</u>" shall mean any bank, financial institution or other lender or investor and any competitor of the Borrower, in each case, as set forth in <u>Schedule 1.02</u>. The Borrower may supplement <u>Schedule 1.02</u> with additional competitors from time to time by providing notice in writing to the Administrative Agent.

"<u>Dollar</u>" and "<u>$</u>" shall mean lawful money of the United States.

"<u>Domestic Subsidiary</u>" shall mean any Subsidiary that is organized under the laws of any political subdivision of the United States.

#4848-5684-9449v14#4848-5684-9449v15

"Electronic Medium" shall mean the electronic medium through which notices and other communications are sent (including e-mail) pursuant to procedures approved by the Administrative Agent and otherwise in accordance with Section 10.02(b).

"Eligible Assignee" shall mean any Person (other than a natural Person) that is (i) a Lender, an Affiliate of any Lender or an Approved Fund with respect to such Lender or (ii) a commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans in the ordinary course of business; provided that no Disqualified Lender, Credit Party or Subsidiary of a Credit Party shall be an Eligible Assignee.

"Environmental Laws" shall mean any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems and including those arising under the Resource Conservation and Recovery Act ("RCRA"), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended ("CERCLA") and the Superfund Amendments and Reauthorization Act of 1986 ("SARA").

"Environmental Liability" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Credit Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) under common control with any Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" shall mean (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of any Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate.

#4848-5684-9449v14#4848-5684-9449v15

"Eurodollar Rate" shall mean, for any Interest Period, the per annum rate of interest determined by the Administrative Agent at approximately 11:00 a.m. (London time) two London Banking Days prior to commencement of such Interest Period, for a term comparable to such Interest Period, equal to (a) the rate for Dollar deposits as reported on Reuters screen LIBOR01 Page (or any successor thereto or similar source determined by the Administrative Agent from time to time, "LIBOR01"); or (b) if LIBOR01 is not available for any reason, the interest rate determined by the Administrative Agent to be the arithmetic mean of the rates at which Dollar deposits in the approximate amount of the Loan are offered by the principal London office of major banks in the London interbank Eurodollar market selected by the Administrative Agent; provided that, if fewer than two quotations are provided by the Administrative Agent by such major banks as requested, the Eurodollar Rate shall be the arithmetic mean of the rates quoted to the Administrative Agent by major banks in New York City, selected by the Administrative Agent, at approximately 11:00 a.m. (New York City time) for loans in Dollars to leading European banks for a term comparable to such Interest Period commencing on the first day of such Interest Period and in an amount equal to the principal amount of the Loans. In no event shall the Eurodollar Rate be less than 1.0%.

"Event of Default" shall have the meaning specified in Section 8.01.

"Excluded Accounts" shall mean any (a) deposit account or securities account specially and exclusively used in the ordinary course of business for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Credit Party's salaried employees, which accounts are funded only in the ordinary course of business and not in excess of any amounts necessary to fulfill payroll obligations that are then currently owing,  (b) pension fund accounts, 401(k) accounts and trust accounts, (c) other deposit accounts, securities accounts and commodities accounts having a  balance of less than $500,000 at all times in the aggregate for all such accounts, or (d) any deposit accounts the entire balance of which is swept each Business Day to a deposit account or securities account subject to an Agency Account Agreement, provided that not more than a maximum aggregate amount of $2,500,000 of cash and Cash Equivalents shall be maintained in deposit accounts not subject to an Agency Account Agreement pursuant to this clause (d) at any time.

"Excluded Debt Incurrence" shall mean the incurrence or any issuance by any Credit Party or any of its Subsidiaries of any Indebtedness permitted by Section 7.02.

"Excluded Taxes" shall mean any of the following Taxes imposed on or with respect to ny Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Taxes (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender or any other Recipient of a payment hereunder, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Recipient on the date such Recipient becomes a party to this Agreement or to or for the account of a Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the any Borrower under Section 3.06) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01(a), such amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

#4848-5684-9449v14#4848-5684-9449v15

"Existing Letters of Credit" shall mean those letters of credit set forth on Schedule 1.01.

"Exit Term Loan Facility" shall have the meaning assigned to the term in the recitals hereto.

"Extraordinary Receipt" shall mean any cash received by or paid to or for the account of any Credit Party not in the ordinary course of business, including, tax refunds, pension plan reversions, proceeds of insurance, condemnation awards (and payments in lieu thereof), indemnity payments (including in connection with any acquisition) and any purchase price adjustments (including in connection with any acquisition); provided that an Extraordinary Receipt shall not include cash receipts from proceeds of insurance, or condemnation awards (or payments in lieu thereof) to the extent that such proceeds or awards or payments arose as a result of a Casualty Event and are applied to prepay the Obligations in accordance with of Section 2.05(b) .

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any intergovernmental agreements entered into in connection therewith, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any current or future regulations or official interpretations of the foregoing.

"Federal Funds Rate" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to major financial institutions reasonably acceptable to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"Financial Officer" shall mean, with respect to any Person, its chief financial officer, treasurer, controller or assistant controller or other officer reasonably acceptable to the Administrative Agent.

"Fiscal Month" shall mean any fiscal month of any Fiscal Year, which month shall generally end on the last day of each calendar month in accordance with the fiscal accounting calendar of the Borrowers.

"Fiscal Quarter" shall mean any fiscal quarter of any Fiscal Year of Holdings, which quarters shall generally end on the last day of each March, June, September or December of such Fiscal Year in accordance with the fiscal accounting calendar of Holdings.

"Fiscal Year" shall mean any period of twelve (12) consecutive months ending on December 31 of any calendar year.

"Foreign Lender" shall mean any Lender that is not a U.S. Person.

"Foreign Plan" shall mean any employee benefit plan or arrangement (a) maintained or contributed to by any Credit Party or Subsidiary that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of any Credit Party or Subsidiary.

"<u>Foreign Subsidiary</u>" shall mean (a) any Subsidiary that is not a Domestic Subsidiary and any Subsidiary of such Subsidiary and (b) any Subsidiary substantially all the assets of which are CFCs.

"<u>FRB</u>" shall mean the Board of Governors of the Federal Reserve System of the United States.

"<u>Fresh Air</u>" shall mean Fresh Air Freight, Inc., a California corporation.

"<u>Fund</u>" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"<u>GAAP</u>" shall mean generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"<u>Governing Documents</u>" shall mean, with respect to any Person, its certificate or articles of incorporation, certificate of change of name (if any), certificate of formation, or, as the case may be, certificate of limited partnership, its by-laws, memorandum and articles of association, operating agreement or, as the case may be, partnership agreement or other constitutive documents and all shareholder agreements, voting trusts and similar arrangements applicable to any of its Capital Stock.

"<u>Governmental Authority</u>" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"<u>Guarantee</u>" shall mean, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" shall mean Holdings, the Borrowers, Fresh Air, each other Person party to any of the Credit Party Guarantees as a guarantor thereunder and each other Person, if any, that executes a guaranty or other similar agreement in favor of the Administrative Agent in connection with the transactions contemplated by this Agreement and the other Loan Document; provided that no Foreign Subsidiary shall be required to be a Guarantor.

"Hazardous Materials" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" shall mean [American Apparel, LLC²], a Delaware [limited liability company].

"Holdings LLC Agreement" shall mean that certain Limited Liability Company Operating Agreement of Holdings dated as of the Closing Date, among Holdings and the equityholders of Holdings party thereto from time to time.

"Indebtedness" shall mean, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business consistently with past practices);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     Capitalized Leases and Synthetic Lease Obligations;

(g)     all Disqualified Capital Stock issued by such Person with the amount of Indebtedness represented by such Disqualified Capital Stock being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in

---

² Name TBD

#4848-5684-9449v14#4848-5684-9449v15

which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person or unless such Person expressly does not have liability for such obligations of a joint venture.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of any Capitalized Lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.  The "maximum fixed repurchase price" of any Disqualified Capital Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to this Agreement, and if such price is based upon, or measured by, the fair market value of such Disqualified Capital Stock, such fair market value shall be determined reasonably and in good faith by the board of directors of the issuer of such Disqualified Capital Stock.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payments hereunder or any other Loan Documents and (b) to the extent not otherwise described in clause (a) herein, Other Taxes.

"Indemnitee" shall have the meaning specified in Section 10.04(b).

"Information" shall have the meaning specified in Section 10.07.

"Insolvency Proceeding" shall mean (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors or (b) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case in clauses (a) and (b) above, undertaken under U.S. federal, state or foreign law, including the Bankruptcy Code.

"Intercompany Note" shall mean, collectively, (a) that certain Intercompany Note dated as of the Closing Date, among the Credit Parties, as payors, and the Credit Parties, as payees, subject to the terms of a Subordination Agreement, (b) that certain Intercompany Note dated Closing Date, among certain Foreign Subsidiaries of the Credit Parties, as payors, and the Credit Parties, as payees and (c) any other intercompany note among any of the Credit Parties, as payors or payees, on the one hand, and their Subsidiaries, on the other hand, entered into after the date hereof.

"Intercreditor Agreement" shall mean ~~(i) an intercreditor agreement substantially in the form of Exhibit H or (ii) such other~~ __an__ intercreditor agreement to be entered into between the Revolving Facility Agent and the Administrative Agent that is in form and substance reasonably satisfactory to Administrative Agent and Required Lenders.

"Interest Payment Date" shall mean, as to any Loan, (a) the first day of each month, (b) the date of any prepayment with respect to the principal amount of Loans being prepaid and (c) the Maturity Date.

"Interest Period" shall mean, as to each Eurodollar Rate Loan, the period commencing on the date such Loan is disbursed and ending on the date one, two, three or six months thereafter, as selected by the Borrower Representative in the Borrowing Request Notice or Notice of Continuation, as applicable.

"Investment" shall mean, all expenditures made and all liabilities incurred (contingently or otherwise) for the acquisition of Capital Stock, assets that constitute a business unit or Indebtedness of,

or for loans, advances or capital contributions to, or in respect of any Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person (including any Acquisition).  In determining the aggregate amount of Investments outstanding at any particular time: (a) the amount of any Investment represented by a guaranty shall be taken at not less than the principal amount of the obligations guaranteed and still outstanding, (b) there shall be deducted in respect of each such Investment all cash returns, cash dividends and cash distributions received with respect thereto and (c) there shall not be deducted from the aggregate amount of Investments any decrease in the value, write-downs or write-offs with respect thereof.

"IP Security Agreement" shall mean, collectively, (a) the Intellectual Property Security Agreement dated as of the Closing Date made by each Credit Party party thereto in favor of the Administrative Agent, on behalf of itself and the other Secured Parties and (b) each other intellectual property security agreement, patent security agreement, trademark security agreement and copyright security agreement required to be delivered pursuant to Section 6.12 in form and substance reasonably satisfactory to the Administrative Agent.

"IRS" shall mean the United States Internal Revenue Service.

"KCL Knitting" shall have the meaning specified in the introductory paragraph hereto.

"Laws" shall mean, collectively, all international, foreign, Federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lenders" shall mean each Lender with a Commitment or which has Loans outstanding and any other Person who becomes an assignee of the rights and obligations of a Lender pursuant to terms of this Agreement.

"Lending Office" shall mean, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrowers and the Administrative Agent.

"Leverage Ratio" shall mean the ratio, as of any date of determination, of (a) Borrowed Money of Holdings and its Subsidiaries as of such date to (b) Adjusted Earnings for the Reference Period then ending.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement for security, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and the filing of or agreement to authorize, any financing statement under the UCC or comparable law of any jurisdiction (other than precautionary filing of UCC financing statements with respect to obligations that do not constitute Indebtedness).

"Liquidity" shall mean, as of any date of determination, the sum of (i) the aggregate unused amount of the commitments as of such date under the Revolving Facility (or such lesser amount that is available as of such date under any borrowing base with respect to the Revolving Facility, if applicable),

but only to the extent that the Credit Parties are permitted to borrow such amounts thereunder as of such date, plus (ii) the aggregate amount of cash and Cash Equivalents of the Credit Parties as of such date that would not appear as "restricted" on a consolidated balance sheet of Holdings.

"Loans" shall mean the Closing Date Loans made to the Borrowers pursuant to Section 2.01(a) and the Converted Loans deemed made to the Borrowers pursuant to Section 2.01(b).

"Loan Account" shall have the meaning specified in Section 2.16(a).

"Loan Documents" shall mean this Agreement, each Note, each Security Document, the Administrative Agent's Letter Agreement, each Subordination Agreement and each other agreement or instrument delivered by any Credit Party in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"London Banking Day" shall mean any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"Material Adverse Effect" shall mean (a) a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Credit Parties, taken as a whole (excluding (i) any matters publicly disclosed prior to the filing of the Chapter 11 Cases, (ii) any matters disclosed in the schedules to the DIP Facility Agreement or the schedules hereto, (iii) any matters disclosed in any first day pleadings or declarations in connection with the Chapter 11 Cases and (iv) the effect of filing the Chapter 11 Cases, the events and conditions related and/or leading up thereto and the effects thereof and any action required to be taken under the DIP Facility Documents or the Loan Documents); (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document, or of the ability of the Credit Parties, taken as a whole, to pay any Obligations under the Loan Documents, when due; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Credit Party of any Loan Documents to which it is a party.

"Maturity Date" shall mean **February** [————————], 2020.[32]

"Maximum Rate" shall have the meaning specified in Section 10.09.

"Mortgages" shall mean each mortgage or deed of trust with respect to each fee interest of each Credit Party in Real Estate executed and delivered to the Administrative Agent after the Closing Date pursuant to Section 6.12 hereof, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

"Multiemployer Plan" shall mean any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" shall mean a Plan which has two or more contributing sponsors (including any Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

---

[32] NTD: Insert date that is four years from the Closing Date.

"Net Cash Proceeds" shall mean, with respect to any event or transaction described in Sections 2.05(a) through (c), (a) the cash proceeds received in respect of such event or transaction, including (i) any cash received in respect of any non-cash proceeds (including the monetization of notes receivables), but only as and when received or (ii) in the case of a Casualty Event, insurance proceeds, proceeds of a condemnation award or other compensation payments, in each case net of (b) the sum of (x) all reasonable fees and out-of-pocket expenses (including appraisals, and brokerage, legal, advisory, banking, title and recording tax expenses and commissions) paid by any Credit Party or a Subsidiary to third parties (other than Affiliates) in connection with such event, (y) in the case of a sale or other disposition of an asset described in Section 2.05(a), income or other taxes paid or reasonably estimated by the Borrower Representative (determined in good faith by a Financial Officer) to be actually payable in connection therewith and (z) in the case of a sale or other disposition of an asset described in Sections 2.05(a) and (b), the amount of all payments required to be made by any Credit Party (or to establish an escrow) for the repayment of any Indebtedness by the terms thereof (other than the Obligations) secured by such asset to the extent the lien in favor of the holder of such Indebtedness is permitted by Section 7.03(a)(vi); provided that such payments made shall not exceed the amount of cash proceed received by such Credit Party or the aggregate amount of such Indebtedness.

"Non-Consenting Lender" shall mean any Lender (other than the Administrative Agent) that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 10.01 and (b) has been approved by the Required Lenders (or to the extent there are only two (2) Lenders, would have been approved by the Required Lenders if such Lender had approved of such consent, waiver or amendment).

"Non-Defaulting Lender" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"Note" shall mean a promissory note made by the Borrowers in favor of a Lender evidencing the Loans made (or deemed made) by such Lender, substantially in the form of Exhibit C.

"Notice of Continuation" shall mean a notice of a continuation of a Loan, which shall be substantially in the form of Exhibit B.

"Obligations" shall mean all advances to, and debts, liabilities and obligations of, any Credit Party arising under any Loan Document or otherwise with respect to any Loan whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, premium (including the Prepayment Premium), fees and expenses that accrue after the commencement by or against any Credit Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees or expenses are allowed claims in such proceeding.

"OFAC" shall mean the Office of Foreign Assets Control of the United States Department of the Treasury.

"Other Connection Taxes" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment or sale of a participation (other than an assignment made pursuant to Section 3.06).

"Participant" shall have the meaning specified in Section 10.06(d).

"Participant Register" shall have the meaning specified in Section 10.06(d).

"PBGC" shall mean the Pension Benefit Guaranty Corporation.

"Pension Act" shall mean the Pension Protection Act of 2006.

"Pension Funding Rules" shall mean the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" shall mean any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by any Borrower and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Perfection Certificates" shall mean, collectively, (a) each Perfection Certificate delivered by the Credit Parties to the Administrative Agent on the Closing Date and (b) each other Perfection Certificate from time to time delivered by the Credit Parties following the Closing Date to the Administrative Agent in accordance with this Agreement.

"Permitted Acquisition" shall mean each Acquisition with respect to which: (a) the Credit Parties and any such newly created or acquired Subsidiary shall comply with the requirements of Section 6.12(a); (b) the lines of business of the Person to be (or the property and assets of which are to be) so purchased or otherwise acquired shall be a business permitted by Section 7.11; (c) the aggregate consideration (including any purchase price adjustment, earn-out provision, payments in respect of non-competition or consulting agreements or deferred compensation agreements) paid or payable for all such Acquisitions shall not exceed $10,000,000; (d) the Leverage Ratio for the Reference Period most recently ended prior to such Acquisition, calculated on a pro forma basis giving effect to such Acquisition, and any related incurrence of Indebtedness, as if it had occurred on the first day of such Reference Period, shall not be greater than 5.00 to 1.00; (e) immediately before (including on a pro forma basis giving effect to the Acquisition) and immediately after giving effect to any such Acquisition, no Default or Event of Default shall have occurred and be continuing; and (f) the Borrower Representative shall have (i) provided at least fifteen (15) Business Days' (or such shorter period as agreed by the Required Lenders) prior written notice to the Administrative Agent of such Acquisition along with copies of the acquisition agreements and documentation relating thereto or drafts thereof (with copies of the final agreements and documents to be provided thereafter when completed), which shall be reasonably satisfactory to the Required Lenders, along with a summary of due diligence undertaken by the Credit Parties in connection with such Acquisition, historical financial statements for the most recent fiscal year end (or, if less, for the period of such Person's existence) of the Person or business to be acquired (audited if available) to the extent available and unaudited financial statements thereof for the interim

periods, which are available, pro forma projected financial statements for the twelve (12) month period following such Acquisition after giving effect to such Acquisition (including balance sheets, cash flows and income statements by month for the acquired Person, individually, and on a consolidated basis with all Credit Parties) and such other information readily available to the Credit Parties as the Administrative Agent shall reasonably request and (ii) delivered to the Administrative Agent at least ten (10) Business Days prior to the date on which any such Acquisition is to be consummated or such shorter time as the Required Lenders may allow, a certificate of a member of Senior Management of the Borrower Representative, in form and substance reasonably satisfactory to the Administrative Agent, certifying as to the requirements set forth in clauses (b), (c) and (d) above as of the date of such certificate and stating that the Borrower Representative reasonably believes that all of the requirements set forth above will be satisfied on or prior to the consummation of such Acquisition, together with all supporting documentation and other financial information that the Administrative Agent may reasonably request.

"Permitted Holders" shall mean (a) Monarch Master Funding Ltd., (b) Coliseum Capital Partners, L.P., (c) Blackwell Partners, LLC, Series A, (d) Coliseum Capital Partners II, L.P., (e) Goldman Sachs Trust, on behalf of the Goldman Sachs High Yield Floating Rate Fund, (f) Goldman Sachs LUX Investment Funds for the benefit of Goldman Sachs High Yield Floating Rate Portfolio (LUX), (g) Goldman Sachs LUX Investment Funds for the benefit of Goldman Sachs Global Multi-Sector Credit Portfolio (LUX), (h) Global Opportunities, LLC, (i) Global Opportunities Offshore, Ltd., (j) PWCM Master Fund Ltd., (k) Oceana Master Fund Ltd., (l) Standard General Master Fund, L.P. and (m) P Standard General Ltd., and the affiliates of each of the foregoing.

"Permitted Liens" shall mean those Liens permitted by Section 7.03.

"Permitted Refinancing" shall mean, with respect to any Indebtedness, any extension, renewal or refinancing of such Indebtedness so long as (a) the aggregate principal amount thereof does not exceed the outstanding principal amount of the then outstanding Indebtedness, plus all accrued and unpaid interest and premiums owing thereon, plus all fees, premiums and expenses incurred in connection with the closing of such refinancing, (b) its weighted average life is no shorter than that of the Indebtedness being renewed, refinanced or extended (measured as of the date of the renewal, refinancing or extension), (c) the amortization thereof is not changed (other than to extend the same), (d) the maturity date thereof is no earlier than the maturity date of the Indebtedness being renewed, refinanced or extended, (e) no additional Person which is not obligated on such Indebtedness being renewed, refinanced or extended or required to be so obligated is obligated on such Indebtedness, (f) no additional Lien which is not securing the Indebtedness being refinanced, extended or renewed or required thereunder is granted to secure such Indebtedness and (g) upon giving effect to it, no Default or Event of Default exists.

"Permitted Senior Liens" shall mean those Permitted Liens under Section 7.03(a)(i) (solely to the extent encumbering tangible assets in the possession of such Persons or tangible assets previously in the possession of such Persons to the extent such Persons could assert a valid and enforceable Lien on such Collateral), Section 7.03(a)(ii), Section 7.03(a)(iii), Section 7.03(a)(v), Section 7.03(a)(vi) (solely to the extent encumbering equipment and/or fixed assets being leased or being acquired through the incurrence of such purchase money Indebtedness and the proceeds thereof), Section 7.03(a)(viii), Section 7.03(a)(ix), Section 7.03(a)(xi) (solely to the extent encumbering tangible assets in the possession of such Persons or tangible assets previously in the possession of such Persons to the extent such Persons could assert a valid and enforceable Lien on such Collateral), Section 7.03(a)(xii), Section 7.03(a)(xiv) (solely to the extent encumbering the Revolving Facility Priority Collateral in accordance with the Intercreditor Agreement and Section 7.03(a)(xiv); in each case, solely to the extent such Permitted Liens are valid, enforceable, and prior to the Liens of the Administrative Agent under applicable Law.

"Person" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" shall have the meaning assigned to the term in the recitals hereto.

"PIK Election" shall have the meaning assigned to such term in Section 2.08(b)(i).

"PIK Interest" shall have the meaning assigned to such term in Section 2.08(b)(i).

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of any Borrower or any ERISA Affiliate or any such Plan to which any Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Plan Effective Date" shall have the meaning assigned to the term "Effective Date" in the Plan of Reorganization.

"Plan of Reorganization" shall mean the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated [_____], 2016 (as amended, supplemented or otherwise modified from time to time), in accordance with section 1129 of the Bankruptcy Code, as amended, supplemented or otherwise modified from time to time (whether any such further amendment, supplement or other modification is effected through an amendment, supplement or other modification to the Plan of Reorganization itself or through the Confirmation Order), so long as any such further amendment, supplement or other modification does not adversely affect the Lenders.

"Platform" shall have the meaning specified in Section 10.02(e).

"Pledge Agreements" shall mean any pledge agreement or share charge granted by any Credit Party as required by Section 6.12 which shall be in form and substance reasonably satisfactory to the Administrative Agent.

"Prepayment Premium" shall have the meaning specified in Section 2.09(a).

"Prepetition ABL Documents" means the Prepetition ABL Facility and all instruments and documents executed at any time in connection therewith.

"Prepetition ABL Facility" means that certain Amended and Restated Credit Agreement dated as of August 17, 2015 as amended and supplemented from time to time by and among AA USA as a borrower and as borrower representative for itself and the other borrowers party thereto, the guarantors party thereto, the lenders party thereto from time to time, and Wilmington Trust, National Association, as administrative agent.

"Prepetition Lion Documents" means the Prepetition Lion Facility and all instruments and documents executed at any time in connection therewith.

"Prepetition Lion Facility" means that certain Lion Credit Agreement dated as of May 22, 2013, among American Apparel, LLC, the other Credit Parties party thereto as facility guarantors, Lion/Hollywood L.L.C., as the initial lender, and the other lenders from time to time party thereto.

"Prepetition Senior Notes" means the 13.0% senior secured notes due 2020 issued pursuant to the Prepetition Senior Notes Facility.

"Prepetition Senior Notes Documents" means the Prepetition Senior Notes Facility, the Prepetition Senior Notes and any other related documents or instruments from time to time executed in favor of the U.S. Bank National Association, as trustee and collateral agent for the holders of the Prepetition Senior Notes, or all or any of the holders of the Prepetition Senior Notes.

"Prepetition Senior Notes Facility" means that certain Indenture dated April 4, 2013, by and among American Apparel, LLC, the guarantors party thereto, the holders of the Prepetition Senior Notes from time to time and U.S. Bank National Association, as trustee and collateral agent.

"Prime Rate" shall mean the highest of the rate of interest announced by Citibank, N.A. or Bank of America, N.A. from time to time as its prime rate, which rate may be set by such banks on the basis of various factors, including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such rate.  Any change in such rate shall take effect at the opening of business on the day specified in the public announcement or publication, as applicable, of such change.

"Qualified Capital Stock" shall mean, with respect to any Person, any Capital Stock of such Person that is not Disqualified Capital Stock.

"RCRA" shall have the meaning specified in the definition of "Environmental Laws".

"Real Estate" shall mean all real property at any time owned or leased (as lessee or sublessee) by any Credit Party.

"Recipient" shall mean the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party hereunder.

"Reference Period" shall mean, as of any date of determination, the most recently completed period of four (4) consecutive Fiscal Quarters.

"Register" shall have the meaning specified in Section 10.06(c).

"Related Parties" shall mean, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers and advisors of such Person and of such Person's Affiliates.

"Reportable Event" shall mean any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Required Lenders" shall mean, as of any date of determinations, Lenders holding more than 50% of the sum of the (a) outstanding Loans and (b) aggregate unused Commitments; provided that the unused Commitment of, and the Loans held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Restricted Payment" shall mean any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of any Credit Party or any Subsidiary, (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of

any such Capital Stock, or on account of any return of capital to the stockholders, partners or members (or the equivalent Person thereof) of any Credit Party or any Subsidiary or (c) any payment (whether in cash, securities or other property) of management fees (or other fees of a similar nature) by such Credit Party or such Subsidiary to any equity holder or Affiliate of such Credit Party or such Subsidiary.

"Revolving Facility" shall the meaning set forth in Section 7.02(j).

"Revolving Facility Agent" shall mean, collectively, the administrative agent and collateral agent under the Revolving Facility.

"Revolving Facility Documents" shall mean the documents evidencing the Revolving Facility.

"Revolving Facility Pledge Account" shall have the meaning specified in Section 2.05(a).

"Revolving Facility Priority Collateral" shall mean the Collateral subject to a first priority Lien in favor of the Revolving Facility Agent pursuant to the Intercreditor Agreement.

"Sanction(s)" shall mean any international economic sanction administered or enforced by the United States Government (including OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"SEC" shall mean the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" shall mean, collectively, the Administrative Agent, the Lenders and each Sub-Agent and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Security Documents.

"Security Agreements" shall mean, collectively, (a) Security Agreement dated as of the date hereof entered into by the Credit Parties and the Administrative Agent and (b) any other security agreement granted by any Credit Party as required by Section 6.12 which shall be in form and substance reasonably satisfactory to the Administrative Agent.

"Security Documents" shall mean the Credit Party Guarantees, the Security Agreements, the IP Security Agreement, the Pledge Agreements, the Mortgages (if any), the Agency Account Agreements, intercreditor agreements (including, from and after the date that a Revolving Facility is in effect, the Intercreditor Agreement) and all other guarantees, security agreements, intellectual property security agreements, pledge agreements, mortgages, deeds of trust, control agreements, instruments and documents, including Uniform Commercial Code financing statements and other equivalent registrations and personal property security filings with respect to any other applicable jurisdiction, control agreements, required to be executed or delivered pursuant to, or in connection with, this Agreement or any other Loan Document, all in form and substance reasonably acceptable to the Administrative Agent.

"Senior Management" shall mean, with respect to the any of the Credit Parties, its chairman, president, Financial Officer, chief executive officer or general counsel.

"SG Credit Agreement" means that certain Credit Agreement dated as of March 25, 2015, among American Apparel (Carnaby) Limited, the other borrowers named therein, America Apparel, Inc., and the lenders party thereto.

#4848-5684-9449v14#4848-5684-9449v15

"SG Debt Documents" means the SG Credit Agreement and any other related material documents or instruments from time to time executed in favor of the lenders under the SG Credit Agreement and their respective successors and assigns.

"SG Facility" means that facility created by the SG Credit Agreement.

"Solvent" and "Solvency" shall mean, with respect to the Credit Parties, on a consolidated basis, taken as a whole, on any date of determination, that on such date (a) the fair value of the assets of the Credit Parties, on a consolidated basis, taken as a whole (calculated on a going concern basis), is greater than the total amount of debt, including contingent liabilities, of the Credit Parties, taken as a whole, (b) the present fair saleable value of the assets of such Person is greater than the total amount that will be required to pay the probable liabilities (including contingent liabilities) of such Person as they become absolute and matured, (c) the capital of the Credit Parties, taken as a whole, is not unreasonably small in relation to the business of the Credit Parties, taken as a whole, contemplated as of such date and (d) the Credit Parties, taken as a whole, do not intend to incur, or believe that they will incur, debts including current obligations beyond their ability to pay such debt as they mature in the ordinary course of business.  For the purpose hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, representing the amount that can reasonably be expected to become an actual or matured liability.

"Sub-Agent" shall mean any co-agent, sub-agent, attorney-in-fact, bailee or other designee appointed by the Administrative Agent from time to time pursuant to Section 9.05 and approved by the Required Lenders.

"Subordinated Debt" shall mean unsecured Indebtedness of any Credit Party or any Subsidiary that is expressly subordinated and made junior to the payment and performance in full of the Obligations, and evidenced as such by a Subordination Agreement.

"Subordinated Debt Documents" shall mean all documents, agreements and instruments evidencing any Subordinated Debt and/or executed and/or delivered in connection with the incurrence of any Subordinated Debt, including each Subordination Agreement.

"Subordination Agreement" shall mean a subordination and intercreditor agreement or such other written instrument containing subordination provisions, each in form and substance reasonably acceptable to the Required Lenders.

"Subsidiary" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"Swap Contract" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter

into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement, including any such obligations or liabilities under any master agreement.

"Swap Termination Value" shall mean, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts.

"Synthetic Lease Obligation" shall mean the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Assets Proceeds Account" shall mean an account of a Credit Party subject to an Agency Account Agreement in favor of the Collateral Agent, which is intended to exclusively contain the identifiable proceeds of the Term Priority Collateral pursuant to Sections 2.05(a) and (b).

"Term Priority Collateral" shall mean the Collateral subject to a first priority Lien in favor of the Administrative Agent pursuant to the Intercreditor Agreement.

"Trade Date" shall have the meaning specified in Section 10.06(b)(i).

"U.S. Person" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" shall have the meaning specified in Section 3.01(e)(ii)(B)(III).

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" and "U.S." mean the United States of America.

**1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall," Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Governing Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.03    Accounting Terms**.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio, negative covenant or requirement set forth in any Loan Document, and either the Borrowers or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that until so amended, (i) such ratio, negative covenant or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrowers shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably

requested hereunder setting forth a reconciliation between calculations of such ratio, covenant or requirement made before and after giving effect to such change in GAAP.  Without limiting the foregoing, leases shall continue to be classified and accounted for on a basis consistent with GAAP as in effect on December 31, 2012 for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto and regardless of whether such leases are in effect as of the date hereof or entered into as of the date hereof, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes, as provided for above.

**1.04     Rounding**.  Any financial ratios required to be maintained by any of the Credit Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05     Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06     Certain Currency Translations**.  For purposes of the incurrence of Indebtedness by Foreign Subsidiaries under Section 7.02 or where the permissibility of a transaction depends upon compliance with an amount limitation stated in Dollars, any requisite currency translation shall be based on the exchange rate in effect on the date of incurrence of any amounts to be tested against the limitation of such transaction and shall not be affected by subsequent fluctuations in exchange rates; provided that, if any such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable Dollar-denominated limitation to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.  The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currency in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

# ARTICLE II

## THE COMMITMENTS AND CREDIT EXTENSIONS

**2.01     Commitments to Lend; Loans**.

(a)     Closing Date Loans.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make, on the Closing Date, a Loan to the Borrowers (each such Loan, a "Closing Date Loan") in an aggregate amount not to exceed such Lender's Commitment. The Commitments shall terminate automatically immediately after the making of the Closing Date Loans on the Closing Date. All Loans and all other Obligations in respect thereof shall be paid in full not later than the Maturity Date.  Proceeds of the Loans shall be used solely as permitted herein.

(b)     Conversion of DIP Facility Obligations.  Subject to the terms and conditions set forth herein and to give effect to the conversion of the DIP Facility Obligations owing to each Lender, each Lender severally agrees to make and shall be deemed to have made, on the Closing

Date, a term loan denominated in Dollars to the Borrowers (each such loan, a "Converted Loan") in a principal amount equal to the DIP Facility Obligations owing to such Lender on the Closing Date, and the DIP Facility Obligations owing to the Lenders under the DIP Facility Agreement shall be substituted and exchanged for (and prepaid by) the Converted Loans.  The principal amount of the Converted Loan of each Lender as of the Closing Date is set forth in Schedule 2.01.  The Converted Loans deemed made or issued pursuant this Section 2.01(b) shall be made without any actual funding.

Any Loans borrowed and subsequently repaid or prepaid, in whole or in part, may not be reborrowed.

**2.02    Borrowing and Continuation of Loans; Notice of Borrowing and Continuation**.

(a)    The Borrowing shall be made upon the Borrower Representative's irrevocable notice to the Administrative Agent via a Borrowing Request Notice and each continuation of Eurodollar Rate Loans shall be made upon the Borrower Representative's irrevocable notice to the Administrative Agent via a Notice of Continuation, in each case appropriately completed and signed by a member of Senior Management of the Borrower Representative, which may be given by any Electronic Medium.  Each such notice must be received by the Administrative Agent not later than 1:00 p.m. Eastern time (10:00 a.m. Pacific time) at least three (3) Business Days prior to the requested date of the Borrowing of or continuation of the Eurodollar Rate Loans (or such shorter time as agreed by the Administrative Agent and Requisite Lenders).  The Borrowing Request Notice and each Notice of Continuation shall specify (i) the Borrower requesting the Borrowing or such continuation, (ii) the requested date of the Borrowing or continuation (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed or continued and (iv) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower Representative fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)    Following receipt of the Borrowing Request Notice by the Administrative Agent, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the Closing Date Loans and each Lender shall make the amount of its Applicable Percentage available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 3:00 p.m. Eastern time (12:00 p.m. Pacific time) (or such shorter time as may be agreed by the Administrative Agent) on the Business Day specified in the Borrowing Request Notice.  Upon satisfaction of the applicable conditions set forth in Sections 4.01, the Administrative Agent shall pay all fees and expenses then due and payable under Section 2.09 and the amount net of such applied amount shall be deposited by the Administrative Agent in the account specified by the Borrower Representative in the Borrowing Request Notice.

**2.03    [Intentionally Omitted]**.

**2.04    [Intentionally Omitted]**.

**2.05    Mandatory Prepayments**.

(a)    Asset Dispositions.  Within two (2) business days of receipt by any Credit Party of Net Cash Proceeds from any asset disposition (excluding (i) dispositions of inventory in the ordinary course of business, (ii) dispositions of obsolete inventory, and (iii) Revolving Facility Priority Collateral, so long as a Revolving Facility is in effect), the Borrowers shall prepay the

Obligations in an amount equal to 100% of such Net Cash Proceeds; provided that, so long as no Event of Default has occurred and is continuing, no prepayment shall be required under this Section 2.05(a) to the extent that such Net Cash Proceeds are reinvested in long term productive assets of the general type useful in the business of Holdings and its Subsidiaries within twelve (12) months after receipt of such Net Cash Proceeds; provided, further that (x) from and after the date that a Revolving Facility is in effect, pending any such reinvestment all such Net Cash Proceeds exceeding $2,000,000 shall be held in the Term Loan Assets Proceeds Account  (which Net Cash Proceeds shall be released to or at the direction of the Borrower Representative from the Term Loan Assets Proceeds Account for purposes of or in connection with such reinvestment within three (3) Business Days of the Administrative Agent's receipt of a written request for such release from the Borrower Representative), and (y) any portion of such Net Cash Proceeds not actually reinvested within such twelve (12) month period shall be prepaid in accordance with this Section 2.05 on or before the last day of such twelve (12) month period.

(b)     Casualty Events and Extraordinary Receipts.  Within two (2) business days of receipt thereof, the Borrowers shall prepay the Obligations in an amount equal to (i) 100% of the Net Cash Proceeds received by any Credit Party from Casualty Events with respect to the Term Priority Collateral and (ii) 100% of all Net Cash Proceeds received by any Credit Party with respect to Extraordinary Receipts, provided that (A) so long as no Event of Default has occurred and is continuing, no prepayment shall be required under Section 2.05(b)(i) to the extent that such Net Cash Proceeds are reinvested in long term productive assets of the general type useful in the business of Holdings and its Subsidiaries within twelve (12) months after receipt of such Net Cash Proceeds; provided, further that (x) from and after the date that a Revolving Facility is in effect, pending any such reinvestment all such Net Cash Proceeds exceeding $5,000,000 in the aggregate shall be held in 6.15

the Term Loan Assets Proceeds Account (which Net Cash Proceeds shall be released to or at the direction of the Borrower Representative from the Term Loan Assets Proceeds Account for purposes of or in connection with such reinvestment within three (3) Business Days of the Administrative Agent's receipt of a written request for such release from the Borrower Representative), and (y) any portion of such Net Cash Proceeds not actually reinvested within such twelve (12) month period shall be prepaid in accordance with this Section 2.05 on or before the last day of such twelve (12) month period, and (B) from and after the date that a Revolving Facility is in effect, no prepayment shall be required under Section 2.05(b)(ii) to the extent such prepayment would not be permitted under the Revolving Facility Loan Documents .

(c)     Incurrence of Indebtedness.  Immediately upon the incurrence or issuance by any Credit Party or any of its Subsidiaries of any Indebtedness (other than Excluded Debt Incurrences), the Borrowers shall prepay the Obligations in an amount equal to 100% of such Net Cash Proceeds so received.

(d)     Application of Mandatory Prepayments.  Each prepayment of Loans pursuant to this Section 2.05 shall be applied ratably among the Lenders in proportion to their Applicable Percentages.  Each prepayment of Loans pursuant to Sections 2.05(c) shall be accompanied by the applicable Prepayment Premium, if any, pursuant to Section 2.09(a).

**2.06     Voluntary Prepayments**.  At any time and from time to time, upon not less than three (3) Business Days' prior written notice to the Administrative Agent, the Borrowers may prepay the Loans on any Business Day in whole or in part (subject to payment of Breakage Costs pursuant to Section 3.05 and payment of any applicable Prepayment Premium pursuant to Section 2.09(a)).  Any

such voluntary prepayment pursuant to this <u>Section 2.06</u> shall be applied ratably among the Lenders in proportion to their Applicable Percentages.

2.07    **Repayment of Loans**. The Borrowers shall repay the Lenders, on the Maturity Date, the aggregate principal amount of all Loans outstanding on such date, together with all other Obligations in respect thereof.

2.08    **Interest**.

(a)    Subject to the provisions of <u>Section 2.08(b)(iii)</u>, <u>Section 2.08(c)</u>, <u>Section 3.02</u> and <u>Section 3.03</u>, the Loans shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period <u>plus</u> the Applicable Rate.

(b)    <u>PIK Interest</u>

(i)    The Borrowers may, for any Interest Payment Date (other than the Maturity Date), elect (such election, a "<u>PIK Election</u>") to pay up to one hundred percent (100%) of the interest on the Loans due and payable on such Interest Payment Date in-kind by having such interest capitalized and added to the aggregate outstanding principal amount of the Loans on such Interest Payment Date (any such interest that is capitalized and added to the aggregate outstanding principal amount of the Loans on an Interest Payment Date being referred to herein as "<u>PIK Interest</u>") and pay the balance, if any, of such interest in cash on the such Interest Payment Date; <u>provided</u> that (A) no Default or Event of Default shall have occurred and be continuing on the date of such PIK Election and (B) the amount of interest elected by the Borrowers to be paid as PIK Interest on any Interest Payment Date shall not exceed the amount by which Liquidity would be less than ~~$10,000,000~~**the Applicable Liquidity Amount** on such Interest Payment Date if the Borrowers were to instead make such PIK Interest payment in cash on such Interest Payment Date. Each PIK Election shall apply ratably to all outstanding Loans. Any interest so added to the principal amount of the Loans shall bear interest as provided in this Section 2.08 from the date on which such interest has been so added. Unless the context otherwise requires, for all purposes hereof, references to "principal amount" of the Loans refers to the face amount of the Loans and not gross proceeds funded hereunder and includes any interest so capitalized and added to the principal amount of the Loans from the date on which such interest has been so added.

(ii)    The Borrower Representative shall make a PIK Election with respect to any Interest Payment Date (other than the Maturity Date) by delivering a notice to the Administrative Agent not later than five Business Days prior to the applicable Interest Payment Date in the form of <u>Exhibit F</u>, which notice shall specify the portion of the principal amount of the Loans as to which interest shall be payable as PIK Interest. The Administrative Agent shall promptly deliver a corresponding notice to each Lender. In the absence of any PIK Election for any Interest Period, interest on the Loans shall be payable in cash.

(iii)    Notwithstanding anything herein to the contrary, interest shall be payable on any principal portion of the Loans that was converted as such pursuant to a PIK Election at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate plus 2.00% per annum.

30

(iv)    The obligation of the Borrower to pay PIK Interest shall be automatically evidenced by this Agreement.  Upon the request of the Administrative Agent or any Lender, the Borrower shall confirm in writing the principal amount of the Loans, including all PIK Interest added to the principal amount thereof pursuant to this Section 2.08.

(c)    Following the occurrence and during the continuance of an Event of Default, if the Administrative Agent or the Required Lenders in their discretion so elect, the Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(d)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable (i) on demand by the Administrative Agent during the continuance of an Event of Default or (ii) otherwise, within 10 Business Days of receipt of invoice or statement; provided that the Credit Parties acknowledge and agree that the Administrative Agent may charge such Obligations to the Loan balance (as deemed Loans) immediately to satisfy such Obligations.  Interest accruing at the Default Rate shall be due and payable on demand by the Administrative Agent.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09    Call Protection; Fees**.  All fees payable to the Administrative Agent and described in this Section 2.09 shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(a)    Prepayment Premium.  In the event that all or any portion of the Loans are repaid or prepaid for any reason (including as a result of any mandatory prepayments, voluntary prepayments, payments made following acceleration of the Loans or after an Event of Default) prior to the third anniversary of the Closing Date, such repayments or prepayments will be made at (i) 103.0% of the amount repaid or prepaid, if such repayment or prepayment occurs on or prior to the first anniversary of the Closing Date, (ii) 102.0% of the amount repaid or prepaid, if such repayment or prepayment occurs after the first anniversary of the Closing Date, but on or prior to the second anniversary of the Closing Date and (iii) 101.0% of the amount repaid or prepaid if such repayment or prepayment occurs after the second anniversary of the Closing Date but on or prior to the third anniversary of the Closing Date (the foregoing premiums, the "Prepayment Premium"); provided that the Prepayment Premium shall not apply to mandatory prepayments by Borrower pursuant to Section 2.05(a) and Section 2.05(b).

(b)    Agency Fees.  The Borrowers shall pay to the Administrative Agent the fees in the amounts and at the times specified in the Administrative Agent's Letter Agreement.

(c)    Closing Fees.  The Borrowers agrees to pay on the Closing Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for the funding of such Lender's Closing Date Loan, a closing fee in an amount equal to 2.00% of the stated principal amount of such Lender's Closing Date Loan, payable to such Lender from the proceeds of its Closing Date Loan as and when funded on the Closing Date.  Such closing fee will be in all respects fully earned, due and payable on the Closing Date and non-refundable and non-creditable thereafter.

**2.10** **Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of a year of a 360-day year and actual days elapsed (which results in more interest being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11** **Evidence of Debt**.  The Loans of each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  Consistent with Section 11.06, in the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

**2.12** **Payments Generally; Administrative Agent's Clawback**.

(a) General.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 12:00 p.m. Eastern time (9:00 a.m. Pacific time) on the date specified herein.  The Administrative Agent may promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office or upon the weekly settlement date.  All payments received by the Administrative Agent after 12:00 p.m. Eastern time (9:00 a.m. Pacific time) may be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day (unless otherwise provided herein), and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b) (i) Funding by Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Loans that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made

#4848-5684-9449v14#4848-5684-9449v15

available to the Borrowers to but excluding the date of payment to the Administrative Agent, at the interest rate applicable to such Loans made.  If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    Payments by Borrowers; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon in an amount equal to the interest owing by the Borrowers on such payment (for the account of the Administrative Agent), for each day from and including the date such amount was distributed to the Lenders but excluding the date of payment to the Administrative Agent.

A notice of the Administrative Agent to any Lender or the Borrowers with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds promptly (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans applicable to it and to make payments pursuant to Section 10.04(c) are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 10.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loans, to purchase its participation or to make its payment under Section 10.04(c).

(e)    Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13    Sharing of Payments by Lenders**.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the Loans

#4848-5684-9449v14#4848-5684-9449v15

of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them provided that:

> (i)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

> (ii)    the provisions of this Section shall not be construed to apply to (A) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrowers or any Subsidiary of the Borrowers (as to which the provisions of this Section shall apply).

The Borrowers consent to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.

**2.14    Collateral and Guarantees; Joint and Several Liabilities**.

(a)    Collateral.  The Loans and the other Obligations shall be secured by valid, first priority (subject in priority only to any Permitted Senior Liens), perfected and enforceable Liens in favor of the Administrative Agent, for the benefit of the holders of the Obligations, in all of the Collateral subject to the terms of the Security Documents and, from and after the date that a Revolving Facility is in effect, the Intercreditor Agreement.

(b)    Guarantees.  Payment of the Loans and the other Obligations shall be irrevocably and unconditionally Guaranteed by each Guarantor, jointly and severally with the other Guarantors as a primary obligor and not merely as a surety (whether at the stated maturity, by prepayment, by acceleration or otherwise) subject to the terms of the Credit Party Guarantees.

(c)    Further Assurances.  Each Credit Party covenants and agrees that it shall, and shall cause each of its Subsidiaries party to the Security Documents to, comply with all terms and conditions of each of the Security Documents and that each Credit Party shall, and shall cause each of its Subsidiaries party to the Security Documents to, at any time and from time to time at the request of the Administrative Agent or the Required Lenders execute and deliver such instruments and documents and do such acts and things as the Administrative Agent or the Required Lenders may reasonably request in order to provide for or protect the Lien of the Administrative Agent in the Collateral subject to the terms of the Security Documents.

(d)    Joint and Several Liabilities.  Each Borrower hereby irrevocably and unconditionally agrees that it is jointly and severally liable for all of the liabilities, covenants and Obligations whether now or hereafter existing or due or to become due.  The Obligations may be enforced by the Administrative Agent and the Lenders against any Borrower or all Borrowers in any manner or order selected by the Administrative Agent or the Required Lenders in their sole discretion.  Each Borrower hereby irrevocably waives (i) any rights of subrogation and (ii) any rights of contribution, indemnity or reimbursement, in each case, that it may acquire or that may

34

arise against any other Borrower due to any payment or performance made under this Agreement, in each case until all Obligations shall have been fully satisfied.  Without limiting the foregoing provisions of this Section 2.14(d), each Borrower acknowledges and agrees that:

(A)    its obligations under this Agreement shall remain enforceable against it even though such obligations may be unenforceable or not allowable against any other Credit Party due to the existence of any proceeding under any Debtor Relief Law involving any other Credit Party;

(B)    its obligations under this Agreement are independent of the obligations of any other Credit Party, and a separate action or actions may be brought and prosecuted against it in respect of such obligations irrespective of whether any action is brought against any other Credit Party or any other Credit Party is joined in any such action or actions;

(C)    it hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(I)    any lack of validity or enforceability of this Agreement or any other Loan Document or any agreement or instrument relating thereto in respect of any other Credit Party;

(II)    any change in the time, manner or place of payment of, or in any other term of, all or any of the obligations of any other Credit Party under or in respect of this Agreement or any other Loan Document, or any other amendment or waiver of or any consent to departure from this Agreement, in respect of any other Credit Party;

(III)    any change, restructuring or termination of the structure or existence of any other Credit Party;

(IV)    the failure of any other Person to execute or deliver any other agreement or the release or reduction of liability of any other Person with respect to any obligations of the Credit Parties under this Agreement; or

(V)    any other circumstance (including any statute of limitations but other than the Obligations having been fully satisfied) or any existence of or reliance on any representation by any other Person that might otherwise constitute a defense available to, or a discharge of, any other Borrower;

(D)    its obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any such obligations is rescinded or must otherwise be returned by any Person upon the institution of any proceeding under any Debtor Relief Law of any other Credit Party, all as though such payment had not been made; and

(E)    it hereby unconditionally and irrevocably waives any right to revoke its joint and several liability under the Loan Documents and acknowledges that such liability is continuing in nature and applies to all Obligations, whether existing now or in the future.

**2.15**   **Defaulting Lenders**.

(a)   <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)   <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and <u>Section 10.01</u>.

(ii)   <u>Defaulting Lender Waterfall</u>.  The Administrative Agent may, in its discretion, receive and retain any amounts payable to a Defaulting Lender under the Loan Documents, and a Defaulting Lender shall be deemed to have assigned to the Administrative Agent such amounts until all Obligations owing to the Administrative Agent, Non-Defaulting Lenders and other Secured Parties have been paid in full.  The Administrative Agent may apply such amounts to the Defaulting Lender's defaulted obligations or re-advance the amounts to the Borrowers hereunder.

(b)   <u>Defaulting Lender Cure</u>.  If the Borrowers and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**2.16**   **Loan Account**.

(a)   The Administrative Agent shall maintain in accordance with its usual and customary practices an account or accounts ("<u>Loan Account</u>") evidencing the Indebtedness of the Borrowers resulting from each Loan.  Any failure of the Administrative Agent to record anything in the Loan Account, or any error in doing so, shall not limit or otherwise affect the obligation of the Borrowers to pay any amount owing hereunder.

(b)   Entries made in the Loan Account shall constitute presumptive evidence of the information contained therein.  If any information contained in the Loan Account is provided to or inspected by any Person, then such information shall be conclusive and binding on such Person for all purposes absent manifest error, except to the extent such Person notifies the Administrative Agent in writing within thirty (30) days after receipt or inspection that specific information is subject to dispute.

**2.17**   **Borrower Representative**.  Each Credit Party hereby designates AA USA as its representative and agent on its behalf for the purposes of issuing the Borrowing Request Notice,  giving instructions with respect to the disbursement of the proceeds of the Loans, selecting interest rate options, delivering financial statements and other financial information, delivering Compliance Certificates, giving

and receiving all other notices, communications and consents hereunder or under any of the other Loan Documents, executing Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Credit Party under the Loan Documents.  The Borrower Representative hereby accepts such appointment.  The Administrative Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from the Borrower Representative as a notice or communication from all Credit Parties, and may give any notice or communication required or permitted to be given to any Credit Party hereunder to the Borrower Representative on behalf of such Credit Party or Credit Parties.  Each Credit Party agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Borrower Representative shall be deemed for all purposes to have been made by such Credit Party and shall be binding upon and enforceable against such Credit Party to the same extent as if the same had been made directly by such Credit Party.

**ARTICLE III**

**TAXES, YIELD PROTECTION AND ILLEGALITY**

**3.01    Taxes**.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.  Any and all payments by or on account of any obligation of any Credit Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any Credit Party or the Administrative Agent shall be required to withhold or deduct any Taxes from any payment, then (A) the Administrative Agent or Credit Party shall withhold or make such deductions as are determined by the Administrative Agent or Credit Party to be required taking into account the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent or Credit Party shall timely pay the full amount withheld or deducted to the relevant Governmental Authority, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Credit Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including withholdings and deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    Payment of Other Taxes by the Credit Parties.  Without limiting the provisions of subsection (a) above, the Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law (without duplication of the provisions of subsection (a) above), or at the option of the Administrative Agent timely reimburse the Administrative Agent for the payment of, any Other Taxes.

(c)    Tax Indemnifications.

(i)    Without duplicating the provisions of subsection (a) above, each of the Credit Parties shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount (and describing the basis) of

37

such payment or liability delivered to the Borrower Representative by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)     Each Lender does hereby, severally indemnify, the Administrative Agent and shall make payment in respect thereof within 10 days after demand therefor, (x) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (y) against any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.06(d) relating to the maintenance of a Participant Register and (z) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).

(d)     Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrowers to a Governmental Authority as provided in this Section 3.01, the Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Status of Lenders; Tax Documentation.

(i)     Any Recipient that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower Representative and the Administrative Agent, at the time or times prescribed by applicable Laws and at the time or times reasonably requested by the Borrower Representative or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or reasonably requested by the Borrower Representative or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Recipient, if reasonably requested by the Borrower Representative or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower Representative or the Administrative Agent as will enable the Borrower Representative or the Administrative Agent to determine whether or not such Recipient is subject to any withholding (including backup withholding) or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), (ii)(B), (ii)(D) and (ii)(E) below) shall not be required if in the Recipient's reasonable judgment, such completion, execution or submission would subject such Recipient to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Recipient.

#4848-5684-9449v14#4848-5684-9449v15

(ii)      Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower Representative and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax (or any substantively comparable subsequent versions thereof or successors thereto);

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), whichever of the following is applicable:

(I)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E (or any substantively comparable subsequent versions thereof or successors thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E (or any substantively comparable subsequent versions thereof or successors thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)     executed originals of IRS Form W-8ECI (or any substantively comparable subsequent versions thereof or successors thereto);

(III)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest" a statement substantially in the form of <u>Exhibit G-1</u> (a "<u>U.S. Tax Compliance Certificate</u>"), as applicable, and duly executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E (or any substantively comparable subsequent versions thereof or successors thereto); or

(IV)     to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY (or any substantively comparable subsequent versions thereof or successors thereto), accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E (or any substantively comparable subsequent versions thereof or successors thereto), a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit G-2</u> or <u>Exhibit G-3</u>,

#4848-5684-9449v14#4848-5684-9449v15

IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that, if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made;

(D)    the Administrative Agent shall deliver to the Borrower Representative on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the request of the Borrowers) two copies of IRS Form W-9 (or any substantively comparable subsequent versions thereof or successors thereto) certifying that the Administrative Agent is exempt from United States federal backup withholding tax and such other documentation as will enable the Borrowers to determine whether or not the Administrative Agent is subject to United States federal backup withholding tax or information reporting requirements; and

(E)    if a payment made to a Recipient under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or other Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or other Recipient shall deliver to the Borrower Representative and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower Representative or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower Representative or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (E), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)    Each Recipient agrees that if any change in circumstances would render a form or certification it previously delivered pursuant to this Section 3.01 invalid or

inaccurate in any respect, it shall promptly notify the Borrower Representative and Administrative agent in writing and update such form or certification or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so.

(f)    Treatment of Certain Refunds.    If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Credit Party or with respect to which any Credit Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the Borrower Representative an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Credit Party under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient in connection with such refund, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Credit Party, upon the request of the Recipient, agrees to repay the amount paid over to the Credit Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Credit Party pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.  This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Credit Party or any other Person.

(g)    Survival.    Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**3.02    Illegality.**  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans, or to determine or charge interest rates, in each case, based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, (a) any obligation of such Lender to make Loans by reference to the Eurodollar Rate or to continue Eurodollar Rate Loans shall be suspended and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate, in each case, until such Lender notifies the Administrative Agent and the Borrower Representative that the circumstances giving rise to such determination no longer exist.  Until such circumstances giving rise to the determination no longer exist, as set forth in a written notice provided by such Lender to the Administrative Agent and the Borrower Representative, all outstanding Loans of such Lender and Loans thereafter made by such Lender shall bear interest at the Base Rate (determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate if necessary to avoid such illegality) plus the Applicable Rate (or at the Default Rate if an Event of Default has occurred that is continuing) in the amount specified therein.

#4848-5684-9449v14#4848-5684-9449v15

3.03    **Inability to Determine Rates**.  If the Required Lenders determine that for any reason in connection with any request for a Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and/or Interest Period, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period or (c) the Eurodollar Rate with respect to a proposed Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrowers and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Loans at an interest rate based on the Eurodollar Rate shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component of the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice and during such time, all such outstanding Loans shall bear interest at the Base Rate (determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate if necessary pursuant to clause (y) above) plus the Applicable Rate per annum (or at the Default Rate if an Event of Default has occurred that is continuing).  Upon receipt of such notice, the Borrowers may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans (to the extent of the affected Eurodollar Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

3.04    **Increased Costs**.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in subsection (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition (other than any condition related to Taxes), cost or expense affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender, by an amount that such Lender deems to be material, of making, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender, by an amount that such Lender, as the case may be, deems to be material, of participating in, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have

achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), by an amount that such Lender deems to be material, then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

3.05    **Compensation for Losses**.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of (a) any continuation, payment or prepayment of any Eurodollar Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration or otherwise), (b) any failure by any Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow or continue any Eurodollar Rate Loan on the date or in the amount notified by the Borrower Representative or (c) any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrowers pursuant to Section 10.13, excluding any loss of anticipated profits but including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained (all of such losses, costs or expenses, together with any administrative fees referred to in the following sentence, are referred to herein collectively as the "Breakage Costs").  The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.  The Lenders shall not be required to purchase Dollar deposits in any interbank or offshore Dollar market to fund any Eurodollar Rate Loan.

3.06    **Mitigation Obligations; Replacement of Lenders**.

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or requires any Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then at the request of the Borrower Representative such Lender shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice

pursuant to <u>Section 3.02.</u> as applicable and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender (it being understood that the Borrowers shall be given a reasonable opportunity to reimburse such costs or expenses).  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u> and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with <u>Section 3.06(a)</u>, the Borrowers may replace such Lender in accordance with <u>Section 10.13</u>.

**3.07    Survival**.  All of the Borrowers' obligations under this <u>Article III</u> shall survive termination of the Exit Term Loan Facility and repayment of all other Obligations hereunder.

## ARTICLE IV

## CONDITIONS PRECEDENT

**4.01    Conditions to Effectiveness, the Closing Date and Credit Extension**.  The effectiveness of this Agreement, the obligation of each Lender to make a Closing Date Loan on the Closing Date under <u>Section 2.01(a)</u> and the deemed making of the Converted Loans on the Closing Date under <u>Section 2.01(b)</u> are subject to the satisfaction (or waiver in accordance with <u>Section 10.01</u>) of the following conditions precedent:

(a)    The Administrative Agent shall have received UCC, tax and judgment lien searches and other appropriate evidence in form and substance reasonably satisfactory to the Required Lenders evidencing the absence of any other liens or mortgages on the Collateral other than Permitted Liens and other existing liens acceptable to the Required Lenders in their sole discretion.

(b)    The Security Documents shall be effective to create in favor of the Administrative Agent, for its benefit and the benefit of each Lender, a legal, valid and enforceable first priority security interest in and Lien upon the Collateral (subject in priority only to Permitted Senior Liens).

(c)    The Administrative Agent shall have received appropriate UCC-1 financing statements for filing under the UCC of each jurisdiction of organization of each Credit Party.

(d)    The Administrative Agent's receipt of the following, each of which shall be originals or facsimile or other electronic image transmission (e.g. "PDF" or "TIF" via electronic mail), unless otherwise specified, each properly executed by a member of the Senior Management of the signing Credit Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Lenders:

(i)    (A) executed counterparts of this Agreement, (B) executed counterparts of each Security Document, (C) a Note executed by the Borrowers in favor of each Lender that shall have requested a Note prior to the date hereof, (D) an executed

#4848-5684-9449v14#4848-5684-9449v15

Borrowing Request Notice and (E) executed Credit Party Guarantees from the Guarantors;

(ii)    an officer's certificate of each Credit Party executing a Loan Document, (A) certifying and attaching true, correct and complete copies of: (I) the certificate or articles of incorporation (or such equivalent thereof) of such Credit Party, certified as of a recent date from the Secretary of State (or applicable Governmental Authority) of the state in which such Credit Party is incorporated or formed and (II) the by-laws, limited liability company agreement, partnership agreement or other applicable Governing Document of such Credit Party and (B) certifying the incumbency of members of the Senior Management of such Credit Party authorized to act in connection with this Agreement and the other Loan Documents to which such Credit Party is a party and providing a specimen signature of such members of the Senior Management of such Credit Party who will be signing Loan Documents on the Closing Date and thereafter;

(iii)    such documents and certifications as the Administrative Agent and the Required Lenders may require to evidence that each Credit Party executing a Loan Document is validly existing, in good standing and qualified to engage in business (A) in its jurisdiction of incorporation or formation, as applicable and (B) in each other jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification (other than any jurisdiction to the extent the failure to so qualify could not reasonably be expected to have a Material Adverse Effect) (and in any event excluding any jurisdiction to the extent the Credit Parties ownership, lease or operation of properties or the conduct of business consists solely of the operation of retail stores numbering four or fewer) in such jurisdiction;

(iv)    a certificate of a member of the Senior Management of the Borrower Representative certifying that (A) the conditions specified in this Section 4.01 have been satisfied and (B) all consents, licenses and approvals required in connection with the execution, delivery and performance by each Credit Party and the validity against each Credit Party of the Loan Documents to which such Credit Party is a party have been obtained, and that such consents, licenses and approvals shall be in full force and effect (including consents, approvals and/or amendments necessary under any document or instrument evidencing any Indebtedness of any Credit Party);

(v)    an executed Perfection Certificate; and

(vi)    favorable legal opinions of counsel to the Credit Parties addressed to the Administrative Agent and each Lender as to matters concerning the Credit Parties and the Loan Documents as the Lenders may reasonably request.

(e)    ~~The Administrative Agent shall have received copies of policies and certificates of insurance and endorsements from an independent insurance broker naming the Administrative Agent as additional insured or lender's loss payee thereunder, identifying insurers, types of insurance, insurance limits, and policy terms, and otherwise describing the insurance obtained in accordance with the provisions of this Agreement and the other Loan Documents, which shall be in amounts, types and terms and conditions reasonably satisfactory to the Required Lenders.~~**[Reserved].**

(f)    [Reserved].

(g)     The Administrative Agent shall have received all Intercompany Notes, together with allonges (executed in blank) with respect to each such Intercompany Note, each duly executed and a signed original and in form and substance reasonably satisfactory to the Required Lenders, together with a Subordination Agreement with respect to the Intercompany Note among the Credit Parties, as payors, and the Credit Parties, as payees.

(h)     Payment by the Borrowers on the Closing Date of (i) the administrative and collateral agency fee and expenses (including the reasonable and documented fees and expenses of counsel to the Administrative Agent) pursuant to the Administrative Agent's Letter Agreement, (ii) the reasonable and documented fees of Milbank, Tweed Hadley & McCloy LLP, designated local counsel,  Debevoise & Plimpton LLP and Ducera Partners LLC in connection with the transactions hereunder and (iii) all fees and expenses payable on the Closing Date pursuant to the terms hereof.

(i)     The Administrative Agent shall have received reasonably satisfactory evidence that the principal of and interest on, and all other amounts owing in respect of, all Indebtedness under the DIP Facility Agreement, shall have been paid in full or have been deemed to continue hereunder, that any commitments to extend credit under the DIP Facility Agreement shall have been cancelled or terminated and that all Guarantees in respect of, and all Liens securing, any such Indebtedness shall have been released (or arrangements for such release satisfactory to the Administrative Agent and the Required Lenders shall have been made).

(j)     The Administrative Agent shall have received reasonably satisfactory evidence that the obligations under each of the Prepetition ABL Facility, the Prepetition Lion Facility and the Prepetition Senior Notes have been satisfied in the manner contemplated by the Plan of Reorganization and the Confirmation Order, together with a termination of security interest in intellectual property for each assignment for security recorded pursuant to the Prepetition ABL Documents, the Prepetition Lion Documents and the Prepetition Senior Notes Documents, UCC-3 termination statements for all UCC-1 financing statements filed in connection with the Prepetition ABL Documents, the Prepetition Lion Documents and the Prepetition Senior Notes Documents and covering any portion of the Collateral and termination of any control agreements covering any deposit account or security account subject to the Liens under the Prepetition ABL Documents, the Prepetition Lion Documents and the Prepetition Senior Notes Documents.

(k)     Each of (i) the Plan of Reorganization, (ii) the Disclosure Statement and (iii) the Confirmation Order shall be satisfactory to the Required Lenders (and with respect to any provisions that affect the rights and duties of the Administrative Agent, the Administrative Agent).

(l)     The Confirmation Order shall have been entered in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any applicable orders of the Bankruptcy Court and any applicable local rules.

(m)     The Confirmation Order shall be in full force and effect and shall not, without the consent of the Required Lenders, have been stayed, reversed, modified or amended, shall not be subject to a motion to stay.

(n)     All conditions to the effectiveness of the Plan of Reorganization shall have been satisfied or waived (the waiver thereof having been approved by the Required Lenders) and the Consummation of the Plan of Reorganization in accordance with its terms shall occur on the Closing Date, substantially simultaneously with the making of the Closing Date Loans pursuant

to Section 2.01(a) and the deemed making of the Loan pursuant to Section 2.01(b) (and in no case later than April 5, 2016).

(o)  The Administrative Agent and the Required Lenders shall have received the business plan of the Credit Parties, which shall be reasonably satisfactory to the Required Lenders.

(p)  The Required Lenders shall be reasonably satisfied that, on the Closing Date, immediately after giving effect to the Consummation of the Plan of Reorganization, the making of the Closing Date Loans and any other transactions to occur on the Closing Date, the Credit Parties and their subsidiaries shall have outstanding no indebtedness other than Indebtedness outstanding under the Loan Documents, the SG Credit Agreement, Indebtedness set forth on Schedule 7.02 and any additional indebtedness on terms and conditions (including as to amount) satisfactory to the Required Lenders.

(q)  Each Credit Party shall have obtained all Governmental Authorizations, consents of other Persons and approvals, in each case that are necessary in connection with the transactions contemplated by the Loan Documents and the Plan of Reorganization, and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to Administrative Agent and the Required Lenders.  No action shall have been taken or threatened by any Governmental Authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Loan Documents or the Plan of Reorganization or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending.

(r)  The Administrative Agent shall have received all documentation or other information that the Administrative Agent or any Lender shall have requested not less than three (3) Business Days prior to the Closing Date in order to comply with its ongoing obligations under "know your customer" and anti-money laundering rules and regulations, including the Act, with results satisfactory to the Administrative Agent and such Lender.

(s)  The Administrative Agent shall have received a funds flow memorandum with respect to the transactions contemplated hereby on the Closing Date in form, scope and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

(t)  The representations and warranties of the Borrowers and each other Credit Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (but without any duplication of any materiality qualifications) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (but without any duplication of any materiality qualifications) as of such earlier date, and except that for purposes of this Section 4.01, the representations and warranties contained in Section 5.02 shall be deemed to refer to the most recent statements furnished pursuant to subsections (a) and (b) respectively, of Section 6.04.

(u)  No Default or Event of Default shall exist, or would result from the proposed Borrowing on the Closing Date or from the application of the proceeds thereof.

(w)    The Required Lenders shall be satisfied that since October 5, 2015, there shall not have occurred any event, occurrence, development or state of circumstances or fact that has had or could reasonably be expected to have a Material Adverse Effect.

(x)    The Administrative Agent shall have received such other assurances, certificates, documents, consents or opinions as the Administrative Agent or Required Lenders reasonably may require.

(y)    The Administrative Agent shall have received duly executed Agency Account Agreements, signed by each of the applicable parties thereto, for each deposit account or securities account required to be subject to an Agency Account Agreement pursuant to the terms of Section 6.15.

(z**y**)    The Borrower shall have paid to the Lenders a non-refundable fee payable in the form of the right, and the obligation, to purchase new equity interests in the Borrower in the amounts and as calculated pursuant to [Section 2.1 of]**and the definition of "Purchase Price" in** the Equity Commitment Agreement (as defined in the Plan of Reorganization), which shall be earned and payable on the Closing Date.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or reasonably acceptable or satisfactory to such Person unless the Administrative Agent shall have received notice from such Person prior to the proposed Closing Date specifying its objection thereto.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Each Credit Party signatory hereto represents and warrants to the Lenders and the Administrative Agent for itself and on behalf of its Subsidiaries after giving effect to the Plan of Reorganization and the Confirmation Order as follows:

**5.01    Corporate Authority, Etc**.

(a)    **Existence**, **Qualification and Power.**  Each Credit Party and each Subsidiary thereof (i) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (ii)  has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (A) own or lease its assets and carry on its business and (B) execute, deliver and perform its obligations under the Loan Documents to which it is a party and (iii) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c) of this Section 5.01, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)    **Authorization; No Contravention.**  The execution, delivery and performance by each Credit Party of each Loan Document to which such Person is party have been duly authorized by all necessary corporate or other organizational action, and do not and will not

48

(i) contravene the terms of any of such Person's Governing Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject or (iii) violate any Law; except in each case referred to in clause (ii) or (iii) of this Section 5.01(b) to the extent that such conflict, breach, contravention, creation, payment or violation could not reasonably be expected to have a Material Adverse Effect

(c)    **Governmental Authorization; Other Consents.**  Each Credit Party and Subsidiary has, is in compliance with, and is in good standing, with respect to all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and required reports to, all Governmental Authorities necessary to conduct its business and to own, lease and operate its properties except as could not reasonably be expected to have a Material Adverse Effect.  Except where noncompliance could not reasonably be expected to have a Material Adverse Effect, all necessary import, export or other licenses, permits or certificates for the import or handling of any goods or other Collateral have been procured and are in effect, and the Credit Parties and their Subsidiaries have complied with all foreign and domestic laws with respect to the shipment and importation of any goods or Collateral, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Credit Party of this Agreement or any other Loan Document or (ii) the grant by any Credit Party of the Liens created under the Security Documents and the perfection thereof (including the first priority nature thereof subject in priority only to Permitted Senior Liens), except for approvals, consents, exemptions, authorizations, actions, notice and filing which have been duly obtained, taken, given or made and are in full force and effect and the filing of UCC financing statements.

(d)    **Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Credit Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Credit Party, enforceable against each Credit Party that is party thereto in accordance with its terms, subject to applicable Debtor Relief Laws and general principles of equity relating to enforceability (whether considered in a proceeding at law or in equity) but such principles do not make the remedies afforded by the Loan Documents inadequate for the practical realization of the principal benefits intended to be provided thereby.

#4848-5684-9449v14#4848-5684-9449v15

**5.02    Financial Statements**.    There has been furnished to the Lenders an unaudited consolidated balance sheet of Holdings and its Subsidiaries as of the close of the Fiscal Month ending November 30, 2015 and unaudited consolidated statements of income or operations and cash flow of Holdings and its Subsidiaries as of the close of such Fiscal Month, in each case, certified by a Financial Officer of Holdings.  Such balance sheet and statement of income or operations and cash flows have been prepared in accordance with GAAP and fairly present the financial condition of Holdings and its Subsidiaries as at the close of business on the date thereof and the results of operations subject to year-end and quarterly adjustments and the absence of footnotes.  There are no contingent liabilities of Holdings or any Subsidiary as of such date involving material amounts, known to the officers of Holdings or any Subsidiary required to be disclosed in such balance sheet and the notes related thereto in accordance with GAAP which were not disclosed in such balance sheet and the notes related thereto.

**5.03    [Intentionally Omitted]**.

**5.04    No Material Adverse Change**.  Since October 5, 2015, there not having occurred any event, occurrence, development or state of circumstances or facts that has had or could reasonably be expected to have, individually or in the aggregate a Material Adverse Effect.

**5.05    Ownership of Property; Liens**.  Each of the Credit Parties and each Subsidiary has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business and good title to all of its personal property, in each case, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The property of the Credit Parties and their Subsidiaries is subject to no Liens, other than Liens permitted by Section 7.03.

**5.06    Franchises, Patents, Copyrights, etc**.  Each Credit Party possesses all franchises, patents, copyrights, trademarks, trade names, licenses and permits, and rights in respect of the foregoing, adequate for the conduct of its business without known material conflict with any rights of others.  The Perfection Certificate delivered on the Closing Date sets forth a true, correct and complete list of all patents, patent applications, federally registered copyrights and copyright applications, trademarks and trademark applications owned by any Credit Party as of the Closing Date.

**5.07    Litigation**.  Except for actions, suits, proceedings, investigations, claims or disputes set forth in Schedule 5.07 there are no actions, suits, proceedings, investigations, claims or disputes pending or, to the knowledge of the Credit Parties or any of its Domestic Subsidiaries, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Credit Parties, any of their Domestic Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document or (b) could reasonably be expected to result in a Material Adverse Effect.

**5.08    No Default**.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.09    Compliance with Laws**.  Each Credit Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could

not reasonably be expected to have a Material Adverse Effect.  No material inventory has been produced in violation of the Fair Labor Standards Act of 1938.

**5.10    Tax Status**.  The Credit Parties (i) have filed or caused to be filed all material federal, material provincial, material state, material local and material foreign tax returns, reports and declarations required by any jurisdiction to which any of them is subject and (ii) have paid all material Taxes (including withholdings) required to have been paid including in their capacity as tax withholding agents, except (a) those being contested in good faith and by appropriate proceedings and for which the Credit Parties have set aside on their books reasonably adequate provisions therefor in accordance with GAAP (unless foreclosure or other similar enforcement action has been commenced in respect thereof or any Lien has been filed or otherwise perfected therefor, in which case such exception does not apply) or (b) those that have been excused or prohibited from being paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code in connection with the Chapter 11 Cases.  Proper and accurate amounts have been withheld by each Credit Party from its respective employees for all periods in material compliance with all material applicable, federal, provincial, state, local and foreign laws and such withholdings have been timely paid to the respective Governmental Authorities.

**5.11    Insurance**.  The properties of the Credit Parties are insured with financially sound and reputable insurance companies that are not Affiliates of the Borrowers, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Credit Parties operate.

**5.12    Holding Company and Investment Company Acts**.  None of any Credit Party, any Person Controlling any Credit Party, or any Subsidiary of any Credit Party, (a) is subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code or (b) is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.13    ERISA Compliance**.

(a)    Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state laws.  Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the IRS.  To the best knowledge of each Credit Party, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)    There are no pending or, to the best knowledge of each Credit Party, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or would reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred, and neither any Credit Party nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan, (ii) each Credit Party and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained, (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in

51

Section 430(d)(2) of the Code) is 60% or higher and neither any Credit Party nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date, (iv) neither any Credit Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid, (v) neither any Credit Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

(d)     Neither any Credit Party nor any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan.

(e)     With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices, (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

**5.14    Regulations U and X**.  The proceeds of the Loans shall be used solely for the purposes specified in <u>Section 6.11</u>.  No portion of any Loan is to be used for the purpose of purchasing or carrying any "margin security" or "margin stock" as such terms are used in Regulations U and X of the FRB 12 C.F.R. Parts 221 and 224.

**5.15    True Copies of Governing Documents**.  As of the Closing Date, the Credit Parties have furnished or caused to be furnished to each of the Lenders true and complete copies of the Governing Documents (together with any amendments thereto) of each Credit Party.

**5.16    Fiscal Year**.  The Credit Parties have a fiscal year ending December 31 of each year.

**5.17    Subsidiaries, etc**.  As of the Closing Date, Holdings does not have any Subsidiaries except as set forth on <u>Schedule 5.17</u> hereto and, as of the Closing Date, all of the outstanding Capital Stock in such Subsidiaries has been validly issued, fully paid and nonassessable and are owned by Holdings (or a Subsidiary of Holdings) in the amounts specified on <u>Schedule 5.17</u> free and clear of all Liens (other than Liens in favor of the Administrative Agent granted under the Security Documents).

**5.18    Environmental Compliance**.  Based upon the actual knowledge of the Chief Executive Officer and Chief Financial Officer of Holdings, and except as specifically disclosed in <u>Schedule 5.18</u>, existing Environmental Laws and claims, as they relate to the Credit Parties and their Subsidiaries, could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

#4848-5684-9449v14#4848-5684-9449v15

**5.19    Bank Accounts**.  The Perfection Certificate delivered on the Closing Date sets forth the true, correct and complete account numbers and location of all bank accounts of the Credit Parties as of the Closing Date.

**5.20    Labor Contracts**.  Except as set forth on Schedule 5.20, as of the Closing Date, none of the Credit Parties is party to any collective bargaining agreement.  Except as otherwise disclosed to the Administrative Agent there are no material grievances, disputes or controversies with any union or other organization of any Credit Party's employees, or threats of strikes or work stoppages that would reasonably be expected to result in a Material Adverse Effect.

**5.21    Disclosure**.  Each Credit Party has disclosed to the Administrative Agent all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Credit Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading.

**5.22    OFAC**.  No Credit Party, nor, to the knowledge of any Credit Party, any Related Party, (a) is currently the subject of any Sanctions, (b) is located, organized or residing in any Designated Jurisdiction or (c) is or has been (within the previous five (5) years) engaged in any transaction with any Person who is now or was then the subject of Sanctions or who is located, organized or residing in any Designated Jurisdiction.  No Loan, nor the proceeds from any Loan, has been used, directly or indirectly, to lend, contribute, provide or has otherwise made available to fund any activity or business in any Designated Jurisdiction or to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject of any Sanctions, or in any other manner that will result in any violation by any Person (including any Lender or the Administrative Agent) of Sanctions.

**5.23    Other Debt Documents**.  Except for Indebtedness under the SG Credit Agreement and as set forth in Schedule 7.02, the Borrowers do not have any other Indebtedness for borrowed money outstanding on the Closing Date.

**5.24    Solvency**.  On the Closing Date, after giving effect to the Plan of Reorganization and the Confirmation Order, the Credit Parties on a consolidated basis, taken as a whole, are Solvent.

**ARTICLE VI**

**AFFIRMATIVE COVENANTS**

Each Credit Party signatory hereto covenants and agrees for itself and on behalf of its Subsidiaries that, so long as any Lender shall have any Commitment hereunder or any Loan or other Obligation remains outstanding:

**6.01    [Intentionally Omitted]**.

**6.02    Maintenance of Office; Certain Changes**.  Each Credit Party will maintain its chief executive office, distribution center, warehouse, shipping center, plant, factory, or other similar location at the locations identified in the Perfection Certificate delivered by such Credit Party to the

Administrative Agent, or at such other place as the Borrower Representative shall designate upon not less than thirty (30) days' prior written notice to the Administrative Agent (or such shorter period as may be acceptable to the Administrative Agent).  Each Credit Party shall notify the Administrative Agent, in writing, not less than thirty (30) days prior to any change in its name or the type of its organization, jurisdiction or organization, organizational identification number, or tax identification number (or such shorter period as may be acceptable to the Administrative Agent).

      **6.03**    **Records and Accounts**.  Each Credit Party will (a) keep true and accurate records and books of account in which full, true and correct entries will be made in accordance with, and all financial statements provided for herein shall be prepared in accordance with GAAP consistently applied, (b) maintain adequate accounts and reserves for all material unpaid taxes (including income taxes) and (c) at all times, maintain independent certified public accountants as the Credit Parties' accountants which shall be reasonably satisfactory to the Required Lenders (it being understood that Marcum LLP, PricewaterhouseCoopers, Deloitte Touche Tohmatsu, Ernst & Young, KPMG and BDO Seidman shall be satisfactory to the Required Lenders).

      **6.04**    **Financial Statements, Certificates and Information**.  The Credit Parties will deliver to the Administrative Agent and the Lenders:

      (a)    as soon as practicable, but in any event not later than one hundred and twenty (120) days for the Fiscal Year ending on December 31, 2015 [4] and ninety (90) days after the end of each Fiscal Year thereafter, the consolidated balance sheet of Holdings and its Subsidiaries, as at the end of such Fiscal Year, and the related consolidated statements of income or operations, cash flows and shareholders' equity for such Fiscal Year, each setting forth in comparative form the figures for the previous Fiscal Year and all such consolidated financial statements to be in reasonable detail, prepared in accordance with GAAP consistently applied and such consolidated financial statements to be audited and accompanied by a report and opinion prepared in accordance with generally accepted auditing standards by Marcum LLP or by other independent certified public accountants reasonably satisfactory to the Required Lenders and certified without qualification and without expression of uncertainty as to the ability of Holdings and its Subsidiaries to continue as going concerns, together with (w) a written statement from such accountants (to the extent then available on commercially reasonable terms) to the effect that, in making the examination necessary to said certification, nothing has come to their attention to cause them to believe that any Default or Event of Default has occurred or specifying those Defaults or Events of Defaults that they have become aware of, (x) a copy of their accountants' management letter (if any) for such Fiscal Year, and  (y) a Compliance Certificate duly executed by a Financial Officer of Holdings, which, among other things, (A) attaches and certifies to the foregoing consolidated financial statements, accountants statements, and management letters, (B) certifies that the information contained in such financial statements fairly presents in all material respects the financial condition of the Holdings and its Subsidiaries on the dates indicated therein and (C) states that such Financial Officer has reviewed this Agreement and the other Loan Documents and has no knowledge of any Default or Event of Default during such Fiscal Year, or if such Financial Officer has such knowledge, specifying each Default or Event of Default and the nature thereof;

      (b)    as soon as practicable, but in any event not later than forty five (45) days after the end of each of the first three Fiscal Quarters of each Fiscal Year (i) the unaudited quarterly consolidated financial statements of Holdings and its Subsidiaries for such Fiscal Quarter,

---

[4] TBD whether to extend if emergence is delayed beyond late January 2016.

including the consolidated balance sheet of Holdings and its Subsidiaries, as at the end of such Fiscal Quarter, the related consolidated statements of income or operations, cash flows and shareholders' equity for such Fiscal Quarter and for the portion of the Fiscal Year then ended, each setting forth in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, each, prepared in accordance with GAAP consistently applied, and (ii) a Compliance Certificate duly executed by a Financial Officer of Holdings, which, among other things, (A) attaches and certifies to the foregoing financial statements, (B) certifies that the information contained in such financial statements fairly presents in all material respects the financial condition of Holdings and its Subsidiaries on the dates indicated therein (subject to quarter-end adjustments and the absence of footnotes), (C) sets forth in comparative form the results for and through such Fiscal Quarter with the most recent projections delivered to the Administrative Agent pursuant to Section 6.04(c), (D) sets forth (if applicable) reconciliations to reflect changes in GAAP since the date of the last audited financial statements of Holdings and its Subsidiaries and (E) states that such Financial Officer has reviewed this Agreement and the other Loan Documents and has no knowledge of any Default or Event of Default during such Fiscal Quarter, or if such Financial Officer has such knowledge, specifying each Default or Event of Default and the nature thereof to the Administrative Agent's reasonable satisfaction;

(c)      not later than January 31 of each Fiscal Year (commencing with the 2017 Fiscal Year), an annual business plan and projections for Holdings and its Subsidiaries for the following Fiscal Year on a monthly basis (such projections to include consolidated balance sheets, statements of cash flows, statements of income or operations of Holdings and its Subsidiaries prepared on a month-by-month basis);

(d)      promptly upon receipt thereof, copies of any detailed audit reports, financial control reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Credit Parties by independent accountants or internal auditors in connection with any audit of any of them;

(e)      at the election of the Credit Parties or at the request of the Administrative Agent, copies of all annual, regular, periodic and special reports and registration statements which any Credit Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, and not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(f)      at the election of the Credit Parties or at the request of the Administrative Agent, copies of each notice or other correspondence received from the SEC or any other Governmental Authority concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Credit Party or any Subsidiary;

(g)      promptly after being furnished or received, copies of all notices, reports, certificates, documents and other information furnished to or received by any Credit Party in connection with the Revolving Facility Documents or the Subordinated Debt Documents (including any amendments, waivers, supplements, modifications, notices or other documents relating to any default or potential default thereunder, but in any event excluding routine notices, reports and certificates of an administrative nature);

(h)      (a) promptly following the reasonable request of the Administrative Agent, a report summarizing the insurance coverage in effect for each Credit Party and (b) promptly

following the modification, renewal, replacement of any insurance policy of any Credit Party, updated insurance certificates and endorsements evidencing such coverage;

(i)     as soon as practicable, but in any event not later than ten (10) days (or such longer period as agreed by the Administrative Agent in its discretion) following the end of each Fiscal Year (or more frequently at the election of the Credit Parties), (a) an updated Perfection Certificate as to each Credit Party in substantially the same form as the Perfection Certificate most recently delivered to the Administrative Agent (with such scope and detail as the Administrative Agent's may reasonably require) or a certificate confirming that there has been no change in such information since the Perfection Certificate delivered on the Closing Date or the most recent Perfection Certificate delivered pursuant to this Section 6.04(i) and (b) updated Schedules 5.07, 5.17, 5.18, 5.20 and 7.08 in substantially the same form as the most recent schedule of the same delivered to the Administrative Agent to the Administrative Agent's reasonable satisfaction; and

(j)     promptly following a request therefor, from time to time such other financial data and information as the Administrative Agent or any Lender may reasonably request with respect to the Credit Parties, including updates and such other information and copies of documents with respect to pending litigation or the settlement or compromise thereof.

Documents required to be delivered pursuant to this Section 6.04 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the applicable Credit Party posts such documents and provides a link thereto on such Credit Party's website on the Internet at the website address listed on Schedule 11.02 or (ii) on which such documents are posted on the applicable Credit Party's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that (x) upon the request of the Administrative Agent, the applicable Credit Party shall deliver paper copies of such documents to the Administrative Agent until a written request to cease delivering paper copies is given by the Administrative Agent and (y) the Borrower Representative shall notify the Administrative Agent and each Lender (by facsimile or electronic mail) of the posting of any such documents and provide to the Administrative Agent and each Lender by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by any Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

**6.05    Notices**.

(a)     Defaults.  The Credit Parties will promptly (but in any event within two (2) Business Days) notify the Administrative Agent and each Lender in writing of the occurrence of (i) any Default or Event of Default or (ii) any "default", "event of default" or material breach under any Revolving Facility Document or any Subordinated Debt Document.

(b)     Material Adverse Effect.  The Credit Parties shall promptly (but in any event within two (2) Business Days) disclose in writing to the Administrative Agent (for distribution to each Lender) of any matter that has resulted or would reasonably be expected to result in a Material Adverse Effect.

(c)     ERISA Events.  The Credit Parties shall promptly disclose in writing to the Administrative Agent the occurrence of any ERISA Event;

(d)     Change in Accounting Policies or Financial Reporting.  The Credit Parties shall promptly disclose in writing to the Administrative Agent notice of (i) any material change in accounting policies or financial reporting practices by Holdings or any Subsidiary or (ii) discharge by any Credit Party of its independent accountants or any withdrawal or resignation by such independent accountants.

(e)     Notice of Tax Claims, Litigation and Judgments.  The Credit Parties will give notice to the Administrative Agent in writing within three (3) Business Days of any written notice of proposed assessment or written notice of the commencement of any material audit by any Governmental Authority for unpaid Taxes of any Credit Party or any Subsidiary that are due and payable, any commencement of any litigation or proceedings affecting any Credit Party, any Subsidiary or any member of the Senior Management of any Credit Party or any of its Subsidiaries or to which any Credit Party, any Subsidiary or any member of the Senior Management of any Credit Party or any of its Subsidiaries is or becomes a party that (i) involves any claim that has resulted in or would reasonably be expected to result in liabilities of more than $350,000 that are not covered by insurance policies maintained in accordance with Section 6.07, (ii) to the knowledge of the general counsel or chief financial officer of Holdings, involves any adverse claim or proceeding against any member of the Senior Management of Holdings, which has resulted in or would reasonably be expected to result in material publicity with respect to the Credit Parties or such member of the Senior Management of Holdings, (iii) has resulted in or would reasonably be expected to result in a Material Adverse Effect or (iv) is a criminal investigation or involves a criminal penalty for any felony.  The Credit Parties will give notice to the Administrative Agent and each Lender, in writing, in form and detail reasonably satisfactory to the Administrative Agent, within five (5) Business Days of any judgment not covered by insurance, final or otherwise, against any Credit Party in an amount in excess of $350,000 or of the entry of any non-monetary judgment that would reasonably be expected to have a Material Adverse Effect.

(f)     Notification of Additional Intellectual Property Rights.  Concurrently with the delivery of financial statements with respect to any Fiscal Quarter, the Credit Parties will notify the Administrative Agent in writing of any patents, patent applications, patent application disclosures filed with any patent office during such Fiscal Quarter, registered copyrights or mask works registered during such Fiscal Quarter, applications for registration of copyrights or mask works filed during such Fiscal Quarter and trademark and service mark registrations during such Fiscal Quarter, and trademark and service mark registration applications filed during such Fiscal Quarter, all of the foregoing whether a foreign or United States right, to the extent not listed on the Perfection Certificate most recently delivered to the Administrative Agent in accordance with this Agreement.

(g)     Environmental Events.  The Credit Parties will promptly give notice to the Administrative Agent and each Lender (i) of any violation of any Environmental Law that any Credit Party reports in writing or is reportable by such Person in writing (or for which any written report supplemental to any oral report is made) to any Governmental Authority and (ii) upon any member of Senior Management of any Credit Party becoming aware thereof of any inquiry, proceeding, investigation, or other action, including a notice from any agency of potential Environmental Liability, of any Governmental Authority that, in the case of clause (i) or (ii) of this paragraph, would reasonably be expected to result in a Material Adverse Effect.

(h)    Prepayment Events.  Promptly following the occurrence of any event for which the Borrowers are required to make a prepayment under Sections 2.05(a) through (c), together with all supporting information reasonably requested by the Administrative Agent or the Required Lenders.

(i)    Labor Relations.  The Credit Parties shall provide to the Administrative Agent prompt written notice of any collective bargaining agreement or other labor contract to which a Credit Party becomes a party, or the application for the certification of a collective bargaining agent.

(j)    Amendments to Revolving Facility Documents.  From and after the date that a Revolving Facility is in effect, the Credit Parties shall promptly (but in any event within two (2) Business Days) disclose in writing to the Administrative Agent (for distribution to each Lender) any amendment, restatement, material supplement or other modification to any Revolving Facility Document.

Delivery by the Credit Parties to the Administrative Agent of any and all notices required to be delivered to the Lenders as herein required shall be deemed made upon receipt of such notices by the Administrative Agent.

**6.06    Legal Existence; Maintenance of Properties**.

(a)    Except as permitted by Section 7.05, each Credit Party will do all things necessary to (i) maintain in full force and effect its legal existence and good standing under the laws of its jurisdiction of organization or incorporation, (ii) maintain its qualification to do business in each state or other jurisdiction in which the failure to do so would result in a Material Adverse Effect and (iii) maintain all of its rights and franchises, except where the failure to maintain such right or franchise would not result in a Material Adverse Effect.

(b)    Each Credit Party (i) will cause all of its properties used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment, subject to ordinary wear and tear and except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, (ii) will cause to be made all necessary repairs, renewals and replacement thereof, all as in the judgment of the Credit Parties may be necessary so that the business carried on in connection therewith may be properly conducted at all times and (iii) will continue to engage in the material lines of businesses conducted by them on the date hereof; provided that nothing in this Section 6.06(b) shall prevent any Credit Party from discontinuing the operation and maintenance of any of its properties if such discontinuance is permitted by Section 7.05(b).

**6.07    Insurance**.  Each Credit Party will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with the general practices of businesses engaged in similar activities in similar geographic areas and in amounts, containing such terms, in such forms and for such periods as may be reasonable and prudent and in accordance with the terms of the Security Documents.  Such policies of insurance shall name the Administrative Agent as an additional insured or lender's loss payee, as applicable and provide for such notice to the Administrative Agent of termination, lapse or cancellation of such insurance as is acceptable to the Administrative Agent (and Administrative Agent acknowledges that thirty (30) days' prior written notice (or ten (10) days' prior notice in the case of non-payment of the premium) is acceptable to the Administrative Agent).

**6.08     Taxes**.  Each Credit Party will duly pay and discharge, or cause to be paid and discharged, before the same shall become overdue, all material federal, provincial, state, local and other Taxes, assessments and other governmental charges imposed upon it and its real properties, sales and activities, or any part thereof, or upon the income or profits therefrom, as well as all materials claims for labor, materials, or supplies that if unpaid might by law become a Lien or charge upon any of its property; <u>provided</u> that any such Taxes, assessment, charge, levy or claim need not be paid if (a) the validity or amount thereof shall be contested in good faith by appropriate proceedings and such Credit Party shall have set aside on its books adequate reserves in accordance with GAAP with respect thereto or (b) it shall have been excused or prohibited from being paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code in connection with Chapter 11 Cases.  Each Credit Party shall file or cause to be filed all material federal, material state, material provincial, material local and material foreign income tax returns, and all other material tax returns, reports, and declarations required by any jurisdiction to which it is subject as required by applicable Law.

**6.09     Compliance with Laws, Contracts, Licenses, Permits; Leaseholds and Payment of Obligations Generally**.

(a)     <u>Compliance with Laws, Contracts, Licenses and Permits</u>.  Each of the Credit Parties will comply with (i) the applicable Laws wherever its business is conducted, including all Environmental Laws, (ii) the provisions of its Governing Documents, (iii) all agreements and instruments by which it or any of its properties may be bound, (iv) the Plan of Reorganization and the Confirmation Order and (v) all applicable decrees, orders, and judgments, <u>provided</u> that in each case, such compliance shall be required by this Agreement only where noncompliance with this <u>Section 6.09(a)(i)-(v)</u> would result in a Material Adverse Effect.  If any authorization, consent, approval, permit or license from any Governmental Authority or any central bank or other fiscal or monetary authority shall become necessary or required in order that any Credit Party may fulfill any of its obligations hereunder or any of the other Loan Documents to which such Credit Party is a party, each Credit Party will promptly take or cause to be taken all reasonable steps within the power of such Credit Party to obtain such authorization, consent, approval, permit or license, and upon request of the Administrative Agent, to furnish the Administrative Agent and the Lenders with evidence thereof.

(b)     <u>Compliance with Terms of Leaseholds</u>.  Each Credit Party will make all payments and otherwise perform all material obligations in respect of all leases and licenses of real property (including with respect to any concession units) to which such Credit Party is a party within any grace period provided therefor under such lease, notify the Administrative Agent of any default by any party with respect to such leases or licenses and cooperate with the Administrative Agent in all respects to cure any such default by a Credit Party, and cause each of its Domestic Subsidiaries to do so, except, (i) to the extent such obligations shall be contested in good faith by appropriate proceedings and for which the Credit Parties have set aside on their books reasonably adequate provisions therefor in accordance with GAAP and (ii) the failure to make payments in respect of leases for no more than five (5) retail stores of the Credit Parties at any time.

(c)     <u>Payment of Obligations Generally</u>.  Except to the extent prohibited by <u>Article VII</u>, each of the Credit Parties will pay and discharge, as the same shall become due and payable, all its other obligations and liabilities, including all lawful claims which, if unpaid, would by law become a Lien that is not a Permitted Lien upon its property or otherwise would reasonably be expected to result in a Material Adverse Effect.

**6.10    [Intentionally Omitted]**.

**6.11    Use of Proceeds**.  Subject to the terms and conditions herein, the proceeds of the Loans will be used: (i) to repay on the Closing Date an amount equal to, and used to refinance, all amounts due and owing under the DIP Facility as of the Closing Date and (ii) with respect to the Closing Date Loans, (A) to pay related transaction costs, fees and expenses with respect to this Agreement, (B) to fund certain disbursements, costs and expenses in connection with the Consummation of the Plan of Reorganization and (C) to provide working capital, and for other general corporate purposes of the Credit Parties (including for Permitted Acquisitions, other Investments and Restricted Payments permitted hereunder).

**6.12    Covenant to Guarantee Obligations and Give Security**.

(a)    Upon the formation or Acquisition of any new direct or indirect Subsidiary after the Closing Date (other than any Foreign Subsidiaries) by any Credit Party, then the Credit Parties shall, at the Credit Parties' expense:

(i)    within ten (10) days (or such longer period as agreed by the Administrative Agent in its discretion) after such formation or Acquisition, cause such Subsidiary, and cause each direct and indirect parent and Subsidiary of such Subsidiary (if it has not already done so and is not a Foreign Subsidiary), to be joined as a Guarantor and duly execute and deliver to the Administrative Agent a Credit Party Guaranty guaranteeing the other Credit Parties' obligations under the Loan Documents,

(ii)    within ten (10) days (or such longer period as agreed by the Administrative Agent in its discretion) after such formation or Acquisition, furnish to the Administrative Agent a description of the real and personal properties of such Subsidiary, in detail reasonably satisfactory to the Administrative Agent,

(iii)    within fifteen (15) days (or such longer period as agreed by the Administrative Agent in its discretion) after such formation or Acquisition, cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to duly execute and deliver to the Administrative Agent Security Documents and a joinder to the Intercreditor Agreement, if applicable, as specified by and in form and substance reasonably satisfactory to the Administrative Agent (including delivery of all certificates representing the Capital Stock in and of such Subsidiary), securing payment of all the Obligations of such Subsidiary or such parent, as the case may be, under the Loan Documents and constituting Liens on all such real and personal properties,

(iv)    within fifteen (15) days (or forty-five (45) days with respect to fee owned real property required to be subject to a Mortgage unless substantially all of such property is subject to a Lien permitted by Section 7.03(a)(viii)) (in each case, or such longer period as agreed by the Administrative Agent in its discretion) after such formation or Acquisition, cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents or such other actions as are necessary or desirable under any applicable Law) may be necessary or advisable in the reasonable opinion of the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by

it) valid and subsisting Liens on the properties purported to be subject to the Security Documents delivered pursuant to this Section 6.12, enforceable against all third parties in accordance with their terms, and

(v)       as promptly as practicable after such formation or Acquisition, deliver, upon the request of the Administrative Agent in its sole discretion, to the Administrative Agent with respect to each parcel of fee owned real property having a fair market value greater than $2,500,000 (unless substantially all of such property is subject to a Lien permitted by Section 7.03(a)(viii)) owned or held by the entity that is the subject of such formation or Acquisition and that is to be subject to a Mortgage as provided in this Section 6.12, title reports, surveys and to the extent in the Credit Party's possession or to the extent required by applicable Law, engineering, soils and other reports, and environmental assessment reports, each in scope, form and substance reasonably satisfactory to the Administrative Agent, provided, however, that to the extent that any Credit Party or any of its Subsidiaries shall have otherwise received any of the foregoing items with respect to such real property, such items shall, promptly after the receipt thereof, be delivered to the Administrative Agent.

(b)       Upon the acquisition of any property by any Credit Party following the Closing Date, if such property, in the reasonable judgment of the Administrative Agent, shall not already be subject to a perfected first priority security interest (subject in priority only to Permitted Senior Liens) in favor of the Administrative Agent for the benefit of the Secured Parties (unless such property is specifically excluded as Collateral by the terms of the Security Documents or is subject to a Lien permitted by Section 7.03(a)(viii)), then the Credit Parties shall, at the Credit Parties' expense:

(i)       within ten (10) days (or such longer period as agreed by the Administrative Agent in its discretion) after such acquisition, furnish to the Administrative Agent a description of the property so acquired in detail reasonably satisfactory to the Administrative Agent,

(ii)       within fifteen (15) days (or such longer period as agreed by the Administrative Agent in its discretion) after such acquisition, cause the applicable Credit Party to duly execute and deliver to the Administrative Agent Security Documents (to the extent not already delivered), as specified by and in form and substance reasonably satisfactory to the Administrative Agent, securing payment of all the Obligations of the applicable Credit Party under the Loan Documents and constituting Liens on all such properties,

(iii)       within fifteen (15) days (or forty-five (45) days with respect to fee owned real property required to be subject to a Mortgage) after such acquisition, cause the applicable Credit Party to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents or such action necessary or desirable under applicable Law) may be necessary or advisable in the opinion of the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on such property, enforceable against all third parties,

(iv)       within fifteen (15) days (or forty-five (45) days with respect to fee owned real property required to be subject to a Mortgage unless substantially all of such property is subject to a Lien permitted by Section 7.03(a)(viii)) after such acquisition,

#4848-5684-9449v14#4848-5684-9449v15

deliver to the Administrative Agent, upon the request of the Administrative Agent in its sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Credit Parties reasonably acceptable to the Administrative Agent as to the matters contained in clauses (ii) and (iii) above and as to such other matters as the Administrative Agent may reasonably request, and

(v)     as promptly as practicable after any acquisition of fee owned real property having a fair market value greater than $2,500,000 (unless substantially all of such property is subject to a Lien permitted by Section 7.03(a)(viii), deliver, upon the request of the Administrative Agent in its sole discretion to the Administrative Agent with respect to such real property that is to be subject to a Mortgage as provided in this Section 6.12, flood zone determination forms, flood insurance certificates, to the extent applicable, (and to the extent provided or required to be provided to the Senior Notes Trustee) title reports, surveys and engineering, soils and other reports, and environmental assessment reports, each in scope, form and substance reasonably satisfactory to the Administrative Agent, provided, however, that to the extent that any Credit Party or any of its Subsidiaries shall have otherwise received any of the foregoing items with respect to such real property, such items shall, promptly after the receipt thereof, be delivered to the Administrative Agent;

provided that notwithstanding anything contained in this Section 6.12(b) or any Loan Document to the contrary, (A) no more than 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of any Foreign Subsidiary formed or acquired by any Credit Party shall be required to be subject to the security interest of the Administrative Agent and (B) notwithstanding clause (A) or anything in any Loan Document to the contrary, no property (including Capital Stock) which is directly or indirectly owned by any CFC shall be subject to the security interest of the Administrative Agent.

(c)     Notwithstanding anything herein to the contrary, upon the request of the Required Lenders, from and after the date that a Revolving Facility is in effect, the Credit Parties shall execute and deliver to the Administrative Agent, for the benefit of the Secured Parties, mortgages, charges, deeds of trust, deposit account control agreements, collateral access agreements and other security documents to the extent provided to Revolving Facility Agent or executed in respect of the obligations securing the Revolving Facility, in each case, subject to and in accordance with the priorities set forth in the Intercreditor Agreement.

(d)     At any time upon request of the Administrative Agent or the Required Lenders, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent or the Required Lenders may deem necessary or desirable in obtaining the full benefits of or (as applicable) in perfecting and preserving the Liens of, such Security Documents.

**6.13    Further Assurances**.  Each Credit Party will cooperate with the Lenders and the Administrative Agent and execute such further instruments and documents as the Lenders or the Administrative Agent shall reasonably request to carry out to their reasonable satisfaction the transactions contemplated by this Agreement and the other Loan Documents.

#4848-5684-9449v14#4848-5684-9449v15

**6.14    Inspections**. Each Credit Party shall permit the Lenders and the Administrative Agent, at the Credit Parties' expense, to visit and inspect any of the properties of any Credit Party accompanied by a representative of the Credit Party to the extent such representative does not interfere with such inspection, to examine the books of account of such Credit Party (and to make copies thereof and extracts therefrom), and to discuss the affairs, finances and accounts of such Credit Party with, and to be advised as to the same by, its and their officers, in each case, except when an Event of Default shall have occurred and be continuing, at such reasonable times and intervals and with reasonable prior notice as the Administrative Agent or any Lender may reasonably request.

**6.15    Cash Management**. ~~Unless~~**Subject to Section 6.16, unless** otherwise agreed by the Required Lenders, the Credit Parties shall cause all deposit accounts, all securities accounts and all commodities accounts (other than Excluded Accounts) of the Credit Parties to be subject to Agency Account Agreements. ~~The Credit Parties shall not open any deposit account, securities account or commodities account on or after the Closing Date at any institution other than [_____] or such other depositary bank or clearing bank that is acceptable to the Required Lenders.~~ **at all times.**

**6.16    Post-Closing Obligations    Each Credit Party shall comply with each of the covenants contained in Schedule 6.16 on or before the time periods specified therein.**

## ARTICLE VII

## NEGATIVE COVENANTS

Each Credit Party signatory hereto covenants and agrees for itself and on behalf of its Subsidiaries that, so long as any Lender shall have any Commitment hereunder or any Loan or other Obligation remains outstanding:

**7.01    Investments**. None of the Credit Parties nor any of its Subsidiaries will make any Investment in any Person, except for Investments which consist of:

(a)    Investments comprised of notes payable, or stock or other securities issued by non-Affiliated account debtors to such Credit Parties (or issued by account debtors to Subsidiaries that are not Credit Parties) pursuant to negotiated agreements with respect to settlement of such account debtor's accounts in the ordinary course of business or following delinquency or financial distress of such account debtor;

(b)    Capital Stock (i) issued and outstanding on the Closing Date in its Subsidiaries in existence on the Closing Date, (ii) issued following the Closing Date by a Credit Party to another Credit Party, (iii) issued following the Closing Date by a Subsidiary that is not a Credit Party in favor of a Credit Party, (iv) issued following the Closing Date by a Subsidiary that is not (and that is not required to be) a Credit Party in favor of another Subsidiary that is not (and this is not required to be) a Credit Party or (v) issued to a Credit Party following the Closing Date by another Person that will become a Credit Party promptly following such issuance or capital contribution between such Persons;

(c)    Investments consisting of capital contributions by (i) a Credit Party to another Credit Party or (ii) a Subsidiary that is not a Credit Party in favor of a Credit Party or a Subsidiary that is not a Credit Party;

(d)    Investments consisting of (i) unsecured, intercompany loans by and among the Credit Parties so long as the Administrative Agent has a first priority, perfected Lien in such

intercompany loans and has received the Intercompany Note evidencing such intercompany loans, together with transfer powers executed in blank and a Subordination Agreement in connection therewith and (ii) intercompany loans made by any Subsidiary to any Credit Party on terms and conditions reasonably acceptable to the Required Lenders, including the Administrative Agent's receipt of a Subordination Agreement;

(e)        Investments by a Subsidiary that is not a Credit Party in a Credit Party or a Subsidiary that is not a Credit Party;

(f)        Investments consisting of any Credit Party or any Subsidiary Guaranteeing (i) the Obligations of the Credit Parties and (ii) any obligations or other Indebtedness if such Credit Party or such Subsidiary would be permitted to directly incur such Indebtedness under Section 7.02 or if such obligations would be permitted to be incurred under this Agreement, except in each case, the Guarantee by a Credit Party of Indebtedness or trade payables of Foreign Subsidiaries other than as permitted under clause (k) of this Section 7.01;

(g)        Investments in cash or Cash Equivalents;

(h)        Investments consisting of loans to its respective employees on an arm's-length basis in the ordinary course of business consistent with past practices for travel expenses, relocation costs and similar purposes up to a maximum of $50,000 per employee at any one time outstanding and $500,000 in the aggregate at any one time outstanding;

(i)        Investments existing as of the Closing Date and set forth on Schedule 7.01;

(j)        Investments in Foreign Subsidiaries after the Closing Date in an aggregate amount outstanding at any time not to exceed $2,500,000; provided that to the extent such Investments are in the form of loans, advances or other extensions of credit to a Foreign Subsidiary, such Investments are evidenced by the Intercompany Note pledged to the Administrative Agent, together with transfer powers executed in blank in connection therewith;

(k)        Investments by the Credit Parties in their Foreign Subsidiaries consisting of extensions of credit in the nature of intercompany accounts receivables from the sale of inventory; provided that (i) the aggregate book value of all outstanding accounts receivable of all Subsidiaries that are not Credit Parties owing to any Credit Party, whether or not arising out of the sale of inventory, shall not exceed $40,000,000 at any time, (ii) the amount of cash held at all Foreign Subsidiaries of the Credit Parties (excluding cash on deposit with third parties as security under a lease agreement) shall not exceed $12,500,000 in the aggregate as of the last day of any Fiscal Month, (iii) such Investments may not be converted into Capital Stock or a capital contribution, no payments with respect to such Investments may be waived by the Credit Parties and such Investments are repayable in cash by the Foreign Subsidiaries; provided that returns of inventory by any Foreign Subsidiary to any Credit Party in the ordinary course of business may be credited to any outstanding accounts receivable of such Foreign Subsidiary owing to such Credit Party and (iv) such Investments are evidenced by the Intercompany Note pledged to the Administrative Agent, together with transfer powers executed in blank in connection therewith;

(l)        advances of payroll payments to employees in the ordinary course of business consistent with past practices in an amount not to exceed payments for one (1) payroll period for any employee;

#4848-5684-9449v14#4848-5684-9449v15

(m)    Investments held solely by Foreign Subsidiaries denominated in any foreign currency that is the local foreign currency of such Foreign Subsidiary customarily used by similar foreign companies for cash management purposes in any jurisdiction outside the United States to the extent reasonably required or desirable in connection with any business conducted by any Foreign Subsidiary organized in such jurisdiction;

(n)    Investments consisting of any Credit Party Guaranteeing (i) from and after the date that a Revolving Facility is in effect, pursuant to the Revolving Facility Documents, the Indebtedness evidenced by the Revolving Facility Documents incurred by another Credit Party to the extent such incurrence is permitted by Section 7.02(j) and (ii) pursuant to the SG Debt Documents, the Indebtedness evidenced by the SG Credit Agreement incurred by American Apparel (Carnaby) Limited or other Foreign Subsidiaries party thereto as a borrower to the extent such incurrence is permitted by Section 7.02(p) and such Guaranteeing Credit Party is a guarantor of such Indebtedness under the SG Debt Documents on the Closing Date;

(o)    Permitted Acquisitions;

(p)    Investments of any person that becomes a Subsidiary of Holdings after the Closing Date pursuant to a Permitted Acquisition or other Investment permitted hereunder; provided that (i) such Investments exist at the time such person becomes a Subsidiary of Holdings, (ii) such Investments are not made in anticipation or contemplation of such person becoming a Subsidiary of Holdings and (iii) such Investments are not directly or indirectly recourse to any of Holdings or its Subsidiaries or any of their respective assets, other than to the person that becomes a Subsidiary of Holdings; and

(q)    Investments in an aggregate amount not to exceed $2,500,000 at any time outstanding, so long as no Default or Event of Default has occurred and is continuing immediately prior to and after giving effect to such Investment.

**7.02    Restrictions on Indebtedness**.  None of the Credit Parties nor any of its Subsidiaries will incur, assume, guarantee or be or remain liable, contingently or otherwise, with respect to any Indebtedness other than:

(a)    Indebtedness secured by purchase money security interests and Capitalized Leases permitted by Section 7.03(a)(vi) and any Permitted Refinancing thereof or amendments or modifications thereof that do not have the effect of increasing the principal amount thereof (except by an amount not in excess of accrued and unpaid interest and premiums owing thereon and fees and expenses incurred in connection with such refinancing), changing the amortization thereof (other than to extend the same), accelerating the maturity date thereof or decreasing the weighted average life thereof;

(b)    Indebtedness of the Credit Parties consisting of the Obligations under the Loan Documents;

(c)    Indebtedness in respect of Swap Contracts entered into not for speculative purposes specifically permitted under Section 7.09;

(d)    unsecured Subordinated Debt on terms and conditions acceptable to the Required Lenders in their sole discretion, provided that the maturity date of such Subordinated Debt shall

be at least one hundred and eighty (180) days following the Maturity Date (after taking into account any extension thereof);

(e)       Indebtedness consisting of intercompany loans and advances permitted by Section 7.01;

(f)       Guarantees by (i) any Credit Party of Indebtedness of any Credit Party permitted by this Section 7.02, (ii) any Subsidiary that is not a Credit Party of any Indebtedness of any Credit Party permitted by this Section 7.02, (iii) any Subsidiary that is not a Credit Party of any Indebtedness of any other Subsidiary that is also not a Credit Party permitted by this Section 7.02 and (iv) a Credit Party of any Indebtedness of any other Subsidiary that is not a Credit Party permitted by Section 7.01(k);

(g)       Indebtedness consisting of contingent liabilities under surety bonds and similar instruments incurred in the ordinary course of business;

(h)       Indebtedness in respect of netting services, automatic clearing house arrangements and similar arrangement in the ordinary course of business in each case in connection with deposit and securities account;

(i)       to the extent constituting Indebtedness, obligations in respect of agreements for the deferred payment of premiums or to finance the deferred payment of premiums owing by any Credit Party under any insurance policies entered into in the ordinary course of business that are either (i) unsecured or (ii) secured by a Lien permitted under Section 7.03(a)(xiv);

(j)       Indebtedness under a revolving credit facility (or, with the consent of the Required Lenders, a term loan facility subject to a minimum collateral coverage requirement) in an aggregate principal amount (including loans and letters of credit) not to exceed $40,000,000 in the aggregate at any time outstanding (a "Revolving Facility"); provided that (i) the terms of such Revolving Facility shall be reasonably acceptable to the Required Lenders and (ii) such Revolving Facility shall be subject to the Intercreditor Agreement;.

(k)       Attributable Indebtedness incurred following the Closing Date pursuant to sale-leaseback transactions permitted by Section 7.06;

(l)       Indebtedness of the Foreign Subsidiaries (whether unsecured or secured assets of the Foreign Subsidiaries incurring such Indebtedness) in an aggregate amount outstanding at any time not to exceed $17,000,000;

(m)       assumed Indebtedness of any person that becomes a Subsidiary of Holdings (or is merged or consolidated with and into a Subsidiary of Holdings) after the Closing Date in connection with a Permitted Acquisition or other Investment permitted hereunder in an aggregate principal amount not to exceed $5,000,000 at any time outstanding for all such Indebtedness, provided that such Indebtedness (i) exists at the time of such Permitted Acquisition or other Investment and (ii) is not created in anticipation or contemplation of such Permitted Acquisition or other Investment;

(n)       Indebtedness under the Existing Letters of Credit to the extent cash collateralized;

(o)     unsecured Indebtedness of the Credit Parties incurred after the Closing Date in an aggregate principal amount not to exceed $3,000,000 at any time outstanding, so long no Default or Event of Default shall have occurred and be continuing or would be caused by the incurrence of such Indebtedness;

(p)     unsecured Indebtedness of the borrowers under the SG Debt Documents on the Closing Date in an aggregate principal amount not to exceed the amount outstanding on the Closing Date plus the amount of any increase in principal for the purpose of paying interest in kind or as a result of accretion thereof; and

(q)     Indebtedness of any Credit Party outstanding as of the Closing Date and specified in Schedule 7.02 hereto and any Permitted Refinancing thereof.

**7.03    Restrictions on Liens**.

(a)     **Permitted Liens**.  None of the Credit Parties nor any of its Subsidiaries will create or incur or suffer to be created or incurred or to exist any Lien upon any of their respective property or assets of any character whether now owned or hereafter acquired, or upon the income or profits therefrom other than:

(i)     Liens of landlords, carriers, warehousemen, mechanics and materialmen and other like Liens created in the ordinary course of business, for amounts not yet due or which are being contested in good faith by appropriate proceedings and as to which adequate reserves or other appropriate provisions are being maintained in accordance with GAAP;

(ii)     pledges or deposits made in connection with worker's compensation, employee benefit plans, unemployment or other insurance, old age pensions, or other Social Security benefits, and good faith deposits in connection with tenders, contracts, bids, statutory obligations or leases to which it is a party or deposits to secure, or in lieu of, surety, penalty or appeal bonds, performance bonds, letters of credit and other similar obligations or arising as a result of progress payments under government contracts or contracts with public utilities, in each case, in the ordinary course of business;

(iii)     such minor defects, irregularities, encumbrances, easements, rights of way, and clouds on title as normally exist with respect to similar properties which do not materially interfere with the present or proposed use of the applicable real property;

(iv)     Liens in favor of the Administrative Agent and the other Secured Parties securing the Obligations;

(v)     Liens in existence on the Closing Date and listed on Schedule 7.03; provided that (i) the Lien does not extend to any additional property (other than accessions to equipment and proceeds thereof) and (ii) to the extent such amount secured constitutes Indebtedness, such Indebtedness is permitted by Section 7.02;

(vi)     Liens created after the Closing Date by conditional sale or other title retention agreements (including Capitalized Leases and sale-leaseback transactions permitted by this Agreement) or in connection with purchase money Indebtedness, in each case, with respect to equipment and fixed assets acquired by any Credit Party or

any Subsidiary of a Credit Party, involving the incurrence of an aggregate amount of purchase money Indebtedness and obligations with respect to conditional sale or title retention agreements of not more than $15,000,000  outstanding at any one time for all such Liens (provided that such Liens attach only to the assets subject to such purchase money debt and such Indebtedness is incurred within one hundred twenty (120) days following such purchase and does not exceed 100% of the purchase price of the subject assets);

(vii)    judgment Liens for the payment of money not constituting an Event of Default so long as the enforcement of such Lien has been effectively stayed and so long as such Lien is junior to the Lien in favor of the Administrative Agent granted under the Security Documents;

(viii)    Liens in favor of a banking institution encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry to secure usual and customary fees, returned items and other like exposure with respect to such account relating to deposit or securities accounts maintained by Holdings or any of its Subsidiaries with such banking institution;

(ix)    Liens arising by operation of law under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(x)    Liens for Taxes not yet due and payable or which are being contested in good faith by appropriate proceedings, provided that the applicable Credit Party or Subsidiary shall have set aside on its books adequate reserves in accordance with GAAP with respect thereto;

(xi)    Liens in favor of customs and revenue authorities to secure payment of customs duties in connection with the importation of goods;

(xii)    Liens on unearned insurance premiums securing the payment of financed insurance premiums so long as such financed amounts are promptly paid; provided that such Liens extend only to such insurance premiums or loss payment or similar payment from any insurance provider in an amount not in excess of any unpaid financed premiums;

(xiii)    Liens on assets of a Subsidiary that is not a Credit Party in favor of a Credit Party or Subsidiary thereof, provided that, if such Liens relate to obligations under the Intercompany Note, such Liens are assigned to the Administrative Agent (or, in the Administrative Agent's discretion, subject to a Subordination Agreement) pursuant to documentation and agreements in form and substance reasonably satisfactory to the Administrative Agent;

(xiv)    first-priority Liens on the Revolving Facility Priority Collateral and second-priority Liens on other Collateral, each in favor of the Revolving Facility Agent and subject to the Intercreditor Agreement, securing Indebtedness under a Revolving Facility permitted under Section 7.02(j);

(xv)    Liens on assets of Foreign Subsidiaries; provided that (i) such Liens do not extend to, or encumber, assets that constitute Collateral or the Equity Interests of the AA USA or any Domestic Subsidiary (or the Equity Interests of any first-tier Foreign

68

Subsidiary) and (ii) such Liens secure only Indebtedness permitted to be incurred by Foreign Subsidiaries pursuant to Section 7.02(l);

(xvi)    Liens on property of a person existing at the time such person is acquired or merged with or into or consolidated with any Subsidiary of Holdings to the extent permitted hereunder, provided that (A) such Liens (I) do not extend to property not subject to such Liens at the time of such acquisition, merger or consolidation (other than improvements thereon) and (II) are not created in anticipation or contemplation of such acquisition, merger or consolidation and (B) any Indebtedness that is secured by such Liens is permitted by Section 7.02(m);

(xvii)    Liens in favor of the issuer of the Existing Letters of Credit on the cash constituting cash collateral (and the deposit account holding such cash) in respect of the Existing Letters of Credit; provided that the amount of such cash collateral shall not exceed 105% of the face amount of the Existing Letters of Credit at such time; and

(xviii)    Liens securing Indebtedness and other obligations in an aggregate principal amount not to exceed $2,500,000 at any time outstanding.

(b)    **Restrictions on Negative Pledges and Upstream Limitations**.  No Credit Party shall nor shall any Subsidiary (i) enter into or permit to exist any arrangement or agreement which directly or indirectly prohibits any Credit Party from creating, assuming or incurring any of the Obligations or any Lien upon its properties, revenues or assets whether now owned or hereafter acquired, as security for the Obligations, or from making Guarantees of, or payments on, the Obligations or (ii) enter into any agreement, contract or arrangement (excluding this Agreement and the other Loan Documents and any Revolving Facility Document) restricting the ability of any Subsidiary of any Credit Party to pay or make dividends or distributions in cash or kind to any Credit Party, to make loans, advances or other payments of whatsoever nature to any Credit Party, or to make transfers or distributions of all or any part of its assets to any Credit Party in each case other than customary anti-assignment provisions contained in leases, licensing agreement and other agreements restricting the assignment thereof entered into by any Credit Party or any Subsidiary in the ordinary course of its business; provided that this Section 7.03(b) shall not apply with respect to (x) prohibitions and restrictions contained in this Agreement, the other Loan Documents, any Revolving Facility Document and the SG Debt Documents and (y) Indebtedness permitted under Section 7.02(a) solely to the extent related to the property financed thereby or the property subject thereto.

**7.04    Restricted Payments; Prepayments**.

(a)    **Restricted Payments**.  No Credit Party nor any Subsidiary shall make any Restricted Payment, except (i) Restricted Payments to a Credit Party, (ii) Restricted Payments solely in shares of common stock or preferred stock (other than Disqualified Capital Stock) or warrants or rights to purchase common stock or preferred stock (other than Disqualified Capital Stock) so long as no Change of Control would result therefrom, (iii) Restricted Payments in the form of splits of Capital Stock or reclassifications of Capital Stock into additional shares of common stock, (iv) Restricted Payments by a Subsidiary of a Credit Party that is not a Credit Party made ratably to the holders of its Capital Stock, (v) repurchases of Capital Stock in any Credit Party or any Subsidiary deemed to occur upon "cashless" exercise of stock options or warrants, (vi) so long as no Event of Default shall have occurred and be continuing or would result therefrom, Holdings may make Restricted Payments to any present, former or future director, officer, employee, member of management or consultant of Holdings (or any direct or

69

indirect parent thereof) or any of its Subsidiaries (or their respective estates, heirs, family members, spouses or former spouses) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or arrangement or upon such person's death, disability, retirement or termination of employment, in an aggregate amount not to exceed $1,000,000 in any Fiscal Year; provided that any portion of such amount that is not used in any fiscal year may be applied in any subsequent fiscal year, (vii) Holdings may purchase, repurchase, defease, acquire or retire for value the capital stock of Holdings or options, warrants or other rights to acquire such capital stock solely in exchange for, or out of the proceeds of the sale of (so long as such purchase, repurchase, redemption, defeasance, acquisition or retirement is consummated within sixty (60) days of such sale) Qualified Capital Stock of Holdings or options, warrants or other rights to acquire such Qualified Capital Stock and (viii) other Restricted Payments in an aggregate amount not to exceed the sum of (x) $25,000,000 plus (y) from and after the first anniversary from the Closing Date, $25,000,000 so long as (A) in the case of each of clauses (x) and (y), no Default or Event of Default has occurred and is continuing immediately prior to and after giving effect to such Restricted Payment, and (B) in the case of clause (y), the Leverage Ratio for the Reference Period most recently ended prior to giving effect to such Restricted Payment, calculated on a pro forma basis giving effect to such Restricted Payment as if it had occurred on the first day of such Reference Period, shall not be greater than 5.00 to 1.00.

(b)      **Prepayments of Other Indebtedness**.  No Credit Party nor any Subsidiary shall pay, prepay, redeem, purchase, defease or otherwise satisfy in any manner any Indebtedness under any of the Subordinated Debt Documents other than those payments expressly permitted to be made under the Subordination Agreement applicable thereto.

**7.05    Merger, Consolidation and Disposition of Assets**.

(a)      **Mergers and Consolidations.**   None of the Credit Parties nor any Subsidiary will become a party to any merger, dissolution, liquidation or consolidation, except for, so long as no Default or Event of Default is continuing or would result therefrom:

(i)      the merger or consolidation of one or more of the Domestic Subsidiaries of AA USA with and into a Credit Party (other than Holdings); provided that such Credit Party shall be the surviving entity;

(ii)      the merger or consolidation of any Subsidiary that is not a Credit Party with any other Subsidiary that is not a Credit Party;

(iii)      Holdings may cause any Subsidiary of AA USA to be liquidated or dissolved if Holdings determines in good faith that such liquidation or dissolution is in the best interests of Holdings and is not materially disadvantageous to the Lenders (and any dispositions in connection therewith are permitted by Section 7.05(b)); and

(iv)      Permitted Acquisitions.

(b)      **Disposition of Assets.**   No Credit Party nor any Subsidiary shall dissolve, liquidate or sell, transfer, convey, assign or otherwise dispose of any of its properties or other assets, including any Capital Stock of any of its Subsidiary (whether in a public or a private offering or otherwise), any of its receivables or any of its other Investments, other than:

#4848-5684-9449v14#4848-5684-9449v15

(i)        the sale of inventory in the ordinary course of business;

(ii)       dispositions of assets (other than receivables owned by Credit Parties) (A) among Credit Parties, (B) by Subsidiaries that are not Credit Parties to (x) Credit Parties and (y) other Subsidiaries that are not Credit Parties, (C) among Foreign Subsidiaries or (D) by Foreign Subsidiaries to Credit Parties;

(iii)      dispositions of obsolete or worn out equipment, inventory or fixtures no longer used or useful in the business, whether now owned or hereafter acquired, in the ordinary course of business;

(iv)      sales pursuant to sale-leaseback transactions permitted under <u>Section 7.06</u>;

(v)       non-exclusive licenses of intellectual property in the ordinary course of business (other than to the extent such licenses would restrict the ability of the Credit Party or the Administrative Agent to sell or license the subject intellectual property or impair the security interests granted to the Administrative Agent); <u>provided</u> that to the extent approved by the Required Lenders  in their sole discretion, such licenses are permitted to be exclusive to the extent such licenses relate to specific lines or products or specific geographic locations;

(vi)      the abandonment or termination of intellectual property rights in the ordinary course of business which are not material to the operation of the business of the Credit Parties;

(vii)     dispositions of cash and Cash Equivalents except with respect to transactions prohibited hereunder so long as such dispositions are not in violation of the Agency Account Agreements to which they are subject;

(viii)    dispositions not otherwise permitted hereunder; <u>provided</u> that (A) at the time of such disposition, no Event of Default shall have occurred and be continuing or would result from such Disposition, (B) not less than 75% of the aggregate sale price from such disposition shall be paid in cash, (C) the aggregate Net Cash Proceeds of all Dispositions pursuant to this <u>clause (viii)</u> shall not exceed $5,000,000 in any Fiscal Year of Holdings and (D) all such dispositions shall be for at least the fair market value of the assets or property subject to such disposition (as determined by a Financial Officer of Holdings in good faith); and

(ix) so long as no Default or Event of Default is continuing or would result therefrom, sales of equipment now owned or hereafter acquired by any Credit Party or any Subsidiary thereof in an aggregate amount not to exceed $5,000,000.

**7.06     Sale and Leaseback**.  No Credit Party nor any Subsidiary shall engage in any sale-leaseback of or similar transaction or incur any Synthetic Lease Obligations involving any of its assets, except (i) sale-leaseback transactions consummated prior to the Closing Date and described on <u>Schedule 7.06</u> and (ii) sale-leaseback transactions consummated after the Closing Date with respect to real property or equipment having a fair market value in the aggregate not to exceed $5,000,000, so long as no Event of Default is continuing or would result therefrom.

**7.07    Accounting Changes; Change of Fiscal Year**.  No Credit Party nor any Subsidiary will make any change in (i) accounting policies or reporting practices, except as permitted by GAAP or (ii) their Fiscal Year (except to make the Fiscal Year of a Subsidiary end on December 31).

**7.08    Transactions with Affiliates**.  No Credit Party nor any Subsidiary will engage in any transaction with any Affiliate or its or any of its Affiliate's employees, officers or directors, whether or not in the ordinary course of business, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any such Affiliate, on terms more favorable to such Person than would have been obtainable on an arm's-length basis in the ordinary course of business, provided that the foregoing restriction shall not apply to (a) transactions solely among the Credit Parties otherwise permitted hereunder, (b) transactions solely among Subsidiaries that are not Credit Parties, (c) any Restricted Payment permitted under Section 7.04, (d) Investments permitted by Section 7.01, (e) Indebtedness permitted under Section 7.02(e) and (f), (f) employment, benefit, indemnification and severance arrangements between the Credit Parties, their Subsidiaries and their respective officers, directors and employees in the ordinary course of business and consistent with past practices and (g) transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 7.08 or any amendment thereto that is not materially adverse to any Lender or any Credit Party.

**7.09    No Speculative Transactions**.  No Credit Party shall engage in any transaction involving commodity options, futures contracts or similar transactions, except in connection with Swap Contracts entered into solely to hedge against fluctuations in the prices of commodities owned or purchased by it and the values of foreign currencies receivable or payable by it and interest swaps, caps or collars; provided that, such Swap Contract does not contain any provision exonerating the non-defaulting party from its obligation to make payments on outstanding transactions to the defaulting party and is not for speculative purposes.

**7.10    Change in Terms of Governing Documents; Material Agreements**.  No Credit Party nor any Subsidiary shall change or amend, modify, supplement or waive the terms of any (a) of its Governing Documents, except amendments, modifications, supplements or waivers that do not materially adversely affect the rights or interests of the Administrative Agent or the Lenders, or (b) any Subordinated Debt Document, except to the extent permitted by the Subordination Agreement applicable thereto.

**7.11    Change in Nature of Business**.  No Credit Party nor any Subsidiary shall engage in any line of business substantially different from those lines of business conducted by such Credit Party on the Closing Date other than lines of business reasonably related or ancillary to such lines of business conducted on the Closing Date.

**7.12    Margin Regulations**.  No Credit Party shall use the proceeds of the Closing Date Loans, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

**7.13    Sanctions**.  No Credit Party nor any Subsidiary shall permit any Loan or the proceeds of any Loan, directly or indirectly, (a) to be lent, contributed or otherwise made available to fund any activity or business in any Designated Jurisdiction, (b) to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject of any Sanctions or (c) in any other manner that will result in any violation by any Person (including any Lender or Administrative Agent) of any Sanctions.

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

**8.01** **Events of Default**.  If any of the following events ("Events of Default") shall occur:

(a)     Non-Payment.

(i)     Any Credit Party shall fail to pay any principal of the Loans when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment; or

(ii)     Any Credit Party shall fail to pay any interest on the Loans, any fees, premium (including the Prepayment Premium) or other sums due hereunder or under any of the other Loan Documents (other than an amount referred to in clause (i) above), when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment, and such default shall continue unremedied for a period of five (5) Business Days; or

(b)     Specific Covenants.  Any Credit Party shall fail to comply with any of its covenants contained in Section 6.05(a), Section 6.06(a), Section 6.07, Section 6.11, Section 6.15 or Article VII; or

(c)     Other Defaults.  Any Credit Party shall fail (or, to the extent applicable, fail to cause its Subsidiaries) to perform any term, covenant or agreement contained herein or in any of the other Loan Documents (other than those specified elsewhere in this Section 8.01) and such failure continues for thirty (30) days; or

(d)     Representations and Warranties.  Any representation or warranty of any Credit Party in this Agreement or any of the other Loan Documents or in any other document or instrument delivered pursuant to or in connection with this Agreement shall prove to have been false in any material respect (but without any duplication of any materiality qualifications) upon the date when made or deemed to have been made or repeated; or

(e)     Inability to Pay Debt; Insolvency Proceedings; Etc.  Any Credit Party or any of its Subsidiaries shall make a composition, compromise, arrangement or assignment for the benefit of creditors, or shall petition or apply for the appointment of a trustee or other custodian, liquidator, receiver administrative receiver, compulsory manager or other similar officer of such Credit Party or such Subsidiary or of any substantial part of the assets of any Credit Party or such Subsidiary or shall commence any case or other proceeding relating to any Credit Party or such Subsidiary under any Debtor Relief Law, now or hereafter in effect, or shall take any action to authorize or in furtherance of any of the foregoing, or if any such petition or application (including a bankruptcy application) shall be filed or any such case or other proceeding shall be commenced against any Credit Party or such Subsidiary and such Credit Party or such Subsidiary shall indicate its approval thereof, consent thereto or acquiescence therein or such petition or application shall not have been dismissed or stayed within sixty (60) days following the filing thereof; a decree or order (including a bankruptcy order) is entered appointing any such trustee, custodian, liquidator, receiver, compulsory or other similar officer or adjudicating any Credit Party or any Subsidiary bankrupt or insolvent, or approving a petition or a bankruptcy application in any such case or other proceeding, or a decree or order (including

#4848-5684-9449v14#4848-5684-9449v15

a bankruptcy order) for relief is entered in respect of any Credit Party or any Subsidiary in an involuntary case under federal bankruptcy laws or applicable bankruptcy laws in any jurisdiction as now or hereafter constituted; a moratorium is declared in respect of any indebtedness of any Credit Party or any of its Subsidiaries (and if a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium); or

(f)        Judgments.  There shall remain in force for more than thirty (30) days, whether or not consecutive, any final judgment against any Credit Party (considered collectively) that exceeds in the aggregate $5,000,000 which are not covered by insurance policies unless such judgment has been discharged, satisfied, bonded or stayed pending appeal; or

(g)        ERISA Event.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of the Credit Parties under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $5,000,000 or (ii) any Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $5,000,000; or

(h)        Indebtedness.  Any Credit Party shall fail to pay at maturity, or within any applicable period of grace, any obligation for Indebtedness in excess of $5,000,000, or fail to observe or perform any material term, covenant or agreement contained in any agreement by which it is bound, evidencing or securing Indebtedness in excess of $1,000,000 for such period of time as would permit (assuming the lapse of time and/or giving of appropriate notice if required and assuming such breach has not been cured within the applicable grace period thereunder) the holder or holders thereof or of any obligations issued thereunder to accelerate the maturity thereof; or

(i)        Invalidity of Loan Documents; Etc.  If any of the Loan Documents shall be cancelled, terminated, revoked, rescinded or otherwise ceases to be in full force and effect other than in accordance with their terms; or the Administrative Agent's security interests, mortgages or Liens in all or a material portion of the Collateral shall cease to be perfected, or shall cease to have the priority contemplated by the Security Documents and, from and after the date that a Revolving Facility is in effect, the Intercreditor Agreement, in each case other than in accordance with the terms thereof or with a consent or approval obtained in accordance with Section 10.01; or any action at law, suit or in equity or other legal proceeding to cancel, revoke, rescind or declare void any of the Loan Documents shall be commenced by or on behalf of any Credit Party, any Subsidiary or any of their respective equity holders; or any court or any other Governmental Authority shall make a determination that, or issue a judgment, order, decree or ruling to the effect that, any one or more of the Loan Documents is illegal, invalid or unenforceable in accordance with the terms thereof; or

(j)        Change of Control.  A Change of Control shall occur; or

(k)        Conduct of Business.  Any Credit Party shall be enjoined, restrained or in any way prevented by the order of any Governmental Authority from conducting any part of their business unless such order would not have a Material Adverse Effect; or there shall otherwise be, except to the extent permitted by Section 7.05(b), a suspension of the conduct of any material portion of the Credit Parties business, taken as a whole in the ordinary course, a liquidation of any material portion of the Credit Parties' assets or store locations, a retention of an agent or other third party to conduct any store closings, store liquidations or "Going-Out-Of

Business" sales with respect to any material portion of the Credit Parties' assets or store locations (or any Credit Party shall take any action in furtherance of the foregoing, whether by vote of its board of directors (or equivalent governing body) or otherwise); or

      (m)    Licenses, Permits, Etc.  There shall occur the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Credit Party if such loss, suspension, revocation or failure to renew would have a Material Adverse Effect; or

      (n)    Subordinated Debt. (i) Any "event of default" under any Subordinated Debt Document shall occur, (ii) the holders of all or any part of the Subordinated Debt shall accelerate the maturity of all or any part of the Subordinated Debt, (iii) other than in accordance with the express terms of Section 7.04(b), the Subordinated Debt shall be prepaid, redeemed or repurchased in whole or in part or an offer to prepay, redeem or repurchase the Subordinated Debt in whole or in part shall be required to be made or (iv) the Obligations shall cease for any reason to rank senior in right of payment to any Subordinated Debt; or

      (o)    Liens.  (i) Any lien or security interest created by Loan Documents with respect to Collateral shall, for any reason, cease to be valid or (ii) any action is commenced by the Credit Parties which contests the validity, perfection or enforceability of any of the liens and security interests of the Administrative Agent and/or the Lenders created by the Loan Documents; or

      (p)    Chapter 11. The Plan of Reorganization or Confirmation Order fails to be in full force and effect or fails to be valid, subsisting and continuing, or has been vacated, modified, stayed, reversed, or amended in any material respect (or any proceeding is commenced to effect that same), in each case, without the consent of the Required Lenders.

    **8.02**    **Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, the Administrative Agent may, or at the request of the Required Lenders, shall take any or all of the following actions:

      (a)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, all premium (including the Prepayment Premium) and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Credit Parties; and

      (b)    exercise on behalf of itself and the other Secured Parties all rights and remedies available to it and the other Secured Parties under the Loan Documents or any other remedies provided by applicable law;

provided that, upon the occurrence of an Event of Default under Section 8.01(e), the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.  No termination of the commitments hereunder shall relieve any Credit Party of any of the Obligations.

    **8.03**    **Application of Funds**.  In the event that, following the occurrence and during the continuance of any Event of Default, the Administrative Agent or any Lender, as the case may be, receives any monies in connection with the enforcement of any of the Loan Documents, or otherwise with respect to the realization upon any of the Collateral, the Administrative Agent may apply (and shall

#4848-5684-9449v14#4848-5684-9449v15

apply at (a) the request of the Required Lenders or (b) following the exercise of remedies pursuant to <u>Section 8.02</u>, including without limitation, pursuant to the proviso thereof) such monies as follows (and each Lender shall comply with the instructions of the Administrative Agent in the case of any such monies received by any Lender):

(i)　　<u>First</u>, to payment of that portion of Obligations owing to the Administrative Agent constituting (A) indemnities and expenses due and payable under this Agreement and the other Loan Documents (including fees, charges and disbursements of counsel to the Administrative Agent) and (B) the fees due and payable under the Administrative Agent's Letter Agreement;

(ii)　　<u>Second</u>, to payment of that portion of the Obligations constituting indemnities and expenses (including fees, charges and disbursements of counsel to Lenders and amounts payable under <u>Article III</u>) due and payable to the Lenders under this Agreement and the other Loan Documents, ratably among such Persons in proportion to the respective amounts described in this <u>clause Second</u> payable to them;

(iii)　　<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest, fees and premium (including the Prepayment Premium) and payable to the Lenders under this Agreement and the other Loan Documents ratably among such Persons in proportion to the respective amounts described in this <u>clause Third</u> payable to them;

(iv)　　<u>Fourth</u>, to the payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the holders thereof in proportion to the respective amounts described in this <u>clause Fourth</u> held by them;

(v)　　<u>Fifth</u>, to the payment of all other Obligations ratably among the holders thereof in proportion to the respective amounts described in this <u>clause Fifth</u>; and

(vi)　　<u>Sixth</u>, the balance, if any, after all of the Obligations have been indefeasible paid in full, to the Borrowers or as otherwise required by Law.

All payments applied to the Loans pursuant to this <u>Section 8.03</u> shall be applied to the Loans owing to the Lenders in accordance with their respective Applicable Percentages.

## ARTICLE IX

## ADMINISTRATIVE AGENT

**9.01　Appointment and Authority**.

(a)　　Each of the Lenders hereby irrevocably appoints Wilmington Trust, National Association to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this <u>Article IX</u> are solely for the benefit of the Administrative Agent and the Lenders, and neither any Borrower nor any other Credit Party shall have rights as a third party beneficiary of any of such provisions other than as provided in <u>Section 9.09</u>.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other

#4848-5684-9449v14#4848-5684-9449v15

similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties.

(b)     The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the collateral agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any Sub-Agent for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this <u>Article IX</u> and <u>Article X</u> (including <u>Section 10.04(c)</u> as though such Sub-Agent were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

**9.02     Rights as a Lender**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Credit Parties or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**9.03     Exculpatory Provisions**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information

#4848-5684-9449v14#4848-5684-9449v15

relating to the Credit Parties or any of their Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable order. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent in writing by a Credit Party or a Lender. The Administrative Agent shall promptly notify the Lenders upon receipt of any such notice. The Administrative Agent shall hold all security for itself and for and on behalf of the Secured Parties, in accordance with this Agreement and the other Loan Documents. The Administrative Agent shall provide copies of all Security Documents requested by any Lender and follow the instructions of the Required Lenders with respect to perfecting and maintaining the security granted to the Administrative Agent under this Agreement or Security Documents, provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Notwithstanding anything to the contrary set forth herein, the Administrative Agent shall not be required to take, or to omit to take, any action hereunder or under the Loan Documents unless, upon demand, the Administrative Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to the Administrative Agent, any other Secured Party) against all liabilities, costs and expenses that, by reason of such action or omission, may be imposed on, incurred by or asserted against such Administrative Agent or any of its directors, officers, employees and agents.

**9.04    Reliance by Administrative Agent**.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Credit Parties),

independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.05    **Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more Sub-Agents appointed by the Administrative Agent.  The Administrative Agent and any such Sub-Agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article IX shall apply to any such Sub-Agent and to the Related Parties of the Administrative Agent and any such Sub-Agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any Sub-Agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such Sub-Agents.

9.06    **Resignation of Administrative Agent**.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrowers, to appoint a successor from among the Lenders (or an Affiliate of a Lender) or a financial institution or other entity that provides agency or trustee services, in each case, having an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders), then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor meeting the qualifications set forth above; provided that, if the Administrative Agent shall notify the Borrowers and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender, until such time as the Required Lenders appoint a successor as provided for above in this Section 9.06.  Upon the acceptance of a successor's appointment hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.06).  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Section 10.04 shall continue in effect for the benefit of such retiring Administrative Agent any Sub-Agent and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them prior to such resignation.

9.07    **Non-Reliance**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its

own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**9.08    Administrative Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**9.09    Collateral and Guarantee Matters; Credit Bidding**.  Each of the Lenders irrevocably authorizes the Administrative Agent to and upon the commercially reasonable request of the Borrower Representative (and at its sole cost and expense) with reasonable advance notice, the Administrative Agent hereby agrees,

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Exit Term Loan Facility and payment in full in cash of all Obligations (other than contingent indemnification obligations for which no claim has then been asserted), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder (other than sales among Credit Parties) or (iii) subject to Section 10.01, if approved, authorized or ratified in writing by the Required Lenders; and

(b)    to release any Guarantor from its obligations under the Security Documents and release any related Collateral if such Person ceases to be a Subsidiary as a result of a transaction permitted by Section 7.05.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of

property, or to release any Guarantor from its obligations under the Credit Party Guarantees pursuant to this Section 9.09.

The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

The Credit Parties and the Secured Parties hereby irrevocably authorize the Administrative Agent, based upon the instruction of the Required Lenders, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Section 363 of the Bankruptcy Code of the United States or any similar Laws in any other jurisdictions to which a Credit Party is subject or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of the Administrative Agent to credit bid and purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of the Administrative Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Secured Parties whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Capital Stock of the acquisition vehicle or vehicles that are used to consummate such purchase). Upon request by the Administrative Agent or the Borrower Representative at any time, the Secured Parties will confirm in writing the Administrative Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 9.09.

## ARTICLE X

## MISCELLANEOUS

**10.01    Amendments, Etc**. No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrowers or any other Credit Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrowers or the applicable Credit Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    extend, increase or decrease the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

(b)    postpone any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; provided that for the avoidance of doubt, mandatory prepayments pursuant to

#4848-5684-9449v14#4848-5684-9449v15

Section 2.05 may be postponed, delayed, reduced, waived or modified with the consent of the Required Lenders;

(c)     reduce the principal of, or the rate of interest specified herein on any Loan, or any fees, premiums or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender directly affected thereby; provided, however, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;

(d)     (i) change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby or the order of the application of payments thereunder, in each case, without the written consent of each Lender or (ii) change Section 2.05 in a manner that would alter the pro rata sharing of Commitments reductions required thereby without the written consent of each Lender affected thereby;

(e)     change any provision of this Section 10.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender; or

(f)     (i) release all or substantially all of the Collateral in any transaction or series of related transactions, (ii) release all or substantially all of the Guarantors party to the Credit Party Guarantees, (iii) subordinate the Obligations hereunder to any other Indebtedness or (iv) except as provided by operation of applicable law, subordinate the Liens on all or substantially all of the Collateral granted in favor of the Administrative Agent for itself and the other Secured Parties under the Security Documents to any other Lien, in each case, without the written consent of each Lender;

and, provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (ii) the Administrative Agent's Letter Agreement may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to exercise any voting, consent, elective or request right as a Lender, approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of all applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

**10.02    Notices; Effectiveness; Electronic Communication**.

(a)     Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

> > (i)  if to any Borrower, any other Credit Party or the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 11.02; and
>
> > (ii)  if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

> (b)  Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including through any Electronic Medium) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrowers may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

> Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement) and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) upon notification that such notice or communication is available and identifying the website address therefor; provided that for both clauses (i) and (ii), if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

> (c)  Change of Address, Etc. Each of the Borrowers and the Administrative Agent, may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrowers and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

> (d)  Reliance by Administrative Agent and Lenders. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The

#4848-5684-9449v14#4848-5684-9449v15

Borrowers shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

(e)     <u>Platform</u>. Borrower Materials may be delivered pursuant to procedures approved by the Administrative Agent, including electronic delivery (if possible) upon request by the Administrative Agent to an electronic system maintained by the Administrative Agent ("<u>Platform</u>"). The Borrower Representative shall notify the Administrative Agent of each posting of Borrower Materials on the Platform and the materials shall be deemed received by the Administrative Agent only upon its receipt of such notice. Borrower Materials and other information relating to this credit facility may be made available to the Lenders on the Platform. The Platform is provided "as is" and "as available." The Administrative Agent does not warrant the accuracy or completeness of any information on the Platform nor the adequacy or functioning of the Platform, and expressly disclaims liability for any errors or omissions in the Borrower Materials or any issues involving the Platform. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE ADMINISTRATIVE AGENT WITH RESPECT TO BORROWER MATERIALS OR THE PLATFORM. The Lenders acknowledge that Borrower Materials may include material non- public information of the Credit Parties and should not be made available to any personnel who do not wish to receive such information or who may be engaged in investment or other market-related activities with respect to any Credit Party's securities. None of the Administrative Agent or any Related Party thereof shall have any liability to the Credit Parties, the Lenders or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform or delivery of Borrower Materials and other information through the Platform

**10.03   No Waiver; Cumulative Remedies**. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided and provided under each other Loan Document are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with <u>Section 8.02</u> for the benefit of all the Lenders; <u>provided</u>, <u>however</u>, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with <u>Section 10.08</u> (subject to the terms of <u>Section 2.13</u>) or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any Debtor Relief Law; and <u>provided</u>, <u>further</u>, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders

#4848-5684-9449v14#4848-5684-9449v15

shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**10.04    Expenses; Indemnity; Damage Waiver**.

(a)    Costs and Expenses.  The Borrowers shall pay (i) all reasonable and documented out-of-pocket expenses incurred by any of the Administrative Agent, the Lenders and their respective Affiliates (including, in each case, the reasonable fees, charges and disbursements of counsel and advisors for any of such Persons, including local counsel to any of such Persons in any relevant jurisdiction), in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by any of the Administrative Agent, the Lenders and their respective Affiliates (including, in each case, the fees, charges and disbursements of counsel (including local counsel to any of such Persons in any relevant jurisdiction) and advisors for the Lenders) in connection with the enforcement or protection of its rights (A) relating to or arising out of, in connection with or the result of this Agreement and the other Loan Documents, including its rights under this Section 10.04, (B) relating to or arising out of, in connection with, or as a result of, the Loans made hereunder, including all such reasonable documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or (C) relating to or arising out of, in connection with or the result of the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or document request) related to this Agreement, the other Loan Documents, or the Loans in any action, litigation, investigation, or proceeding.

(b)    Indemnification by the Borrowers.  The Borrowers shall indemnify the Administrative Agent (and any Sub-Agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, obligations, liabilities, costs and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any of the Borrowers or any other Credit Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any Sub-Agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any of the Borrowers or any other Credit Party, or any Environmental Liability related in any way to any of the Borrowers or any other Credit Party or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by or on behalf of any Person (including any of the Borrowers or any other Credit Party), and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, obligations, liabilities, costs or related

expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. Without limiting the provisions of <u>Section 3.01(c)</u>, this <u>Section 10.04(b)</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    <u>Reimbursement by Lenders</u>.  To the extent that any Borrower for any reason fails to pay any amount required under <u>subsection (a)</u> or <u>(b)</u> of this <u>Section 10.04</u> to be paid by it to the Administrative Agent (and any Sub-Agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (and any Sub-Agent thereof) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Applicable Percentage) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), such payment to be made severally among them based on such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (and any Sub-Agent thereof).  The obligations of the Lenders under this <u>subsection (c)</u> are subject to the provisions of <u>Section 2.12(d)</u>.

(d)    <u>Waiver of Consequential Damages, Etc</u>.  To the fullest extent permitted by applicable law, the Borrowers shall not assert, and the Borrowers hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in <u>subsection (b)</u> above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence, bad faith, willful misconduct or material breach of this Agreement or the other Loan Documents by such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    <u>Payments</u>.  All amounts due under this <u>Section 10.04</u> shall be payable not later than ten (10) Business Days after demand therefor.

(f)    <u>Survival</u>.  The agreements in this <u>Section 10.04</u> and the indemnity provisions of <u>Section 10.02(d)</u> shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all the other Obligations.

**10.05    Payments Set Aside**.  To the extent that any payment by or on behalf of any Credit Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not

been made or such setoff had not occurred and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06   Successors and Assigns**.

(a)   <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Credit Party (except to the extent permitted by Section 7.05(a) to the extent a transaction permitted thereby would constitute an assignment) may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>subsection (b)</u> of this <u>Section 10.06</u>, (ii) by way of participation in accordance with the provisions of <u>subsection (d)</u> of this <u>Section 10.06</u> or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>subsection (f)</u> of this <u>Section 10.06</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>subsection (d)</u> of this <u>Section 10.06</u> and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)   Except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "<u>Trade Date</u>" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $2,000,000 in the case of any assignment, unless the Administrative Agent consents (such consent not to be unreasonably withheld or delayed); <u>provided</u>, <u>however</u>, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)   Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(iii)    No consent shall be required for any assignment except to the extent required by subsection (b)(i)) of this Section 10.06 and, in addition, the consent of the Administrative Agent and the Borrower (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment or Loans if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; provided that (i) the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Administrative Agent within ten (10) Business Days after having received notice thereof and (B) consent from the Borrower pursuant to this clause (iii) shall not be required if an Event of Default shall have occurred and be continuing.

(iv)    The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500 payable to the Administrative Agent; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)    Notwithstanding anything to the contrary in this Section 10.06(b), no such assignment shall be made (A) to any Credit Party or Subsidiary of any Credit Party, (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B),  (C) to a natural person or (D) any Person that is not an Eligible Assignee.

(vi)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrowers and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (B) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section 10.06, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall

cease to be a party hereto) but shall continue to be entitled to the benefits and obligations of Sections 3.01, 3.04, 3.05, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.  Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section 10.06.

(c)     Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than a natural Person, a Defaulting Lender, any Credit Party, any Affiliate or Subsidiary of any Credit Party or a Disqualified Lender) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 10.04(c) without regard to the existence of any participation.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant.  The Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 10.06 (it being understood that the documentation required under Section 3.01(e) shall be delivered to the Lender who sells the participation) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section (subject to the requirements and limitations therein, including the requirements under Section 3.01(e)); provided that such Participant (i) agrees to be subject to the provisions of Sections 3.06 and 10.13 as if it were an assignee under subsection (b) of this Section 10.06 and (ii) shall not be entitled to

receive any greater payment under Section 3.01 or 3.04, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 3.06 with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers (solely for tax purposes), maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as such) shall have no responsibility for maintaining a Participant Register.

(e)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.07    Treatment of Certain Information; Confidentiality**.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to Exit Term Loan Facility or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to

#4848-5684-9449v14#4848-5684-9449v15

an agreement containing provisions substantially the same as those of this Section 10.07, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations, (g) on a confidential basis to any rating agency in connection with rating the Credit Parties or this Agreement, (h) with the consent of the Borrowers or (i) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section 10.07 or (B) becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a non-confidential basis from a source other than the Borrowers.

For purposes of this Section 10.07, "Information" means all information received from the Borrowers or any Credit Party relating to the Borrowers or any Credit Party or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrowers or any Credit Party, provided that in the case of information received from the Borrowers or any Credit Party after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 10.07 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrowers or a Credit Party, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

Notwithstanding anything to the contrary contained in this Section 10.07, each Credit Party consents to the publication by the Administrative Agent or the Lenders of any press releases, tombstones, advertising or other promotional materials (including via any Electronic Medium) relating to the financing transactions contemplated by this Agreement using such Credit Party's name, product photographs, logo or trademark. No party hereto shall or shall permit any of its Affiliates to, issue any press release or other public disclosure relating to the closing of the credit facilities provided for herein (other than any document required to be filed by the Credit Party with the SEC) using the name, logo or otherwise referring to any Lender, the Administrative Agent or the Sub-Agent or of any of their Affiliates or the Loan Documents to which any such Person is a party without the prior written consent (including via e-mail) of such Person (not to be unreasonably withheld) except to the extent required to do so under applicable Requirements of Law and then, only after consulting with such Persons.

**10.08    Right of Setoff**. If an Event of Default shall have occurred and be continuing, each Lender and their respective Affiliates is hereby authorized at any time and from time to time after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Credit Party against any and all of the obligations of any Credit Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or its respective Affiliates, irrespective of whether or not such Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Credit Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness, provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the

#4848-5684-9449v14#4848-5684-9449v15

Administrative Agent for further application in accordance with the provisions of <u>Section 2.12</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its respective Affiliates under this <u>Section 10.08</u> are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have.  Each Lender agrees to notify the Borrower Representative and the Administrative Agent, promptly after any such setoff and application, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

     **10.09    Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

     **10.10    Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto and in accordance with <u>Section 4.01</u>.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

     **10.11    Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at Closing Date, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

     **10.12    Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular

jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions of this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13    Replacement of Lenders**. If the Borrowers are entitled to replace a Lender pursuant to the provisions of Section 3.06, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then (a) the Borrowers may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent and (b) the Administrative Agent may upon notice to such Lender, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights (other than its existing rights to payments pursuant to Sections 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

> (i)        the Borrowers shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.06(b);

> (ii)        such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

> (iii)        in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

> (iv)        such assignment does not conflict with applicable Laws; and

> (v)        in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the Administrative Agent shall have consented to such assignment and the applicable assignee shall have consented to the applicable amendment, waiver or consent;

provided that the failure by any Lender to execute and deliver an Assignment and Assumption in connection with any of the foregoing assignments shall not impair the validity of the removal of such Lender and the mandatory assignment of such Lender's Commitments and outstanding Loans and participations pursuant to this Section 10.13 shall nevertheless be effective without the execution by such Lender of an Assignment and Assumption.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling any Borrower to require such assignment and delegation cease to apply.

**10.14    Governing Law; Jurisdiction; Etc**.

(a)        GOVERNING LAW. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO

ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW (OTHER THAN THE NEW YORK GENERAL OBLIGATIONS LAW §§ 5-1401 AND 5-1402)).

(b)      SUBMISSION TO JURISDICTION.  EACH PARTY HERETO EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY LENDER OR THE L/C ISSUER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER, THE OTHER CREDIT PARTIES SIGNATORY HERETO OR THEIR RESPECTIVE PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)      WAIVER OF VENUE.  EACH PARTY HERETO EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN SUBSECTION (b) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)      SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)      WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE

FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.14.

(f)     Judicial Reference.  If any action or proceeding relating to any Obligations or Loan Documents is filed in a court sitting in or applying the Laws of California, the court shall, and is hereby directed to, make a general reference pursuant to Cal. Civ. Proc. Code §638 to a referee (who shall be an active or retired judge) to hear and determine all issues in such case (whether fact or law) and to report a statement of decision.  Nothing in this Section 10.14 shall limit any right of the Administrative Agent or any other Secured Party to exercise self-help remedies, such as setoff, foreclosure or sale of any Collateral, or to obtain provisional or ancillary remedies from a court of competent jurisdiction before, during or after any judicial reference.  The exercise of a remedy does not waive the right of any party to resort to judicial reference.  At the Administrative Agent's option, foreclosure under a mortgage or deed of trust may be accomplished either by exercise of power of sale thereunder or by judicial foreclosure.

**10.15    USA PATRIOT Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined), the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Credit Parties and their Subsidiaries, which information includes the name and address of the Credit Parties and their Subsidiaries and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Credit Parties and their Subsidiaries in accordance with the Act.  The Credit Parties shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" an anti-money laundering rules and regulations, including the Act.

**10.16    ENTIRE AGREEMENT**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

**10.17    No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Credit Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (a) (i) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Credit Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (ii) each Credit Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate and (iii) each Credit Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) the Administrative Agent and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Credit Party or any of its Affiliates, or any other Person and (ii) none of the Administrative Agent or any Lender has any obligation to any Credit Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents and (c) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad

range of transactions that involve interests that differ from those of Credit Parties and their Affiliates, and neither the Administrative Agent nor any Lender have any obligation to disclose any of such interests to the Credit Parties or any of their Affiliates.  To the fullest extent permitted by law, the Credit Parties hereby waive and release any claims that they may have against the Administrative Agent with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**10.18   ORIGINAL ISSUE DISCOUNT LEGEND**.  THE CLOSING DATE LOANS HAVE BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES.  THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY OF THE LOANS MAY BE OBTAINED BY WRITING TO THE ADMINISTRATIVE AGENT AT ITS ADDRESS SET FORTH ON SCHEDULE 11.02.

*[The Remainder of this Page Left Intentionally Blank]*

#4848-5684-9449v14#4848-5684-9449v15

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

<u>The Borrowers:</u>

**AMERICAN APPAREL (USA), LLC**

By: _____
       Name:
       Title:

**AMERICAN APPAREL RETAIL, INC.**

By: _____
       Name:
       Title:

**AMERICAN APPAREL DYEING & FINISHING. INC.**

By: _____
       Name:
       Title:

**KCL KNITTING, LLC,**

By: _____
       Name:
       Title

CREDIT AGREEMENT

Signature Page

**The Guarantors:**

**AMERICAN APPAREL,** ~~INC.~~LLC

By: _____
    Name:
    Title:

**FRESH AIR FREIGHT, INC.**

By: _____
    Name:
    Title:

CREDIT AGREEMENT

Signature Page

**The Administrative Agent:**

**WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent**

By:
      Name:
      Title:

**The Lenders:**

**[_____], as a Lender**

By:
      Name:
      Title:

**CREDIT AGREEMENT**

**Signature Page**

#4848-5684-9449v15

**The Lenders:**

**MONARCH MASTER FUNDING LTD.**

**By: Monarch Alternative Capital LP**
**Its: Advisor**

**By: _____**
**        Name:**
**        Title:**

**CREDIT AGREEMENT**

**Signature Page**

**GOLDMAN SACHS TRUST, on behalf of the
GOLDMAN SACHS HIGH YIELD FLOATING
RATE FUND**

**By:**    **Goldman Sachs Asset Management, L.P.,
as investment advisor and not as principal**

**By: _____**
      **Name:**
      **Title:**

**GOLDMAN SACHS LUX INVESTMENT FUNDS
for the benefit of
GOLDMAN SACHS HIGH YIELD FLOATING
RATE PORTFOLIO (LUX)**

**By:**    **Goldman Sachs Asset Management, L.P.,
solely as its investment advisor and not as
principal**

**By: _____**
      **Name:**
      **Title:**

**GOLDMAN SACHS LUX INVESTMENT FUNDS
for the benefit of
GOLDMAN SACHS GLOBAL MULTI-SECTOR
CREDIT PORTFOLIO (LUX)**

**By:**    **Goldman Sachs Asset Management, L.P.,
solely as its investment advisor and not as
principal**

**By: _____**
      **Name:**
      **Title:**

**GLOBAL OPPORTUNITIES, LLC**

**By:**    **Goldman Sachs Asset Management, L.P.,
not in its individual capacity, but solely as
investment adviser**

**By: _____**
      **Name:**
      **Title:**

**CREDIT AGREEMENT**

**Signature Page**

**GLOBAL OPPORTUNITIES OFFSHORE, LTD.**

**By:     Goldman Sachs Asset Management, L.P., not in its individual capacity, but solely as investment adviser**

**By: _____**
**        Name:**
**        Title:**

**CREDIT AGREEMENT**

**Signature Page**

**COLISEUM CAPITAL PARTNERS, L.P.**

**By:**      **Coliseum Capital, LLC, General Partner**

**By:**_____

**BLACKWELL PARTNERS, LLC, SERIES A**

**By:**      **Coliseum Capital Management, LLC, Attorney-in-fact**

**By:**_____

**COLISEUM CAPITAL PARTNERS II, L.P.**

**By:**      **Coliseum Capital, LLC, General Partner**

**By:**_____

**CREDIT AGREEMENT**

**Signature Page**

**PWCM MASTER FUND LTD.**

**By:** _____
____**Name:**
____**Title:**


**OCEANA MASTER FUND LTD.**


**By:** _____
____**Name:**
____**Title:**

**CREDIT AGREEMENT**

**Signature Page**

**STANDARD GENERAL MASTER FUND L.P.**


**By:** _____
     **Name:**
     **Title:**



**P STANDARD GENERAL LTD.**


**By:** _____
     **Name:**
     **Title:**

**CREDIT AGREEMENT**

**Signature Page**

**SCHEDULE 2.01**

**<u>Commitments and Applicable Percentages</u>**

| Lender | Commitment | Applicable Percentage |
|---|---|---|
| Standard General Master Fund L.P. | | |
| P Standard General Ltd. | | |
| Monarch Master Funding Ltd | | |
| Coliseum Capital Partners, L.P. | | |
| Coliseum Capital Partners II, L.P. | | |
| Blackwell Partners, LLC, Series A | | |
| Goldman Sachs Trust - Goldman Sachs High Yield Floating Rate Fund | | |
| Goldman Sachs Lux Investment Funds - Goldman Sachs High Yield Floating Rate Portfolio (LUX) | | |
| Goldman Sachs Lux Investment Funds - Global Multi-Sector Credit Portfolio (LUX) | | |
| Global Opportunities LLC | | |
| Global Opportunities Offshore Ltd | | |
| Oceana Master Fund Ltd. | | |
| PWCM Master Fund Ltd. | | |
| **Total** | | |