EXHIBIT A

1   JOHNSON BOTTINI, LLP
    FRANCIS A. BOTTINI, JR. (CA 175783)
2   FRANK J. JOHNSON (CA 174882)
    BRETT M. WEAVER (CA 204715)
3   501 West Broadway, Suite 1720
    San Diego, California 92101
4   Telephone:  (619) 230-0063
    Facsimile:  (619) 238-0622
5
    Attorneys for Plaintiff Smith
6
    [Additional Counsel Appear on Signature Page]
7



8
9               SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                 FOR THE COUNTY OF LOS ANGELES

11  In re AMERICAN APPAREL, INC.
    SHAREHOLDER DERIVATIVE
12  LITIGATION                              **Lead Case No.: BC443763**

13  ─────────────────────────────          CONSOLIDATED AMENDED
    This document relates to:               SHAREHOLDER DERIVATIVE
14                                          COMPLAINT
    ALL ACTIONS
15                                          DEMAND FOR JURY TRIAL

16
17
18
19
20
21
22
23
24
25
26
27
28

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1

**NATURE AND SUMMARY OF THE ACTION**

2   1.   Plaintiffs John L. Smith, Lisa Kim, Teresa Lankford, and Wesley Norris

3   ("Plaintiffs"), by their attorneys, hereby submit this Consolidated Amended Shareholder Derivative

4   Complaint (the "Complaint") against certain officers and directors of American Apparel, Inc.

5   ("American Apparel" or the "Company"). Plaintiffs assert state law claims for breach of fiduciary

6   duty against the Individual Defendants (as defined herein) seeking to remedy defendants' breaches

7   of fiduciary duties and unjust enrichment from December 2006 to the present.

8   2.   Plaintiffs base their allegations upon information and belief, except those allegations

9   concerning themselves, which are based upon personal knowledge. Because Plaintiffs lack access

10   to all information and documents on which their claims are based, certain of their allegations are

11   made by necessity upon information and belief. After Plaintiffs have had the opportunity to

12   conduct discovery, they will, to the extent necessary and appropriate, amend or seek leave to amend

13   this Complaint. Plaintiffs' information and belief is derived from their counsel's investigation,

14   which included counsel's review and analysis of the following: (i) American Apparel's filings with

15   the United States Securities and Exchange Commission ("SEC"); (ii) press releases, conference call

16   transcripts, public statements, analyst reports, news articles, and other publications by or pertaining

17   to American Apparel and the Defendants named herein; and (iii) other publicly available

18   documents.

19   2.   American Apparel is a vertically integrated manufacturer, distributor and retailer of

20   "hip" clothing for men, women, children and dogs. American Apparel is based in downtown Los

21   Angeles, California and employs approximately 10,000 people globally and operates more than

22   285 retail stores in 20 countries. American Apparel is a publicly traded company (NYSE: Amex)

23   whose stock traded at a high of $16.80 in December 2007.

24   3.   American Apparel's stock trades at less than $1.00 a share, in part, because the

25   Company disclosed twice that its independent accounting auditors have found material weaknesses

26   in its financial controls.

27   4.   Specifically, American Apparel disclosed in its 2009 SEC Form 10-K that its

28   outside auditor Marcum & Kliegman LLP ("Marcum") had determined that "American Apparel,

1  Inc. has not maintained effective internal control over financial reporting as of December 31,
2  2008." Rather than correcting the deficiencies, the Individual Defendants terminated Marcum's
3  engagement and retained Deloitte & Touche LLP ("Deloitte"). Things did not get any better.
4  American Apparel's 2010 10-K similarly disclosed Deloitte's opinion that "the Company has not
5  maintained effective internal control over financial reporting as of December 31, 2009." Then, on
6  July 22, 2010, Deloitte resigned based on its doubts about the reliability of American Apparel's
7  2009 financial statements.

8      5.      Deloitte later revealed that American Apparel withheld its February 2010 monthly
9  financial statements until after American Apparel filed its 2009 year-end 10-K.

10     6.      In addition, American Apparel has been beset by other problems, including having
11  to lay off 1,800 experienced manufacturing employees who could not provide legal documentation
12  in response to a federal immigration investigation. Losing one third of its manufacturing
13  employees seriously damaged American Apparel's manufacturing efficiency and also seriously
14  damaged its public image, especially since one of its main selling points is that its garments are
15  "Made in the USA."

16     7.      The Individual Defendants' failure to ensure adequate accounting controls at the
17  Company, as well as their other misconduct, has damaged American Apparel and its shareholders.
18  As well, there is already a putative class action against American Apparel for violations of the
19  Securities Exchange Act of 1934. Additionally, the Company's goodwill and reputation are
20  materially undermined and tarnished as a direct result of the Individual Defendants' actions.

21     8.      Plaintiffs bring this derivative action to: (i) recover damages against the Individual
22  Defendants for the benefit of the Company; and (ii) require the Company to reform and improve its
23  corporate governance and internal procedures to protect American Apparel and its shareholders
24  from a repeat of the damaging events described below.

25                          **JURISDICTION AND VENUE**

26     9.      This Court has jurisdiction over all claims asserted herein because the claims arise
27  under state law and all Defendants are subject to personal jurisdiction within this state. American
28  Apparel conducts business in California and has its principal place of business at 747 Warehouse

Street, Los Angeles, California 90021. Thus, American Apparel is a resident and citizen of California. Likewise, certain of the defendants are residents and citizens of California. This action is not removable to federal court.

10.     Venue is proper in this Court because some or all of the events giving rise to Plaintiffs' claims occurred and/or had effect in this County, the Company is located in this County, and many of the Individual Defendants reside in this County.

## THE PARTIES

11.     Plaintiff John L. Smith is an owner and holder of American Apparel common stock, was a shareholder of American Apparel at the time of the transaction of which Plaintiff complains, and has continuously held his shares. Plaintiff is a citizen and resident of California.

12.     Plaintiff Lisa Kim is an owner and holder of American Apparel common stock, was a shareholder of American Apparel at the time of the transaction of which Plaintiff complains, and has continuously held her shares. Plaintiff is a citizen and resident of California.

13.     Plaintiff Teresa Lankford is an owner and holder of American Apparel common stock, was a shareholder of American Apparel at the time of the transaction of which Plaintiff complains, and has continuously held her shares. Plaintiff is a citizen and resident of California.

14.     Plaintiff Wesley Norris is an owner and holder of American Apparel common stock, was a shareholder of American Apparel at the time of the transaction of which Plaintiff complains, and has continuously held his shares. Plaintiff is a citizen and resident of Texas.

15.     Nominal Defendant American Apparel is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 747 Warehouse Street, Los Angeles, California 90021. Prior to December 13, 2007, American Apparel was known as Endeavor Acquisition Corp. ("Endeavor"), which had entered into an agreement as of the beginning of the Relevant Period to acquire American Apparel.

16.     Defendant Dov Charney ("Charney") has served as the Chairman of the Board of Directors ("Board"), Chief Executive Officer, President, and a Director of American Apparel since it went public in December 2007. Before that, Defendant Charney served as director, chief

1  executive officer and president of American Apparel's predecessor companies since 1989 when he
2  founded them in Columbia, South Carolina. He currently owns 53% of the Company's stock.

3      17.    Defendant Adrian Kowalewski ("Kowalewski") became a member of American
4  Apparel's Board in December 2007 and currently serves as a Director and Executive Vice
5  President. Until recently, he was also the Chief Financial Officer for the Company.

6      18.    Defendant Mark Samson ("Samson") is currently a member of the Board and has
7  been since December 2007. Additionally, Defendant Samson chairs the Board's Audit Committee.

8      19.    Defendant Keith Miller ("Miller") is a member of the Board and has been since
9  December 2007. Additionally, Defendant Miller chairs the Board's Compensation Committee
10 and also serves on the Board's Audit Committee and Nominating Committee.

11     20.    Defendant Mark A. Thornton ("Thornton") is a member of the Board and has been
12 since December 2007. Additionally, Defendant Thornton chairs the Board's Nominating
13 Committee and also serves on the Board's Audit Committee and Compensation Committee.

14     21.    Defendant Robert Greene ("Greene") is a member of the Board and has been since
15 December 2007. Additionally, Defendant Greene serves on the Board's Nominating Committee
16 and Compensation Committee.

17     22.    Defendant Allan Mayer ("Mayer") is a member of the Board and has been since
18 December 2007. Additionally, Defendant Mayer is a member of the Board's Compensation
19 Committee.

20     23.    Defendant Neil Richardson ("Richardson") is a member of the Board and has been
21 since March 2009.

22     24.    Defendant Martin Bailey ("Bailey") has served as Chief Manufacturing Officer of
23 the Company since December 12, 2007. He had previously served as President of Manufacturing
24 since 2002, overseeing operations of textile and apparel production and the planning, purchasing,
25 sourcing, product development, quality-assurance and distribution departments.

26     25.    Defendant Joyce E. Crucillo ("Crucillo") has served as Chief Litigation Counsel
27 since February 2009. Among other things, Crucillo is responsible for ensuring the Company's
28 compliance with governmental regulatory requirements, handling employment-related matters, and

1  advising management and the Company's Board on various legal matters. Crucillo previously
2  served as the Company's General Counsel.

3      26.    Defendant Lyndon Lea ("Lea") has served as a director of the Company since May
4  2010.

5      27.    Defendant Ken Cieply ("Cieply") served as the Company's CFO from 2006 until he
6  "resigned" in May 2008.

7      28.    The individual defendants listed above are referred to in this Complaint as the
8  "Individual Defendants."

9      29.    The true names and capacities, whether individual, corporate, associate, or
10 otherwise, of Defendants named in this action as Does 1-20, inclusive, are unknown to Plaintiffs,
11 who therefore sue these Defendants by such fictitious names. Plaintiffs will amend this Complaint
12 to show their true name(s) and capacities when they have been ascertained. Plaintiffs are informed
13 and believe, and on that basis allege, that each of these fictitiously-named Defendants is
14 responsible in some manner for the occurrences herein alleged, and that Plaintiffs' injuries as
15 herein alleged were proximately caused by conduct of these fictitiously-named Defendants.

16                    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

17     30.    By reason of their positions as officers, directors and/or fiduciaries of American
18 Apparel, and because of their ability to control the business and corporate affairs of American
19 Apparel, the Individual Defendants owed American Apparel and its shareholders fiduciary
20 obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost
21 ability to control and manage American Apparel in a fair, just, honest and equitable manner. The
22 Individual Defendants were and are required to act in furtherance of the best interests of American
23 Apparel and its shareholders so as to benefit all shareholders equally and not in furtherance of their
24 personal interest or benefit.

25     31.    Each director and officer of the Company owes to American Apparel and its
26 shareholders the fiduciary duty to exercise good faith and diligence in the administration of the
27 affairs of the Company and in the use and preservation of its property and assets, and the highest
28 obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the

1  Individual Defendants had a duty to maintain sufficient and proper internal accounting controls and

2  to promptly disseminate accurate and truthful information with regard to the Company's revenue,

3  margins, operations, performance, management, projections and forecasts so that the market price

4  of the Company's stock would be based on truthful and accurate information.

5      32.    Pursuant to the Company's Code of Ethics (the "Code of Ethics"), which is applicable

6  to all directors, officers and employees of the Company, all directors and officers shall "promote

7  compliance with applicable governmental laws, rules and regulations." Further, all directors and

8  officers are required to "promote the full, fair, accurate, timely and understandable disclosure[s] in

9  reports and documents that the Company files with, or submits to, the Securities and Exchange

10  Commission (the "SEC"), as well as in other public communications made by or on behalf of the

11  Company."

12      33.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are

13  required, *inter alia*, to:

14
15  •    Review the adequacy and effectiveness of the Company's accounting and
         internal control policies and procedures through inquiry and discussions with
         the Company's independent auditors and management;

16  •    Review with management the Company's administrative, operational and
17       accounting internal controls;

18  •    Review with management any reportable conditions and material weaknesses
         affecting internal control;

19  •    Review legal and regulatory matters, including any matters that may have a
20       material impact on the financial statements;

21  •    Review the Company's Annual Reports on Form 10-K, the Company's
         Quarterly Reports on Form 10-Q, and proxy statements prior to filing; and

22  •    Review the Corporation's program to monitor compliance with the
         Company's Code of Ethics.

23      34.    To discharge their duties, the officers and directors of American Apparel were
24
25  required to exercise reasonable and prudent supervision over the management, policies, practices

26  and controls of the financial affairs of the Company. By virtue of such duties, the officers and

    directors of American Apparel were required to, among other things:
27

28

1          a)  ensure that the Company implements and maintains effective internal accounting
2    and internal control policies and procedures to prevent any reportable and material weaknesses
3    with the Company's financial reporting;

4          b)  ensure that the Company complied with its legal obligations and requirements,
5    including acting only within the scope of its legal authority and disseminating truthful and accurate
6    statements to the SEC and the investing public;

7          c)  conduct the affairs of the Company in an efficient, business-like manner so as to
8    make it possible to provide the highest quality performance of its business, to avoid wasting the
9    Company's assets, and to maximize the value of the Company's stock;

10          d)  properly and accurately guide investors and analysts as to the true financial
11    condition of the Company at any given time, including making accurate statements about the
12    Company's financial results and prospects, and ensuring that the Company maintained an adequate
13    system of financial controls such that the Company's financial reporting would be true and
14    accurate at all times;

15          e)  supervise the preparation and filing of any audits, reports, or other information
16    required by law of the Company, and examine and evaluate any reports of examinations, audits, or
17    other financial information concerning the financial affairs of the Company, and make full and
18    accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set
19    forth herein;

20          f)  remain informed as to how American Apparel conducted its operations, and, upon
21    receipt of notice or information of imprudent or unsound conditions or practices, make reasonable
22    inquiry in connection therewith, and take steps to correct such conditions or practices and make
23    such disclosures as necessary to comply with federal and state securities laws; and

24          g)  ensure that the Company was operated in a diligent, honest and prudent manner in
25    compliance with all applicable federal, state and local laws, rules and regulations.

26        35.    The conduct of the Individual Defendants complained of herein involves a violation
27    of their obligations as directors and officers of American Apparel, the absence of good faith on
28    their part, and a reckless disregard for their duties to the Company and its shareholders, which the

1  Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the
2  Company.

3         36.    The Individual Defendants breached their duties of loyalty and good faith by
4  allowing, or by themselves causing, the Company to misrepresent its financial results and
5  prospects, as detailed herein, and by failing to prevent the Individual Defendants from taking such
6  illegal actions.

7         37.    The Individual Defendants, because of their positions of control and authority as
8  directors and/or officers of American Apparel, were able to and did, directly and/or indirectly,
9  exercise control over the wrongful acts complained of herein. Because of their advisory, executive,
10 managerial, and directorial positions with American Apparel, each of the Individual Defendants
11 had knowledge of material non-public information regarding the Company.

12                **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

13        38.    The Individual Defendants engaged in a conspiracy, common enterprise and/or
14 common course of conduct commencing by at least December 2006, and continuing thereafter.
15 During this time, the Individual Defendants caused the Company to conceal the true facts as
16 alleged herein.

17        39.    The purpose and effect of the conspiracy, common enterprise, and/or common
18 course of conduct was, among other things, to disguise the Individual Defendants' violations of
19 law, breaches of fiduciary duty, and unjust enrichment; to conceal adverse information concerning
20 the Company's operations, financial condition and future business prospects; and to artificially
21 inflate the price of American Apparel common stock so the Individual Defendants could protect
22 and enhance their executive and directorial positions and the substantial compensation and prestige
23 they obtained as a result thereof.

24        40.    The Individual Defendants accomplished their conspiracy, common enterprise
25 and/or common course of conduct by causing the Company to purposefully, recklessly or
26 negligently fail to maintain effective accounting and internal control policies and procedures.
27 Because the actions described herein occurred under the authority of the Board, each of the
28

1  Individual Defendants was a direct, necessary and substantial participant in the conspiracy,
2  common enterprise and/or common course of conduct complained of herein.

3       41.     Each of the Individual Defendants aided and abetted and rendered substantial
4  assistance in the wrongs complained of herein. In taking such actions to substantially assist the
5  commission of the wrongdoing complained of herein, each Individual Defendant acted with
6  knowledge of the primary wrongdoing, substantially assisted the accomplishment of that
7  wrongdoing, and was aware of his or her overall contribution to and furtherance of the
8  wrongdoing.

9       42.     At all times relevant hereto, each of the Individual Defendants was the agent of each
10  of the other Individual Defendants and of American Apparel, and was at all times acting within the
11  course and scope of such agency.

12                                **BACKGROUND**

13                **Defendant Charney's Formation Of American Apparel**

14       43.     While in high school, Defendant Charney began importing T-shirts across the border
15  to his Canadian friends. In 1990, he dropped out of Tufts University to pursue his T-Shirt business
16  full time. He borrowed $10,000 from his father and moved to South Carolina to transition from
17  importing T-shirts to manufacturing them.

18       44.     In 1991, Charney began making T-shirts under the American Apparel brand. The
19  primary market objective was to sell garments to screen printers and wholesale clothiers in the
20  United States and Canada.

21       45.     In 2000, American Apparel moved into its current 800,000 square feet factory in
22  downtown Los Angeles. In 2003 it expanded into the retail market. Today, American Apparel is
23  one of the nation's leading retail brands with more than 280 retail stores worldwide. American
24  Apparel has an almost cult-like following based largely on its unique advertising campaigns that
25  spotlight the Company's treatment of its workers and promote American Apparel's goods as "Made
26  In The USA" and "sweatshop free."

27       46.     In December 2006, Charney entered into an agreement to sell American Apparel for
28  $360 million to a special purpose acquisition company as a way of taking the company public. As a

1  result of the agreement, Charney was named Chairman, President and Chief Executive Officer of the
2  new publicly-traded American Apparel. He remained the majority shareholder owning 53% of the
3  Company's stock.

4       47.    As Chairman/President/CEO, Charney is directly involved in every aspect of the
5  Company's business, including picking and photographing the models used in the Company's
6  advertisements. He walks through the factory most days, talking to employees, handling fabrics and
7  seeing garments being made. His mobile number is available to all employees and he prides himself
8  on returning all calls. Charney's tenure has not been without controversy, however.

9       48.    Over the past several years, he has been sued numerous times by female employees
10  for sexual harassment. . .

11      49.    In 2007, film director Woody Allen sued American Apparel for using his picture in
12  one of its advertisements. The advertisement, which was created by Charney, was meant to be a
13  parody of Charney's sexual scandals compared with Allen's infamous sex scandal. American
14  Apparel paid Allen $5 million to settle the lawsuit, the largest reported invasion of privacy
15  settlement in New York state history.

16      50.    On December 20, 2006, American Apparel filed a Form 8-K with the SEC
17  announcing that, on December 18, 2006, Endeavor had entered into an agreement and plan of
18  reorganization by which it would acquire American Apparel and its affiliated companies. The Form
19  8-K stated that Endeavor had received representations and warranties regarding a number of issues
20  related to American Apparel's business, including:

21       The Agreement contains representations and warranties of each of American Apparel
         and Endeavor relating to, among other things, (a) proper corporate organization and
22       similar corporate matters, . . . (f) financial information and absence of undisclosed
         liabilities, . . . (l) employee matters, (m) compliance with laws, [and] (n) compliance
23       with applicable provisions of securities laws . . . .

24      51.    The December 20, 2006 Form 8-K included a press release issued by the Individual
25  Defendants which discussed the Company's employees:

26       All manufacturing is done under one roof at its downtown Los Angeles factory and
         headquarters. Committed to its employees as crucial components of the Company's
27       success and stability as well as the quality of its garments, American Apparel is a
         leader in employer/employee relations, offering benefits to all employees.
28

- 10 -

1

## SUBSTANTIVE ALLEGATIONS

2      52.    On January 23, 2007, the Individual Defendants caused American Apparel to issue a

3  press release entitled "American Apparel Announces $41 Million Debt Financing." Defendant

4  Charney was quoted in the release:

5      "As the first major investment of institutional capital into American Apparel, this
       financing represents an important validation of our vertically-integrated business
6      model . . . . This transaction places the company on a firm financial footing and
       allows us to pursue our ambitious growth plans, as well as our proposed merger with
7      Endeavor Acquisition Corp. The hard work and dedication of our employees, and the
       support of our customers, vendors, and creditors, have been critical during American
8      Apparel's rapid growth."

9      53.    On April 4, 2007, the Individual Defendants caused American Apparel to issue a

10  press release entitled "Endeavor Acquisition Corp. Announces Transaction with American Apparel

11  to Move Forward," which stated that American Apparel had advised Endeavor that it would post at

12  least $30 million for the fiscal year ending December 31, 2006 in adjusted Earnings Before Interest,

13  Taxes, Depreciation, Amortization after giving effect to one-time charges ("pro forma adjusted

14  EBITDA"). This satisfied terms of the merger agreement wherein American Apparel was required

15  to demonstrate pro forma adjusted EBITDA of at least $30 million for the fiscal year ending

16  December 31, 2006.

17      54.    The release quoted defendant Charney:

18      "I am pleased that American Apparel continues to flourish with strong same store
       sales this quarter. The merger with Endeavor will provide the equity capital
19      necessary to fuel our continued growth and expansion of our operations in several of
       the most influential metropolitan centers around the world . . . . Until the merger is
20      completed, we continue to prepare the company for this influx of capital," said
       Charney.

21

22      55.    On June 11, 2007, the Individual Defendants filed a preliminary merger proxy

       statement with the SEC. The proxy statement reported that American Apparel's workers were
23

       documented and authorized to work in the United States:
24

25      Many of American Apparel's workers are documented immigrants and authorized to
       work in the United States; however, changes in immigration and labor laws could
       affect such labor force.
26

       Many of American Apparel's workers are documented immigrants, authorized to
27      work in the United States. Changes to existing U.S. immigration laws or labor laws
       could affect this labor force and could make it harder for members of such force to
28      remain or legally work in the United States. Any changes in U.S. laws having such

- 11 -

an affect could make it harder for American Apparel to maintain and expand its work
force, which would be adverse to American Apparel's manufacturing capabilities and
harm American Apparel's operations and financial results.

56.     On August 20, 2007, the Individual Defendants filed a preliminary revised proxy

statement with the SEC, which repeated that American Apparel's workers were documented and

authorized to work in the United States:

Many of American Apparel's workers are documented immigrants and authorized to
work in the United States; however, changes in immigration and labor laws could
affect such labor force.

Many of American Apparel's workers are documented immigrants, authorized to
work in the United States. Changes to existing U.S. immigration laws or labor laws
could affect this labor force and could make it harder for members of such force to
remain or legally work in the United States. Any changes in U.S. laws having such
an affect could make it harder for American Apparel to maintain and expand its work
force, which would be adverse to American Apparel's manufacturing capabilities and
harm American Apparel's operations and financial results.

57.     These statements asserting that American Apparel's immigrant workers were

documented and authorized to work in the United States were repeated verbatim by the Individual

Defendants in Endeavor's (i) October 5, 2007 preliminary revised proxy statement; (ii) November 9,

2007 preliminary revised proxy statement; (iii) November 20, 2007 revised preliminary proxy

statement; and (iv) November 28, 2007 definitive proxy statement.

58.     These statements contained in the Company's proxy solicitations were materially

false and misleading because many of the Company's workers were not documented immigrants,

and were not authorized to work in the United States. Rather, the Individual Defendants knew, or

were deliberately reckless in not knowing, that a third of the Company's manufacturing employees

were not authorized to work in the United States.

59.     On August 20, 2007, the Individual Defendants caused American Apparel to issue a

press release entitled "Endeavor Acquisition Corp. Reports American Apparel's Second Quarter

2007 Financial Results," which stated in part:

American Apparel reported unaudited combined sales for the 2007 second quarter
ended June 30, 2007 of $95.6 million, a 35% increase over sales of $71.0 million for
the three month period ended June 30, 2006. Retail sales increased 51 % to $52.6
million for the second quarter of 2007 as compared to $34.9 million for the same
period in 2006, with same-store sales for stores open at least 12 months rising 24%.
At June 30, 2007, American Apparel had 156 stores as compared to 131 stores at

1    June 30, 2006. Wholesale results were $43.0 million for the 2007 second quarter as
     compared to $36.3 million for the 2006 second quarter, an increase of 19%.

2
                                   *        *        *
3

4    Dov Charney, Chief Executive Officer of American Apparel stated: "After reviewing
     the financial results for the first half of 2007, I am very excited about the growth that
     the company has experienced so far this year. Despite a challenging retail
5    environment, the second quarter was the most successful period in American
     Apparel's history. We are pleased that our product offering has appealed to so many
6    customers and we are eager to introduce the vibrant, emerging brand we have
     developed to metropolitan adults around the world. In the months ahead, we look
7    forward to building upon the strong financial performance of the first half of 2007."

8    "The fortuitous timing of our refinancing this past July is providing us with the
     liquidity to continue to enhance the value of the American Apparel business, while
9    we work patiently towards closing the merger with Endeavor," added Adrian
     Kowalewski, American Apparel's Director of Corporate Finance and Development.

10
     60.    On November 12, 2007, the Individual Defendants caused American Apparel to issue
11
a press release entitled "Endeavor Acquisition Corp. Reports American Apparel's Third Quarter

12
2007 Financial Results," which stated in part:

13
     American Apparel reported unaudited combined sales for the 2007 third quarter
14   ended September 30, 2007 of $106.5 million, a 34% increase over sales of $79.4
     million for the three month period ended September 30, 2006. Retail sales increased
15   43% to $55.9 million for the third quarter of 2007 as compared to $39.1 million for
     the same period in 2006, with same-store sales for stores open at least 12 months
16   rising 27%. At September 30, 2007, American Apparel had 165 stores as compared
     to 142 stores at September 30, 2006. Wholesale results were $50.6 million for the
17   2007 third quarter as compared to $40.3 million for the 2006 third quarter, an
     increase of 25%.

18
                                   *        *        *
19

20   Dov Charney, Chief Executive Officer of American Apparel stated: "I am very proud
     of the financial results we have delivered in the third quarter, which were made
     possible by the important contributions of everyone at the company. I look forward
21   to the completion of our merger with Endeavor which will result in American
     Apparel becoming a public company, and will allow our employees and the public to
22   share in the future success of our business."

23   61.    On March 17, 2008, the Individual Defendants caused American Apparel to issue a

24   press release entitled "American Apparel Reports Fourth Quarter and Full Year 2007 Financial

25   Results – Fourth quarter 2007 net sales of $111.2 million up 48% over the fourth quarter of 2006."

26   In the press release, the Individual Defendants reported:

27   Net income for the fourth quarter of 2007 of $3.0 million versus a loss of $1.5
     million in the fourth quarter of 2006; net income for 2007 of $15.5 million, compared
28   to a net loss of $1.6 million in 2006.

                                        - 13 -

62.     Also on March 17, 2008, the Individual Defendants caused the Company to file a Form 10-K with the SEC for the year ended December 31, 2007.  In the 2007 Form 10-K, the Individual Defendants reported the Company's gross profit and operating expenses as follows:

*Gross Profit*: Gross profit increased from $145.6 million for the year ended December 31, 2006 to $215.5 million for the year ended December 31, 2007, which represents an increase of 48.0%. The overall increase in gross profit is a result of growth in retail sales which realize higher margins. This increase in gross profit is also a result of an increased amount of sales being generated from the International segments and the portion of the U.S. Wholesale segment related to online sales. In the International segment, there was growth in online sales and the addition of new retail stores contributed to sales which generated higher margins.

*Operating Expenses*: The following table sets forth American Apparel's operating expenses for the year ended December 31, 2007 as compared to December 31, 2006.

| | Year Ended December 31, 2007 | | | Year Ended December 31, 2006 | | | $ Change | % Change | |
|---|---|---|---|---|---|---|---|---|---|
| | Amount | % | | Amount | % | | Amount | % | |
| **OPERATING EXPENSES** | $ 184,351 | 100 | % | $ 135,064 | 100 | % | $49,287 | 36.5 | % |
| | | | | | | | | | |
| Selling | 115,602 | 62.7 | % | 83,957 | 62.2 | % | 31,645 | 37.7 | % |
| Warehouse and Distribution | 10,663 | 5.8 | % | 9,721 | 7.2 | % | 942 | 9.7 | % |
| General and Administrative | 58,086 | 31.5 | % | 41,386 | 30.6 | % | 16,700 | 40.4 | % |
| | | | | | | | | | |
| | 184,351 | 100 | % | 135,064 | 100 | % | 49,287 | | |

63.     The 2007 Form 10-K also discussed the Company's purported compliance with immigration regulations in the hiring of employees, stating that "[t]he Company makes diligent efforts to comply with all employment and labor regulations, including immigration laws, in the many jurisdictions in which the Company conducts operations."

64.     The 2007 Form 10-K was accompanied by certifications signed by defendant Charney and the Company's then-CFO, defendant Cieply, which stated:

I, [Charney/Cieply], certify that:

1.      I have reviewed this annual report on Form 10-K of American Apparel, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial

- 14 -

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f)) for the registrant and have:

a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

65.     On May 13, 2008, the Individual Defendants caused the Company to issue a press release entitled "American Apparel Reports First Quarter 2008 Financial Results." In the press release, the Individual Defendants announced:

Total retail sales across all segments increased 65% to $63.1 million for the first quarter of 2008 as compared to $38.3 million for the same period in 2007, with same-store sales for stores open at least 12 months rising 36%. . . .

1
2     Gross margin in the quarter declined 280 basis points to 55.3%. . . . The company
      also incurred additional training and startup costs relating to increased hiring to
      support an expansion in production capacity starting in the first quarter.

3     Operating expenses increased 170 basis points to 51.4% of sales, partly as a result of
4     a shift in mix due to the growth of the company's retail operations. . . .

5     Net income for the first quarter was $1.1 million versus $1.7 million in the same
      period a year ago, or $0.02 per diluted share versus $0.03 per diluted share a year
6     ago.

7     66.     On May 16, 2008, the Individual Defendants caused the Company to file a Form 10-

8     Q with the SEC. In the May 16, 2008 Form 10-Q, Defendants reported the Company's gross profits

9     and operating expenses as follows:

10    **Gross Profit**: Gross profit percentage decreased from 58.1 % of net sales for the
      three months ended March 31, 2007 to 55.3% of net sales for the three months ended
11    March 31, 2008. One of the factors leading to the decrease in gross profit was the
      product sales mix for the three months ended March 31, 2008, which included a
12    relatively higher amount of costlier winter styles. In addition, gross profit decreased
      as a result of the above described startup expenses, moving costs; increased hiring,
13    freight and duty, and ERP cutover costs.

14    **OPERATING EXPENSES**: The following table sets forth American Apparel's
      operating expenses for the three months ended March 31, 2008 as compared to the
15    three months ended March 31, 2007 (dollars in thousands).

|                            | Three months ended March 31, 2008 | | Three months ended March 31, 2007 | | Change | |
|                            | Amount | % of operating expense | Amount | % of operating expense | Amount | % |
|----------------------------|--------|------------------------|--------|------------------------|--------|-----|
| OPERATING EXPENSES         | $ 57,384 | 100 | % $ 36,498 | 100 | % $ 20,886 | 57.2 % |
| Selling                    | 36,782 | 64.1 | % 22,183 | 60.8 | % 14,599 | 65.8 % |
| Warehouse and Distribution | 3,167  | 5.5  | % 2,255  | 6.2  | % 912    | 40.4 % |
| General and Administrative | 17,435 | 30.4 | % 12,060 | 33.0 | % 5,375  | 44.6 % |
|                            | $ 57,384 | 100 | % $ 36,498 | 100 | % $ 20,886 | |

22    67.     The May 16, 2008 Form 10-Q was signed by defendants Charney and Cieply.

23    68.     On August 14, 2008, the Individual Defendants caused the Company to issue a press

24    release entitled "American Apparel Reports Second Quarter 2008 Financial Results." In the press

25    release, the defendants stated:

26    Gross margin for the second quarter of 2008 increased to 59.5% from 56.5% for the
      prior year second quarter. The increase in gross margin was primarily the result of an
27    increase in the mix of sales coming from retail sales and online consumer sales,
      which generate a higher gross margin than wholesale sales. This benefit was partially
28    offset by the impact of hiring of approximately 1,400 new manufacturing employees

- 16 -
CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

in the second quarter of 2008 to support increased production. During the period, American Apparel began operating a fabric dyeing and finishing facility in Garden Grove, California, which it purchased in May. Gross margin for the U.S. Wholesale segment decreased to 28.4% in the second quarter of 2008, versus 28.9% in the second quarter of 2007.

69.    On August 15, 2008, the Individual Defendants caused the Company to file a Form 10-Q with the SEC. In the August 15, 2008 Form 10-Q, Defendants reported gross profits and operating expenses as follows:

> *Gross profit*: Gross profit percentage increased from 56.5% of net sales for the three months ended June 30, 2007 to 59.5% of net sales for the three months ended June 30, 2008. Gross margin benefited from an increase in the mix of sales coming from retail sales versus wholesale, along with an increase in online consumer sales. This benefit was partially offset by the hiring of a significant number of new manufacturing employees to support increased production which continued through the second quarter.

> *OPERATING EXPENSES*: The following table sets forth the Company's operating expenses for the three months ended June 30, 2008 as compared to the three months ended June 30, 2007 (dollars in thousands).

| | Three Months Ended | | | | Change | |
| | June 30, 2008 | | June 30, 2007 | | | |
| | Amount | % of operating expenses | Amount | % of operating expenses | Amount | % |
|---|---|---|---|---|---|---|
| Selling | $39,257 | 61.9 % | $28,307 | 67.4 % | $10,950 | 38.7 % |
| Warehouse and Distribution | 4,069 | 6.4 % | 1,998 | 4.8 % | 2,071 | 103.7 % |
| General and Administrative | 20,116 | 31.7 % | 11,688 | 27.8 % | 8,428 | 72.1 % |
| Total operating expenses | $63,442 | 100.0 % | $41,993 | 100.0 % | $21,449 | 51.1 % |

70.    On October 29, 2008, the Individual Defendants caused the Company to file a proxy statement with the SEC. The proxy statement included a Report of the Audit Committee, which discussed the Audit Committee's role in purportedly ensuring the Company's compliance with legal regulatory requirements:

> The Audit Committee assists the Board in fulfilling its responsibilities for general oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's system of internal control over financial reporting and the qualifications, independence and performance of the Company's internal audit function and independent auditor.

> *       *       *

> Based on the reviews and discussions referred to above, we recommended to the Board of Directors, and the Board of Directors has approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2007 for filing with the SEC.

- 17 -

1    71.    On November 10, 2008, the Individual Defendants caused the Company to file a

2  Form 10-Q with the SEC. In the November 10, 2008 Form 10-Q, the Individual Defendants reported

3  the Company's gross profits and operating expenses as follows:

4        *Gross profit*: Gross profit percentage decreased from 55.2% of net sales for the three
         months ended September 30, 2007 to 50.1% of net sales for the three months ended
5        September 30, 2008. Gross margin was negatively impacted by the $13.2 million of
         expenses from the stock award to manufacturing employees and related employer
6        payroll taxes. The $13.2 million of expenses decreased our gross margin by 8.5%.
         Excluding the impact of the aforementioned expenses related to the stock award, our
7        gross margin increased from 55.2% for the three months ended September 30, 2007
         to 58.6% for the three months ended September 30, 2008. The increase in our gross
8        margin was due to an increase in the mix of sales coming from retail sales versus
         wholesale and an increase in online consumer sales. Gross profit was also favorably
9        impacted from a reduction in inventory reserves of $1.1 million which increased our
         gross profit percentage by 0.7% during the three months ended September 30, 2008.
10       The reduction in the inventory reserve was primarily the result of the opening of two
         closeout stores in key markets and expansion of certain existing closeout stores to
11       increase inventory for sale. Popular styles among the Company's slow- moving stock
         were actively merchandized in these closeout stores, resulting in higher inventory
12       turnover of potentially obsolete inventory. These benefits were partially offset by the
         hiring of additional manufacturing employees, as described above, to support
13       increased production which continued through the third quarter ended September 30,
         2008.

14
15    72.    Also on November 10, 2008, the Individual Defendants caused the Company to issue

16  a press release entitled "American Apparel Reports Third Quarter 2008 Financial Results." In the

17  press release, the Individual Defendants stated:

18       American Apparel reported net sales for the quarter ended September 30, 2008 of
         $154.8 million, a 45.2% increase over net sales of $106.6 million for the quarter
19       ended September 30, 2007.

20                              *        *        *

21       Gross margin for the third quarter of 2008 was 50.1% versus 55.2% for the prior year
         third quarter, including the impact of the merger related stock based compensation
22       expense. . . .

23       Operating expenses for the third quarter of 2008 increased to 45.7% of net sales,
         versus 44.2% for the third quarter of 2007. Operating expenses increased due to
24       higher payroll, rent and occupancy expense related to the growth in the number of
         retail stores from 163 as of September 30, 2007 to 228 as of September 30, 2008.
25       Pre-opening expenses for retail stores were $4.4 million in the third quarter of 2008,
         versus $0.9 million in the prior year third quarter. . . .

26       . . . Operating margin for the third quarter of 2008 was 4.4%, versus 11.0% in the
         quarter a year ago.

27
28

- 18 -
CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1       **American Apparel's Undocumented Employee Problem**

2       73.     On March 16, 2009, the Individual Defendants caused the Company to file a Form
3   10-K with the SEC for the year ended 12/31/08. The Form 10-K was signed by Defendants Charney
4   and Kowalewski and stated that "the Company makes diligent efforts to comply with all
5   employment and labor regulations, including immigration laws, in the many jurisdictions in which
6   the Company conducts operations."

7       74.     This statement was false, since the Individual Defendants had actual knowledge of, or
8   consciously disregarded, the fact that the Company was employing over 1,800 employees in its Los
9   Angeles manufacturing operations who were not U.S. citizens and who did not have the necessary
10  paperwork to prove that they were legal aliens.

11      75.     In 2009, the federal Immigration and Customs Enforcement agency ("ICE") began
12  auditing companies in the United States, including American Apparel, for potential violations of the
13  United States immigration laws.    ICE sought documentation from American Apparel's
14  approximately 5,100 mostly Hispanic factory workers that they were in the country legally.  More
15  than 1,800 employees could not produce the requested documents.

16      76.     On June 30, 2009, the Company filed a Form 8-K with the SEC which was prepared
17  by Charney. It disclosed that the Company had notified ICE that the Company "was unable to verify
18  the employment eligibility of approximately 200 current employees because of discrepancies in
19  these employees' records. Additionally, ICE notified the Company that another approximately 1,600
20  current employees appear not to be authorized to work in the United States and appear to have
21  obtained employment by providing, on Form I-9, documentation which ICE believes, based on its
22  proprietary databases, to be suspect and not valid."

23      77.     After months of negotiations with ICE, American Apparel laid off these 1,800
24  workers.

25      78.     Despite these significant problems, the Individual Defendants caused the Company to
26  state in the Form 8-K that "[E]ven if the Company were to lose substantially all of the 1,800
27  identified employees (which represent approximately one-third of the 5,600 employees the Company
28  currently employs in its manufacturing operations in the Los Angeles area), *the Company does not*

1   *currently believe that the loss of these employees would have a materially adverse impact on its*
2   *financial operations*."

3        79.    Defendants Crucillo and Bailey, along with the other defendants, had a duty to ensure
4   that the Company was complying with all applicable laws, including immigration laws.  Due to the
5   large number of workers employed at the Los Angeles facility, many of whom were Hispanic,
6   Crucillo, Bailey and the other Individual Defendants knew that there was a higher-than-normal risk
7   that many of the workers did not have the necessary visas and/or "green cards" to work legally in the
8   United States.  Nonetheless, Crucillo, Bailey, Charney, and the Board turned a blind eye to the
9   immigration violations and did not take adequate steps to ensure that all its workers had the
10  necessary visas and immigration papers.  Moreover, all corporations, including American Apparel,
11  have had special duties since 9/11 to ensure that all persons hired are U.S. citizens or legal aliens.

12       80.    In public statements, Charney continued to re-assure investors and stock analysts that
13  the loss of one third of American Apparel's manufacturing employees would not hurt American
14  Apparel because it had enough inventory on hand to satisfy demand until new employees could be
15  hired.

16       81.    For example, based on such comments by Charney to stock analysts during a
17  conference call, KeyBanc Capital Markets issued an analyst report on American Apparel on July 1,
18  2009 which stated:

19      "There's some paper, but thankfully no paddy wagons.  This determination was met
20      with a notice, and thankfully no mass arrest or deportation of employees.  In fact, the
    employees have a period of remediation when they can demonstrate their eligibility
21      to work.  *Management was clear in emphasizing that even if a significant number*
    *of the 1,800 employees are deemed ineligible to work, the Company should not see*
22      *a material financial impact*."

23       82.    In stark contrast to Charney's assurances, American Apparel was eventually forced to
24  admit in a press release dated March 25, 2010 that its gross margin was negatively affected "by a
25  substantial reduction in manufacturing efficiency at the Company's production facilities in the fourth
26  quarter of 2009 compared to the prior year period.  The reduction in manufacturing efficiency was
27  principally a result of the forced termination of over 1,500 experienced manufacturing employees in
28

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

the third and fourth quarters of 2009 following the completion of the previously disclosed I-9 inspection by U.S. Immigration and Customs Enforcement."

83.    Further, American Apparel branded itself as one of the United States' most socially responsible retailers and its main selling points was that its goods were "Made in the USA." The fact that a significant portion of its workforce was made up of illegal immigrants has significantly harmed American Apparel's public image and reputation.

### American Apparel's Accounting Problems

84.    On March 16, 2009, the Individual Defendants caused the Company to issue its SEC Form 10-K for the fiscal year ended December 31, 2008. That 10-K included a report from American Apparel's independent auditor, Marcum entitled "Report of Independent Registered Public Accounting Firm On Internal Control Over Financial Reporting." According to the report, "the following material weaknesses have been identified and included in the "Management's Report on Internal Control Over Financial Reporting:"

1.    **Inadequate Expertise in the Application of U.S. General Accepted Accounting Principles**: At its foreign offices, the Company did not have a sufficient number of adequately trained accounting personnel with appropriate expertise in United States generally accepted accounting principles (US GAAP). Also, the Company lacked sufficient US GAAP expertise to ensure that certain complex material and non-routine transactions were properly reflected in its consolidated financial statements. Consequently, the Company may not anticipate and identify accounting issues, or other risks critical to financial reporting, that could materially impact the consolidated financial statements.

2.    **Inadequate Review**: In certain instances, the Company's personnel, at both U.S. and foreign operations, did not perform adequate independent review of reconciliations and other processes.

3.    **Inadequate Financial Information Systems**: The Company's world-wide financial information systems were not integrated and contained many manual processes that may prevent the Company from meeting regulatory filing requirements on a timely and accurate basis. The Company has also identified information technology control weaknesses in the areas of information security, end-user computing, systems program development and change controls.

\*    \*    \*

*In our opinion, because of the effect of the material weaknesses described above on the achievement of objectives of the control criteria, American Apparel, Inc. has not maintained effective internal control over financial reporting as of December 31, 2008, based on criteria established in Internal Control-Integrated*

- 21 -

*Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission* (emphasis added).

85.   In April 2009, American Apparel terminated Marcum and hired Deloitte as its independent auditor.

86.   On March 31, 2010, the Individual Defendants caused the Company to issue its SEC Form 10-K for the fiscal year ended December 31, 2009. The "Management's Report on Internal Control Over Financial Reporting" included in the 10-K included the following statement:

**Remediation of Previously Identified Material Weakness & Other Remediation Activities**

While we implemented certain controls to remediate deficiencies in our internal controls over financial reporting during 2009, certain material weaknesses identified as of December 31, 2008 still remain to be remediated. Our material weaknesses as of December 31, 2009 represent continuing material weaknesses identified as of December 31, 2008. The following describes the remediation activities performed during 2009 for the partially remediated material weaknesses in the control environment and financial closing and reporting process, as well as, the completed remediation of the material weakness over the inadequate financial information systems as disclosed in the quarterly report on Form 10-Q for the quarter ended September 30, 2009.

87.   The 2010 10-K also included Deloitte's "Report of Independent Registered Public Accounting Firm." According to the report, "the following material weaknesses have been identified and included in management's assessment:"

*Material weakness related to the control environment.* In certain instances, the Company did not maintain an adequate control environment that fully emphasized the establishment of, adherence to, or adequate communication regarding appropriate internal control over financial reporting. Specifically, the Company did not have adequate controls in the following areas for the purposes of establishing, maintaining and communicating its control environment: (i) a sufficient number of adequately trained accounting personnel in its foreign subsidiaries with appropriate expertise in GAAP, (ii) a sufficient number of trained accounting personnel with expertise in GAAP to ensure complex material and/or non-routine transactions are properly reflected in its consolidated financial statements and (iii) a process to adequately capture and communicate relevant changes in contractual arrangements that have a financial impact. Consequently, the Company may not anticipate and identify accounting issues, or other risks critical to financial reporting, that could materially impact its consolidated financial statements.

*Material weakness related to financial closing and reporting process.* The Company did not perform adequate independent reviews and maintain effective controls over the preparation of its financial statements in the following respects: preparation of the consolidated financial statements and related notes thereto, account analyses, account summaries and account reconciliations prepared in the areas of inventory and related inventory reserves, fixed assets, deferred rent, cost of sales and certain other accounts. Specifically related to inventory, the Company

- 22 -
CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  determined that certain merchandise inventory costs were not accurately analyzed
2  and recorded by its foreign subsidiaries resulting in a material reduction in inventory
   and an increase in cost of sales. The Company also identified deficiencies in (i)
3  inventory costing related to its retail segment that was offset by adjustments in
   transfer pricing (ii) management's identification and evaluation of manufacturing
4  variances resulting from out-of-date standard costs and recent changes in the
   manufacturing process and (iii) the timely completion of management's evaluation of
5  excess and obsolete inventory reserves. These deficiencies in the Company's
   internal controls over the financial closing and reporting process increase the
6  likelihood of potential material errors to the consolidated financial statements.
                              *          *          *

7  **In our opinion, because of the effect of the material weaknesses identified above**
8  **on the achievement of the control criteria, the Company has not maintained**
   **effective internal control over financial reporting as of December 31, 2009, based**
9  **on criteria established in Internal Control – Integrated Framework issued by the**
   **Committee of Sponsoring Organizations of the Treadway Commission.** (emphasis
10  added).

11      88.     On May 19, 2010, the Individual Defendants caused the Company to issue a SEC

12  Form 8-K disclosing, among other things, that it was not in compliance with the SEC's requirement

13  that it timely file a 10-Q report for the quarter ended March 31, 2010. According to the 8-K, it was

14  unable to file timely financial statements because the Company was still reviewing certain items

15  "including retail store impairment, inventory reserves and the provision for income taxes." The 8-K

16  further disclosed that "[o]n May 18, 2010, the Company received a letter from the NYSE Amex LLC

17  (the "Exchange") stating that the Company's timely filing of its Quarterly Report on Form 10-Q for

18  the quarter ended March 31, 2010 (the "Form 10-Q") is a condition for the Company's continued

19  listing on the Exchange . . . and that the company's failure to timely file the Form 10-Q is a material

20  violation of the Company's listing agreement with the Exchange." The Exchange directed American

21  Apparel to file a Form 10-Q by August 16, 2010, or else it would be de-listed.

22      89.     On July 29, 2010, the Individual Defendants caused the Company to issue an SEC

23  Form 8-K disclosing that "Effective July 22, 2010, Deloitte & Touche, LLP ("Deloitte") resigned as

24  the independent registered public accounting for American Apparel, Inc. (the "Company")." The 8-

25  K further disclosed that "Deloitte advised the Company that certain information has come to

26  Deloitte's attention, that if further investigated may materially impact the reliability of either its

27  previously issued audit reports or the underlying consolidated financial statements for the year ended

28  December 31, 2009 included in the Company's 2009 Form 10-K." The 8-K further disclosed that

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1 "Deloitte has requested that the Company provide Deloitte with the additional information Deloitte
2 believes is necessary to review before the Company and Deloitte can reach any conclusions as to the
3 reliability of the previously issued consolidated financial statements for the year ended December
4 31, 2009 auditors' report thereon." Notably, the Company rehired Marcum — the same accounting
5 firm it fired a year earlier — to replace Deloitte.

6        90.    After the news that Deloitte resigned became public, American Apparel's shares
7 tumbled from $1.81 per share to close at $1.55 per share, on abnormally high trading volume.

8        91.    On August 10, 2010, the Individual Directors caused the Company to announce that it
9 would be late in filing its Form 10-Q for the 2010 second fiscal quarter. Among the reasons given
10 for the delay: (1) "[t]he Company's new auditors, Marcum, need sufficient time to complete their
11 review procedures for the quarter ended June 30, 2010, as well as for the quarter ended March 31,
12 2010; and (2) "[t]he Company is also working to provide Deloitte with the additional information
13 requested by them as further described in the July 28, 2010 Form 8-K. The Company is working
14 diligently to finalize its Form 10-Q."

15        92.    On August 17, 2010, the Company issued a press release entitled "American Apparel
16 Reports Preliminary Second Quarter 2010 Financial Results." The press release disclosed that
17 American Apparel expected to report a loss of $5 million to $7 million in the second quarter of 2010
18 on net sales of $132 million to $143 million. A significant factor for the anticipated losses was
19 "lower labor efficiency at the Company's production facilities in the second quarter of 2010
20 compared to the prior year period. The lower labor efficiency was primarily a result of the hiring of
21 over 1,600 net new manufacturing workers during the second quarter of 2010."

22        93.    The press release also stated that the Company's gross margins for Q2 '10 were
23 expected to be 50% to 52%, down from 59% in Q2 '09. The lower margins were attributed again to
24 the Company's forced firing of 1,600 illegal immigrant workers.

25        94.    The August 17, 2010 press release also conceded that the dire problems that the
26 Individual Defendants had caused the Company were not only highly material, but also threatening
27 the very viability of the Company: ". . . the Company may not have sufficient liquidity necessary to
28

1  sustain operations for the next twelve months. . . These factors, among others, raise a substantial

2  doubt that the Company will be able to continue as a going concern."

3      95.    In December 2010, the Individual Defendants were forced to reveal that Deloitte

4  resigned because American Apparel's management had withheld American Apparel's February 2010

5  financial statements until after American Apparel filed its 2009 10-K.  Specifically, American

6  Apparel's 8-K, dated December 15, 2010, revealed:

7  **Item 4.02  Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

As described in the Company's Current Report on Form 8-K filed on July 28, 2010, effective July 22, 2010, Deloitte & Touche LLP ("Deloitte") resigned as the independent registered public accounting firm for American Apparel, Inc. (the "Company") and requested that the Company provide Deloitte with the additional information Deloitte believed was necessary to review before the Company and Deloitte could reach any conclusions as to the reliability of the previously issued consolidated financial statements for the year ended December 31, 2009 and the auditors' report thereon.  On July 26, 2010, the Audit Committee of the Company engaged Marcum LLP ("Marcum") as the Company's independent auditors to audit the Company's financial statements for the fiscal year ending December 31, 2010.

On December 10, 2010, at the Company's 2010 Annual Meeting of Stockholders, Marcum was ratified as the Company's independent auditors for the fiscal year ending December 31, 2010.  In connection with the ratification, the Audit Committee and management also formally engaged Marcum to begin to reaudit the fiscal year ending December 31, 2009.

Since July 2010, the Company has responded to a series of information requests from Deloitte to provide the additional information sought by Deloitte and has met with representatives of Deloitte to discuss the information and respond to additional questions from time to time.

On December 15, 2010, the Audit Committee of the Company received notice from Deloitte stating that Deloitte had concluded that Deloitte's report on the Company's previously issued consolidated financial statements as of and for the year ended December 31, 2009 (the "2009 financials"), including Deloitte's report on internal control over financial reporting at December 31, 2009, included in the Company's Annual Report on Form 10-K for the year ended December 31, 2009 (such reports, collectively, the "Deloitte Reports") should not be relied upon or associated with the 2009 financials.

Deloitte explained that its conclusion was based on the significance of the declines in operations and gross margin in the Company's February 2010 monthly financial statement, combined with the January 2010 monthly financial statements, the Company's issuance of revised projections in early May 2010 which reflected a significant decrease in the Company's 2010 projections, and Deloitte's disagreement with the Company's conclusion that the results shown in the February 2010 monthly financial statements would not have required a revision to the Company's projections as of the date of the 10-K filing and the issuance of Deloitte's reports.  Deloitte further indicated that their decision considered their inability to perform additional

- 25 -
CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

audit procedures, their resignation as registered public accountants and their professional judgment that they are no longer willing to rely on management's representations due to Deloitte's belief that management withheld from Deloitte the February 2010 monthly financial statements until after the filing of the 2009 10-K and made related misrepresentations.

The Audit Committee has discussed the matters disclosed herein with Deloitte. The Audit Committee and the Company's management are currently evaluating these matters. The Audit Committee of the Company has commenced an investigation into the assertions that management withheld the February 2010 monthly financial statements and related misrepresentations. Management disagrees with Deloitte's assertions and does not believe that the February 2010 monthly financial statements were withheld. The Company does not currently believe, including after discussions with Marcum, that the reaudit will result in any changes to the 2009 financials, though no assurance can be given in this regard.

96.     On December 21, 2010, Deloitte sent a letter to the SEC stating it disagreed with American Apparel's contention that it provided Deloitte with the February 2010 financial statements: According to Deloitte's letter "we believe that we requested the February 2010 financial information prior to issuing our reports and that management informed us that such information was not available."

97.     Plaintiffs are informed and believe that the Attorney General for the State of New York has issued subpoenas related to American Apparel's improper accounting practices.

## DAMAGES TO THE COMPANY

98.     As a result of the Individual Defendants' improprieties, American Apparel failed to maintain proper internal accounting controls.  The Company will likely face lawsuits alleging violations of the federal securities laws.  Indeed, there is already a putative class action against American Apparel for violations of the Securities Exchange Act of 1934.

99.     American Apparel will likely also have to re-state its previously filed financial earnings after its auditors complete their investigations, which will no doubt cause American Apparel's stock price to drop even further. As a direct and proximate result of the Individual Defendants' actions as alleged above, American Apparel's market capitalization has been substantially damaged.

1    100.    Further, as a direct and proximate result of the Individual Defendants' actions,
2    American Apparel has expended and will continue to expend significant sums of money that it
3    otherwise would not have had to. Such expenditures include, but are not limited to:

4         a)  Costs incurred in investigating and defending American Apparel and certain officers
5    in the class actions, plus potentially millions of dollars in settlements or adverse judgment;

6         b)  Costs incurred from compensation and benefits paid to the Individual Defendants,
7    which compensation was based at least in part on American Apparel's artificially-inflated stock
8    price and inflated revenues; and

9         c)  Costs incurred from the loss of the Company's customers' confidence in American
10   Apparel's services.

11   101.    As a result of the Individual Defendants' misconduct, American Apparel's corporate
12   image and goodwill have been irreparably damaged. American Apparel's Board has misled the
13   investing public, such that American Apparel's ability to raise equity capital or debt on favorable
14   terms in the future is now impaired.

15              **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

16   102.    Plaintiffs bring this action derivatively in the right and for the benefit of American
17   Apparel to redress injuries suffered, and to be suffered, by American Apparel as a direct result of the
18   breaches of fiduciary duty, as well as the aiding and abetting thereof, and unjust enrichment by the
19   Individual Defendants. American Apparel is named as a nominal defendant solely in a derivative
20   capacity. This is not a collusive action to confer jurisdiction on this Court that it would not
21   otherwise have.

22   103.    Plaintiffs will adequately and fairly represent the interests of American Apparel in
23   enforcing and prosecuting its rights.

24   104.    Plaintiffs have continuously held the stock of American Apparel during all times
25   relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain
26   shareholders of the Company.

27   105.    The current Board of American Apparel consists of the following nine individuals:
28   Defendants Charney, Kowalewski, Samson, Miller, Thornton, Greene, Mayer, Richardson, and Lea

1  (the "Director Defendants").  Plaintiffs have not made any demand on the present Board of
2  American Apparel to institute this action because such a demand would be a futile, wasteful and
3  useless act.  Demand is futile for a combination of the following reasons:

4  **Defendant Charney**

5  106.    Charney is the Founder, Chairman, President, and CEO of the Company.  The
6  principal professional occupation of Charney is his employment with American Apparel, pursuant to
7  which he received and continues to receive substantial monetary compensation and other benefits.
8  In fact, over the past 3 years, American Apparel has paid Charney more than $16 million in salary
9  alone.  Given his personal ties to the Company, as well as his significant compensation, Charney is
10  not capable of fairly considering a demand that he initiate this lawsuit against himself or his fellow
11  directors.

12  107.    Further, as Chairman, President, and CEO, Charney is ultimately responsible for
13  ensuring that American Apparel maintains effective accounting controls and complies with state and
14  federal laws and regulations concerning the employment of undocumented aliens.  As discussed
15  above, Charney breached these duties and, thus, is not capable of fairly considering a litigation
16  demand.

17  108.    In addition, Charney signed the Company's SEC Form 10-K for the fiscal year ended
18  December 31, 2009.  Thus, Charney faces a substantial threat of liability should Deloitte's
19  investigation conclude that the financial statements contained therein are unreliable.

20  109.    The Company admits that Charney is not independent in its SEC Form 10-K for the
21  fiscal year ended December 31, 2009.

22  **Defendant Kowalewski**

23  110.    At the time this action was commenced and until recently, Kowalewski was the
24  Company's CFO.  As CFO, one of his main responsibilities is to ensure that the Company maintains
25  effective accounting controls and procedures.  Kowalewski breached this duty as discussed above
26  and, thus, is not capable of fairly considering a demand that he initiate this lawsuit against himself or
27  his fellow directors.

28

1    111.   Further, Kowalewski signed the Company's SEC Form 10-K for the fiscal year ended
2  December 31, 2009. Thus, Kowalewski faces a substantial threat of liability should Deloitte's
3  investigation conclude that the financial statements contained therein are unreliable, based on,
4  among other things, American Apparel's failure to provide Deloitte with its February 2010 financial
5  statements.

6    112.   In addition, Kowalewski's principal professional occupation is his employment with
7  American Apparel, pursuant to which he received and continues to receive substantial monetary
8  compensation and other benefits. In fact, over the past 3 years, American Apparel has paid
9  Kowalewski more than $700,000 in salary alone. Given his significant compensation, Kowalewski
10  is incapable of fairly considering a litigation demand.

11    113.   Further, because of his positions with the Company, Kowalewski was fully aware of
12  the Company's undocumented employee problem. However, he did nothing to ensure that American
13  Apparel complied with the applicable state and federal laws and regulations. As such, he faces a
14  substantial threat of liability.

15    114.   The Company admits that Kowalewski is not independent in its SEC Form 10-K for
16  the fiscal year ended December 31, 2009.

17    **Defendant Samson**

18    115.   Samson is the Chair of the Board's Audit Committee. The Audit Committee's charter
19  charges the Audit Committee with reviewing the adequacy and effectiveness of the Company's
20  accounting and internal control policies and procedures.  Thus, Samson was expressly responsible
21  for ensuring that American Apparel did not have any material weaknesses in its accounting controls.
22  Samson intentionally breached his fiduciary duties of due care, loyalty, and good faith because
23  Marcum expressly told the Audit Committee that it had material weaknesses in its accounting
24  controls. Rather than correcting the problems, the Audit Committee fired Malcum and hired
25  Deloitte. A year later, the material weaknesses still existed. Further, Deloitte discovered additional
26  information that caused it to doubt the reliability of American Apparel's financial statements for the
27  fiscal period ended December 31, 2009. Moreover, Samson signed American Apparel's SEC Form
28  10-K for the fiscal period ended December 31, 2009, thereby representing the accuracy of the

1   statements contained therein, including the financial statements called into question by Deloitte,
2   based on, among other things, American Apparel's failure to provide Deloitte with its February 2010
3   financial statements.  Thus, Samson faces a sufficiently substantial likelihood of liability that makes
4   any litigation demand upon him futile.

5        116.   In addition, the Audit Committee is also responsible for ensuring that American
6   Apparel complies with all law and regulations that have a material impact on the Company's
7   financial statements.  As detailed above, American Apparel violated state and federal labor laws by
8   employing at least 1,800 undocumented workers.  The forced layoff of these workers had a material
9   impact on the Company's financial statements.  As such, Samson faces a substantial threat of
10  liability such that he cannot fairly consider a litigation demand.

11  **Defendant Miller**

12       117.   Miller is a member of the Board's Audit Committee.  The Audit Committee's charter
13  charges the Audit Committee with reviewing the adequacy and effectiveness of the Company's
14  accounting and internal control policies and procedures.   Thus, Miller was expressly responsible for
15  ensuring that American Apparel did not have any material weaknesses in its accounting controls.
16  Miller intentionally breached his fiduciary duties of due care, loyalty, and good faith because
17  Marcum expressly told the Audit Committee that it had material weaknesses in its accounting
18  controls.  Rather than correcting the problems, the Audit Committee fired Malcum and hired
19  Deloitte.  A year later, the material weaknesses still existed.  Further, Deloitte discovered additional
20  information that caused it to doubt the reliability of American Apparel's financial statements for the
21  fiscal period ended December 31, 2009.  Moreover, Miller signed American Apparel's SEC Form
22  10-K for the fiscal period ended December 31, 2009, thereby representing the accuracy of the
23  statements contained therein, including the financial statements called into question by Deloitte,
24  based on, among other things, American Apparel's failure to provide Deloitte with its February 2010
25  financial statements.  Thus, Miller faces a sufficiently substantial likelihood of liability that makes
26  any litigation demand upon him futile.

27       118.   In addition, the Audit Committee is also responsible for ensuring that American
28  Apparel complies with all law and regulations that have a material impact on the Company's

1  financial statements. As detailed above, American Apparel violated state and federal labor law by
2  employing at least 1,800 undocumented workers. The forced layoff of these workers had a material
3  impact on the Company's financial statements. As such, Miller faces a substantial threat of liability
4  such that he cannot fairly consider a litigation demand.

5  **Defendant Thornton**

6  119.   Thornton is a member of the Board's Audit Committee. The Audit Committee's
7  charter charges the Audit Committee with reviewing the adequacy and effectiveness of the
8  Company's accounting and internal control policies and procedures. Thus, Thornton was expressly
9  responsible for ensuring that American Apparel did not have any material weaknesses in its
10 accounting controls. Thornton intentionally breached his fiduciary duties of due care, loyalty, and
11 good faith because Marcum expressly told the Audit Committee that it had material weaknesses in
12 its accounting controls. Rather than correcting the problems, the Audit Committee fired Malcum
13 and hired Deloitte. A year later, the material weaknesses still existed. Further, Deloitte discovered
14 additional information that caused it to doubt the reliability of American Apparel's financial
15 statements for the fiscal period ended December 31, 2009. Moreover, Thornton signed American
16 Apparel's SEC Form 10-K for the fiscal period ended December 31, 2009, thereby representing the
17 accuracy of the statements contained therein, including the financial statements called into question
18 by Deloitte, based on, among other things, American Apparel's failure to provide Deloitte with its
19 February 2010 financial statements. Thus, Thornton faces a sufficiently substantial likelihood of
20 liability that makes any litigation demand upon him futile.

21 120.   In addition, the Audit Committee is also responsible for ensuring that American
22 Apparel complies with all law and regulations that have a material impact on the Company's
23 financial statements. As detailed above, American Apparel violated state and federal labor law by
24 employing at least 1,800 undocumented workers. The forced layoff of these workers had a material
25 impact on the Company's financial statements. As such, Thornton faces a substantial threat of
26 liability such that he cannot fairly consider a litigation demand.

27

28

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

**Defendant Greene**

121.    Because of his positions with the Company, Greene was fully aware that the Company lacked effective accounting controls and procedures. Indeed, in March 2009, Marcum disclosed the material weaknesses with the Company's financial controls. Rather than correcting the deficiencies, the Board, including Greene, fired Marcum. As of March 2010, the weaknesses identified by Marcum still existed. As such, Greene completely abdicated his fiduciary duties as a director and, thus, faces a substantial threat of liability such that he cannot consider a litigation demand.

122.    Further, Greene signed the Company's SEC Form 10-K for the fiscal year ended December 31, 2009. Thus, Greene faces a substantial threat of liability should Deloitte's investigation conclude that the financial statements contained therein are unreliable.

123.    In addition, because of his position Greene was aware of the Company's undocumented employee problem. However, he did nothing to ensure that American Apparel complied with the applicable state and federal laws and regulations. As such, he faces a substantial threat of liability.

**Defendant Mayer**

124.    Because of his positions with the Company, Mayer was fully aware that the Company lacked effective accounting controls and procedures. Indeed, in March 2009, Marcum disclosed the material weaknesses with the Company's financial controls. Notably, Mayer signed American Apparel's SEC 10-K for the fiscal year ended December 31, 2008, which contained Marcum's report regarding the deficiencies. Thus, Mayer was clearly aware that the Company lacked effective accounting controls and procedures. Rather than correcting the deficiencies, the Board, including Mayer, fired Marcum. As of March 2010, the weaknesses identified by Marcum still existed. As such, Mayer completely abdicated his fiduciary duties as a director and, thus, faces a substantial threat of liability such that he cannot consider a litigation demand.

125.    Further, Mayer signed the Company's SEC Form 10-K for the fiscal year ended December 31, 2009. Thus, Mayer faces a substantial threat of liability should Deloitte's investigation conclude that the financial statements contained therein are unreliable.

1    126.    In addition, because of his positions with the Company, Greene was aware of the
2  Company's undocumented employee problem. However, he did nothing to ensure that American
3  Apparel complied with the applicable state and federal laws and regulations. As such, he faces a
4  substantial threat of liability.

5        **Defendant Richardson**

6    127.    Because of his positions with the Company, Richardson was fully aware that the
7  Company lacked effective accounting controls and procedures. Indeed, in March 2009, Marcum
8  disclosed the material weaknesses with the Company's financial controls. Rather than correcting the
9  deficiencies, the Board, including Richardson, fired Marcum. As of March 2010, the weaknesses
10 identified by Marcum still existed. As such, Richardson completely abdicated his fiduciary duties as
11 a director and, thus, faces a substantial threat of liability such that he cannot consider a litigation
12 demand.

13   128.    Further, Richardson signed the Company's SEC Form 10-K for the fiscal year ended
14 December 31, 2009. Thus, Richardson faces a substantial threat of liability should Deloitte's
15 investigation conclude that the financial statements contained therein are unreliable.

16   129.    In addition, because of his positions with the Company, Richardson was aware of the
17 Company's undocumented employee problem. However, he did nothing to ensure that American
18 Apparel complied with the applicable state and federal laws and regulations. As such, he faces a
19 substantial threat of liability.

20      **All Director Defendants**

21   130.    The acts complained of constitute violations of the fiduciary duties owed by
22 American Apparel's officers and directors and these acts are incapable of ratification.

23   131.    Any suit by the Director Defendants to remedy these wrongs would likely expose the
24 Director Defendants (as well as Crucillo and Cieply) and American Apparel to civil actions being
25 filed against one or more of the Individual Defendants for violatons of the federal securities laws and
26 thus, the Director Defendants are hopelessly conflicted in making any supposedly independent
27 determination whether to sue themselves.

28

132.    American Apparel has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for American Apparel any part of the damages American Apparel suffered and will suffer thereby.

133.    If American Apparel's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of American Apparel. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by American Apparel against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of American Apparel, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the Director Defendants will not cause American Apparel to sue them, since they will face a large uninsured liability.

134.    In addition, each of the Director Defendants is required to comply with the Code of Ethics. The Code of Ethics requires each of the Company's directors to promote compliance with laws and regulations. Further, the Code of Ethics requires the Director Defendants to make accurate public disclosures. Each of the Director Defendants permitted the violations of law described herein to occur. Further, each of the Director Defendants permitted the Company to make the false and misleading statements described above. Therefore, each of the Director Defendants faces a substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them is futile.

135.    Moreover, despite the Director Defendants having knowledge of the claims and causes of action raised by Plaintiffs, the Director Defendants have failed and refused to seek to recover for American Apparel for any of the wrongdoing alleged by Plaintiffs herein.

## FIRST CAUSE OF ACTION
### Against All Defendants For Breach Of Fiduciary Duty For Disseminating False And Misleading Information

136.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

137.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants Samson, Miller and Thornton) had a duty to ensure that American Apparel disseminated accurate, truthful and complete information to its shareholders.

138.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to American Apparel shareholders materially misleading and inaccurate information through, inter alia, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

139.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## SECOND CAUSE OF ACTION
### Against All Defendants For Breach Of Fiduciary Duties For Failing To Maintain Internal Controls

140.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

141.    As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

1    142.    Defendants willfully ignored the obvious and pervasive problems with American

2  Apparel's internal controls and practices and procedures and failed to make a good faith effort

3  to correct these problems or prevent their recurrence.

4    143.    As a direct and proximate result of the Defendants' foregoing breaches of

5  fiduciary duties, the Company has sustained damages.

6                            **THIRD CAUSE OF ACTION**
                  **Against All Defendants For Breach Of Fiduciary Duties For**
7                  **Failing To Properly Oversee And Manage The Company**

8    144.    Plaintiffs incorporate by reference and reallege each and every allegation

9  contained above, as though fully set forth herein.

10    145.    Defendants owed and owe American Apparel fiduciary obligations. By reason of

11  their fiduciary relationships, Defendants specifically owed and owe American Apparel the

12  highest obligation of good faith, fair dealing, loyalty and due care.

13    146.    Defendants, and each of them, violated and breached their fiduciary duties of

14  care, loyalty, reasonable inquiry, oversight, good faith and supervision.

15    147.    As a direct and proximate result of Defendants' failure to perform their fiduciary

16  obligations, American Apparel has sustained significant damages, not only monetarily, but also

17  to its corporate image and goodwill.

18    148.    As a result of the misconduct alleged herein, Defendants are liable to the

19  Company.

20    149.    Plaintiffs, on behalf of American Apparel, have no adequate remedy at law.

21                            **FOURTH CAUSE OF ACTION**
                        **Against All Individual Defendants For**
22                  **Breach Of Fiduciary Duty (Labor Law Violations)**

23    150.    Plaintiffs incorporate by reference and reallege each and every allegation contained

24  above, as though fully set forth herein.

25    151.    Plaintiffs incorporate by reference and reallege each and every allegation contained

26  above, as though fully set forth herein.

27

28

1    161.    Plaintiffs, as shareholders and representatives of American Apparel, seek

2 restitution from Defendants, and each of them, and seeks an order of this Court disgorging all

3 profits, benefits, and other compensation obtained by Defendants, and each of them, as a result

4 of their wrongful conduct and fiduciary breaches.

### SIXTH CAUSE OF ACTION
### Against All Defendants For Abuse Of Control

5

6

7    162.    Plaintiffs incorporate by reference and reallege each and every allegation

contained above, as though fully set forth herein.

8

9    163.    Defendants' misconduct alleged herein constituted an abuse of their ability to

control and influence American Apparel, for which they are legally responsible. In particular,

10

Defendants abused their positions of authority by causing or allowing American Apparel to

11

misrepresent material facts regarding its financial position and business prospects.

12

13    164.    As a direct and proximate result of Defendants' abuse of control, American

Apparel has sustained significant damages.

14

15    165.    As a result of the misconduct alleged herein, Defendants are liable to the

Company.

16

17    166.    Plaintiffs, on behalf of American Apparel, have no adequate remedy at law.

### SEVENTH CAUSE OF ACTION
### Against All Defendants For Gross Mismanagement

18

19    167.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

20 above, as though fully set forth herein.

21    168.    Defendants had a duty to American Apparel and its shareholders to prudently

22 supervise, manage and control the operations, business and internal financial accounting and

23 disclosure controls of American Apparel.

24    169.    Defendants, by their actions and by engaging in the wrongdoing described herein,

25 abandoned and abdicated their responsibilities and duties with regard to prudently managing the

26 businesses of American Apparel in a manner consistent with the duties imposed upon them by

27 law. By committing the misconduct alleged herein, Defendants breached their duties of due

28

1 | care, diligence and candor in the management and administration of American Apparel's affairs
2 | and in the use and preservation of American Apparel's assets.

3 | 170. During the course of the discharge of their duties, Defendants knew or recklessly
4 | disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants
5 | caused American Apparel to engage in the scheme complained of herein which they knew had
6 | an unreasonable risk of damage to American Apparel, thus breaching their duties to the
7 | Company. As a result, Defendants grossly mismanaged American Apparel.

8 | **EIGHTH CAUSE OF ACTION**
**Against All Defendants For Waste Of Corporate Assets**

9 |

10 | 171. Plaintiffs incorporate by reference and reallege each and every allegation
contained above, as though fully set forth herein.

11 |

12 | 172. As a result of the misconduct described above, and by failing to properly consider
the interests of the Company and its public shareholders, Defendants have caused American

13 | Apparel to incur (and American Apparel may continue to incur) significant legal liability and/or

14 | legal costs to defend itself as a result of Defendants' misconduct and unlawful actions.

15 |

16 | 173. As a result of this waste of corporate assets, Defendants are liable to the
Company.

17 |

18 | 174. Plaintiffs, on behalf of American Apparel, have no adequate remedy at law.

19 | **PRAYER FOR RELIEF**

20 | WHEREFORE, Plaintiffs demand judgment as follows:

21 | A. Against all the Individual Defendants and in favor of the Company for the amount of
damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary

22 | duties and unjust enrichment;

23 |

24 | B. Directing American Apparel to take all necessary actions to reform and improve its
corporate governance and internal procedures to comply with applicable laws and to protect

25 | American Apparel and its shareholders from a reoccurrence of the damaging events described

26 | herein, including, but not limited to, putting forward for shareholder vote resolutions for

27 | amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as

28 |

1    may be necessary to place before shareholders for a vote the following Corporate Governance
2    Policies:

3              1.      a proposal to strengthen the Board's supervision of operations and develop
4    and implement procedures for greater shareholder input into the policies and guidelines of the Board;

5              2.      a provision to permit the shareholders of American Apparel to nominate at
6    least three candidates for election to the Board;

7              3.      a proposal to ensure the accuracy of the qualifications of American Apparel's
8    directors, executives and other employees;

9              4.      a proposal to strengthen the Company's procedures for the receipt, retention
10    and treatment of complaints received by the Company regarding accounting, internal controls and
11    auditing matters; and

12              5.      appropriately test and then strengthen the internal audit and control functions.

13         C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state
14    statutory provisions sued hereunder so as to assure that Plaintiffs on behalf of American Apparel
15    have an effective remedy;

16         D.      Awarding to American Apparel restitution from the Defendants, and each of them,
17    and ordering disgorgement of all profits, benefits and other compensation obtained by the
18    Defendants;

19         E.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable
20    attorneys' fees, accountants' and experts' fees, costs, and expenses; and

26    ///
27    ///
28    ///

F.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  March 18, 2011         JOHNSON BOTTINI, LLP

Francis A. Bottini, Jr.
Frank J. Johnson
Brett M. Weaver

501 West Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile:  (619) 238-0622

*Attorneys for Plaintiff John L. Smith*

DATED:  March 18, 2011         LAW OFFICE OF GREGORY P. OLSON

Gregory P. Olson

501 West Broadway, Suite 1370
San Diego, CA 92101
Telephone: (619) 564-3650
Facsimile:  (619) 233-1969

*Attorneys for Plaintiff Lisa Kim*

DATED:   March 18, 2011          THE WEISER LAW FIRM, P.C.


_____
                                          Kathleen A. Herkenhoff


                                 12707 High Bluff Drive, Suite 200
                                 San Diego, CA 92130
                                 Telephone: (858) 794-1441
                                 Facsimile:  (858) 794-1450

                                 THE WEISER LAW FIRM, P.C.
                                 Robert Weiser
                                 Brett D. Stecker
                                 Jeffrey J. Ciarlanto
                                 121 N. Wayne Avenue, Suite 100
                                 Wayne, PA 19087
                                 Telephone: (610) 225-2677
                                 Facsimile: (610) 225-2678

                                 THE SHUMAN LAW FIRM
                                 Kip B. Shuman
                                 Rusty Glenn
                                 885 Arapahoe Avenue
                                 Boulder, CO 80302
                                 Telephone: (303) 861-3003
                                 Facsimile: (303) 484-4886

                                 *Attorneys for Plaintiff Teresa Lankford*

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    DATED:  March 18, 2011              MOTLEY RICE, LLP

2

3                                        _____
                                              Mark I. Labaton
4

5                                        1100 Glendon Avenue, 14th Floor
                                         Los Angeles, CA 90024
6                                        Telephone: (310) 500-3540
                                         Facsimile:  (310) 824-2870
7

8                                        GOLDFARB BRANHAM, LLP
                                         Trey Branham
9                                        Hamilton Lindley
                                         2501 Harwood Street, Suite 1801
10                                       Dallas, TX 75201
                                         Telephone: (214) 583-2233
11                                       Facsimile:  (214) 583-2234

12                                       *Attorneys for Plaintiff Wesley Norris*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                       - 43 -

1  *In re American Apparel, Inc. Shareholder Litigation*
   Lead Case No. BC443763

2

3  **PROOF OF SERVICE**

   [CCP §§ 1013A(3) and 2015.5]

4

5      I am employed in the City and County of San Diego, State of California. I am over the age of

6  eighteen (18) years and am not a party to the within action. My business address is 501 W. Broadway,

7  Suite 1720, San Diego, California.

8      On March 18, 2011, I caused to be served the following document:

9      **(1)    CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE
              COMPLAINT.**

10  **X      [BY MAIL]** I placed each such sealed envelope with postage thereon fully prepaid for first-class
    mail, for collection and mailing at Johnson Bottini, LLP, San Diego, California, following ordinary
11  business practices.   I am familiar with the firm's practice for collection and processing of
    correspondence, said practice being that in the ordinary course of business, correspondence is deposited
12  in the United States Postal Service the same day as it is placed for collection.

13
         O'Melveny & Myers LLP
14       Seth Aronson
         Carolyn Kubota
15       Amy Longo
         400 South Hope Street
16       Los Angeles, CA 90071

17       *Attorneys for Defendants Dov Charney, Adrian Kowalewski, and Martin Bailey*

18
         Akin Gump Strauss Hauer & Feld LLP
19       Steven Kaufhold
         580 California Street, Suite 1500
20       San Francisco, CA 94104

21       *Attorneys for Defendants Mark Samson, Keith Miller, Mark A. Thornton, Robert Greene,*
         *Allan Mayer, Neil Richardson, and Lyndon Lea*
22

23       Munger Tolles & Olson LLP
         John Spiegel
24       Bradley Schneider
         355 South Grand Avenue, 35th Floor
25       Los Angeles, CA 90071
         *Attorneys for Defendant Joyce E. Crucillo*
26

27

28

                                      -1-

Skadden, Arps, Slate, Meagher & Flom, LLP
Peter B. Morrison
Harriet S. Posner
Gila D. Jones
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071

*Attorneys for Nominal Defendant American Apparel, Inc.*

Paul, Hastings, Janofsky & Walker, LLP
William F. Sullivan
515 South Flower Street, 25th Floor
Los Angeles, California 90071

*Attorneys for Defendant Ken Cieply*

The Weiser Law Firm, P.C.
Kathleen A. Herkenhoff
Robert Weiser
Brett Stecker
Jeffrey Ciarlanto
12707 High Bluff Drive, Suite 200
San Diego, CA 92130

The Shuman Law Firm
Kip B. Shuman
Rusty Glenn
885 Arapahoe Avenue
Boulder, CO 80302

*Attorneys for Plaintiff Teresa Lankford*

Motley Rice, LLP
Mark I. Labaton
1100 Glendon Avenue, 14th Floor
Los Angeles, CA 90024

Goldfarb Branham, LLP
Trey Branham
Hamilton Lindley
2501 Harwood Street, Suite 1801
Dallas, TX 75201

*Attorneys for Plaintiff Wesley Norris*

Law Office of Gregory P. Olson
Gregory P. Olson
501 West Broadway, Suite 1370
San Diego, CA 92101

*Attorney for Plaintiff Lisa Kim*

-2-

1        I declare under penalty of perjury under the laws of the State of California that the foregoing is

2 true and correct.

3        Executed on March 18, 2011, at San Diego, California.

4

5

6                                   SHELBY M. RAMSEY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-